such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following the denial of a claim on review.

(c)    A claimant may request a review by the Administrator of a decision denying a claim in writing within 60 days following receipt of the denial. All such reviews will be decided in writing by the Administrator within 60 days after receipt of the request for review. If the Administrator determines that an extension of time for processing the review is required, it may extend the date by which a decision is required to 120 days after the request for review is submitted if it notifies the claimant in writing of the extension prior to the termination of the initial 60-day period, including the special circumstances requiring an extension of time and the date by which it expects to render a decision.

(d)    In connection with a review of a denied claim for benefits, a claimant will have the opportunity to submit written comments, documents, records and other information relating to the claim for benefits and be provided, on request and free of charge, reasonable access to and copies of all documents, records and other information relevant to his claim for benefits. The review of a denied claim will take into account all comments, documents, records and other information submitted by the claimant related to the claim, without regard to whether such information was submitted or considered in the initial review of the claim. If a claim is denied on review, the written notice of the denial will specify (i) the specific reasons for the denial, (ii) reference to the specific Plan provisions on which the denial is based and (iii) a statement that the claimant is entitled to receive, on request and free of charge, reasonable access to and copies of all documents, records and other information relevant to his claim for benefits.

(e)    The claimant may have an authorized representative to act on his behalf in pursuing a benefit claim or appeal of the denial of the benefit. For a representative to be recognized as acting on the claimant's behalf, the claimant must provide the name, address and phone number of his authorized representative in writing to the Administrator and a statement that the representative is authorized to act on his behalf concerning his claim for benefit and, if applicable, an appeal of the denial of the claim.

## ARTICLE VI
## FUNDING

The Plan is an unfunded arrangement. No portion of any funds of the Company or any of its affiliates is required to be set apart for a Participant or Beneficiary. Accounts will be payable from the Company's general assets, and the rights of a Participant or Beneficiary to his Account is limited to those of a general, unsecured creditor of the Company who has a claim equal to the value of the Participant's Account.

## ARTICLE VII
## AMENDMENT AND TERMINATION

This Plan may only be amended or terminated upon the written agreement of the Company and the Participants. However, no amendment or termination may result in an acceleration of benefit payment (except as permitted by Section 409A of the Code).

ARTICLE VIII
GENERAL PROVISIONS

8.1     Payments to Minors and Incompetents.  If the Participant or any Beneficiary entitled to receive any benefits under the Plan is a minor or is deemed by the Administrator or is adjudged to be legally incapable of giving valid receipt and discharge for such benefits, they will be paid to the person or institution the Administrator designates or to a duly appointed guardian. Such payment will, to the extent made, be deemed a complete discharge of any payment due under the Plan.

8.2     No Contract.  The Plan will not be deemed a contract of employment with the Participant and will not affect the Company's right to terminate the Participant's employment.

8.3     Non-Alienation of Benefits.  No amount payable to or held under the Plan for the account of the Participant or any Beneficiary will be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same will be void.  No amount payable to or held under the Plan for the account of the Participant will be subject to any legal process of levy or attachment.

8.4     Income Tax Withholding.  The Company may withhold from any payments under the Plan any amount it is required to withhold under applicable federal, state or other income tax law, and transmit such withheld amounts to the appropriate taxing authority.  In lieu thereof, the Company will have the right, to the extent permitted by law, to withhold the amount of such taxes from any other sums due from the Company to the Participant on such terms and conditions as the Administrator may prescribe.

8.5     Governing Law.  The Plan will be interpreted, construed and administered under the laws of the State of California without regard to the choice of law provisions thereof and to the extent that ERISA and other federal laws do not apply.

8.6     Captions.  The captions contained in the Plan are inserted only as a matter of convenience and for reference and in no way define, limit, enlarge or describe the scope or intent of the Plan or in any way affect the construction of any provision of the Plan.

8.7     Severability.  If any provision of the Plan is held invalid or unenforceable, its invalidity or unenforceability will not affect any other provision of the Plan, and the Plan will be construed and enforced as if such provision had not been included.

8.8     Notices.  The Participant will be responsible for furnishing the Administrator with the current and proper address for the mailing of notices and delivery of payments.  Any notice required or permitted to be given will be deemed given if directed to the person to whom addressed at such address and mailed by regular United States first class mail, postage prepaid. If any item mailed to such address is returned as undeliverable to the addressee, mailing will be suspended until the Participant furnishes the proper address.

8.9     No Guaranty of Performance or Payout.  Each Participant agrees and acknowledges that the Company is not in any way or manner guarantying the performance of the

Business or any particular financial result or payout under this Plan, nor undertaking or committing to invest additional capital or resources in the Business.

8.10    Interpretation.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine or neuter, as the identity of the person requires.  As the context may require, the singular may be read as the plural and the plural as the singular.

The Plan is intended to comply with Section 409A of the Code.  Consistent with that intent, the Plan will be interpreted in a manner consistent with Section 409A of the Code.  If any provision that is necessary for the Plan to comply with Section 409A of the Code is determined by the Administrator, in its sole discretion, to have been omitted, such omitted provision will be deemed included in the Plan.  Company agrees to hold harmless and indemnify Participant for all additional taxes, interest and penalties Participant may incur in the event this Plan is found to be in violation of Section 409A.

**APPENDIX A**

Participants shall receive an aggregate of 25% of the Net Profits attributable to the Business.

| <u>**Participant**</u> | <u>**25% Economic Interest**</u> |
|---|---|
| John Goede | 8 1/3% |
| John Schrenkel | 8 1/3% |
| David Berry | 8 1/3% |

**Schedule 2.2(a)**

Purchase Price Calculation

The table below provides an example of the calculation of the Initial Purchase Price using a multiple of Seller's net income for the 12-month period that ended on May 31, 2016.

| 12 Month Rolling - projected as of 5/31/16 | | | 2016 *pro forma* | |
|---|---|---|---|---|
| AEM net income before state taxes | $7,064,724 | | AEM net income before state taxes | $9,581,559 |
| One time losses or Events | - | | State specific taxes (?) | |
| AE Escrow Corp - net income | $1,959,518 | | AE Escrow Corp - net income | $1,899,422 |
| Add back officer salaries & one time events | $840,000 | | Add back officer salaries | $800,000 |
| Add back Pipeline profit | $765,601 | | | |
| **Unaudited** | **$10,629,843** | | **Unaudited** | **$12,280,981** |
| | | | | |
| Value - 4X | $42,519,374 | | Value - 4X | $49,123,924 |
| **After tax value @ 60%** | **$25,511,624** | | **After tax value @ 60%** | **$29,474,354** |
| | | | | |
| Value based on 2015 unaudited | 2.40 | | Value based on 2015 unaudited | 2.77 |
| Value based on 2015 balance sheet of $7.8mm | 3.27 | | Value based on 2015 balance sheet of $7.8mm | 3.78 |
| Balance sheet multiple needed after adjusted 12 month rolling P&L | 2.75 | | | |
| Balance sheet equity needed after adjusted 12 month rolling P&L | $9,276,954 | | | |
| | | | | |
| Payout | | | | |
| **Upfront @75%** | **$19,133,718** | | | |
| **Remaining @25%** | **$6,377,906** | | | $10,340,636.15 |
| | | | | |
| ***Version date:  May 25, 2016*** | | | | |
| | | | | |

[ADD LEGAL DESCRIPTION OF FORMULA]

**Schedule 2.2(b)**

Net Book Value Calculation

| ASSETS | as of 5/31/2016 | | Non Book adjustments | | Adjusted book as of 5/31/2016 | | Explanations |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Cash: | | | | | | | |
| Operating Cash | $ | 3,657,243.09 | | | $ | 3,657,243.09 | |
| Restricted Cash | $ | 402,103.77 | | | $ | 402,103.77 | |
| | | | | | | | |
| Receivables: | | | | | | | |
| Mtg Payments Rcvbl | $ | 54,069.25 | | | $ | 54,069.25 | |
| Accts Rcvbl Credit Cards | $ | 6,565.99 | | | $ | 6,565.99 | |
| Accts Rcvbl Closing $ | $ | 88,483.25 | | | $ | 88,483.25 | |
| Accts Rcvbl Investors | $ | 551,762.15 | | | $ | 551,762.15 | |
| Employee Advances Rcvbl | $ | - | | | $ | - | |
| | | | | | | | |
| Prepaids: | | | | | | | |
| Prepaid Health Insurance | $ | 85,477.72 | | | $ | 85,477.72 | |
| Prepaid Rent | $ | 1,350.00 | | | $ | 1,350.00 | |
| Prepaid Other Costs | $ | 167,110.81 | $ | (150,000.00) | $ | 17,110.81 | |
| Prepaid Corp. Insurance | $ | 6,850.50 | | | $ | 6,850.50 | |
| | | | | | | | |
| Receivables Loans: | | | | | | | |
| Mortgages Rcvbl | $ | 53,086,986.00 | | | $ | 53,086,986.00 | |
| Revenue Receivable Closings | $ | 2,150,771.25 | | | $ | 2,150,771.25 | |
| | | | | | $ | - | |
| Mandatory Derivatives: | | | | | $ | - | |
| Open Pipeline | $ | 2,757,443.12 | | | $ | 2,757,443.12 | |
| Hedges | $ | (24,179.69) | | | $ | (24,179.69) | |
| | | | | | | | |
| Fixed Assets | | | | | | | |
| Furniture & Fixtures | $ | 180,596.80 | $ | (124,005.00) | $ | 56,591.80 | Ineligible Assets |
| Goodwill | $ | 8,531.00 | $ (8,531.00) | | $ | - | Ineligible Assets |
| Land | $ | 95,000.00 | | | $ | 95,000.00 | |
| Computers & Equipment | $ | 103,383.91 | $ (2,675.00) | | $ | 100,708.91 | Ineligible Assets |
| Buildings | $ | 695,603.00 | $ | (40,000.00) | $ | 655,603.00 | Ineligible Assets |
| Covenant Non Compete | $ | 4,000.67 | $ (4,000.67) | | $ | - | Ineligible Assets |

| | | | | | | |
|---|---|---|---|---|---|---|
| Leasehold | $ | 190,635.88 | $ | (48,624.00) | $ | 142,011.88 | Ineligible Assets |
| | | | | | | |
| Security Deposits: | | | | | | |
| Rent | $ | 35,441.08 | | | $ | 35,441.08 | |
| Telephone/Utilities | $ | 1,480.00 | | | $ | 1,480.00 | |
| Indems & repurchases | $ | 9,000.00 | | | $ | 9,000.00 | |
| Workers Comp | $ | 10.00 | | | $ | 10.00 | |
| | | | | | | |
| TOTAL ASSETS | $ | 64,315,719.55 | $ | (377,835.67) | $ | 63,937,883.88 | |
| | | | | | | |
| LIABILITIES | | | | | | |
| | | | | | | |
| Payables: | | | | | | |
| W/H Notes pybl - Comerica | $ | 13,742,375.50 | | | $ | 13,742,375.50 | |
| W/H Notes pybl - 1st Tenn | $ | 39,043,050.65 | | | $ | 39,043,050.65 | |
| Repair Reserves Pybl | $ | 191,889.43 | | | $ | 191,889.43 | |
| MIP Pybl | $ | - | | | $ | - | |
| Escrow Reserves Pybl | $ | 210,214.34 | | | $ | 210,214.34 | |
| Mortgage Payable | $ | 410,000.00 | | | $ | 410,000.00 | |
| Accts Pybl Investors | $ | 3,950.00 | | | $ | 3,950.00 | |
| Accts Pybl Hedges | $ | 15,820.31 | | | $ | 15,820.31 | |
| Accts Pybl Pymts Held | $ | 11,169.06 | | | $ | 11,169.06 | |
| | | | | | | |
| Accruals: | | | | | | |
| General Expenses | $ | 671,884.80 | | | $ | 671,884.80 | |
| Interest | $ | 90,572.88 | | | $ | 90,572.88 | |
| Payroll | $ | 414,878.90 | | | $ | 414,878.90 | |
| Commissions on Hedges | $ | 886,578.89 | | | $ | 886,578.89 | |
| Taxes | $ | 35,459.65 | | | $ | 35,459.65 | |
| | | | | | | |
| TOTAL LIABILITIES | $ | 55,727,844.41 | | | $ | 55,727,844.41 | |
| | | | | | | |
| Equity: | | | | | | |
| Prior Year Retained Earnings | $ | 5,712,620.62 | | | $ | 5,712,620.62 | |
| Current Earnings | $ | 2,875,254.52 | | | $ | 2,875,254.52 | |
| | | | | | | |
| TOTAL CAPITAL | $ | 8,587,875.14 | $ | (377,835.67) | $ | 8,210,039.47 | |
| | | | | | | |
| TOTAL LIABILITIES PLUS CAPITAL | $ | 64,315,719.55 | $ | (377,835.67) | $ | 63,937,883.88 | |

**Exhibit D**

**PURCHASE PRICE ALLOCATION PRINCIPLES**

The Purchase Price, together with any additional amounts deemed to be consideration for the assets of AEM, shall be allocated among such assets in accordance with Treasury Regulations under Section 1060 of the Code and the Treasury Regulations thereunder, and specifically in accordance with the following principles:

•        First, a total of $500,000 shall be allocated to the Non-Compete Agreement.

•        Second, the Purchase Price shall be allocated to Class I through V assets in an amount equal to the fair value of such assets set forth on the AEM balance sheets as of the Closing Date.

•        The remainder of the Purchase Price shall be allocated to goodwill and/or going concern value.

# EXHIBIT B

## AMENDMENT AND CLARIFICATION AGREEMENT

THIS AMENDMENT AND CLARIFICATION AGREEMENT (this "*Agreement*") is entered into as of July 29, 2016, by and between on the one hand (1) RPM Mortgage, Inc., a California corporation, or its assigns (collectively the "*Buyer*"), and on the other hand (2) The American Eagle Mortgage Co., LLC, an Ohio limited liability company ("*AEM*" or "Company"), JDJ Management, LLC, a Florida limited liability company (the "*Seller*") and John Goede, John Schrenkel, David Berry (the "*Principal(s)*" and together with the Seller, the "*Selling Parties*"). Buyer, AEM, and the Selling Parties are referred to collectively herein as the "*Parties*" and each individually as a "*Party*."

A.   The Parties previously entered into an equity purchase agreement dated as of June 30, 2016 ("*EPA*") pursuant to which Buyer agreed to acquire all of the outstanding membership interests of AEM from the Selling Parties ("*Transaction*").

B.   The Parties wish to clarify certain terminology used in the EPA and also set forth the agreed upon methodology for calculating the net profits for purposes of the earn-out provisions set forth in the EPA and the management incentive program that will be adopted in connection with the Transaction.

C.   Any terms not defined herein shall have the meanings assigned to them in the EPA.

In consideration of the promises and mutual covenants contained herein, the undersigned hereby agree as follows:

**SECTION 1.   AMENDMENT AND CLARIFICATION OF EPA.**  Section 2.6 of the EPA is hereby amended so as to clarify that the Earn-Out Payments shall be based on "*net income*" of the Business and not "*net operating income*" and shall be restated in its entirety to read as follows:

"2.6   Earn-Out PaymentsEarn-Out Payments.  Subject to the procedures specified below, the Principals may be entitled to contingent cash consideration payments (collectively, the "*Earn-Out Payments*") if the net income of the Business exceeds certain thresholds for the period starting on the Closing Date and ending on June 30, 2017 (the "*Year One Earn-Out Period*"), and for the period starting on the July 1, 2017 and ending on June 30, 2018 ("*Year Two Earn-Out Period*" and, together with the Year One Earn-Out Period, the "*Earn-Out Periods*").  The threshold amount for any Earn-Out Payment shall be $100,000 of net income during the applicable Earn-Out Period.  Each Earn-Out Payment, if any earned, shall be made by the Buyer to the Principals as set forth below:

(i)   Year One Earn-Out.  No later than August 31, 2017, the Buyer shall pay the Principals an Earn-Out Payment equal to seventy-five percent (75%) of the net income of the Business during the Year One Earn-Out Period, which Earn-Out Payment shall not exceed Ten Million, Three Hundred Forty Thousand, Six Hundred Thirty-Six and 15/100ths Dollars ($10,340,636.15) (the "*Year One Earn-Out*").

(ii)   Year Two Earn-Out.  No later than August 31, 2018, the Buyer shall pay the Principals an Earn-Out Payment equal to equal to seventy-five percent (75%) of the net income of the Business during the Year Two Earn-Out Period *less* any losses during the Year

One Earn-Out, which Earn-Out Payment shall not exceed the difference between Ten Million, Three Hundred Forty Thousand, Six Hundred Thirty-Six and 15/100ths Dollars ($10,340,636.15) and the Year One Earn-Out, if any (the "*Year Two Earn-Out*").

(b)    Earn-Out Statements.  Within twenty (20) Business Days following the end of the applicable Earn-Out Period, the Buyer shall prepare and deliver to the Seller Representative its calculation of the applicable Earn-Out Payment (the "*Earn-Out Statement*"), which statement shall be prepared and calculated in accordance with GAAP, applied on a basis consistent with the policies, procedures and practices utilized in the preparation of the financial statements of AEM.  The Earn-Out Statement shall include a reasonably detailed calculation of (i) the profits and losses of the Business for the applicable Earn-Out Period, and (ii) the amount, if any, of the Earn-Out Payment.

(c)    Objection Notice.  The Seller Representative shall have twenty (20) days from delivery of the Earn-Out Statement (the "*Objection Period*") to raise any objection thereto by delivery of written notice to the Buyer setting forth such objections in reasonable detail (the "*Objection Notice*").  During the Objection Period, the Seller Representative shall be entitled, subject to execution of a nondisclosure agreement, to access the books and records and employees and agents involved in the preparation of the Earn-Out Statement for purposes of determining any objections and preparing the Objection Notice; provided, however, that such access shall not unreasonably interfere with the conduct of the Business.  If the Seller Representative does not deliver an Objection Notice within the Objection Period, then the Earn-Out Statement shall be deemed final and binding on the parties.

(d)    Dispute.  In the event that an Objection Notice is delivered within the Objection Period, the Buyer and the Seller Representative shall attempt, in good faith, to resolve such objections and, if unable to do so within twenty-five (25) days after delivery of the Objection Notice, shall follow the dispute mechanism contemplated in Section **Error! Reference source not found.** above.  The determination of the Independent Accountant shall be (i) in writing, (ii) delivered to the Buyer and the Seller Representative, and (iii) final and binding on the parties absent manifest error (the "*Final Determination*").  Subject to Section **Error! Reference source not found.** and Section **Error! Reference source not found.**, the Buyer shall pay to the each Principal such Principal's Proportional Percentage of such Earn-Out Payment shown on the Final Determination within ten (10) Business Days after receipt of the Final Determination.  The fees and expenses of the Independent Accountant shall be borne equally by the Buyer (on the one hand) and the Seller Representative (on the other hand).

(e)    Allocation of Earn-Out Payments.  Each Earn-Out Payment shall be allocated among the Principals based on their Proportional Percentage, provided however:

(i)    in the event a Principal voluntarily terminates his employment with the Company between the Closing and June 30, 2017, such Principal shall not be entitled to receive his Proportional Percentage of the Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the Principal who voluntarily terminates his employment with the Company on or prior to June 30, 2017 to the remaining Principals' Proportional Percentages;

(ii)    in the event a Principal voluntarily terminates his employment with the Company between July 1, 2017 and June 30, 2018, such Principal shall not be entitled to receive his Proportional Percentage of the Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the

Principal who voluntarily terminates his employment with the Company between July 1, 2017 and June 30, 2018 to the remaining Principals' Proportional Percentages; and

   (iii) in the event the Company terminates the employment of a Principal for Cause (as such term is defined in the Management Incentive Program) at any time, such Principal shall not be entitled to receive his Proportional Percentage of any unpaid Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the Principal whose employment with the Company is terminated for Cause to the remaining Principals' Proportional Percentages.

   (iv) The Company's termination of employment of a Principal without Cause (as such term is defined in the Management Incentive Program) shall not affect, reduce, change or eliminate such Principal's Proportional Percentage for purposes of the Earn-Out Payments.

   (v) The Parties acknowledge and agree that the Earn-Out Payments constitute compensation for services performed by the Principals as employees of the Company.  Each Earn-Out Payment made to a Principal will be reported on such Principal's Form W-2 for the year in which the payment was made and will be reduced by required withholdings of applicable income and payroll Taxes."

**SECTION 2.  METHODOLOGY FOR CALCULATING NET INCOME.** Each Party agrees as follows:

 A. For purposes of the Earn-Outs and the Management Incentive Program, "net income" of the Business shall mean the net income after all applicable taxes (including but not limited to income taxes, employer paid payroll taxes, property taxes), calculated in accordance with U.S. Generally Accepted Accounting Principles (GAAP).

 B. The Earn-Out Payments will be reduced by all employer paid payroll taxes pertaining to the Earn-Out Payment; however, the following expenses shall not be included as expenses when calculating the Earn-Out Payment: (i) the sign-on bonuses of $300,000 in the aggregate, payable to the Sellers, (ii) payments to NVD Consulting, Inc. at the Closing, or (iii) the Purchase Price.

   **SECTION 3.  EFFECT ON THE EPA AND ANCILLARY AGREEMENTS.** Except as amended herein, the EPA shall continue in full force and effect as originally executed and delivered.  Any reference in the EPA to "this Agreement," "hereunder," hereof," "herein," or words of like import referring to such agreement shall refer to the EPA as amended and clarified by this Agreement.

   **SECTION 4.  COUNTERPARTS.** This Agreement may be executed in any number of counterparts, with each executed counterpart constituting an original and all counterparts together constituting one agreement.

   **SECTION 5.  EFFECTIVENESS.** This Agreement shall become effective as of the date hereof upon the execution of counterparts hereof by the parties hereto.

**SECTION 6. GOVERNING LAW.**   This Agreement shall be governed by, and construed in accordance with, the laws of the state of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

BUYER:

RPM Mortgage, Inc.

By: _____
      Name: Rob Hirt
      Title:   Chief Executive Officer

COMPANY:

American Eagle Mortgage Co., LLC

By: _____
      Name:  John Schrenkel
      Title:   Chief Executive Officer

MEMBER:

JDJ Management, LLC

By: _____
Name:  John Goede
Title:   Manager

PRINCIPALS: _____
John Schrenkel

_____
John Goede

_____
David Berry

IN WITNESS WHEREOF, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

**BUYER:**

**RPM Mortgage, Inc.**

By: _____
          Name: Rob Hirt
          Title:   Chief Executive Officer

**COMPANY:**

**American Eagle Mortgage Co., LLC**

By: _____
          Name:  John Schrenkel
          Title:   Chief Executive Officer

**MEMBER:**

**JDJ Management, LLC**

By: _____
Name:  John Goede
Title:   Manager

**PRINCIPALS:**

_____
John Schrenkel

_____
John Goede

_____
David Berry

IN WITNESS WHEREOF, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

<u>BUYER</u>:

RPM Mortgage, Inc.

By: _____
       Name: Rob Hirt
       Title: Chief Executive Officer

<u>COMPANY</u>:

American Eagle Mortgage Co., LLC

By: _____
       Name: John Schrenkel
       Title: Chief Executive Officer

<u>MEMBER</u>:

JDJ Management, LLC

By: _____
Name: John Goede
Title: Manager

<u>PRINCIPALS</u>:

_____
John Schrenkel

_____
John Goede

_____
David Berry

DocuSign Envelope ID: 5A5311D1-A2EA-4A15-5FA0-AE125BF241FA

IN WITNESS WHEREOF, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

**BUYER:**

**RPM Mortgage, Inc.**

By: _E. Robert Hirt_____

Name: Rob Hirt

Title: Chief Executive Officer

**COMPANY:**

**American Eagle Mortgage Co., LLC**

By: _____

Name: John Schrenkel

Title: Chief Executive Officer

**MEMBER:**

**JDJ Management, LLC**

By: _____

Name: John Goede

Title: Manager

**PRINCIPALS:**

_____

John Schrenkel

_____

John Goede

_____

David Berry

# EXHIBIT C

## SECOND AMENDING AGREEMENT

THIS SECOND AMENDING AGREEMENT (this "*Agreement*") is entered into as of July __, 2017, by and between on the one hand (1) LendUSA, LLC, a Delaware limited liability company (formerly RPM Mortgage, Inc., a California corporation), or its assigns (collectively the "*Buyer*"), and on the other hand (2) The American Eagle Mortgage Co., LLC, an Ohio limited liability company ("*AEM*" or "Company"), JDJ Management, LLC, a Florida limited liability company (the "*Seller*"), and the remaining signatory principals John Goede and John Schrenkel (the "*Principal(s)*" and together with the Seller, the "*Selling Parties*").  Buyer, AEM, and the Selling Parties are referred to collectively herein as the "*Parties*" and each individually as a "*Party*."

A.   The Parties previously entered into an equity purchase agreement dated as of June 30, 2016, as amended ("*EPA*") pursuant to which Buyer agreed to acquire all of the outstanding membership interests of AEM from the Selling Parties ("*Transaction*").

B.   The Parties amended the EPA and certain ancillary agreements on or about December 1, 2016, in order to among other things accommodate Dave Berry's request to have his equity interest redeemed and that he no longer be a party to the EPA and the ancillary agreements.

C.   On June 16, 2017, RPM Mortgage, Inc. merged with and into LendUSA, LLC.

C.   The Parties now wish to amend the EPA to memorialize a modified time schedule for the payment of Earn-Outs.

D.   Any terms not defined herein shall have the meanings assigned to them in the EPA.

In consideration of the promises and mutual covenants contained herein, the undersigned hereby agree as follows:

**SECTION 1.   AMENDED PAYMENT SCHEDULE FOR EARN-OUT.**   The payment schedule for the Earn-Out Payments shall be modified as follows:

(i)   on August 31, 2017, the Buyer shall pay $1,000,000 each to the Principals and Dave Barry out of the Earn-Out for the Year One Earn-Out Period;

(ii)   on January 5, 2018 ("*New Payment Date*"), the Buyer shall pay to the Principals the remaining balance of the Earn-Out for the Year One Earn-Out Period;

(iii)   on the New Payment Date, the Buyer shall also calculate and pay to the Principals the Earn-Out Payment for the initial five months (August - December) of the Year Two Earn-Out Period; and

(iv)   thereafter the Buyer shall pay the balance of the Earn-Out, if any, for the Year Two Earn-Out Period *plus* any profit share under the Management Incentive Program that follows the calendar year, ending on December 31 and restarting the following year, with the

effective date of January 1, after the release of the 2018 audited financials for the Buyer in early 2019 (April 5 or earlier).

As provided in the EPA, the Earn-Out Payments may cease to accrue before the end of the Year Two Earn-Out Period if on an earlier date the Buyer has paid (or reserved for later payment) an aggregate of $10,340,636.15 in Earn-Out Payments, following which the Management Incentive Program will become effective and replace the Earn-Out Payments. To illustrate, if the Earn-Out exceeds $10,340,636.15 on June 30, 2018, then from July 1 through December 31, 2018, the Principals shall receive 25% of the Net Profits under the Management Incentive Program.

In all other respects, the terms and conditions of the Earn-Out Payments shall remain in full force and continue to be governed by Section 2.6 of the EPA, as amended.

**SECTION 2. EFFECT ON THE EPA AND ANCILLARY AGREEMENTS.** Except as amended herein, the EPA shall continue in full force and effect as originally executed and delivered. Any reference in the EPA to "this Agreement," "hereunder," hereof," "herein," or words of like import referring to such agreement shall refer to the EPA as amended and clarified by this Agreement.

**SECTION 3. COUNTERPARTS.** This Agreement may be executed in any number of counterparts, with each executed counterpart constituting an original and all counterparts together constituting one agreement.

**SECTION 4. EFFECTIVENESS.** This Agreement shall become effective as of the date hereof upon the execution of counterparts hereof by the parties hereto.

**SECTION 5. GOVERNING LAW.** This Agreement shall be governed by, and construed in accordance with, the laws of the state of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

[*Signature Page Follows*]

**IN WITNESS WHEREOF,** the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

<u>**BUYER**</u>**:**

**LendUSA, LLC**
**(formerly RPM Mortgage, Inc.)**

By: _____
       Name: Ava Noack
       Title:  President

<u>**COMPANY**</u>**:**

**American Eagle Mortgage Co., LLC**

By: _____
       Name:  John Schrenkel
       Title:   Chief Executive Officer

<u>**MEMBER**</u>**:**

**JDJ Management, LLC**

By: _____
Name:  John Goede
Title:   Manager

<u>**PRINCIPALS**</u>**:**

_____
John Schrenkel


_____
John Goede

# EXHIBIT D

From: Rob Flint [mailto:flint@rbod.in]
Sent: Monday, January 01, 2018 11:56 PM
To: John Schrenkel <jschrenkel@aemx.com>; John L. Gonda; <...@gesalawyer.com>
Cc: Ava Roack <ARoack@blueskylend.us>
Subject: Matters at hand

John and John

Happy New Year! In order to keep our discussions relevant I asked Ava to go back against our definitive agreement to be certain that we clearly understand what we all agreed upon when we signed our deal in July of '16.

As we all know, in TT overall GOS in AEM was down over 100 basis point plus RPM accepted $500,000 in expenses that we did NOT charge AEM. If organisations stayed even over '16 then AEM is down over $5mm in net profit. When we figured the deal to purchase AEM that price we paid was based on net income (P&L), not loan origination in 3's. Regardless, I cannot see any metric below which supports John S's perspective that we should pay you more that what is agreed per our definitive agreement.

Matters at hand:

Expense allocations – In the Management Incentive Agreement, under section 1.13, it has been clarified that AEM's books "shall track the income and cost, net profit and net losses directly related to the AUM assets" and have to exclude any income or loss related to other business assets of the company. Assuming that expenses utilized by the AEM team will be absorbed by other boutiques was never the case. We also discussed that if there are any expenses incurred by the other boutiques via sharing labor or by other means, the expense allocations will be 1:1 and will never be more than the actual cost was.

At the end of the day, only expenses were allocated to date that were primarily related to Cindy Garron's accounting work.

Payout of the earout. The relevant schedule is copied below and attached.

At the end of the day, the new payout arrangement is more beneficial for John and John.

Payout Term 1

| Month | Earnout | Guarantee | Net payout |
|---|---|---|---|
| August | 1,141,614 | | |
| September | 459,399 | | |
| October | 551,278 | | |
| November | 323,929 | | |
| December | 269,668 | | |
| January | 153,816 | | |
| February | 405,984 | | |
| March | 739,152 | | |
| April | 448,445 | | |
| May | 768,257 | 445,967 | 1,214,224 |
| June | 1,316,138 | (22,291) | 1,292,841 |
| July | 820,814 | (22,291) | 798,517 |
| | 7,408,494 | 401,373 | 7,809,867 |

| | | |
|---|---|---|
| August payout to Five, John and John | (1,557,077) | |
| Delayed payout | 4,242,790 | |
| Delayed payout @ 6% @ 6 month average | 127,384 | |
| (Sept, Oct, Nov, Dec, Jan, Feb) | | |

Payout Term 2

| | Earnout | guarantee amortization | Repurchase adj | Net payout |
|---|---|---|---|---|
| August | 1,076,655 | (22,297) | | 1,054,358 |
| September | 13,398 | (22,397) | | (6,899) |
| October | 284,728 | (22,297) | | 262,431 |
| November | 922,949 | (22,297) | (26,156) | 874,496 |
| December (assuming) | 368,712 | (22,297) | | 346,415 |
| | | | | |
| | | Early payout | | 2,530,801 |
| | | Early payout @ 6% @ 13 month average | | 164,302.07 |
| | | (March, April, May, June, July, Aug, Sept, Oct, Nov, Dec, Jan, Feb, March) | | |
| | | | | |
| | | Benefits of the modified arrangement to John and John | | 3,6,918,636 |

Premise of $1mm if double the size of the company –

- Production of AEM for 2016 = $642mm
- Production of AEM for 2017 = $928mm

At the end of the day, production did not double, earnings plummeted by 10llipm.

- Promise of paying Dec, Jan, Feb, March we would get 30/50 once we hit our mark. So take those 3 months just assume to $400,000 4 way less than we did lollow... (to $400,000 to us)
- Newhire Incentives – was only a one-time agreement and was never discussed to forever continue as GAAP but accounting principles we have to follow do not allow

amortization of guarantees.

At the end of the day, we should keep everything as is. Close December and based on the December 31 financials, we will pay $3.5mm on February 1 and the remaining in the payroll cycle immediately following April 1.

Let's work on getting on a call tomorrow or Wednesday. I am also still trying to get Lauran's agreement understood and agreed upon by all of us.

Thank you,

Rob

Robert Hirt
CEO
RPM Mortgage, Inc.
3240 Stone Valley Road West
Alamo, CA 94507

D: 925-293-9340
F: 925-944-8910
E: rhirt@rpm-mtg.com
www.rpm-mtg.com

*The RPM Story:*
**Take a Closer Look at RPM**
Protect your personal financial information by not sending it in an e-mail. Only send personal financial information attached to an e-mail if you use encryption software. This message, and any attachments, is intended only for the intended recipient(s) and it may be privileged and confidential. Please note that any views or opinions expressed in this e-mail are solely those of the author and do not necessarily represent those of LendUS, LLC, and/or its affiliates. If you are not the intended recipient(s), or agent responsible to deliver this message to the intended recipient(s), you are hereby notified that any review, re-transmission, conversion to hard copy, copying, circulation, or other use of this message or any attachments is strictly prohibited and may be illegal. If you are not the intended recipient(s), please notify the sender immediately by return e-mail and permanently delete this message and any attachments. Thank you.

# Initial Claim/Report
# John Goede

**LABOR COMMISSIONER, STATE OF CALIFORNIA**
DEPARTMENT OF INDUSTRIAL RELATIONS – DIVISION OF LABOR STANDARDS ENFORCEMENT

| CLEAR | PRINT |

## Initial Report or Claim

*PLEASE PRINT OR TYPE ALL INFORMATION*
*Refer to the accompanying Guide to assist you in filling out this form.*

| FOR OFFICE USE ONLY | | |
|---|---|---|
| Taken by: | Office: | Case #: |
| Date filed: | | SIC #: |
| RCI Complaint: ☐ YES ☐ NO | Amount: | |

## PRELIMINARY QUESTIONS

1. Is your claim about a public works project? [If your answer is "YES," STOP here, DO NOT FILL OUT THIS FORM, and fill out the "PW-1" claim form instead. If your answer is "NO," proceed with this form.]

2. Have you filed a retaliation complaint against your employer with the Labor Commissioner?
   ☐ YES, on: _____ _____ _____     ☒ NO  [If you have been retaliated against, you may file a retaliation
                    Month   Day   Year                  complaint by filling out another form, "DLSE FORM 285."]

3. Is there a union contract covering your employment?
   ☐ YES   [If "YES," attach a copy of the Collective Bargaining Agreement.]
   ☒ NO

4. Are other employees also filing wage claims against your employer?   ☒ YES   ☐ NO   ☐ I DON'T KNOW

## Part 1: LANGUAGE ASSISTANCE & REPRESENTATION

| 5a. Do you need an interpreter? ☐ YES ☒ NO | 5b. If you checked "YES" to Box 5a, enter the language needed | | |
|---|---|---|---|
| 6a. If you are being assisted with your claim by a lawyer or other advocate, enter your ADVOCATE'S NAME and ORGANIZATION | | 6b. ADVOCATE'S PHONE ( ) | |
| 6c. Your ADVOCATE'S MAILING ADDRESS (Number, Street, Floor, Suite) | CITY | STATE | ZIP CODE |

## Part 2: YOUR INFORMATION

| 7. Your FIRST NAME | 8. Your LAST NAME | 9. HOME PHONE | 10. OTHER PHONE | 11. BIRTH DATE |
|---|---|---|---|---|
| John | Goede | 239 687-3330 | ( ) | 11/19/1971 |
| 12. Your MAILING ADDRESS (Street Number, Street Name, Apartment Number) 8950 Fontana del Sol Way, Suite 100 | | CITY Naples | STATE FL | ZIP CODE 34109 |

## Part 3: CLAIM FILED AGAINST (EMPLOYER INFORMATION)

| 13. EMPLOYER / BUSINESS NAME(S) LendUS, LLC | 14. EMPLOYER'S VEHICLE LICENSE PLATE # | 15. EMPLOYER PHONE (925) 295-9300 | | |
|---|---|---|---|---|
| 16. ADDRESS of EMPLOYER / BUSINESS (Street Number, Street Name, Floor, Suite) 3240 Stone Valley Road West | CITY Alamo | STATE CA | ZIP CODE 94507 | |
| 17. ADDRESS where you worked, if different from Box 16 (number, Street, Floor, Suite) 305 5th Avenue South, Unit 204 | CITY Naples | STATE FL | ZIP CODE 34102 | |
| 18. NAME of PERSON IN CHARGE (First Name, Last Name) Robert Hirt | 19. JOB TITLE / POSITION of PERSON IN CHARGE Chief Executive Officer | | | |
| 20. TYPE OF BUSINESS Mortgage Lending | 21. TYPE OF WORK PERFORMED Management/Legal | 22. TOTAL NUMBER OF EMPLOYEES 1200 | 23. EMPLOYER STILL IN BUSINESS? ☒ YES ☐ NO ☐ DON'T KNOW | |
| 24. Check which box describes your employer, if you know: ☐ CORPORATION   ☐ INDIVIDUAL   ☐ PARTNERSHIP   ☒ LLC   ☐ LLP | | | | |

PRINT YOUR NAME  John Goede

## Part 4: FINAL WAGES / BOUNCED CHECKS

| 25. DATE OF HIRE | 26. Check which box applies to you: |
|---|---|
| 8 / 1 / 2016<br>Month   Day   Year | ☐ Still working for employer  ☐ QUIT on __ / __ / __<br>Month  Day  Year<br>☒ DISCHARGED on 3 / 30 / 2018<br>Month  Day  Year |
| | ☐ Other (specify): _____ |

| 27a. If you QUIT, did you give 72 hours notice before quitting?<br>☐ YES<br>☐ NO | 27b. If you QUIT, have you received your final payment of wages including all wages owed?<br>☐ YES, on: __ / __ / __<br>Month  Day  Year<br>☐ NO |

28. If you were DISCHARGED, have you received your final payment of wages including all wages owed?

☐ YES, on __ / __ / __
       Month  Day  Year
☒ NO

| 29a. How were your wages paid?<br>☐ BY CHECK  ☐ BY CASH  ☐ BY BOTH CASH & CHECK<br>☒ OTHER: Direct deposit | 29b. If paid by check, did any of your paychecks "bounce" (for example, paycheck could not be cashed because employer has insufficient funds)?<br>☐ YES  ☐ NO |

## Part 5: HOURS YOU TYPICALLY WORKED

30. Check which box applies: ☒ My work hours and days of work were usually the same each week that I worked

☐ My work hours and/or days of work varied per week or were irregular. **If you checked this box and you are claiming unpaid wages or meal and rest period violations, you should also fill out and submit the DLSE FORM 55.**

31. If your work hours and days of work were usually the same each week, give your **BEST ESTIMATE** below of the hours you usually worked and any time you took for a duty-free meal period during your **TYPICAL** workweek. **DO NOT fill this out if your work hours were too irregular to estimate a typical or average workweek (instead fill out the DLSE Form 55).**

| | TIME WORK STARTED | TIME WORK ENDED | 1st MEAL START TIME (if applicable) | 1st MEAL END TIME (if applicable) | 2nd MEAL START TIME (if applicable) | 2nd MEAL END TIME (if applicable) | ONLY IF YOU WORKED A SPLIT SHIFT: | |
|---|---|---|---|---|---|---|---|---|
| DAY 1 of your workweek | 8 ☒ am ☐ pm | 5 ☐ am ☒ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | 1st shift ended at ☐ am ☐ pm | 2nd shift started at ☐ am ☐ pm |
| DAY 2 of your workweek | 8 ☒ am ☐ pm | 5 ☐ am ☒ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | 1st shift ended at ☐ am ☐ pm | 2nd shift started at ☐ am ☐ pm |
| DAY 3 of your workweek | 8 ☒ am ☐ pm | 5 ☐ am ☒ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | 1st shift ended at ☐ am ☐ pm | 2nd shift started at ☐ am ☐ pm |
| DAY 4 of your workweek | 8 ☒ am ☐ pm | 5 ☐ am ☒ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | 1st shift ended at ☐ am ☐ pm | 2nd shift started at ☐ am ☐ pm |
| DAY 5 of your workweek | 8 ☒ am ☐ pm | 5 ☐ am ☒ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | 1st shift ended at ☐ am ☐ pm | 2nd shift started at ☐ am ☐ pm |
| DAY 6 of your workweek | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | 1st shift ended at ☐ am ☐ pm | 2nd shift started at ☐ am ☐ pm |
| DAY 7 of your workweek | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | ☐ am ☐ pm | 1st shift ended at ☐ am ☐ pm | 2nd shift started at ☐ am ☐ pm |

## Part 6: PAYMENT OF WAGES

32. Were you paid or promised a FIXED amount of wages per pay period, no matter how many hours you worked (for example, $400 per week, regardless of how many hours you worked)?

☒ YES: I was paid $ __7,932.69__ per ☐ day ☐ week ☒ every 2 weeks ☐ month ☐ semi-monthly
☐ other (specify): ___

I was promised $ _____ per ☐ day ☐ week ☐ every 2 weeks ☐ month ☐ semi-monthly
☐ other (specify): ___

☐ NO

| | |
|---|---|
| 33a. Were you an HOURLY employee?<br><br>☐ YES: I was paid $_____ per hour.<br>I was promised $_____ per hour.<br>☒ NO | 33b. If you were an HOURLY employee, were you paid or promised more than one hourly rate (based on the hours you worked or different job tasks)?<br><br>☐ YES (describe)<br><br>☐ NO |
| 34. Were you paid by PIECE RATE? ☐ YES ☒ NO | 35. Were you paid by COMMISSION? ☒ YES ☐ NO |

## Part 7: WAGES, COMPENSATION & PENALTIES OWED

| 36. CLAIMS (Check all boxes below that apply) | CLAIM PERIOD: START DATE (Month/ Day/ Year) | CLAIM PERIOD: END DATE (Month/ Day/ Year) | AMOUNT EARNED / CLAIMED | |
|---|---|---|---|---|
| ☐ REGULAR WAGES (for non-overtime hours) | | | $ | |
| ☐ OVERTIME WAGES (including double time) | | | $ | |
| ☐ MEAL PERIOD WAGES | | | $ | |
| ☐ REST PERIOD WAGES | | | $ | |
| ☐ SPLIT SHIFT PREMIUM | | | $ | |
| ☐ REPORTING TIME PAY | | | $ | |
| ☒ COMMISSIONS *** | 12/31/2017 | 4/2/2018 | $ | 1,400,000 |
| ☒ VACATION WAGES *** | 8/1/2016 | 3/30/2018 | $ | 19,831.73 |
| ☐ BUSINESS EXPENSES | | | $ | |
| ☐ UNLAWFUL DEDUCTIONS | | | $ | |
| ☒ OTHER (Specify): Bonus | 1/1/2018 | 3/31/2018 | $ | 37,500 |
| ENTER SUBTOTAL (add all Amounts Earned/Claimed): | | | $ | 1,457,331.73 |
| ENTER TOTAL AMOUNT PAID: | | | $ | 0 |
| GRAND TOTAL OWED [Subtotal minus Total Amount Paid]: | | | $ | 1,457,331.73 |

*** Additional DLSE form should be submitted if you are making this claim. See "Instructions for Filing a Wage Claim."

37. Check box(es) if you are claiming ☒ Waiting time penalties (Labor Code §203)

☐ Penalties for "bounced" checks (checks issued with insufficient funds) [Labor Code §203.1]

I hereby certify that the information I have provided is true to the best of my knowledge and/or recollection. The amounts claimed are based on my best estimates at this time and may be adjusted based on further information, or based on assistance with my claim provided by DLSE.

Signed _____  Date April 5, 2018 _____

Print Name: John Goode

**DO NOT WRITE ON THIS SIDE—For Office Use Only**

| Claimant: | Against: | Attorney Needed: | Action Number: |
|---|---|---|---|
| Address of Claimant: | Address of Defendant: | Docket Date | Date Closed |
| Phone No. of Claimant: | Phone No. of Defendant: | DAYBOOK CLAIM RECEIVED | |
| Name & Address of Witness: | | | |
| Phone No. of Attorney: | | | |
| Address (change of Claimant) etc. | Address (change of Defendant) etc. | DATE-WORK COMPLAINT FILED (if applicable) | DATE RCI COMPLAINT FILED (if applicable) |

**RECORD OF RECEIPTS**

| Date Received | Check Cash, etc. | Receipt Number | Amount |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**RECORD OF PAYMENTS TO CLAIMANT**

| Invoice Check Number | Date Paid | Balance Due | Disbursements |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**CONFERENCE DATES**

| | | |
|---|---|---|
| | | |

**FINAL DATES**

| | | |
|---|---|---|
| | | |

DATES:

# EMPLOYMENT AGREEMENT

## John C. Goede



August 1, 2016

<u>PERSONAL AND CONFIDENTIAL</u>

John C. Goede
9118 Strada Place, Unit 8105
Naples, Florida 34108

Dear John:

As you are aware, RPM Mortgage, Inc., or its subsidiary, RPM Holdings I, LLC ("<u>RPM</u>") has entered into an Equity Purchase Agreement ("<u>EPA</u>") with you and American Eagle Mortgage Co., LLC, an Ohio limited liability company (the "<u>Company</u>"), pursuant to which RPM will purchase all of the outstanding membership interests of the Company, subject to the terms and conditions set forth in the EPA. One of the conditions to the effectiveness of the EPA and the consummation of the transactions contemplated thereunder is your entering into an employment relationship with the Company, pursuant to the terms and conditions set forth in this offer letter. Additionally, the establishment of the Management Incentive Program for your benefit by RPM is part of the consideration for you to enter into the EPA and to consummate the transactions contemplated thereby.

Subject to the terms and conditions of the EPA, the Company is pleased to offer you the part-time position of SVP Sales & Legal. This letter summarizes the initial terms of your employment, which terms will be effective immediately after the Closing (as defined in the EPA). Please note that if the Closing does not occur, this offer letter shall be null and void and of no legal effect.

During your employment with the Company, you will be responsible for performing those duties as are consistent with your title and/or position and as may from time to time otherwise be reasonably assigned to or requested of you. You shall devote your full business time, attention, skill and best efforts to perform such responsibilities faithfully and to the best of your abilities so as to maintain and promote the business and reputation of the Company and RPM. To that end, you shall not engage in any other active business or occupation while employed by the Company.

Your salary will be paid at the rate of $8,333.33 per month (which is annualized to a rate of $100,000 per annum) for the initial two years following the Closing (as defined in the EPA), after which we may review your salary in accordance with our standard practice. You will be paid in accordance with the Company's normal payroll practices as established or modified from time to time, and your salary shall be subject to all applicable federal, state and

local taxes and withholdings. The Company currently pays salaries on a semi-weekly basis (every other Friday).

In addition to your salary, you will also be (i) paid a sign-on bonus of $100,000, and (ii) granted a profit interest pursuant to the terms set forth in the Management Incentive Program attached hereto as Exhibit A ("Bonus Program").

If your profit interest is redeemed in connection with a Change in Control (as defined in the Bonus Program), you will have the right to purchase an equity interest in the Business (as defined in the Bonus Program) within thirty days after the closing of the Change in Control at the then current fair market, as determined following the Change in Control event in accordance with the Bonus Program. The right to purchase such equity interest shall be limited to the percentage profit interest that you hold immediately before the closing of such Change in Control ("Percentage Interest"). For example, if you hold an 8.33% profit interest in the Business immediately prior to the Change in Control, then you will have the right to acquire an equity interest representing up to 8.33% of the Business after the Change in Control. In addition, and subject to the consent of the acquirer of RPM, in the event you do not purchase the full Percentage Interest, you will have the right to invest subsequent distributions until your capital account for the Business relative to all outstanding capital accounts is equal to the Percentage Interest. For clarity, this right to invest (i) is limited to the Business (legacy AEM assets) and shall not be exercisable for an interest in RPM or its affiliates, and (ii) the equity interest might be structured as a special interest directly tied to the AEM assets even if, at that time, such AEM assets have been combined with the business assets of RPM or its affiliates.

Furthermore, you will be eligible to participate in the Company's employee benefits programs, which currently include those listed on Exhibit B attached hereto. Your participation in the Company's benefit programs shall be subject to (a) the terms and conditions of the applicable program documents; (b) generally applicable Company policies; and (c) the discretion of any administrative or other committee overseeing each program. Please note that the Company (in RPM's sole discretion) may alter, add to, modify or delete its benefits programs at any time in its sole discretion.

RPM requires you to verify that the performance of your position at the Company does not and will not breach or contravene (i) any agreement or contract entered into by you prior to the Closing (i.e., you have not entered into any agreements that are in conflict with your obligations to AEM); or (ii) any obligation you may otherwise have under applicable law to any other person. You further represent and warrant that you have delivered or disclosed, as the case may be, to RPM all agreements, contracts and/or obligations relevant to clauses (i) and (ii) above.

In connection with the purchase of the Company and the mutual promises set forth herein, you will also be required to sign a separate Noncompetition and Nondisclosure Agreement, which will be effective as of the Closing.

The above terms are a summary of our proposed initial employment relationship and are subject to later modification by RPM and/or the Company. Your employment will be "at-

will," meaning that either you or the Company (at the sole discretion of RPM) may terminate your employment relationship at any time, for any reason, with or without prior notice. RPM is a not guarantor, financial or otherwise, of the employment arrangement discussed herein other than in its commitment to ensure that the terms and conditions set forth herein will be offered to you by the Company from and after the Closing Date.

John, we are excited about the prospect of you joining our team, and look forward to the addition of your professionalism and experience to help the RPM team achieve its goals. If this offer letter meets your approval, please countersign below and return a fully executed copy of the offer letter to me.

[Signature Page Follows]

DocuSign Envelope ID: 5A5311D1-A2EA-1A15-8FA0-AE125BF241FA

Sincerely,

**RPM MORTGAGE, INC.**

By: E. Robert Hirt

Accepted and Agreed By:

John C. Goode, as an individual

Sincerely,

RPM MORTGAGE, INC.

By: _____

Accepted and Agreed By:

_____
John C. Goede, as an individual

Signature Page to Employment Offer

Exhibit A

Management Incentive Program
(aka Bonus Program)

(See attached.)

A

## MANAGEMENT INCENTIVE PROGRAM

### PURPOSE AND EFFECTIVE DATE

The Plan is adopted as of _____, 2016 with an effective date as specified below. The purpose of the Plan is to retain employees of the Company by providing Participants with an opportunity to receive annual bonuses and a long-term interest in the profits attributable to the business assets of The American Eagle Mortgage Co., LLC, an Ohio limited liability company ("AEM" or "Company"). This Plan is adopted by AEM in connection with RPM's acquisition of the outstanding membership interests of AEM (the "Acquisition") and the profit interests defined herein are expressly limited to the profits generated by such AEM assets. The Plan is intended to be exempt from the reporting and disclosure requirements of Title 1 of ERISA because it is an unfunded plan maintained by an employer for the purpose of providing benefits for a select group of management or highly compensated employees.

### ARTICLE 1
### DEFINITIONS

The following words and phrases when used in the Plan will have the meanings indicated in this Article 1. Unless indicated otherwise, references in the Plan to articles and sections are to articles and sections of the Plan.

1.1   "Account" means the bookkeeping account of each Participant to which annual Net Profits and Net Losses of the Business (as defined below) are credited.

1.2   "Acquisition Agreement" means that certain equity purchase agreement by and among the Company, AEM, and certain members of AEM, dated June 30, 2016.

1.3   "Administrator" means the person designated by the Company to administer the Plan.

1.4   "Beneficiary" means any individual designated by a Participant as his beneficiary in accordance with procedures established by the Administrator. If a Participant has no Beneficiary designation in effect or the Participant's designated Beneficiary predeceases the Participant, the Participant's Beneficiary will be his surviving spouse or, if none, his estate.

1.5   "Business" means the business of originating, making, selling and servicing residential mortgage loans attributable only to the assets of AEM acquired by the Company, and shall be exclusive of any and all business assets of the Company or other affiliates of the Company, as the case may be.

1.6   "Cause" means (i) conviction of a felony, (ii) an act that constitutes gross negligence or willful misconduct in the performance of services, (iii) theft or misappropriation of property, (iv) breach of any confidentiality or non-compete agreement, or (v) failure to perform the Services or his or her obligations and duties (other than due to his death or disability) after there has been delivered to him or her a written notice of such failure to perform and his or her failure to substantially cure such failure within thirty (30) calendar days after written notice is given by the Company.

1.7    "Change of Control Event" means:  (i) any acquisition of the Company by an unaffiliated third party by means of merger or other form of corporate reorganization; (ii) any issuance, sale or other disposition (or series of related sales or dispositions) of the outstanding stock of the Company to an unaffiliated third party, in which the stockholders immediately prior to such event do not hold a majority of the outstanding stock of the Company immediately after such event, except where such issuance, sale or disposition is for the purposes of an equity financing of the Company; or (iii) any sale, disposition or transfer of all or substantially all of the assets of the Company or the Business to an unaffiliated third party.

1.8    "Code" means the Internal Revenue Code of 1986, as amended, and the regulations and other guidance thereunder.

1.9    "Company" means The American Eagle Mortgage Co., LLC, an Ohio limited liability company, or its assigns.

1.10    "Economic Interest" means, with respect to a Participant, his or her percentage interest in the Net Profits and Net Losses shown opposite such Participant's name on Appendix A.

1.11    "Effective Date" means the date this Plan becomes effective, which is anticipated to occur on the earlier of (i) the date the full Earn-Out Amount (as defined in the Acquisition Agreement) has been earned by the Principals (as defined in the Acquisition Agreement), or (ii) August __, 2018.

1.12    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations and other guidance thereunder.

1.13    "Net Profits" and "Net Losses" shall be calculated in accordance with GAAP based on a separate income statement for the assets attributable to the Business.  The Company shall at all times maintain a separate income statement for the Business, which shall track the income and cost, net profits and net losses directly related to the legacy assets of AEM, and will exclude income and cost related to other business assets of the Company and its affiliates.

1.14    "Participant" means an employee of the Company or any of its affiliates who is designated by the Company as a Participant on Appendix A.

1.15    "Plan" means this Management Incentive Program, as amended from time to time.

1.16    "Plan Year" means the period from the Effective Date *through* December 31 of the same year and each 12-month period thereafter from each January 1 through each December 31.

1.17    "RPM" means RPM Holdings I, LLC, a Delaware limited liability company, or its assigns.

1.18    "Separation from Service" means a Participant's death or the Company's termination of Participant's employment with the Company without Cause.

2

## ARTICLE II
## PARTICIPATION

The Participants in the Plan will consist of the individuals set forth on Appendix A attached hereto. It is intended that the Participants be part of management of the Business or other highly compensated employees of the Company and its affiliates.

## ARTICLE III
## ANNUAL BONUS PAYMENT

3.1     Determination and Payment of Annual Bonus.

(a)     The balance of each Participant's Account shall be $0 on the Effective Date. Before or as soon as practicable but in any event within ninety (90) days after the end of each Plan Year, the Company will determine the Net Profit or Net Loss of the Business for such Plan Year and will notify the Participants in writing of such determination. Any payout hereunder is contingent upon continuous employment with the Company as of the date the payment obligation matures and becomes due and payable. If Participant voluntarily leaves the employment of the Company or if Participant's services are terminated for Cause, then the Participant's Economic Interest shall be transferred to the remaining Participants equally; provided, that to the extent RPM needs to replace the Participant who voluntarily leaves or is terminated for Cause, then the cost associated with such hire, including but not limited to excess salary over the salary paid to the departing Participant, equity, profit interests and any sign-on bonus, shall be deducted from any payout based on any Economic Interest transferred under the preceding sub-clause.

(b)     A Participant shall have the right to dispute in writing the calculation of such Net Profit or Net Loss within thirty (30) days following receipt of the calculation thereof (such 30-day period, the "Notice Period"). If the Company has not received notice of such a dispute within the Notice Period, the Company will increase (in the case of a Net Profit for such Plan Year) or decrease (in the case of a Net Loss for such Plan Year) each Participant's Account with an amount equal to the product of (i) such Net Profit or Net Loss, and (ii) such Participant's Economic Interest for such Plan Year. If the Company has received a notice of such a dispute within the Notice Period, then the Participant and the Company shall, for an additional thirty (30) days following receipt of such notice of dispute (such additional 30-day period, the "Resolution Period"), attempt to reach agreement on the determination of such Net Profit or Net Loss. If no resolution of this dispute is finalized within the Resolution Period, the disputed items or amounts shall be submitted for review and final determination by an auditing firm jointly selected by the Participant and the Company which is not then providing substantial services to either the Participant or the Company (the "Independent Accounting Firm"). If the Company and the Participant are unable to agree upon the selection of the Independent Accounting Firm within thirty (30) days following the end of the Resolution Period, the Company, on the one hand, and the Participant, on the other, shall select one independent accounting firm within ten (10) days following the end of such thirty (30) day period. Such accounting firms shall jointly select a third independent accounting firm, and such firm shall be the Independent Accounting Firm. The Independent Accounting Firm shall review all relevant data, including any necessary books and records of the Company, to determine the changes to such Net Profit or Net Loss, if any,

3

necessary to resolve the disputed items or amounts. The determination by the Independent Accounting Firm shall be made as promptly as practical but in no event beyond thirty (30) days, and shall be final and binding on the parties. In the event that the final Net Profit or Net Loss differs from the initial amount determined by the Company by five percent (5%) or less, the costs of the Independent Accounting Firm shall be borne exclusively by the Participant(s). In the event that the final Net Profit or Net Loss differs from the initial amount determined by the Company by more than five percent (5%), the costs of the Independent Accounting Firm shall be borne exclusively by the Company.

(c)    As soon as practicable after the Participant's Account is adjusted for a Plan Year in accordance with Section 3.1(a) or 3.1(b) above, the Company will determine the Participant's Account balance. If the Participant was employed on the last day of such Plan Year, and the Participant's Account balance is a positive amount, the Company shall pay such Account balance to the Participant as soon as practicable following the end of such Plan Year, and in any event no later than April 15 of the year following such Plan Year. If the Participant's Account balance is a negative amount or if Participant is not employed on the last day of the applicable Plan Year, no amount shall be paid for such Plan Year. Any negative Account balance will be set off against Net Profits for the following fiscal year (and any future fiscal years) until all Net Losses has been set off against Net Profits. For clarity, the bonus amount payable hereunder with respect to any fiscal year with respect to which Net Losses occur shall be zero (0) and such Net Losses shall reduce the Net Profits payable to the Participant, if any, for subsequent years until such Net Losses have been used in their entirety. Allocations of Net Profits and Net Losses shall be allocated among the Participants in accordance with such Participant's Economic Interest.

(d)    Deductions from Accounts. The Participant's Account will be reduced by the amount of any payment made to the Participant pursuant to this Article III. The Company may reduce the Participant's Account or any payment owed by the Participant to the Company or any of its affiliates by the amount of any debt or monetary obligation that a Participant owes the Company, provided that no such reduction will be applied to the extent that such reduction would cause the Plan or any other deferred compensation arrangement to fail to comply with the requirements of Section 409A of the Code or the regulations thereunder.

ARTICLE IV
SETTLEMENT OF INTEREST IN NET PROFITS

4.1    Determination of Settlement Amounts.

(a)    Company Right to Redeem after Five Years. Following (i) the death of a Participant, or (ii) the fifth anniversary of the Effective Date, the Company shall have the right, but not the obligation, to redeem the Economic Interests by paying to the Participants the Settlement Amount (as defined below) by issuing a Promissory Note (as defined below) to the Participant(s) within thirty (30) days after delivering written notice of exercise, the Promissory Note to be in the principal amount equal to the Settlement Amount *less* any tax withholding required in connection with such redemption. In the case of death, the Company shall have thirty days after receiving notice of death to exercise its option to redeem the profit interest. The Company shall exercise such right of redemption by written notice delivered to the Participants.

For purposes of this Section 4.1(a), the term "*Promissory Note*" shall mean a 1% 3-year promissory note pursuant to which the acquirer (or the surviving entity in the Change in Control Event) shall agree to pay the Participant the Settlement Amount *less* applicable tax withholdings in three equal annual installments, with the first payment being made on the 12-month anniversary of the Promissory Note.

(b)   Automatic Redemption.   In the event the Company terminates a Participant's employment without Cause or upon a Change of Control Event but and only if Participant agrees to remain an employee during a 90-day transition period after the consummation of such Change of Control Event, then the Participants' Economic Interests shall be redeemed automatically and without any further action required on the part of the Company or the Participants in exchange for the payment of the Settlement Amount in accordance with Section 4.2 below.

(c)   For purposes of this Section 4.1, the "*Settlement Amount*" shall mean (i) the fair value of the Participant's Economic Interest *multiplied by* (ii) a fraction (not to exceed one), the numerator of which shall be the total number of the Participant's years of continuous service with the Company and its affiliates (up to five years) from and after the Closing (as defined in the Acquisition Agreement), and the denominator of which shall be five. The fair market value of such interest shall be determined by an independent accounting firm (acting as a third party appraiser) mutually acceptable to the Company and the Participants. Such appraiser shall determine such fair market value by taking into account factors typically used for such valuations, including, but not limited to, the size and profitability of the Business, cash flow, the market or the lack of a market for the sale of the interests, non-equity interests, and the net income and mortgage loan production of the Business relative to the aggregate net income and mortgage loan production of the Company and its affiliates, but shall disregard the fact that the Participant's interest is directly tied to employment.

4.2   Payment of Settlement Amount. The Settlement Amount determined in Section 4.1(b) shall be paid to the Participant(s) in three (3) equal annual installments, the first of which shall be made on the one-year anniversary of the event prompting the redemption, followed by subsequent installment payments on the second and third anniversaries.

4.3   Non-Competition and Non-Solicitation Agreement. A Participant who engages in Competition with the Company shall not be entitled to any payments set forth in Article III or this Article IV to the extent such payments are not related to the last day of the immediately preceding Plan Year as of the date the Participant engages in Competition and all entitlement to future payments shall abate. For purposes of this Plan, the term "Competition" means any activity prohibited under that certain Non-competition and Non-solicitation Agreement.

4.4   Section 409A Specified Employees. Notwithstanding any provision of this Plan to the contrary, and solely to the extent required by Section 409A of the Code and not otherwise eligible for exclusion from the requirements of Section 409A of the Code, if as of the date of a Participant's Separation from Service, (a) the Participant is deemed to be a "specified employee" (as defined in Section 409A of the Code and the related regulations) and (b) the Company or any member of a controlled group including the Company is publicly traded on an established securities market or otherwise, to the extent required by Section 409A of the Code and the

regulations thereunder, no payment or other distribution required to be made to the Participant under the Plan (including any payment of cash, any transfer of property and any provision of taxable benefits) solely as a result of the Participant's Separation from Service will be made earlier than the first day of the seventh month following the date of the Participant's Separation from Service.

## ARTICLE V
## ADMINISTRATION

### 5.1 Administrator.

(a)     The Plan will be administered by the Administrator, which will be responsible for interpreting the Plan and establishing rules and regulations governing the Plan's administration consistent with the terms of the Plan. Except as otherwise set forth in the Plan, the Administrator's decision in any matter involving the interpretation and application of the Plan will be final and binding on all parties. Neither the Administrator, the Company, the Company of Directors of the Company nor any member of the Company will be liable for any action or determination made in good faith with respect to the Plan or any person's rights under the Plan.

(b)     The Administrator may execute or deliver any instrument, make any payment or perform any other act that the Administrator determines necessary or appropriate to administer the Plan, including, without limitation, the retention of counsel and other agents required in carrying out the Plan.

(c)     The Administrator will keep all records necessary for the Plan's administration and will furnish any periodic information to Participants as required pursuant to Section 3.1(b), or that is otherwise necessary or desirable, in the Administrator's reasonable discretion. All expenses of administering the Plan will be paid by the Company and will not affect a Participant's right to or the amount of benefits.

### 5.2 Claims Procedures.

(a)     Except as otherwise required by the Plan, all claims for benefits under the Plan will be submitted to, and within 90 days thereafter decided by, in writing, the Administrator. If the Administrator determines that it needs an extension of time for processing the claim, it may extend the date by which a decision is required to 180 days after the claim is submitted if it notifies the claimant in writing of the extension prior to the termination of the initial 90-day period, including the special circumstances requiring an extension of time and the date by which it expects to render a decision.

(b)     Written notice of the decision on each claim will be furnished reasonably promptly to the claimant. If the claim is wholly or partially denied, such written notice will set forth (i) the specific reasons for the denial, (ii) reference to the specific Plan provisions on which the denial is based, (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary and (iv) a description of the Plan's review procedures and the time limits applicable to

such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following the denial of a claim on review.

(c)     A claimant may request a review by the Administrator of a decision denying a claim in writing within 60 days following receipt of the denial. All such reviews will be decided in writing by the Administrator within 60 days after receipt of the request for review. If the Administrator determines that an extension of time for processing the review is required, it may extend the date by which a decision is required to 120 days after the request for review is submitted if it notifies the claimant in writing of the extension prior to the termination of the initial 60-day period, including the special circumstances requiring an extension of time and the date by which it expects to render a decision.

(d)     In connection with a review of a denied claim for benefits, a claimant will have the opportunity to submit written comments, documents, records and other information relating to the claim for benefits and be provided, on request and free of charge, reasonable access to and copies of all documents, records and other information relevant to his claim for benefits. The review of a denied claim will take into account all comments, documents, records and other information submitted by the claimant related to the claim, without regard to whether such information was submitted or considered in the initial review of the claim. If a claim is denied on review, the written notice of the denial will specify (i) the specific reasons for the denial, (ii) reference to the specific Plan provisions on which the denial is based and (iii) a statement that the claimant is entitled to receive, on request and free of charge, reasonable access to and copies of all documents, records and other information relevant to his claim for benefits.

(e)     The claimant may have an authorized representative to act on his behalf in pursuing a benefit claim or appeal of the denial of the benefit. For a representative to be recognized as acting on the claimant's behalf, the claimant must provide the name, address and phone number of his authorized representative in writing to the Administrator and a statement that the representative is authorized to act on his behalf concerning his claim for benefit and, if applicable, an appeal of the denial of the claim.

## ARTICLE VI
## FUNDING

The Plan is an unfunded arrangement. No portion of any funds of the Company or any of its affiliates is required to be set apart for a Participant or Beneficiary. Accounts will be payable from the Company's general assets, and the rights of a Participant or Beneficiary to his Account is limited to those of a general, unsecured creditor of the Company who has a claim equal to the value of the Participant's Account.

## ARTICLE VII
## AMENDMENT AND TERMINATION

This Plan may only be amended or terminated upon the written agreement of the Company and the Participants. However, no amendment or termination may result in an acceleration of benefit payment (except as permitted by Section 409A of the Code).

ARTICLE VIII
GENERAL PROVISIONS

8.1     Payments to Minors and Incompetents.   If the Participant or any Beneficiary entitled to receive any benefits under the Plan is a minor or is deemed by the Administrator or is adjudged to be legally incapable of giving valid receipt and discharge for such benefits, they will be paid to the person or institution the Administrator designates or to a duly appointed guardian. Such payment will, to the extent made, be deemed a complete discharge of any payment due under the Plan.

8.2     No Contract.   The Plan will not be deemed a contract of employment with the Participant and will not affect the Company's right to terminate the Participant's employment.

8.3     Non-Alienation of Benefits.   No amount payable to or held under the Plan for the account of the Participant or any Beneficiary will be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same will be void. No amount payable to or held under the Plan for the account of the Participant will be subject to any legal process of levy or attachment.

8.4     Income Tax Withholding.   The Company may withhold from any payments under the Plan any amount it is required to withhold under applicable federal, state or other income tax law, and transmit such withheld amounts to the appropriate taxing authority. In lieu thereof, the Company will have the right, to the extent permitted by law, to withhold the amount of such taxes from any other sums due from the Company to the Participant on such terms and conditions as the Administrator may prescribe.

8.5     Governing Law.   The Plan will be interpreted, construed and administered under the laws of the State of California without regard to the choice of law provisions thereof and to the extent that ERISA and other federal laws do not apply.

8.6     Captions.   The captions contained in the Plan are inserted only as a matter of convenience and for reference and in no way define, limit, enlarge or describe the scope or intent of the Plan or in any way affect the construction of any provision of the Plan.

8.7     Severability.   If any provision of the Plan is held invalid or unenforceable, its invalidity or unenforceability will not affect any other provision of the Plan, and the Plan will be construed and enforced as if such provision had not been included.

8.8     Notices.   The Participant will be responsible for furnishing the Administrator with the current and proper address for the mailing of notices and delivery of payments. Any notice required or permitted to be given will be deemed given if directed to the person to whom addressed at such address and mailed by regular United States first class mail, postage prepaid. If any item mailed to such address is returned as undeliverable to the addressee, mailing will be suspended until the Participant furnishes the proper address.

8.9     No Guaranty of Performance or Payout.   Each Participant agrees and acknowledges that the Company is not in any way or manner guarantying the performance of the

Business or any particular financial result or payout under this Plan, nor undertaking or committing to invest additional capital or resources in the Business.

      8.10    Interpretation.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine or neuter, as the identity of the person requires.  As the context may require, the singular may be read as the plural and the plural as the singular.

        The Plan is intended to comply with Section 409A of the Code.  Consistent with that intent, the Plan will be interpreted in a manner consistent with Section 409A of the Code.  If any provision that is necessary for the Plan to comply with Section 409A of the Code is determined by the Administrator, in its sole discretion, to have been omitted, such omitted provision will be deemed included in the Plan.  Company agrees to hold harmless and indemnify Participant for all additional taxes, interest and penalties Participant may incur in the event this Plan is found to be in violation of Section 409A.

## APPENDIX A

Participants shall receive an aggregate of 25% of the Net Profits attributable to the Business.

| Participant | 25% Economic Interest |
|---|---|
| John Cinede | 8 1/3% |
| John Schronkel | 8 1/3% |
| David Berry | 8 1/3% |

## Exhibit B

### Employee Benefits

1.  AEMC Benefit Explanation
2.  American Eagle Mortgage #574708 STD LTD Booklet
3.  Buy-up Plan I Summary of Benefits and Coverage
4.  Buy-up Plan III Summary of Benefits and Coverage
5.  Core Plan HSA Summary of Benefits and Coverage
6.  SuperDental Advanced PPO
7.  Key Person
8.  401(k) Plan

# PAY STUB

# John C. Goede

# LendUS

3240 Stone Valley Road West
Second Floor
Alamo, CA 94507

| | |
|---|---|
| Pay Statement | |
| Period Start Date | 03/04/2018 |
| Period End Date | 03/17/2018 |
| Pay Date | 03/23/2018 |
| Document | 21061 |
| Net Pay | $5,787.01 |

## Pay Details

John C Griede
8950 Fontana Del Sol Way
Suite #100
Naples, FL 34109
USA

| | |
|---|---|
| Employee Number | 003348 |
| SSN | XXX-XX-XXXX |
| Job | Divisional Vice President |
| Pay Rate | $99.1587 |
| Pay Frequency | Biweekly |

| | |
|---|---|
| Pay Group | AEM Bi-Weekly E |
| Location | Naples (5th) - AEM |
| Division | AEM - American Eagle Mortgage |
| Region | AEM500 - AEM 500 |
| Branch | 500 - AEMC Corp (former RegPtfd) |
| Department | S - Support Departments Corp |

| | |
|---|---|
| Federal Income Tax | M 0 |
| FL State Income Tax (Residence) | M 0 |
| FL State Income Tax (Work) | M 0 |

## Earnings

| Pay Type | Hours | Pay Rate | Current | YTD |
|---|---|---|---|---|
| Holiday | 0.0000 | $0.0000 | $0.00 | $3,173.08 |
| Regular Pay | 80.0000 | $99.1587 | $7,932.69 | $44,423.06 |

Total Hours  80.0000

## Deductions

| Deduction | Based On | Pre-Tax | Employee Current | Employee YTD | Employer Current | Employer YTD |
|---|---|---|---|---|---|---|
| 401K | $7,932.69 | Yes | $237.98 | $1,189.90 | $0.00 | $0.00 |
| 401k ER Match5Y | $0.00 | Yes | $0.00 | $0.00 | $59.50 | $297.50 |
| AD&D - ER | $0.00 | No | $0.00 | $0.00 | $0.05 | $0.30 |
| ER - STD | $0.00 | No | $0.00 | $0.00 | $12.00 | $72.00 |
| Group Term Life | $0.00 | No | $0.00 | $0.00 | $0.28 | $1.68 |

## Taxes

| Tax | Based On | Current | YTD |
|---|---|---|---|
| Federal Income Tax | $7,594.71 | $1,300.85 | $8,127.81 |
| Employee Medicare | $7,932.69 | $115.02 | $890.14 |
| Social Security Employee Tax | $7,932.69 | $491.83 | $2,950.96 |

## Paid Time Off

| Plan | Taken | Current | Balance |
|---|---|---|---|
| Floating Hol | 0.0000 | 0.0000 | 8.0000 |
| SICK | 0.0000 | 0.0000 | 24.0000 |
| Vacation | 0.0000 | 0.0000 | 83.0400 |
| Volunteer | 0.0000 | 0.0000 | 8.0000 |

## Net Pay Distribution

| Account Number | Account Type | Amount |
|---|---|---|
| xxxxx0790 | Checking | $5,787.01 |
| Total | | $5,787.01 |

## Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current | $7,932.69 | $7,594.71 | $1,907.70 | $237.98 | $5,787.01 |

| YTD | $47,596.14 | $40,400.34 | $11,708.01 | $1,188.00 | $34,637.03 |
|-----|-----------|-----------|-----------|-----------|-----------|

# EQUITY PURCHASE AGREEMENT

EQUITY PURCHASE AGREEMENT

by and among

RPM Mortgage, Inc.,

JDJ Management, LLC, John Goede, John Schrenkel, and David Berry,

and

The American Eagle Mortgage Co., LLC

Dated as of June 30, 2016

*This document (1) is not intended to create, nor will it be deemed to create, a legally binding or enforceable offer or agreement of any type or nature, unless and until agreed to and executed and delivered by the parties hereto; and (2) remains subject to parties' agreement on formula for purchase price and Buyer's continuing due diligence.*

**TABLE OF CONTENTS**

Page

ARTICLE I PURCHASE AND SALE OF EQUITY ....................................................................... 1
    1.1    Purchase and Sale of Securities ............................................................. 1
    1.2    Excluded Assets ...................................................................................... 1

ARTICLE II CLOSING; PURCHASE PRICE; DELIVERABLES........................................... 2
    2.1    Closing...................................................................................................... 2
    2.2    Purchase Price......................................................................................... 2
    2.3    Closing Obligations ................................................................................ 2
    2.4    Calculation of the Initial Purchase Price; Net Tangible Worth............. 3
    2.5    Purchase Price and Adjustment Retained Amount Calculation ............ 3
    2.6    Earn-Out Payments ................................................................................ 5
    2.7    Allocation................................................................................................ 7

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLING PARTIES ............ 8
    3.1    Organization and Authority ................................................................... 8
    3.2    Capitalization of Seller ......................................................................... 8
    3.3    No Conflict.............................................................................................. 9
    3.4    Absence of Certain Changes or Events.................................................. 9
    3.5    No Brokers .............................................................................................. 10
    3.6    Financial Statements .............................................................................. 10
    3.7    Contracts and Commitments ................................................................. 10
    3.8    Absence of Undisclosed Liabilities....................................................... 11
    3.9    Real Property .......................................................................................... 11
    3.10   Intellectual Property .............................................................................. 12
    3.11   Transactions with Affiliates.................................................................. 13
    3.12   Litigation and Orders............................................................................. 13
    3.13   Employment Matters; Benefit Plans ..................................................... 13
    3.14   Labor Relations...................................................................................... 14
    3.15   Compliance with Laws .......................................................................... 14
    3.16   Regulatory Matters................................................................................ 14
    3.17   Permits ................................................................................................... 15
    3.18   Mortgage Loans ..................................................................................... 15
    3.19   Environmental Matters........................................................................... 17
    3.20   Taxes ...................................................................................................... 17
    3.21   Risk Management Instruments .............................................................. 18
    3.22   Insurance................................................................................................. 19
    3.23   Advances; Receivables .......................................................................... 19
    3.24   No Regulatory Impediment.................................................................... 19
    3.25   Statements Made; Diligence Materials.................................................. 19
    3.26   [Intentionally Left Blank] ..................................................................... 20

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ...................................... 20
    4.1    Organization, Authority ......................................................................... 20
    4.2    No Conflict.............................................................................................. 20
    4.3    Financial Ability ..................................................................................... 21
    4.4    No Brokers .............................................................................................. 21

ARTICLE V COVENANTS...................................................................................................21

    5.1    Covenants of Seller..............................................................................................21
    5.2    Cooperation.........................................................................................................24
    5.3    Publicity..............................................................................................................24
    5.4    Further Assurances..............................................................................................24
    5.5    Exclusivity..........................................................................................................24
    5.6    Notification of Certain Matters...........................................................................24
    5.7    Tax Matters..........................................................................................................25
    5.8    Building Loan Mortgage......................................................................................26
    5.9    Warehouse Line Guarantees................................................................................26
    5.10   Liquidation of AEE.............................................................................................26

ARTICLE VI EMPLOYEES................................................................................................26

    6.1    Key Employees....................................................................................................26
    6.2    At-Will Employment; Employees........................................................................26

ARTICLE VII CONDITIONS TO CLOSING......................................................................26

    7.1    Conditions to the Obligations of Buyer, the Selling Parties, and Seller.............26
    7.2    Conditions to the Obligations of Buyer...............................................................27
    7.3    Conditions to the Obligations of Seller...............................................................28

ARTICLE VIII INDEMNIFICATION...................................................................................29

    8.1    Survival of Representations, Warranties and Covenants.....................................29
    8.2    Indemnification by the Selling Parties and Seller...............................................30
    8.3    Indemnification by the Buyer of Seller and Selling Parties................................30
    8.4    Determination of Losses; Method of Asserting Claims.......................................31

ARTICLE IX MISCELLANEOUS.......................................................................................33

    9.1    Assignment..........................................................................................................33
    9.2    No Third-Party Beneficiaries..............................................................................33
    9.3    Termination..........................................................................................................33
    9.4    Expenses..............................................................................................................34
    9.5    Amendment and Modification..............................................................................35
    9.6    Notices................................................................................................................35
    9.7    Governing Law....................................................................................................36
    9.8    Severability.........................................................................................................36
    9.9    Waiver.................................................................................................................36
    9.10   Counterparts; Facsimile.......................................................................................37
    9.11   Entire Agreement................................................................................................37
    9.12   Interpretation.......................................................................................................37
    9.13   Enforcement in Equity and at Law......................................................................37

ARTICLE X DEFINITIONS................................................................................................38

    10.1   Definitions...........................................................................................................38
    The table below provides an example of the calculation of the Initial Purchase Price
    using a multiple of Seller's net income for the 12-month period that ended
    on May 31, 2016.............................................................................................................1

Exhibits
A       Form of Employment Agreement (Key Employees)
B       Form of Non-Compete & Non-Solicitation Agreement

C       Form of Management Incentive Program
D       Purchase Price Allocation Principles

Schedules of Seller
2.2       Purchase Price Calculation & Schedule of Principals
2.2(a)   Financial Statements of AEM dated March 5, 2016
3.2       Capitalization of AEM
3.3(b)   Seller Governmental Approvals and Consents
3.4       Absence of Certain Changes and Events
3.7       Material Contracts
3.8       Absence of Undisclosed Liabilities
3.9(a)   Real Property
3.10(a) Company Intellectual Property
3.10(b) IP Infringements
3.10(d) Licensed Intellectual Property
3.11     Transactions with Affiliates
3.12(a) Litigation
3.12(b) Orders
3.13(a) Employment Agreements
3.13(b) Company Benefit Plans
3.13(e) Nonqualified Plans
3.15     Compliance with Laws
3.16     Regulatory Matters
3.17     Permits
3.19     Environmental Matters
3.21     Risk Management
3.23     Advances
7.2(h)  Key Employees
7.2(l)   Termination of Contracts

## EQUITY PURCHASE AGREEMENT

THIS EQUITY PURCHASE AGREEMENT, dated as of June 30, 2016 (this "*Agreement*"), is by and between on the one hand (1) RPM Mortgage, Inc., a California corporation, or its assigns (collectively the "*Buyer*"), and on the other hand (2) The American Eagle Mortgage Co., LLC, an Ohio limited liability company ("*AEM*" or "Company"), JDJ Management, LLC, a Florida limited liability company (the "*Seller*") and John Goede, John Schrenkel, David Berry (the "*Principal(s)*" and together with the Seller, the "*Selling Parties*"). Buyer, AEM, and the Selling Parties are referred to collectively herein as the "*Parties*" and each individually as a "*Party*."

### BACKGROUND

WHEREAS, AEM is engaged in the business of originating, making, selling and servicing residential mortgage loans and providing related escrow services in various states including Florida, Georgia, Indiana, Kentucky, Ohio and West Virginia (collectively, the "*Business*");

WHEREAS, Seller owns all of the issued and outstanding membership interests of AEM (the "*Membership Interests*");

WHEREAS, Buyer desires to purchase from Seller and Seller desires to sell, transfer and assign to Buyer, all of the Membership Interests upon the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the terms not defined in this Agreement will have the meanings assigned to them in ARTICLE X below.

### AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties hereby agree as follows:

### ARTICLE I
### PURCHASE AND SALE OF EQUITY

1.1    Purchase and Sale of Securities.  On the terms and subject to the conditions of this Agreement, at the Closing, the Buyer shall purchase and acquire from Seller, and Seller shall sell, transfer, assign and convey to Buyer, and Buyer will purchase and accept from the Seller, the Membership Interests free and clear of all Encumbrances.  At the Closing, in full payment for the Membership Interests, the Buyer will pay to, or on behalf of, Seller the amounts specified in Section 2.2.

1.2    Excluded Assets. The Company's assets at the Closing will not include the assets described in Schedule 1.2 (which assets are not owned by the Company or will be distributed to the Selling Parties prior to the Closing).

## ARTICLE II
## CLOSING; PURCHASE PRICE; DELIVERABLES

2.1     Closing.  Unless this Agreement shall have been terminated pursuant to Section 9.3, the closing of the Contemplated Transactions (the "*Closing*") shall take place at the offices of K&L Gates LLP, Embarcadero 4, Suite 1200, San Francisco, California  on a date mutually agreed upon by the Parties; provided that if the conditions set forth in ARTICLE VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to those conditions in fact being satisfied at Closing) shall not have been satisfied or waived by such date, then the Closing shall occur five (5) Business Days after the satisfaction or waiver of such conditions (the time and date on which the Closing occurs is hereinafter referred to as the "*Closing Date*").

2.2     Purchase Price.  The purchase price (the "*Purchase Price*") shall be paid as follows: (a) the payment of the Initial Purchase Price (as defined below) in cash to the Seller at the Closing (the "*Initial Purchase Price*"), as adjusted in accordance with the provisions set forth in Section 2.5, and (b) the Retained Amount (as defined below) shall be held back by the Buyer from the Initial Purchase Price to cover any adjustment under Section 2.5.  The "*Initial Purchase Price*" shall be calculated based on AEM's net income (including for the sake of clarity the net income of AEE) over the 12-month period that ended on May 31, 2016, as specified in Schedule 2.2(a).  Based on the *pro forma* calculations in Schedule 2.2(a) the Initial Purchase Price is estimated to be $19,133,718.  The underlying financial statements shall be prepared in accordance with Generally Accepted Accounting Principles ("*GAAP*") as of the Closing Date.

2.3     Closing Obligations.

(a)     Deliveries of the Selling Parties.

(i)     No later than the Cut-Off Date, the Selling Parties shall deliver the Seller Governmental Approvals, Third Party Consents, the "Estimated Closing Balance Sheet," and the Estimated Income Statement to Buyer;

(ii)     No later than two (2) Business Days prior to the Closing Date, Seller shall deliver to Buyer payment instructions indicating the bank account or accounts to which Buyer shall pay, by wire transfer of immediately available funds, the Initial Purchase Price *less* the amount determined by multiplying the Initial Purchase Price by a factor of 0.05 (the "*Retained Amount*") in consideration for the Membership Interests; and

(iii)     At the Closing, Seller shall deliver to Buyer or shall cause to be delivered to Buyer, (A) duly executed Ancillary Agreements, and (B) any and all other agreements, certificates, instruments and documents otherwise required of Seller under this Agreement or as may reasonably be requested by Buyer.

(b)     Deliveries of Buyer.

(i)     At the Closing, Buyer shall deliver to Seller the Initial Purchase Price *less* the Retained Amount in immediately available funds by wire transfer to the account designated by Seller.

(ii)    At the Closing, Buyer shall execute and deliver to Seller (A) duly executed Ancillary Agreements, and (B) any and all other agreements, certificates, instruments and documents otherwise required of Buyer under this Agreement or as may reasonably be requested by Seller.

(iii)    At the Closing, Buyer shall pay Seven Hundred Fifty Thousand Dollars ($750,000) to NVD Consulting, Inc., a New York corporation, qualified to do business in Florida ("*NVD Consulting*"), for services rendered in connection with the transactions contemplated herein, as specified in a separate agreement among AEM, Selling Parties, NVD Consulting, and RPM.

(iv)    Notwithstanding any other provision in this Agreement, Buyer and AEM will be entitled to deduct and withhold from any payment to be made under this Agreement all Taxes that Buyer or AEM, as the case may be, is required to deduct and withhold with respect to such payment under the Code (or any provision of applicable Law). Taxes withheld pursuant to this Agreement will be (A) timely remitted by Buyer or AEM, as the case may be, to the appropriate Governmental Authority and (B) treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

2.4    Calculation of the Initial Purchase Price; Net Tangible Worth.

(a)    Seller shall furnish to Buyer on the Cut-Off Date an unaudited income statement of AEM for the 12-month period ending on the Measurement Date (the "*Estimated Income Statement*"), and a statement detailing the estimated calculation of the Initial Purchase Price. The Estimated Closing Income Statement shall be prepared in accordance with GAAP applied on a basis consistent with the preparation of AEM's full unaudited financial statements at that date (except that the Estimated Closing Income Statement will not contain footnotes). The "Measurement Date" shall be May 31, 2016.

(b)    The Final Purchase Price shall be determined after the Closing in accordance with Section 2.5.

(c)    The Net Book Value of the Company shall be at least $9,276,954 ("*Required Net Book Value*") at the Closing, calculated in a manner consistent with AEM's financial statements and the example attached hereto as Schedule 2.2(b). To the extent the Net Book Value of the Company as of the Closing Date is in excess of the Required Net Book Value, Buyer shall pay Seller the amount of the excess within thirty (30) days of the Closing Date. To the extent the Net Book Value of the Company as of the Closing Date is less than the Required Net Book Value, Seller shall pay Buyer the amount of the difference within thirty (30) days of the Closing Date. An unaudited pro forma balance sheet of AEM for the period ending on the Closing Date (the "*Estimated Balance Sheet*") shall be prepared in a manner consistent with Schedule 2.2(b) and delivered to Buyer no later than 8:00 a.m. (PST) on the Closing Date.

2.5    Purchase Price and Adjustment Retained Amount Calculation.

(a)    The Purchase Price shall be adjusted, dollar-for-dollar, based on any adjustment in the income statement for AEM as provided in this Section 2.5. Upon the earlier to occur of (i) the Parties' agreement (or deemed agreement pursuant to Section 2.5(d)) below with

respect to the calculation of the final Purchase Price, or (ii) the delivery of any report of the Independent Accountant as provided in Section 2.5(d) with respect to the Purchase Price, as applicable, the Purchase Price shall be adjusted as follows:

(i)     if the Initial Purchase Price is greater than the Final Purchase Price, then the Purchased Price shall be reduced by (and Buyer shall withdraw (or retain) from the Retained Amount) an amount equal to the difference between the Initial Purchase Price and Final Purchase Price (the "*Adjustment*").  If the Retained Amount is insufficient to cover such Adjustment in full, then the Retained Amount shall be released to (or retained by) the Buyer and Seller shall pay to Buyer an amount equal to the difference between the Adjustment *less* the Retained Amount.  If the Retained Amount is greater than the amount of the Adjustment, then the remaining balance of the Retained Amount after payment of the Adjustment to the Buyer shall be paid to the Seller.  Any settlement of an Adjustment shall be paid by wire transfer within five (5) Business Days after the earlier to occur of the events described in Section 2.5(a); and

(ii)     if the Final Purchase Price is equal to or greater than the Initial Purchase Price, then Buyer shall (i) release the Retained Amount to the Seller, and (ii) pay an amount equal to the difference between the Final Purchase Price and the Initial Purchase Price, if any, by wire transfer of immediately available funds to the Seller within five (5) Business Days after the earlier to occur of the events described in Section 2.5(a).

(b)     As soon as practicable after the Closing, but in no event later than sixty (60) days after the Closing Date, Buyer shall prepare and deliver to the Seller an audited income statement as of the Measurement Date (the "*Measurement Date Income Statement*"), together with a calculation of the Purchase Price as of the Measurement Date, calculated in accordance with the methodology required to calculate the Estimated Income Statement in accordance with the formula set forth in Schedule 2.2(a) (the "*Final Calculation Statement*").

(c)     Seller shall have fifteen (15) days from receipt of the Final Calculation Statement to give Buyer written notice of objection to any item or calculation contained in the Final Calculation Statement specifying in reasonable detail all disputed items and the basis therefor (a "*Dispute Notice*").  If Seller concurs with the Final Calculation Statement or otherwise do not give Seller a Dispute Notice within such fifteen (15) day period, such Final Calculation Statement shall be deemed final and conclusive with respect to the determination of the Purchase Price, and shall be binding on the Parties for all purposes under this Agreement.  If, however, Seller delivers to Buyer a Dispute Notice objecting to any items or calculations contained in the Final Calculation Statement within the applicable fifteen (15) day period, the Parties shall meet within fifteen (15) days following the date of the Dispute Notice (in each case, the "*Resolution Period*") and shall attempt in good faith to resolve such objections and any written resolution by them as to any disputed amount shall be deemed final and conclusive with respect to the determination of the Purchase Price, and shall be binding on the Parties for all purposes under this Agreement.  Any amounts that were not timely disputed pursuant to a Dispute Notice (or if so disputed, subsequently resolved) may not be disputed. In all events the Final Calculation Statement shall be final and binding, except to the extent of those amounts timely identified in a Dispute Notice as disputed items and not resolved in accordance with this paragraph.

(d)     If the Parties are unable to resolve Seller's objections within the Resolution Period, then, no later than five (5) Business Days after the end of the applicable Resolution Period,

all amounts and issues remaining in dispute and Seller's responses thereto will be submitted by Seller and Buyer for review by the Independent Accountant. The Parties agree to execute, if requested by the Independent Accountant, a reasonable engagement letter with respect to the determination to be made by the Independent Accountant. The Independent Accountant will determine only those issues still in dispute at the end of the applicable Resolution Period and the Independent Accountant's determination will be based upon and consistent with the terms and conditions of this Agreement. The determination by the Independent Accountant will be based solely on presentations with respect to such disputed items by Buyer and Seller to the Independent Accountant and not on the Independent Accountant's independent review. Each of Buyer and Seller will use its commercially reasonable efforts to make its presentation as promptly as practicable following submission to the Independent Accountant of the disputed items, and each such Party will be entitled, as part of its presentation, to respond to the presentation of the other Party and any questions and requests of the Independent Accountant. Discovery shall be limited to documents designated by the Independent Accountant as necessary for it to assess the proper calculation of the Purchase Price, consistent with this Agreement. The Independent Accountant's determination will be made within thirty (30) days after its engagement, or as soon thereafter as possible, and will be set forth in a written statement delivered to Buyer and Seller. The Final Calculation Statement, as finalized by the Independent Accountant, shall be deemed final and conclusive with respect to the Purchase Price and shall be binding on Buyer and Seller for all purposes under this Agreement. In deciding any matter, the Independent Accountant (i) will be bound by the provisions of this Section 2.5 and (ii) may not assign a value to any item greater than the greatest value for such item claimed by either Buyer or Seller or less than the smallest value for such item claimed by Buyer or Seller. The fees and expenses of the Independent Accountant in resolving all such objections shall be borne by (i) Buyer in an amount equal to the proportion of the total disputed amount that the Independent Accountant finds in favor of Seller and (ii) Seller in an amount equal to the proportion of the total disputed amount that the Independent Accountant finds in favor of Buyer. Except as provided in the preceding sentence, all other costs and expenses incurred by the Parties in connection with resolving any dispute hereunder before the Independent Accountant will be borne by the Party incurring such cost and expense. "*Final Purchase Price*" means the Purchase Price as finally adjusted in accordance with this Section 2.5.

2.6    Earn-Out Payments.

(a)    Earn-Out Payments. Subject to the procedures specified below, the Principals may be entitled to contingent cash consideration payments (collectively, the "*Earn-Out Payments*") if the net operating income of the Business (inclusive only of the net income attributable to the Business) exceeds certain thresholds for the period starting on the Closing Date and ending on June 30, 2017 (the "*Year One Earn-Out Period*"), and for the period starting on the July 1, 2017 and ending on June 30, 2018 ("*Year Two Earn-Out Period*" and, together with the Year One Earn-Out Period, the "*Earn-Out Periods*"). The threshold amount for any Earn-Out Payment shall be $100,000 of net operating income during the applicable Earn-Out Period. Each Earn-Out Payment, if any, earned, shall be made by the Buyer to the Principals as set forth below:

(i)    Year One Earn-Out. No later than August 31, 2017, the Buyer shall pay the Principals an Earn-Out Payment equal to seventy-five percent (75%) of the net operating income of the Business during the Year One Earn-Out Period, which Earn-Out Payment shall not exceed Ten Million, Three Hundred Forty Thousand, Six Hundred Thirty-Six and 15/100ths Dollars ($10,340,636.15) (the "*Year One Earn-Out*").

5

(ii)     Year Two Earn-Out.  No later than August 31, 2018, the Buyer shall pay the Principals an Earn-Out Payment equal to equal to seventy-five percent (75%) of the net operating income of the Business during the Year Two Earn-Out Period *less* any losses during the Year One Earn-Out, which Earn-Out Payment shall not exceed the difference between Ten Million, Three Hundred Forty Thousand, Six Hundred Thirty-Six and 15/100ths Dollars ($10,340,636.15) and the Year One Earn-Out, if any (the "*Year Two Earn-Out*").

(b)     Earn-Out Statements.  Within twenty (20) Business Days following the end of the applicable Earn-Out Period, the Buyer shall prepare and deliver to the Seller Representative its calculation of the applicable Earn-Out Payment (the "*Earn-Out Statement*"), which statement shall be prepared and calculated in accordance with GAAP, applied on a basis consistent with the policies, procedures and practices utilized in the preparation of the financial statements of AEM.  The Earn-Out Statement shall include a reasonably detailed calculation of (i) the profits and losses of the Business for the applicable Earn-Out Period, and (ii) the amount, if any, of the Earn-Out Payment.

(c)     Objection Notice.  The Seller Representative shall have twenty (20) days from delivery of the Earn-Out Statement (the "*Objection Period*") to raise any objection thereto by delivery of written notice to the Buyer setting forth such objections in reasonable detail (the "*Objection Notice*").  During the Objection Period, the Seller Representative shall be entitled, subject to execution of a nondisclosure agreement, to access the books and records and employees and agents involved in the preparation of the Earn-Out Statement for purposes of determining any objections and preparing the Objection Notice; provided, however, that such access shall not unreasonably interfere with the conduct of the Business.  If the Seller Representative does not deliver an Objection Notice within the Objection Period, then the Earn-Out Statement shall be deemed final and binding on the parties.

(d)     Dispute.  In the event that an Objection Notice is delivered within the Objection Period, the Buyer and the Seller Representative shall attempt, in good faith, to resolve such objections and, if unable to do so within twenty-five (25) days after delivery of the Objection Notice, shall follow the dispute mechanism contemplated in Section 2.5 above.  The determination of the Independent Accountant shall be (i) in writing, (ii) delivered to the Buyer and the Seller Representative, and (iii) final and binding on the parties absent manifest error (the "*Final Determination*").  Subject to Section 2.2 and Section 8.2, the Buyer shall pay to the each Principal such Principal's Proportional Percentage of such Earn-Out Payment shown on the Final Determination within ten (10) Business Days after receipt of the Final Determination.  The fees and expenses of the Independent Accountant shall be borne equally by the Buyer (on the one hand) and the Seller Representative (on the other hand).

(e)     Allocation of Earn-Out Payments.  Each Earn-Out Payment shall be allocated among the Principals based on their Proportional Percentage, provided however:

(i)     in the event a Principal voluntarily terminates his employment with the Company between the Closing and June 30, 2017, such Principal shall not be entitled to receive his Proportional Percentage of the Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the Principal who voluntarily terminates his employment with the Company on or prior to June 30, 2017 to the remaining Principals' Proportional Percentages;

(ii)    in the event a Principal voluntarily terminates his employment with the Company between July 1, 2017 and June 30, 2018, such Principal shall not be entitled to receive his Proportional Percentage of the Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the Principal who voluntarily terminates his employment with the Company between July 1, 2017 and June 30, 2018 to the remaining Principals' Proportional Percentages; and

(iii)    in the event the Company terminates the employment of a Principal for Cause (as such term is defined in the Management Incentive Program) at any time, such Principal shall not be entitled to receive his Proportional Percentage of any unpaid Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the Principal whose employment with the Company is terminated for Cause to the remaining Principals' Proportional Percentages.

(iv)    The Company's termination of employment of a Principal without Cause (as such term is defined in the Management Incentive Program) shall not affect, reduce, change or eliminate such Principal's Proportional Percentage for purposes of the Earn-Out Payments.

(v)    The Parties acknowledge and agree that the Earn-Out Payments constitute compensation for services performed by the Principals as employees of the Company. Each Earn-Out Payment made to a Principal will be reported on such Principal's Form W-2 for the year in which the payment was made and will be reduced by required withholdings of applicable income and payroll Taxes.

2.7    Allocation.    The amount of the aggregate Purchase Price allocated to the noncompetition provisions contained in the Non-Competition & Non-Solicitation Agreement in the form attached hereto as Exhibit B (the "Non-Compete Agreement") shall be Five Hundred Thousand Dollars ($500,000). Buyer shall prepare an allocation of the remainder of the aggregate Purchase Price (together with other amounts deemed to be consideration for applicable income Tax purposes) among the assets of AEM (the "Purchase Price Allocation"). The Purchase Price Allocation shall be prepared in accordance with the applicable provisions of Section 1060 of the Code and the regulations thereunder, and in accordance with the principles set forth on Exhibit D. Buyer shall deliver such Purchase Price Allocation to Seller as soon as practicable after the determination of the Final Purchase Price. If Seller has any objection to the Purchase Price Allocation, it shall notify Buyer in writing of such objection within 15 days after receipt of the Purchase Price Allocation, specifying in reasonable detail its objections and its proposed modification to the Purchase Price Allocation (the "Dispute Notice"). Buyer and Seller shall act in good faith to resolve any disagreement over the Purchase Price Allocation. In the event that Buyer and Seller cannot agree on a mutually satisfactory Purchase Price Allocation within 60 days after the date of the Dispute Notice, the Parties shall submit the dispute to the Independent Accountant to determine the appropriate Purchase Price Allocation, with the understanding that the Independent Accountant shall resolve only the items set forth in the Dispute Notice. The determination of the Independent Accountant shall be final and binding upon the Parties. Each Party shall file all Tax Returns (including amended Tax Returns and claims for refund) in a manner reflecting the Purchase Price Allocation as finally determined in accordance with this Section 2.7. The Parties shall each execute and timely file a Form 8594 consistent with the Purchase Price Allocation, after exchanging mutually acceptable drafts of such form (and any equivalent state, municipal, county, local, foreign or other Tax forms).

7

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLING PARTIES

To induce the Buyer to enter into this Agreement, Seller, the Company, and each Principal, jointly and severally, hereby represents and warrants to Buyer as of the date hereof and as of the Closing Date, with respect to the Seller and AEM, as follows, except to the extent set forth in Seller's disclosure schedule, dated as of the date of this Agreement and attached to this Agreement as Schedule 3 (the "*Disclosure Schedule*"):

3.1     Organization and Authority.  Seller is duly organized, validly existing and in good standing as a limited liability company under the Laws of Florida and has the requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement and the Ancillary Agreements and to consummate the Contemplated Transactions.  AEM has the requisite power and authority to carry on the Business as currently conducted, and is duly qualified or otherwise authorized to do business in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified has not and would not reasonably be expected to, individually or in the aggregate, result in a Seller Material Adverse Effect.  All necessary corporate action and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the Contemplated Transactions have been duly taken or will be taken before execution of such documents or consummation of the related transaction, as applicable.  This Agreement has been, and each of the Ancillary Agreements will be, duly executed and delivered by Seller, and, assuming the due execution by Buyer of this Agreement and the Ancillary Agreements, constitute the legal, valid and binding obligations of Seller, enforceable against it in accordance with their terms, except as such enforceability may be limited by Laws applicable to receivership, bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and other similar Laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies or by general principles of equity.  Since its date of formation, Seller has not engaged in any business other than the Business. True, complete and correct copies of the articles of organization, and any amendment thereto (collectively, the "*Articles of Organization*"), and the operating agreement, and any amendments thereto (collectively, the "*Operating Agreement*"), of the Company in effect as of the date of this Agreement, have been previously made available to Buyer.

3.2     Capitalization of Seller.  Schedule 3.2 contains a complete and accurate capitalization table of AEM, setting forth the name of each member, the number and class of units held by each member, and the total number of units of each class that are outstanding.  Other than the units listed on such capitalization table, no units of any class of AEM's securities are issued or outstanding. Seller owns one hundred percent (100%) of the Membership Interests of AEM, which interest constitutes all outstanding equity securities of AEM  All of the Membership Interests: (i) have been duly and validly issued; (ii) are fully paid and nonassessable; (iii) were not issued in violation of any preemptive rights or rights of first refusal or first offer, any purchase or call option, subscription right or any similar rights and were offered, sold and issued in compliance with applicable Laws, including the securities Laws.  No prior sales or issuances of equity, or redemptions of outstanding equity, were completed in violation of any preemptive rights or rights of first refusal or first offer, any purchase or call option, subscription right or any similar rights and were offered, sold and issued, or redeemed, in compliance with applicable Laws, including the securities Laws.  The Seller has full capacity, power, legal right and authority to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by the Seller pursuant hereto and to carry out the transactions contemplated hereby and thereby.  All of the Membership Interests have been duly

8

authorized and legally issued, and fully paid and nonassessable. Upon consummation of the Contemplated Transactions, the Buyer will be the owner of the Membership Interests, which in the hands of the Buyer shall be duly authorized and legally issued, fully paid and nonassessable, and free and clear of all Encumbrances, other than pursuant to the Securities Laws. There are no subscriptions, options, warrants, calls, commitments, preemptive rights or other rights of any kind outstanding for the purchase of, or any securities convertible or exchangeable for, any units of ownership of the Company. Except as set forth in Schedule 3.2, there are no restrictions upon, or obligations with respect to, the voting or transfer of the Membership Interests. AEM has no subsidiaries and does not own any interest in any other Person.

3.3    No Conflict.

(a)    The execution, delivery and performance by Seller of this Agreement and any of the Ancillary Agreements, and the consummation by Seller of the Contemplated Transactions, will not:

(i)    violate or conflict with Seller's or AEM's charter documents, including their respective articles of organization or operating agreements, as amended;

(ii)    assuming the receipt of Seller Governmental Approvals and Third Party Consents, violate any provision of Law to which Seller or the conduct of the Business is subject or violate or conflict with any Order applicable to Seller or the conduct of its Business;

(iii)    assuming the receipt of Seller Governmental Approvals and Third Party Consents, violate, breach or constitute a default (with or without notice or lapse of time or both) under or give rise to a right of termination, cancellation or acceleration of any right, remedy or obligation of Seller or any of its applicable Affiliates with respect to any Material Contract to which Seller is a party; or

(iv)    result in the creation of any Encumbrance other than a Permitted Encumbrance on any of the assets of Seller.

(b)    Except for notices or consents listed on Schedule 3.3(b) (the "*Seller Governmental Approvals and Third Party Consents*"), the execution, delivery and performance by Seller of this Agreement, the Ancillary Agreements and the consummation by Seller of the Contemplated Transactions do not require any consent from, registration, declaration or other filing with or approval or authorization of any Agency, other Governmental Authority or other third party by or with respect to Seller or the Business.

(c)    There are no rights of first refusal, rights of first offer or other similar rights of any Person that would be applicable to any of the Contemplated Transactions or the execution, delivery or performance by Seller under this Agreement or any of the Ancillary Agreements.

3.4    Absence of Certain Changes or Events.

(a)    Except as set forth on Schedule 3.4(a), since January 1, 2016 AEM has been operating the Business in the Ordinary Course of Business.

9

(b)     Except as set forth on Schedule 3.4(b), since January 1, 2016, there has not been (i) any material damage, destruction or loss, whether or not covered by insurance with respect to any material portion of AEM's assets, (ii) any change in financial or tax accounting methods, principles or practices by AEM, except insofar as may have been required by a change in GAAP or applicable Law, (iii) any Tax election or change in Tax election or any settlement or compromise of any Tax Liability, (iv) any revaluation by AEM of any of its assets, (v) any licensing or other agreement with regard to the acquisition or disposition of any material assets or rights thereto, or (vi) any Seller Material Adverse Effect.

3.5     No Brokers.     Except as contemplated in Section 2.3(b)(iii), no agent, broker, investment banker, financial advisor or other Person is or will be entitled to any broker's or finder's fee or any other similar commission or fee from Seller or any of its Affiliates in connection with any of the Contemplated Transactions.

3.6     Financial Statements.

(a)     True, correct and complete copies of the audited balance sheet and the related statements of income, of member's equity and of cash flows of AEM at December 31, 2013, December 31, 2014 and December 31, 2015, including the footnotes thereto (the "*Audited Financial Statements*"), and the unaudited balance sheet and the related statements of income, of member's equity and of cash flows of AEM at March 31, 2016 (the "*Interim Financial Statements*", together with the Audited Financial Statements, the "*Seller Financial Statements*"), have been delivered to Buyer by Seller. The Financial Statements are based on the books and records of AEM, and fairly present, the financial position and results of operations of AEM, as of the date or for the periods indicated therein, in accordance with GAAP (except, in the case of the Interim Financial Statements, for the omission of footnotes required in accordance with GAAP and subject to normal year-end adjustments). All business currently conducted through AEE shall be conducted through AEM after the Closing such that AEM will capture all revenue and net profits previously projected for AEE.

(b)     AEM maintains internal controls over financial reporting designed to provide assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, including policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of AEM, (ii) are designed to provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of AEM are being made only in accordance with authorizations of the board of directors (or comparable management group) of AEM, and (iii) are designed to provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of AEM that could have a material effect on Seller Financial Statements.

3.7     Contracts and Commitments.

(a)     Except for this Agreement, the Ancillary Agreements and Mortgage Loan documents, including loan applications and Serviced Mortgage Loans documents, Schedule 3.7 sets forth, with respect to AEM, a complete list of each (i) material (for the purposes of this item (i) material means an obligation requiring the payment of more than $10,000 per annum in the aggregate in any consecutive twelve month period) Contract not made in the Ordinary Course of Business; (ii) each warehouse agreement and each other Contract relating to the borrowing or lending of money in excess of $50,000 or Guarantee of any such obligation; (iii) Contract that by its terms limits the

payment of dividends or distributions by AEM or that by its terms either requires AEM to do business with the contract party on an exclusive basis or restricts or limits AEM from owning, managing or operating any business or in any geographical location (including non-competition agreements); (iv) Contract that is a joint venture or partnership agreement; (v) Contract that grants any right of first refusal, right of first offer or similar right to third parties, or that limits or purports to limit the ability of AEM to pledge, sell, transfer or otherwise dispose of any material amounts of assets or business; (vi) Contract providing for any future payments that are conditioned, in whole or in part, on a change of control with respect to AEM; (vii) agency, broker, sale representative, loan referral, marketing or similar Contract; (viii) Contract that contains a "most favored nation" clause obligating AEM to change the material terms and conditions of such Contract based on better terms or conditions provided to other parties in similar contracts; (ix) Contract relating to (A) any merger or business combination concerning AEM, (B) the acquisition by AEM of all or substantially all of the assets of any other Person, or (C) the disposition by AEM of all or substantially all of its assets to any other Person; (x) Contract with AEM, any manager, director, officer, employee or Affiliate of AEM; (xi) Servicing Agreement; and (xii) other Contract involving aggregate annual expenditures or revenues in excess of $50,000 (the contracts of the type covered in clauses (i) through (xii), the "*Material Contracts*").

(b)     Except as set forth in Schedule 3.7(b), (i) each Material Contract is valid and binding on AEM, in full force and effect and is valid and binding on the other parties thereto, except as such enforceability may be limited by Laws applicable to receivership, bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and other similar Laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies or by general principles of equity, and (ii) AEM (and, to the Knowledge of Seller, any counterparty thereto) has performed all obligations required to be performed by it to date under each Material Contract.  AEM is not in default in any material respect under any Material Contract, and there has not occurred any event that, with the lapse of time or giving of notice or both, would constitute such a default.

3.8     Absence of Undisclosed Liabilities.  AEM has no material Liability (contingent or otherwise), including with respect to (a) any deferred compensation arrangements with any person employed or formerly employed by AEM or (b) any business, operations or activities conducted or undertaken pursuant to joint venture or partnership arrangements except (i) as specifically disclosed or reserved against in Seller Financial Statements or on Schedule 3.8, (ii) for liabilities incurred in the Ordinary Course of Business consistent with past practice since the date of the Interim Financial Statements, or (iii) for obligations arising out of future performance under Material Contracts.

3.9     Real Property.

(a)     Schedule 3.9(a) sets forth the parties to and dates of each office leased or subleased by AEM (the "*Office Leases*"), date of execution and expiry date, the rent, the location, the particulars of any options to renew, particulars of any requirement necessary for AEM to continue the Office Lease, and, with respect to the real property owned by AEM (the "*Real Property*"), the locations (including municipal addresses) and the terms of any outstanding mortgage of such property.

(b)     AEM has a good and marketable title of the Real Property, free and clear of all Encumbrances, except Permitted Encumbrances, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and

subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(c)     AEM has valid, binding and enforceable leasehold interests under the Office Leases, free and clear of all Encumbrances, except Permitted Encumbrances, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). The Office Leases are in full force and effect, and AEM has not received any notice of any default or event that with notice or lapse of time, or both, would constitute a default under the Office Leases and no party to the Office Leases is in default or has exercised any termination rights with respect thereto. AEM has no obligation to enter into any office lease or sublease other than the Office Leases.

(d)     AEM has all material Permits of any Governmental Authority required under applicable Law for the current use and operation of the Business under the Office Leases, and AEM has fully complied with all conditions of the Permits applicable to it. No material default or violation, or event that with the lapse of time or giving of notice or both would become a material default or violation, has occurred in the due observance of any Permit.

(e)     There does not exist any actual, threatened or contemplated condemnation or eminent domain proceedings that affects any Office Lease or any part thereof, and AEM has not received any notice of the intention of any Governmental Authority or other Person to take or use all or any part thereof.

3.10    Intellectual Property.

(a)     AEM owns or otherwise has the right to use (free and clear of any Encumbrances other than a Permitted Encumbrance) all Company Intellectual Property, including all Company Intellectual Property material to the conduct of the Business as set forth on and as limited by Schedule 3.10(a).

(b)     Except as set forth in Schedule 3.10(b), AEM, the conduct of the Business as presently conducted by AEM, and Company Intellectual Property are not infringing upon the rights of any Person with regard to any Intellectual Property owned by such Person. No Person is infringing on or otherwise violating any right of AEM with respect to any Company Intellectual Property.

(c)     There is no outstanding Order by or with any Governmental Authority relating to any of Company Intellectual Property by which AEM is bound.

(d)     Set forth on Schedule 3.10(d) is a true, correct and complete list of all licenses, agreements, authorizations and permissions pursuant to which AEM uses any one or more items of Intellectual Property licensed from third parties in connection with the Business ("*Licensed IP Agreements*"), other than software that is generally commercially available at retail. Seller has delivered to Buyer correct and complete copies of each of the Licensed IP Agreements. Each of the Licensed IP Agreements is legal, valid, binding, enforceable and in full force and effect. AEM has performed all obligations imposed upon it under each of the Licensed IP Agreements, and is not in breach of any of the Licensed IP Agreements, and no other party to any of the Licensed IP Agreements is in breach thereof. AEM has not granted any sublicense or similar right with respect to

any Licensed IP Agreement. AEM has not received any notice that the other parties to the Licensed IP Agreements intend to cancel, terminate or refuse to renew the same or to exercise or decline to exercise any option or right thereunder. Consummation of the Contemplated Transactions will not cause a breach of any of the Licensed IP Agreements.

(e)    Except as set forth on Schedule 3.10(e), no action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand is pending or threatened against AEM, that challenges the legality, validity, enforceability, or ownership of, or the right of AEM to use, any one or more items of the Intellectual Property owned or used by AEM in connection with the Business.

3.11    Transactions with Affiliates.  Except with respect to any distributions, salaries or bonuses payable pursuant to written Contracts set forth on Schedule 3.11 and any business expense reimbursement payments (or advances) and other similar payments made or payable in the ordinary course, there are no Contracts with, outstanding amounts payable to or receivable from, or outstanding advances by AEM to Seller, to any director, manager or officer of AEM or any Affiliates of AEM other than AEE.

3.12    Litigation and Orders.

(a)    Litigation.  Schedule 3.12(a) sets forth a true, correct and complete list of all material claims or Actions pending or threatened against AEM, or any of its Affiliates relating to or involving the conduct of the Business.

(b)    Orders.  Except as disclosed on Schedule 3.12(b), there is no Order relating to or involving AEM, the conduct of the Business by AEM or Seller with respect to the Business.  AEM is not in breach or default (with or without notice or lapse of time, or both) under any Order.

3.13    Employment Matters; Benefit Plans.

(a)    Except as set forth on Schedule 3.13(a), none of the Employees are bound by employment agreements.

(b)    Schedule 3.13(b) sets forth a list of all Company Benefit Plans.  Seller has made available to Buyer complete and correct copies of each Company Benefit Plan, including any amendments thereto.

(c)    Each Company Benefit Plan has been operated and administered in accordance with the terms of such Plan and applicable Law, including ERISA and the Code, except to the extent that any noncompliance would not reasonably be expected to result in a material Liability to AEM.

(d)    AEM does not maintain, participate in, contribute to, or have any obligation to contribute to, and has never maintained, participated in, or contributed to, or had any obligation to contribute to (i) a Company Benefit Plan subject to Title IV of ERISA; (ii) a multiemployer plan within the meaning of Section 3(37) of ERISA; or (iii) a Company Benefit Plan subject to the minimum funding standards of Section 412 of the Code or Section 302 of ERISA.  For the purposes of this Section 3.13(d), the term "*Company*" includes AEM and any Person that would have been treated as a single employer with AEM under Section 414(b), (c), (m) or (o) of the Code.

11

(e)      AEM has not made any promises or incurred any Liability under any Company Benefit Plan or otherwise to provide health or other welfare benefits to employees (or their spouses or dependents) following retirement or other termination of employment, except as specifically required by Law or as disclosed on Schedule 3.13(e). Except as set forth on Schedule 13.3 (e), AEM is not a party to any agreement, contract, plan or other arrangement (whether or not written and whether or not a Company Benefit Plan) that is a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code and the Treasury Regulations promulgated thereunder.

(f)      Except as otherwise provided in this Agreement, the execution of this Agreement and consummation of the contemplated Transactions do not constitute a triggering event under any Company Benefit Plan or other arrangement or agreement that will or may result in any payment, acceleration, vesting or increase in benefits to any Employee or former Employee of AEM which could be payable by AEM or Buyer on or after the Closing Date.

3.14      Labor Relations. None of the Employees is a member of, represented by or otherwise subject to any (a) labor union, works council or similar organization or (b) collective bargaining agreement. With respect to the Employees, AEM is, and has been, in compliance with all applicable Laws and Orders with respect to labor relations, employment and employment practices, occupational safety and health standards, terms and conditions of employment, payment of wages, classification of employees, immigration, visa, work status and workers' compensation, and is not engaged in any unfair labor practices. There is no unfair labor practice charge or complaint against AEM pending or, to the Knowledge of AEM, threatened before the National Labor Relations Board or any comparable Governmental Authority. There is no labor dispute or strike pending or threatened in writing, against AEM that would reasonably be expected to interfere with the operation of the Business. AEM has not initiated any plant or facility closing or mass layoff which would trigger any obligations under the WARN Act.

3.15      Compliance with Laws. Except as set forth on Schedule 3.15, AEM and its Affiliates are in compliance with all Laws and Mortgage Loan Requirements applicable to the conduct of the Business. Except as set forth on Schedule 3.15, neither AEM nor its Affiliates has received any communication from any Governmental Authority, the substance of which has not been resolved, regarding any actual or potential violation of, or failure to comply with, any Law or Mortgage Loan Requirements. No fact or circumstance exists that could reasonably be expected to give rise to a claim by any Investor, Insurer, Governmental Authority, Regulatory Authority or other Person based on AEM's failure to comply with any Law or Mortgage Loan Requirements.

3.16      Regulatory Matters. Except as set forth on Schedule 3.16, none of AEM, nor any of its managers, officers, directors or Employees or any of their respective Affiliates, including Seller, is or in the last five (5) years has been, in connection with conduct of the Business by AEM, a party to or is subject to any suspension, debarment, outstanding order, decree, agreement, finding, memorandum of understanding or similar supervisory arrangement with, or a commitment letter or similar submission to, or extraordinary supervisory letter from, any Investor, Insurer or any Governmental Authority charged with the supervision or regulation of residential mortgage lenders (including the Agencies) or the supervision or regulation of AEM and its Employees (each, a "*Regulatory Authority*"). Except as set forth on Schedule 3.16, no current or former officer and no Mortgage Loan Originator or other current personnel of AEM has been indicted, arraigned or convicted (or has been in the last five (5) years or currently is under investigation) for any criminal offenses, any dishonesty or fraudulent activity related to the origination, servicing or sale of

Mortgage Loans or the conduct of the Business. Except for normal examinations conducted by a Regulatory Authority in the ordinary course of business of AEM, no Governmental Authority or Regulatory Authority has initiated or, to the Knowledge of AEM, threatened, any material proceeding or investigation into the business or operations of AEM that is ongoing or pending. There is no unresolved violation by any Governmental Authority or Regulatory Authority with respect to any report or statement relating to any examinations or investigation of AEM or any Employee.

3.17    Permits.  Except as set forth on Schedule 3.17, AEM and its applicable Employees have all of the Permits that are required to carry on the Business as presently conducted by AEM. AEM is (i) an approved servicer, seller/servicer or issuer, as applicable, of Mortgage Loans for HUD, FNMA, FHLMC, GNMA, FHA and VA, (ii) properly licensed and qualified to do business and in good standing in each jurisdiction in which such licensing and qualification is necessary to act as the servicer under any Servicing Agreement and applicable Law, and (iii) qualified to act as the servicer under each Servicing Agreement, and no event has occurred which would make AEM unable to comply with all such eligibility requirements or which would require notification to FNMA, FHLMC, GNMA, FHA or VA.  Except as set forth on Schedule 3.17, AEM and its applicable Employees have complied in all material respects with all requirements in connection with such Permits and such Permits are in full force and effect and, to the Knowledge of Seller, no suspension or cancellation of any of them has been threatened and the Permits will not be subject to suspension, modification or revocation as a result of this Agreement or the consummation of the Contemplated Transactions.  AEM has not received any notice or other written communication from any Governmental Authority or Regulatory Authority that such Governmental Authority or Regulatory Authority intends to terminate or restrict AEM's status as an approved participant in its programs involving the Business for which AEM is as of the date hereof registered, approved or authorized.

3.18    Mortgage Loans.

(a)    Portfolio Information.

(i)    Seller has previously delivered to Buyer, in agreed form and, as of the date hereof (which will be updated as of the Closing Date), the following information with respect to each Mortgage Loan:

(A)    the loan number;

(B)    the unpaid principal balance and original term to maturity;

(C)    the payment status;

(D)    the monthly principal and interest payments;

(E)    the monthly escrow payment;

(F)    the interest rate, and whether such interest rate is adjustable;

(G)    the state in which the secured property is located;

(H)    the identity of the Agency or Investor; and

(1)      whether such Mortgage Loan is secured by a first or second lien.

(ii)      Seller has previously delivered to Buyer, in agreed form, certain information with respect to each Pipeline Loan, including, without limitation, the proposed loan amount, interest rate, loan type, and closing date, as of the date hereof (which will be updated as of the Closing Date).

(b)      Each Mortgage Loan sold by AEM was eligible for sale to, insurance by, or pooling to back securities issued or guaranteed by, the applicable Investor or Insurer upon such sale, issuance of insurance or pooling. Each Mortgage Loan held by AEM intended for sale by AEM is eligible for sale under the agreement with the related Investor. No Investor or Insurer has taken, or threatened to take any action, and there exists no fact or circumstance that would entitle the applicable Insurer or Investor to take any action, including, but not limited to (i) demand from AEM either repurchase of any Serviced Mortgage Loan or Previously Disposed of Mortgage Loan (the "*Repurchase Obligation*") or to refuse to purchase a Mortgage Loan, (ii) impose on AEM sanctions, penalties or special requirements in respect of any Mortgage Loan, or (iii) rescind any insurance policy or reduce insurance benefits in respect of any Mortgage Loan that would result in a breach of any obligation of AEM under any Contract. Each Pipeline Loan complied with Mortgage Loan Requirements for the stage of processing that had been achieved as of the Closing Date based on the Investor or Insurer program under which AEM originated such Pipeline Loan, including but not limited to compliance with applicable Laws and procurement of requirement settlement services (e.g., appraisal, title and insurance). AEM has handled each REO in accordance with Mortgage Loan Requirements.

(c)      Each Mortgage Loan held by AEM is evidenced by a Mortgage Note and is duly secured by a valid first lien or, if applicable, second Mortgage on the related Mortgaged Property, in each case, on such forms and with such terms that comply with all Mortgage Loan Requirements. Each Mortgage Note and the related Mortgage is genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting generally the enforcement of creditors' rights and the discretion of a court to grant specific performance. All parties to the Mortgage Note and the Mortgage had legal capacity to execute the Mortgage Note and the Mortgage and each Mortgage Note and Mortgage has been duly and properly executed by such parties. Each Mortgage Loan is not subject to any rights of rescission, set-off, counterclaim or defense (other than payment), including the defense of usury, or will with operation of any of the terms of the Mortgage Note or the Mortgage be unenforceable by AEM, in whole or in part, or subject to any right of rescission (except any Mortgage Loans that are closed but not funded), set-off, counterclaim or defense (other than payment), including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto. All Mortgage Loan files are complete and have been maintained in accordance with applicable Mortgage Loan Requirements. For purposes of this Section 3.18, references to Mortgage Notes shall be deemed to include mortgage notes in respect of REO.

(d)      AEM and each Originator have complied with applicable Mortgage Loan Requirements in all material respects.

(e)      There has not been any fraudulent action on the part of any Person (including without limitation any borrower, appraiser, builder or developer, credit reporting agency, settlement agent, realtor, broker or correspondent) in connection with the origination of any Mortgage Loan or

Pipeline Loan or the application of any insurance proceeds with respect to a Mortgage Loan or the Collateral for which AEM is responsible to the applicable Investor or Insurer.

(f)     The Servicing of all Mortgage Loans subject to Servicing Agreements, and otherwise, has complied in all material respects with all applicable Mortgage Loan Requirements.

(g)     All Custodial Funds accounts required to be maintained by AEM have been established and continuously maintained in accordance with Mortgage Loan Requirements. All Custodial Funds account balances required by the Mortgage Loans and paid to AEM for the account of the Mortgagors under the Mortgage Loans have been credited to the appropriate account in accordance with the Mortgage Loan Requirements. Subject to and in accordance with Mortgage Loan Requirements pertaining generally to the type, size, rating or capitalization of depository institution qualified to hold such balances, AEM has the right and power to determine the financial institution in which the Custodial Funds accounts are held.

(h)     Each appraisal made in connection with the origination of a Mortgage Loan or, if applicable, a Pipeline Loan, was performed in accordance with Mortgage Loan Requirements.

(i)     All flood and hazard insurance policies with respect to Mortgage Loans were obtained where required by applicable Law and are in compliance with Mortgage Loan Requirements.

(j)     There are no taxes, ground rents, water charges, sewer rents, assessments (including assessments payable in future installments), insurance premiums, leasehold payments or other outstanding charges affecting the related Mortgaged Properties (i) with respect to any Mortgage Loans held by AEM or REO and (ii) with respect to any Serviced Mortgage Loan (except those items which, if unpaid, are not obligations of AEM under Mortgage Loan Requirements), in each case that are past due and for which a penalty is payable.

3.19     Environmental Matters. Except as set forth on Schedule 3.19 hereto, AEM has all Permits required for the conduct of the Business as presently conducted under applicable Environmental Laws ("Environmental Permits") and is in compliance with all terms and conditions of such Environmental Permits and all applicable Environmental Laws. AEM has not received any communication concerning any violation or alleged violation of any Environmental Law or any alleged Liability involving the presence of or exposure to any Hazardous Substance. There are no Orders outstanding, or any Actions pending, relating to compliance by AEM with or any Liability under any Environmental Law affecting AEM.

3.20     Taxes.

(a)     Each of Seller and AEM has timely filed, subject to permitted extensions, all Tax Returns that it was required to file. All such Tax Returns were correct and complete and were prepared in compliance with all applicable Laws. All Taxes owed by Seller and AEM (whether or not shown or required to be shown on any Tax Return) have been paid. There are no outstanding claims in any jurisdiction in which Seller or AEM does not file Tax Returns that such entity is or may be subject to taxation by that jurisdiction.

(b)     Each of Seller and AEM has withheld and paid all Taxes, social security and any other applicable withholdings required to have been withheld and paid in connection with any

17

amounts paid or owing to any employee, independent contractor, creditor, member or other third party, and all forms required with respect thereto have been properly completed and timely filed.

(c)　　No federal, state, local or foreign audits, examinations, investigations or other administrative proceedings or court proceedings are currently ongoing, pending or threatened with regard to any Taxes or Tax Returns of Seller or AEM. There are no claimed, proposed, or asserted Tax deficiencies or assessments of Tax with respect to Seller or AEM that have not been fully paid.

(d)　　None of Seller, AEM or AEE has waived any statute of limitations in respect of Taxes or has agreed to any extension of time with respect to a Tax assessment or deficiency.

(e)　　None of Seller or AEM has any obligation to make a payment that is not deductible under Sections 280G or 162(m) of the Code.

(f)　　There are no liens for Taxes upon any asset of AEM, except for Permitted Encumbrances.

(g)　　AEM will not be required to include any item of income in, or exclude any item of deduction from, income for any Tax period (or portion thereof) ending after the Closing Date as a result of any (i) change in method of accounting made on or prior to the Closing Date pursuant to Code Section 481(a) (or any comparable provision of applicable Law), (ii) closing agreement described in Code Section 7121 (or any comparable provision of applicable Law), (iii) installment sale or open transaction disposition made on or prior to the Closing Date, or (iv) prepaid amount received on or prior to the Closing Date.

(h)　　AEM is, and has been since 2010 been, properly treated as either an entity treated as a partnership or as an entity "disregarded as an entity separate from its owner," within the meaning of Treasury Regulation Section 301.7701-2, and since 2010 no election has ever been made under Treasury Regulation Section 301.7701-3 to cause AEM to be treated as an association taxable as a corporation for U.S. federal income Tax purposes during said period.

(i)　　Each of Seller and AEM has disclosed on its federal income Tax Returns all positions taken that could give rise to a substantial understatement of federal income Tax within the meaning of Section 6662 of the Code. None of Seller or AEM is a party to any Tax allocation or sharing agreement. None of Seller or AEM (a) has been a member of an affiliated group filing a consolidated federal income Tax Return or (b) has any Liability for the Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any other similar provision of state, local or non-U.S. law) as a transferee or successor, by contract or otherwise.

3.21　　Risk Management Instruments. All material interest rate swaps, caps, floors, option agreements, futures and forward contracts and other similar risk management arrangements (all of which are listed on Schedule 3.21) were entered into (i) in accordance with commercially reasonable business practices and all applicable Laws and (ii) with counterparties believed to be financially responsible at the time, and each of them constitutes the valid and legally binding obligation of AEM, enforceable in accordance with its terms (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles) and is in full force and effect. Neither AEM nor any other party thereto, is in breach of any of its obligations under such agreement or arrangement.

18

3.22    Insurance.  Seller has previously disclosed all material insurance Contracts and policies of insurance relating to the Business (other than title insurance policies or insurance policies relating materially to loans which AEM Services) that name AEM as an insured party thereunder. All such insurance Contracts and insurance policies are in full force and effect.  AEM is not in material default thereunder, and all claims thereunder have been filed in a timely fashion.

3.23    Advances; Receivables.

(a)    The Advances reflected in the Interim Financial Statements, and those to be reflected on the Closing Date Balance Sheet, are or will be valid and subsisting amounts owing to AEM and are carried on the books of AEM at values determined consistent with the applicable policies, procedures and methodologies currently employed by AEM.  Except as set forth in Schedule 3.23, no Investor has claimed or has threatened to claim any material defense, offset or counterclaim to repayment of any outstanding Advance that is pending.

(b)    The accounts receivable reflected on the Interim Balance Sheet, and those to be reflected on the Closing Date Balance Sheet, have or will have arisen from bona fide transactions in the ordinary course of business of AEM and are or will be valid obligations of the respective makers thereof and are not and will not be subject to material setoffs or claims, except for the amounts properly reserved for doubtful or uncollectible accounts as reflected on the Interim Financial Statements or the Closing Date Balance Sheet, as the case may be.

3.24    No Regulatory Impediment.  To the Knowledge of Seller, there are no facts relating to AEM, AEM or the conduct of Business that might reasonably be expected to impair AEM's, Seller's or Buyer's ability to obtain all consents, orders, authorizations and approvals from Governmental Authorities or Regulatory Authorities necessary for the consummation of the Contemplated Transactions.

3.25    Statements Made; Diligence Materials.  Subject to applicable Knowledge or materiality limitations contained in the relevant provisions of this Agreement, no representation, warranty or statement made by Seller, or document that is within the control of Seller, in connection with this Agreement, or any exhibit, Schedule, data tape, statement or certificate furnished to Buyer by Seller or, to Seller's Knowledge, by any other Person on Seller's behalf who is not an Employee, in connection with the Contemplated Transactions contains or will contain, as of the date provided or date stated in such materials, any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.  All due diligence information that Seller has provided to Buyer in connection with this Agreement, whether provided directly, made available in an electronic data room at provided by Seller through Teraverde Management Advisors ShareFile Folders entitled (i) AEMC Disclosure Schedules for RPM KLGates Attachments to Schedules at https://teraverde.sharefile.com/app/#home/shared/foa3d6f5-c62f-418a-a8b1-f4d8e6e35bf8;  and,  (ii)  American  Eagle  Data  Room  at https://teraverde.sharefile.com/app/#home/shared/foc90f37-70d9-460d-ba6b-3f7f604f33bf    or otherwise, is true, accurate and complete as of the date provided or specified therein.  All due diligence information that Seller has provided to Buyer in connection with this Agreement is true, accurate and complete as of the date provided or specified therein.  If at any time prior to the Closing, Seller becomes aware of any inaccuracy, misstatement or omission with respect to any Schedule delivered pursuant to this ARTICLE II, Seller shall notify Buyer promptly after becoming so aware and shall promptly provide Buyer with a corrected Schedule.  No matter included on such corrected Schedule shall affect Seller's indemnification obligations under ARTICLE VIII, and any such matter

may be taken into account by Buyer in determining whether any condition to closing has been satisfied, unless Buyer consents to such correction, which consent may be withheld in Buyer's sole discretion, provided, however, the Closing of the Contemplated Transactions hereunder shall evidence Buyer's consent to such correction or waiver of the applicable condition to closing.

3.26    [Intentionally Left Blank].

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the date hereof and as of the Closing Date as follows:

4.1    Organization, Authority.   Buyer is duly organized and validly existing and in good standing as a corporation under California law.  Buyer has all corporate power and authority to enter into this Agreement and to consummate the Contemplated Transactions.  All necessary corporate action and other proceedings required to be taken by Buyer to authorize the execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the Contemplated Transactions have been duly taken.  This Agreement has been, and each of the Ancillary Agreements will be, duly executed and delivered by or on behalf of Buyer and, assuming the due execution by Seller and the Selling Parties of this Agreement and the Ancillary Agreements, constitute the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by Laws applicable to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and other similar Laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies or by general principles of equity.

4.2    No Conflict.

(a)    Except as set forth on Schedule 4.2(a), the execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the Contemplated Transactions will not:

(i)    violate or conflict with the organizational documents of Buyer;

(ii)    assuming the receipt of Buyer Governmental Approvals, violate any provision of Law to which Buyer is subject or violate or conflict with any Order applicable to Buyer; or

(iii)    violate, breach or constitute a default (with or without notice or lapse of time or both) under or give rise to a right of termination, cancellation or acceleration of any right, remedy or obligation under any term or provision of any Material Contract to which Buyer is a party which breach could reasonably be expected to result in a Buyer Material Adverse Effect.

(b)    Buyer has obtained or will have obtained Buyer Governmental Approvals, and the execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the Contemplated Transactions do not require any consent from, registration, declarations

or other filing with or approval or authorization of any Agency, other Governmental Authority or any other third party.

4.3     Financial Ability.  Buyer has immediate access to all funds necessary to pay the Purchase Price and related fees and expenses, and Buyer has the financial capacity to perform all of its other obligations under this Agreement.

4.4     No Brokers.  Except for the fee of Seven Hundred and Fifty Thousand Dollars ($750,000.00) owed by Buyer to NVD Consulting, Inc., no agent, broker, investment banker, financial advisor or other Person is or will be entitled to any broker's or finder's fee or any other similar commission or fee from Buyer or any of its Affiliates in connection with any of the Contemplated Transactions.

## ARTICLE V
## COVENANTS

5.1     Covenants of Seller.  Seller hereby covenants and agrees as follows:

(a)     Pre-Closing Access.  Prior to the Closing, Seller shall (i) give Buyer and its Representatives reasonable access to the officers, management, agents, books, records, offices and other facilities and properties of AEM during mutually agreeable business hours and (ii) furnish to Buyer and its Representatives such information concerning AEM and the Business that is reasonably requested by Buyer or its Representatives; provided, however, that any such access shall be granted at reasonable times during normal business hours and in such a manner as not to interfere with the normal business operations of AEM.  No investigation by Buyer or its Representatives pursuant to this Section 5.1(a) shall affect or be deemed to modify any representation or warranty made by AEM or the Selling Parties herein.

(b)     Ordinary Conduct.  From and after the date hereof and prior to the Closing Date or the earlier termination of this Agreement, except (i) as consented to in writing by Buyer, (ii) to the extent required to comply with any Law, (iii) as set forth on Schedule 5.1(b), or (iv) as otherwise contemplated by this Agreement, Seller shall cause AEM to:

(i)     conduct the Business in the Ordinary Course of Business, including with respect to the management of its working capital;

(ii)    not make any capital expenditure or commitment for capital expenditures in excess of $50,000 in the aggregate unless approved by Buyer in writing in advance;

(iii)   use its best efforts to (i) maintain AEM's company or other existence in good standing, (ii) preserve the business organization in a commercially reasonable manner, (iii) retain the Employees, (iv) maintain complete and accurate business and accounting records relative to the Business, (v) preserve the goodwill of the suppliers, customers and others having business dealings with AEM, (vi) maintain AEM's assets in good condition and repair, subject to ordinary wear and tear, (vii) maintain procedures for protection of Company Intellectual Property, and (viii) maintain presently existing insurance coverages with respect to the Business; and

(iv)     not enter into, amend or terminate any Material Contract except in the Ordinary Course of Business;

(v)     not increase or decrease its work force except specifically set forth on Schedule 5.1(h)(v), not enter into any employment agreement with any Person, and not grant any salary, wage or compensation increase or increase any employee benefit for any Employee (including incentive, commission or bonus payments), except in either case to satisfy contractual obligations existing as of the date hereof, which have been disclosed to Buyer;

(vi)     except for the sale of Mortgage Loans in the Ordinary Course of Business, not sell, transfer, assign, pledge, lease, license or otherwise dispose of or encumber any of AEM's assets in one transaction or a series of related transactions having a value in excess of $10,000;

(vii)     not sell, transfer, assign, pledge, lease, license or otherwise dispose of or encumber the Real Property;

(viii)     not cancel any debt or waive or compromise any claim or right relating to the Business in one transaction or a series of related transactions having a value in excess of $10,000;

(ix)     not incur, assume or Guarantee or otherwise become responsible for any Indebtedness;

(x)     not enter into any joint venture, partnership or other similar arrangement, form any other new material arrangement for the conduct of its Business (including any new marketing or loan referral agreement) or purchase any material assets or securities of any Person;

(xi)     not terminate, cancel or amend any material insurance coverage with respect to the assets or activities of the Business that is not replaced by an adequate amount of insurance coverage at reasonable cost;

(xii)     not merge or consolidate with or into any other Person or permit any other Person to merge or consolidate with or into it;

(xiii)     not transfer, mortgage, encumber or otherwise dispose of any of Pipeline Loans other than in the Ordinary Course of Business;

(xiv)     except as necessary in order to comply with applicable Laws or this Agreement, not make any material changes in its policies and practices with respect to (a) underwriting, pricing, originating, acquiring or buying or selling Mortgage Loans or rights to Service Mortgage Loans or (b) hedging the Pipeline Loans;

(xv)     not make any changes to its accounting methods, practices or policies, except as may be required by Law or under GAAP, in each case as concurred in writing by AEM's independent public accountant;

22

(xvi)   not settle or consent to the settlement of any action filed or otherwise instituted against it, any of its Affiliates, or any officer or director of it or any of their respective Affiliates, or related to AEM's Business, if such settlement would contain any relief against or otherwise affect AEM's assets, the Business or AEM's operation of the Business;

(xvii)   not enter into any new master loan sale agreements with any Investors or originate any new loan products or materially modify any existing loan products;

(xviii)   maintain all existing state and federal governmental licenses, permits, registrations, consents and approvals;

(xix)   not declare or pay any dividend on its units, distribute profits, eliminate receivables or payables between AEM and any of its Affiliates, or transfer assets of AEM to any of its Affiliates, except for payments for services to AEE in the ordinary course of business;

(xx)   not (i) issue any units or other equity interests, or rights, warrants or options to purchase its units or other equity interests, (ii) split, combine or reclassify any of its units or other equity interests, or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for units or (iii) purchase, redeem or otherwise acquire any units or other equity interests, or any other securities thereof or any rights, warrants or options to acquire any such units, interests or other securities except for the redemption of certain membership interests disclosed in Section 3.2 of the Disclosure Schedule;

(xxi)   not amend its charter documents, including its articles of organization or operating agreement;

(xxii)   not make any tax election or settle or compromise any Tax Liability, or agree to an extension of a statute of limitations for taxes;

(xxiii)   take any action that is intended or may reasonably be expected to result in any of its representations and warranties set forth in this Agreement being or becoming untrue at any time prior to the Closing Date, or in any of the conditions set forth in ARTICLE VII not being satisfied or in a violation of any provision of this Agreement;

(xxiv)   engage in any transaction with, or enter into any agreement, arrangement, or understanding with, directly or indirectly, any officer, director, Key Employees or any of their respective Affiliates, or make any payment or distribution to any officer, director, Key Employees, or any of their respective Affiliates (other than payments for services as an officer, director, or Employee of Seller), except for transactions in the Ordinary Course of Business consistent with past practice or involving immaterial amounts or terms or pursuant to the Contracts listed in Schedule 3.7;

(xxv)   enter into, establish, adopt or amend (except as may be required by applicable Laws) any pension, retirement, stock option, stock purchase, savings, profit sharing, deferred compensation, consulting, bonus, group insurance or other employee benefit, incentive or welfare contract, plan or arrangement, or any trust agreement (or similar arrangement) related thereto, in respect of any current or former director, officer, employee or other service

provider of or to AEM or take any action to accelerate the vesting or exercisability of stock options, restricted stock or other compensation or benefits payable thereunder;

(xxvi)  other than in the Ordinary Course of Business, acquire (other than by way of foreclosures or acquisitions of control in a bona fide fiduciary capacity or in satisfaction of debts previously contracted in good faith) all or any portion of the assets, business, deposits or properties of any other entity;

(xxvii)  close or relocate any offices at which the Business is conducted or open any new offices or enter into any new leases except as set forth on Schedule 5.1(h); and

(xxviii)  not agree to do any of the foregoing.

5.2     Cooperation.  Buyer, Seller and the Selling Parties shall cooperate with each other at their own cost and expense and use (and shall cause their respective Affiliates to use) commercially reasonable efforts to take or cause to be taken all actions, and to do or cause to be done all things necessary, reasonably proper or advisable under this Agreement and applicable Law to consummate the Contemplated Transactions and enable Buyer to operate the Business after the Closing, including: (i) the obtaining of all necessary consents and approvals from Governmental Authorities, Regulatory Authorities and third parties, (ii) taking of all steps as may be necessary to lift any injunction or other legal bar in order to consummate Contemplated Transactions.

5.3     Publicity.  None of the Parties hereto shall issue any press release or other public announcement, or otherwise communicate with the media, concerning the Contemplated Transactions without the prior consent of the others, or after the Closing without the prior consent of Buyer, except as such release or announcement may be required by Law, in which case Party shall notify the other Parties and, to the extent possible, allow other Parties reasonable time to comment on such release or announcement in advance of the issuance.

5.4     Further Assurances.  On and after the Closing Date, and for no additional consideration, the Parties will take all appropriate action and execute all documents, instruments or conveyances of any kind that may be reasonably necessary or advisable to carry out any of the provisions hereof or to more effectively complete the Contemplated Transactions.

5.5     Exclusivity.  Until the termination of this Agreement pursuant to Section 9.3 or the Closing, whichever is sooner, Seller and the Selling Parties shall not, and shall not permit AEM or any of its Affiliates to, directly or indirectly, through any Representative or otherwise, initiate, solicit, encourage, negotiate or discuss with any third party (including by way of furnishing non-public information concerning AEM or any of its Affiliates, or their respective businesses, assets or properties), or take any other action to facilitate any inquiries with respect to or the making of, any proposal that constitutes or may reasonably be expected to lead to a Competing Transaction.  For purposes hereof, the term "*Competing Transaction*" shall mean any proposal with respect to the acquisition of any of AEM or any subsidiary or their respective materials, assets or properties other than as contemplated by this Agreement.

5.6     Notification of Certain Matters.  Seller shall give prompt written notice to Buyer, and Buyer shall give prompt written notice to Seller, of the occurrence or non-occurrence of any Event that is likely to result in the failure of a condition set forth in ARTICLE VII; provided, however, that

the delivery of any notice pursuant to this Section 5.6 shall not limit or otherwise affect the remedies available hereunder to a Party receiving such notice.

     5.7    Tax Matters.

     (a)    Tax Returns. Seller shall prepare or cause to be prepared all Tax Returns of AEM in a manner consistent with past practice, for any Tax period ending on or before the Closing Date (each such period, a "*Pre-Closing Tax Period*"). Seller shall provide a copy of such Tax Returns to Buyer no less than thirty (30) days prior to the filing due date. No later than fifteen (15) days following receipt of such Tax Returns from Seller, Buyer shall inform Seller of any disagreements with such Tax Returns or inform Seller that it is approving the filing of such Tax Returns. Buyer and Seller shall work in good faith to resolve any such disagreements as soon as possible and in any event before such Tax Returns are due to be filed. Buyer shall prepare or cause to be prepared all Tax Returns of AEM for any Straddle Period, and shall provide a copy of such Tax Returns to Seller no less than thirty (30) days prior to the filing due date. No later than fifteen (15) days following receipt of such Tax Returns from Buyer, Seller shall inform Buyer of any disagreements with such Tax Returns or inform Buyer that it is approving the filing of such Tax Returns. Buyer and Seller shall work in good faith to resolve any such disagreements as soon as possible and in any event before such Tax Returns are due to be filed. Buyer shall timely file or cause to be timely filed the Tax Returns for any Pre-Closing Tax Period or Straddle Period, provided that, no later than five (5) days prior to the due date for each such Tax Return, Seller shall pay to Buyer, as applicable, the full amount of any Taxes due with such Tax Returns for Pre-Closing Tax Periods or otherwise attributable to the applicable Pre-Closing Tax Period, or Seller's share of the Taxes due with respect to any Straddle Period (determined in accordance with Section 5.7(b)).

     (b)    Straddle Period. In the case of a Straddle Period: (i) the amount of any Taxes based on or measured by income, gains, or receipts of AEM for the portion of such Straddle Period through the end of the Closing Date will be determined based on an interim closing of the books as of the close of business on the Closing Date; and (ii) the amount of any other Taxes of AEM for a Straddle Period that relate to the portion of such Straddle Period through the end of the Closing Date will be deemed to be the total amount of such Taxes for the Straddle Period multiplied by a fraction, (A) the numerator of which is the number of days in the Straddle Period up to and including the Closing Date, and (B) the denominator of which is the total number of days in such Straddle Period.

     (c)    Tax-Sharing Agreements. All contracts, agreements, or other arrangements regarding the sharing or allocation of either Liability for Taxes or payment of Taxes to which AEM is a party or by which AEM is bound will be terminated as of the Closing Date (and will have no further effect for any Tax period).

     (d)    Cooperation. Seller and Buyer shall cooperate reasonably in (i) preparing and filing all Tax Returns with respect to AEM, including the furnishing or making available during normal business hours of records, personnel (as reasonably required), books of account, powers of attorney and other materials reasonably necessary or helpful for the preparation of such Tax Returns and (ii) giving the other party timely written notice of and responding to any inquiries, audits or similar proceedings by any Governmental Authority of AEM.

     (e)    Transfer Taxes. The Selling Parties will (i) be responsible for and timely pay all transfer, documentary, sales, use, value added, goods and services, stamp, registration, and similar Taxes arising in connection with or as a result of the transactions contemplated by this Agreement,

and (ii) properly prepare and timely file, at their own expense, all Tax Returns with respect to such Taxes.

     5.8    Building Loan Mortgage. The Company is the borrower on a building loan mortgage in the amount of $440,000 ("Building Mortgage"). The Company agrees to keep the Building Mortgage in place and to continue to make the required monthly payments thereunder. If RPM decides to keep the Building Mortgage in place post Closing, then RPM and the Company agree to use commercially reasonable efforts to: (a) negotiate with the Building Mortgage lender the release of John Schrenkel, John Goede, and David Berry from their personal guarantees of the Building Mortgage or (b) refinance the Building Mortgage through another lender to remove the personal guarantees of John Schrenkel, John Goede, and David Berry for the Building Mortgage.

     5.9    Warehouse Line Guarantees. Each of the Principals is a guarantor under a Warehouse Credit Agreement with Comerica Bank and First Tennessee Bank (the "Warehouse Credit Agreements"). RPM and the Company agree to use commercially reasonable efforts to: (a) negotiate with the warehouse credit lenders the release of John Schrenkel, John Goede, and David Berry from their personal guarantees of the Warehouse Credit Agreements or (b) close down the warehouse credit lines and establish one or more new lines to accommodate the Company's funding needs.

     5.10    Liquidation of AEE. The Selling Parties agree to liquidate AEE after the Closing, to not conduct AEM related business via AEE or any other entity, and to direct all AEE business and revenue opportunities to AEM after the Closing.

## ARTICLE VI
## EMPLOYEES

     6.1    Key Employees.    The Key Employees shall have entered into employment agreements with AEM in a form agreed to by Buyer.

     6.2    At-Will Employment; Employees. After the Closing, Buyer shall be entitled to cause AEM to modify any compensation or benefits provided to any Employee and any other terms or conditions of employment with any Employee in its sole discretion. Notwithstanding the foregoing, Buyer intends that as of the Closing Date AEM will continue to maintain current employment and compensation levels for its Employees. Nothing contained in this Agreement shall be construed as an offer of employment or contract between Buyer and any Employee and no Employee shall be considered a third party beneficiary of the provisions of this ARTICLE VI.

## ARTICLE VII
## CONDITIONS TO CLOSING

     7.1    Conditions to the Obligations of Buyer, the Selling Parties, and Seller.   The respective obligations of Buyer, on the one hand, and the Selling Parties and Seller, on the other hand, to effect the Contemplated Transactions shall be subject to the satisfaction or waiver by Buyer, the Selling Parties, and Seller at or prior to the Closing Date of the following: (i) no Law that restrains, enjoins or otherwise prohibits the Contemplated Transactions shall have been enacted, adopted or promulgated or be in effect, (ii) no Order that materially impairs, restrains, enjoins or otherwise prohibits the Contemplated Transactions shall have been issued, entered or enforced or be in effect and (iii) no action or proceeding by a Governmental Authority seeking such an Order shall be pending.

7.2    Conditions to the Obligations of Buyer.  The obligation of Buyer to effect the Contemplated Transactions shall be subject to the satisfaction or written waiver by Buyer at or prior to the Closing Date of the following conditions (provided, however, the Closing of the Contemplated Transaction shall constitute the waiver of any condition contained herein absent a written agreement between Seller and Buyer otherwise):

(a)    Representations and Warranties.  All representations and warranties of the Selling Parties and Seller contained in this Agreement:

(i)    that are qualified as to materiality or Seller Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct, as of the date of this Agreement (or in the case of any representation and warranty that specifically relates to an earlier date, as of such earlier date), and

(ii)    shall be true and correct as of the Closing Date as though made on and as of the Closing Date (or in the case of any representation and warranty that specifically relates to an earlier date, as of such earlier date), except for the failure or failures of such representations and warranties to be so true and correct that (after excluding any effect of materiality or Seller Material Adverse Effect qualifications set forth in any such representation or warranty) they have not had and would not have, individually or in the aggregate, a Seller Material Adverse Effect.

(b)    Covenants and Agreements.  The Seller and the Selling Parties shall have performed all of the covenants and agreements required to be performed by them under this Agreement prior to the Closing.

(c)    Officer's Certificate.  Seller shall have delivered to Buyer a certificate from a duly authorized officer, dated as of the Closing Date, stating that the conditions specified in subsections (a) and (b) of this Section 7.2 have been satisfied.

(d)    Secretary's Certificate.  The Seller shall have delivered to Buyer a certificate of Seller's secretary certifying that it has company authority to execute this Agreement and consummate the Contemplated Transactions.

(e)    No Seller Material Adverse Effect.  A Seller Material Adverse Effect shall not have occurred.

(f)    Government Approvals and Third Party Consents.  Seller shall have obtained Seller Governmental Approvals and Third Party Consents set forth on Schedule 3.3(b).

(g)    Closing Deliveries.  Seller and the Selling Parties shall have delivered (i) all of the closing deliveries set forth in Section 2.3(a); (ii) assignments, representing the Membership Interests, duly endorsed for transfer to Buyer and otherwise in form acceptable for transfer on the books of AEM; and (iii) resignations effective immediately following the Closing of the directors, managers, and officers of AEM as set forth on Schedule 7.1(g).

(h)    Key Employees.  The Key Employees shall have executed employment agreements or offer letters with Buyer or its assign, in substantially the form attached hereto as Exhibit C ("*Employment Agreement(s)*"), effective as of the Closing Date.

(i)      Executed Settlements.  Seller shall have received and delivered to Buyer executed settlements of all repurchase and indemnity claims from the three largest Investors of AEM as of the date hereof (which Investors are set forth on Schedule 7.2(i)).

(j)      Insurance for AEM.  AEM shall, at its cost, on or prior to the Closing Date, have caused Buyer to become a primary beneficiary under the existing life insurance policies on the Key Employees.

(k)      Insurance Policies.  AEM shall have purchased, at its cost, on or prior to the Closing Date, all of the tail-end insurance policies for Seller as Buyer may reasonably request, on terms and conditions satisfactory to Buyer.

(l)      Termination of Certain Contractual Commitments.  AEM shall have amended, revised, modified or terminated, at its cost, the Contracts as set forth on Schedule 7.2(l).

(m)      Office Leases.  AEM shall have entered into a long term leases for the Office Leases designated by Buyer, on terms and conditions satisfactory to Buyer, and the parties shall have agreed to the terms and conditions of a long term lease of at least three (3) years for the Real Property, which lease may not become effective until a sale of the Real Property.

(n)      Legal Opinions.  Buyer shall have received legal opinions of Baker & Hostetler, LLP and such other counsel reasonably acceptable to Buyer, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer and its counsel.

(o)      Non-compete.  The Key Employees shall have entered into a non-compete agreement in the form attached hereto as Exhibit C.

(p)      Office Lease.  New office lease in the form attached hereto as Exhibit F.

(q)      Net Book Value.  The Net Book Value calculated in accordance with GAAP and consistent with past practice shall not be less than the Required Net Book Value at the Closing.

(r)      Due Diligence.  Buyer shall have completed its due diligence, to its satisfaction, by end of business on July 11, 2016, with any mutually agreed upon actions to be taken or implemented before the Closing.

(s)      FIRPTA Affidavit.  Seller shall have provided to Buyer a non-foreign affidavit, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, and reasonably acceptable to Buyer, duly executed by Seller and stating that Seller is not a "foreign person" as defined in Section 1445 of the Code.

(t)      Other Documents.  All such other documents as Buyer may reasonably request in order to consummate the Contemplated Transactions.

7.3      Conditions to the Obligations of Seller.  The obligation of Seller and the Selling Parties to effect the Contemplated Transactions shall be subject to the satisfaction or written waiver by Seller at or prior to the Closing Date of the following conditions:

(a)     Representations and Warranties.  All representations and warranties of Buyer contained in this Agreement:

(i)     that are qualified as to materiality or Buyer Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct, as of the date of this Agreement (or in the case of any representation and warranty that specifically relates to an earlier date, as of such earlier date), and

(ii)     shall be true and correct as of the Closing Date as though made on and as of the Closing Date (or in the case of any representation and warranty that specifically relates to an earlier date, as of such earlier date), except for the failure or failures of such representations and warranties to be so true and correct that (after excluding any effect of materiality or Buyer Material Adverse Effect qualifications as set forth in any such representation or warranty) they have not had and would not have, individually or in the aggregate, a Buyer Material Adverse Effect.

(b)     Covenants and Agreements.  Buyer shall have performed all of the covenants and agreements required to be performed by it under this Agreement prior to the Closing.

(c)     Government Approvals.  Buyer shall have obtained Buyer Governmental Approvals.

(d)     Closing Deliveries.  Buyer shall have delivered all of the closing deliveries set forth in Section 2.3(b).

(e)     Employment Agreements. The Buyer shall have executed the Employment Agreements with the Key Employees effective as of the Closing Date.

(f)     Office Lease. New office lease in the form attached hereto as Exhibit F.

(g)     Other Documents.  All such other documents as Seller may reasonably request in order to consummate the Contemplated Transactions.

## ARTICLE VIII
## INDEMNIFICATION

8.1     Survival of Representations, Warranties and Covenants  All of the representations and warranties of Seller and the Selling Parties contained in ARTICLE III and all of the representations and warranties of Buyer contained in ARTICLE IV shall survive the Closing and continue in full force and effect for a period of twenty-four (24) months thereafter (the "*General Survival Period*"), except that the representations and warranties in Sections 3.3(a)(ii), 3.3(b), 3.9, 3.12, 3.13, 3.14, 3.16, 3.17, 3.18(b), 3.18(i), 3.18(j), 3.19, 3.20 and 3.24 (collectively "*Special Representations*") shall survive the Closing and continue in full force and effect until the fifth (5th) anniversary of the Closing Date ("*Limited Survival Period*") and the representations and warranties in Sections 3.1, and 3.2 shall survive the Closing and continue in full force and effect perpetually.

Except as otherwise provided in this Section 8.1, Buyer may not seek indemnification under this ARTICLE VIII with respect to a breach of a representation or warranty after the expiration of the applicable Survival Period.  The foregoing limitations shall not apply with respect to (i) those specific pending claims for indemnification for which the requisite written notice was given by

Buyer to the Seller and the Selling Parties of Buyer's claim for indemnification on or prior to the end of the applicable Survival Period for which the requisite written notice shall effectively toll such time limitation until such specific claims are resolved, (ii) fraud, in which case the applicable representations and warranties shall survive the Closing and continue in full force and effect until the expiration of the applicable statutes of limitations (after giving effect to any extensions or waivers), or (iii) under subparagraphs 8.2(b) through 8(d). The Parties' respective covenants and agreements to be performed at or after the Closing Date contained in this Agreement shall survive indefinitely unless otherwise set forth herein; provided, however, that any such survival shall not be deemed, directly or indirectly, to affect the applicable Survival Period for representations and warranties.

8.2 Indemnification by the Selling Parties and Seller. Subject to the limitation of Sections 8.1 and 8.4, Seller and the Selling Parties, jointly and severally, agree to indemnify Buyer and its Representatives (collectively, the "*Buyer Indemnified Parties*") and hold them harmless against any Losses or claimed Losses that any of Buyer Indemnified Parties actually suffer or incur or be forced to defend (or in the event of (b) or (c) below, Losses incurred by Seller after the Closing) that are caused by or are a result of or related to:

(a) any inaccuracy in or breach of any representation or warranty of Seller or any Selling Party contained in this Agreement without regard to any materiality, Seller Material Adverse Effect or Knowledge qualifier, and any Knowledge of Buyer with respect to any matters, direction or indirectly, related to any such disclosures;

(b) any breach of, or failure to perform, any covenant or agreement of Seller or the Selling Parties contained in this Agreement; and

(c) any Repurchase Obligation with respect to a Previously Disposed of Mortgage Loan or Mortgage Loan (excluding Pipeline Contracts) approved by the underwriter but not funded until after the Closing, whether accrued or not accrued or the closing balance sheet (collectively, "*Buyer Losses*").

(d) all Taxes of Seller, (ii) all Taxes of AEM relating to all taxable periods ended on or before the Closing Date, and (iii) the portion of Taxes of AEM attributable to the portion of any Straddle Period beginning as of the first day of such Straddle Period and ending as of the Closing Date (calculated in the manner provided in Section 5.7(b)).

8.3 Indemnification by the Buyer of Seller and Selling Parties. Buyer agrees to indemnify Seller and the Selling Parties and their Representatives (collectively, the "Seller Indemnified Parties") and hold them harmless against any Losses or claimed Losses that any of Seller Indemnified Parties actually suffer or incur or be forced to defend, and will reimburse Seller and Selling Parties, for any Losses arising from or in connection with:

(a) any breach of any representation or warranty made by Buyer in this Agreement or in any certificate, document, writing or instrument delivered by Buyer pursuant to this Agreement; and

(b) any breach of any covenant or obligation of Buyer in this Agreement or in any other certificate, document, writing or instrument delivered by Buyer pursuant to this Agreement.

8.4    Determination of Losses; Method of Asserting Claims.

(a)    With respect to the obligations of the Selling Parties as provided in Section 8.2 above, "*Indemnified Parties*" shall refer to a Buyer Indemnified Parties and the "*Indemnifying Parties*" shall refer to the Selling Parties a obligated to indemnify such Indemnified Parties. With respect to the obligations of Buyer as provided in Section 8.3 above, "*Indemnified Parties*" shall refer to a Seller Indemnified Parties and the "*Indemnifying Parties*" shall refer to the Buyer.

(b)    In the event that any of the Indemnified Parties is (i) made a defendant in or party to any Action, instituted by any third party that may result in Losses (any such third-party Action being referred to as a "*Third-Party Action*") or (ii) otherwise receives a claim or demand by any third party that may result in Losses (any such third-party claim or demand being referred to as a "*Claim*"), the Indemnified Party shall notify the Indemnifying Party in writing, and in reasonable detail, of the Third-Party Action or Claim within ten (10) Business Days after receipt by such Indemnified Party of written notice of the Third-Party Action or Claim; provided, however, that, notwithstanding the foregoing, with respect to any Third-Party Action or Claim, the Indemnified Party shall deliver to the Indemnifying Party copies of all notices, documents and court papers within seven (7) Business Days of the Indemnified Party's receipt thereof. Such notice of the Third-Party Action or Claim from the Indemnified Party shall contain a reference to the section of this Agreement upon which the Indemnified Party is basing its claim for indemnification, the facts giving rise to the basis for the claim and the amount of the Liability asserted against the Indemnifying Party. The failure to give such notice shall not relieve the Indemnifying Party of its obligations hereunder (or limit such obligations) except to the extent that it shall have been prejudiced by such failure.

(c)    With respect to any Third-Party Action or Claim, the Indemnifying Party shall have the sole and absolute right (which may be exercised by Buyer in the event that a Seller Indemnified Party and a Buyer Indemnified Party are the subject of the same Third-Party Action or Claim or Third-Party Actions or Claims brought by the same Person but arising out of the same set of circumstances and both Seller Indemnified Party and Buyer Indemnified Party are asserting a claim for indemnification hereunder), upon written notice thereof to the Indemnified Party provided within twenty (20) Business Days of its receipt of the notice of the Third-Party Action or Claim, at its option and at its own expense, to be represented by counsel of its choice and to control and assume the defense of such Third-Party Action or Claim; provided, however, that the Indemnified Party may participate in any such Third-Party Action or Claim with counsel of its choice and at its own expense. The Parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Third-Party Action or Claim and cooperate in such a manner as to preserve in full (to the extent possible) the confidentiality of all confidential information and the attorney-client and work-product privileges. Notwithstanding the foregoing, to the extent that (i) the Indemnifying Party elects not to defend such Third-Party Action or Claim (or fails to elect such defense within the twenty (20) Business Days period referred to above) and the Indemnified Party defends against or otherwise handles any such Third-Party Action or Claim, or (ii) in the reasonable opinion of counsel for the Indemnified Party, there is a conflict or potential conflict of interest between the Indemnified Party and the Indemnifying Party in such Third-Party Action or Claim, then in each case (A) the Indemnified Party may retain counsel of its own choosing, with the reasonable fees and expenses of one law firm for the Indemnified Parties being at the expense of the Indemnifying Party, and the Indemnified Party may control and assume the defense of such Third-Party Action or Claim and (B) the Indemnifying Party may participate in such defense with counsel of its choice and at its own expense. Neither the Indemnifying Party nor the Indemnified Party may settle any Third-Party Action or Claim which settlement obligates the other Party to pay money,

31

perform obligations or admit Liability without the consent of the other Party, which consent will not be unreasonably withheld; provided, however, if the Indemnifying Party requests the Indemnified Party to accept a proposed financial settlement or financial compromise as the primary aspect of any such settlement with respect to any Third-Party Action or Claim and the Indemnified Party withholds its consent thereto, the obligation of the Indemnifying Party to the Indemnified Party under this ARTICLE VIII with respect to such Third-Party Action or Claim shall not thereafter exceed the aggregate amount that the Indemnifying Party would have paid hereunder in connection with such settlement or compromise (including reimbursable expenses to the date thereof). After (i) any final judgment or award shall have been rendered by a Governmental Authority and the time in which to appeal therefrom has expired, (ii) a settlement shall have been consummated or (iii) the Indemnified Party and the Indemnifying Party shall arrive at a mutually binding agreement with respect to any matter alleged to be indemnified by the Indemnifying Party hereunder, the Indemnified Party shall forward to the Indemnifying Party notice of any sums due and owing by it with respect to such matter and the Indemnifying Party shall pay all of the sums so owing to the Indemnified Party by wire transfer, certified or bank cashier's check within ten (10) Business Days after the date of such notice.

(d)     In the event that any Indemnified Party should have a claim against any Indemnifying Party that does not involve a Third-Party Action or Claim, the Indemnified Party shall deliver a notice of such claim to the Indemnifying Party, setting forth in reasonable detail the identity, nature and estimated amount of Losses related to such claim or claims, with reasonable promptness and in any event prior to the expiration of the Indemnifying Party's indemnification obligation hereunder. If the Indemnifying Party notifies the Indemnified Party that the Indemnifying Party disputes the claim described in such notice, the Indemnifying Party and the Indemnified Party will proceed in good faith to negotiate a resolution of such dispute for a period of at least thirty (30) days. If the Indemnifying Party disputes its Liability to the Indemnified Party for the amount of the claim described in such notice and all or any part of such amount is subsequently determined in any settlement or final resolution by lawsuit to be owed to the Indemnified Party, Indemnifying Party shall promptly, upon such settlement or resolution, pay such amount.

(e)     Notwithstanding any other provision in this ARTICLE VIII, Buyer shall be entitled to indemnification only if and to the extent the aggregate Indemnifiable Amounts exceed Thirty-Seven Thousand Five Hundred Dollars ($37,500) (the "Threshold Amount"), provided that, at such time as the amount to which Buyer is entitled to the indemnified exceeds the Threshold Amount Buyer shall be entitled to be indemnified from the first dollar up to the full Indemnifiable Amount. Notwithstanding any other provision in this Agreement, Seller and the Selling Parties' indemnification obligations described in this ARTICLE VIII shall be satisfied against payments due but not yet paid to the Principals under the Earn-Outs and the Economic Interests. In addition, the Selling Parties and the Seller's obligation to Buyer under this ARTICLE VIII shall not exceed the aggregate amount of the Earn-Outs plus the Economic Interests; provided, however, that such obligations and liabilities to Buyer arising out of fraud committed by Seller or the Selling Parties shall not be subject to the limitation described in this Section 8.4(e).

(f)     All indemnification and other payments under this ARTICLE VIII will, to the extent permitted by law, be treated for all Tax purposes as adjustments to the Earn-Out. Neither the Buyer nor the Seller will take any position on any Tax return, or before any Governmental Authority, that is inconsistent with such treatment unless otherwise required by any applicable Law.

(g)     An Indemnified Party shall take commercially reasonable steps to mitigate indemnifiable Losses to the extent required to do so by applicable Law.

(h)     Notwithstanding anything herein to the contrary, from and after the Closing, the sole and exclusive remedy for any breach or failure to be true and correct, or alleged breach or failure to be true and correct, of any representation or warranty or any covenant or agreement in this Agreement by the Selling Parties (other than claims of fraud), shall be indemnification in accordance with this ARTICLE VIII.  Notwithstanding the foregoing, this Section 8.4(h) shall not operate to limit the rights of the parties to seek equitable remedies (including specific performance or injunctive relief).  This Section 8.3(h) shall not affect the right of a party to pursue any remedy expressly permitted by any Ancillary Agreement.

## ARTICLE IX
## MISCELLANEOUS

9.1     Assignment.  This Agreement and the rights hereunder shall not be assignable or transferable by any Party hereto without the prior written consent of the other Parties hereto; provided, however, that Buyer shall have the right to assign this Agreement (a) to any of its Affiliates or (b) in connection with a sale of interests or by operation of Law in connection with a conversion, merger or in connection with the sale of substantially all of its assets after the Closing; provided, however, that (i) Buyer shall be and remain liable to Seller and Selling Parties for all obligations of Buyer under this Agreement, the Ancillary Agreements, and the other documents and instruments to be executed and delivered by Buyer pursuant hereto and (ii) RPM Mortgage, Inc., a California corporation, shall be liable to Seller for any obligations arising directly and exclusively from this Agreement (whether or not this Agreement has been assigned to it) and expressly not for any liabilities arising from the Ancillary Agreements or any other documents or instructions to be executed and delivered by Buyer pursuant hereto other than to vote in favor of the transactions contemplated herein.  Notwithstanding the above, this Agreement shall inure to the benefit of, and be binding upon and enforceable against, the respective successors and permitted assigns of the Parties.

9.2     No Third-Party Beneficiaries.  Except for the provisions of ARTICLE VIII relating to Indemnified Parties, this Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and nothing herein expressed or implied shall give or be construed to give to any Person (including Employees), other than the Parties and such respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

9.3     Termination.

(a)     This Agreement may be terminated by written notice:

(i)     by the mutual written consent of Seller and Buyer;

(ii)     by either Seller or Buyer, if the Closing shall not have occurred on or before August 31, 2016, (the "*Termination Date*") (unless the failure to consummate the Contemplated Transactions is attributable to a failure on the part of the Party seeking to terminate the Agreement);

33

(iii) by either Seller or Buyer, if (A) any Governmental Authority that must grant a required Governmental Approval has denied such approval and such denial has become final and nonappealable and Buyer does not waive the requirement of such approval or (B) any Governmental Authority shall have issued a final nonappealable Order enjoining or otherwise prohibiting the consummation of the Contemplated Transactions;

(iv) by Buyer, if it is not in material breach of its obligations under this Agreement, and if (A) at any time that any of the representations and warranties of Seller or Seller herein become untrue or inaccurate such that Section 7.2(a) would not be satisfied or (B) there has been a breach on the part of Seller or Seller of any of its covenants or agreements contained in this Agreement such that Section 7.2(b) would not be satisfied, and, in both case (A) and case (B), such breach (if curable) has not been cured within ten (10) days after Buyer has provided written notice of such breach to Seller;

(v) by Seller, if it and the other Selling Parties are not in material breach of their obligations under this Agreement, and if (A) at any time that any of the representations and warranties of Buyer herein become untrue or inaccurate such that Section 7.3(a) would not be satisfied or (B) there has been a breach on the part of Buyer of any of its covenants or agreements contained in this Agreement such that Section 7.3(b) would not be satisfied, and, in both case (A) and case (B), such breach (if curable) has not been cured within ten (10) days after Seller has provided written notice of such breach to Buyer; or

(vi) by Buyer, if Buyer is not satisfied with the results of its due diligence by 5:00 p.m. (EST) on July 11, 2016.

(b) In the event of termination by Seller or Buyer pursuant to Section 9.3(a), written notice thereof shall forthwith be given to the other Parties, this Agreement shall become void and have no effect and the Contemplated Transactions shall be terminated without further action by any Party. If the Contemplated Transactions are terminated as provided herein:

(i) Buyer shall return to Seller all documents and other material received from Seller or its respective Affiliates or Representatives relating to the Contemplated Transactions, whether so obtained before or after the execution hereof;

(ii) all confidential information received by Buyer with respect to the Business shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement; and

(iii) the provisions of this ARTICLE IX shall remain in full force and effect.

(c) In no event shall any termination of this Agreement limit or restrict the rights and remedies of a Party hereto against any other Party which has breached any of the agreements or other provisions of this Agreement prior to termination hereof.

9.4 Expenses. Except as otherwise provided herein, Seller, AEM, Principals, and Buyer will each be liable for its own costs and expenses incurred in connection with the negotiation, preparation, execution or performance of this Agreement, whether or not the Closing shall have occurred. Notwithstanding anything contained herein to the contrary, if the Agreement is terminated due to the violation of Section 5.5 hereof, Buyer shall be entitled to a payment of $100,000 from

Seller, plus a reimbursement of all reasonable fees and costs Buyer has incurred in connection with the negotiation, preparation, execution or performance of this Agreement and the Contemplated Transactions, which amount shall be payable by wire transfer of immediately available funds.

9.5    Amendment and Modification. This Agreement may not be amended except by an instrument or instruments in writing signed and delivered on behalf of each of the Parties hereto.

9.6    Notices. All notices and other communications hereunder shall be in writing and shall be deemed given (a) on the date of delivery if delivered personally, (b) on the date of transmission if sent via facsimile transmission or email to the facsimile number or email address given below, and, in the case of facsimile transmission, telephonic confirmation of receipt is obtained promptly after completion of transmission, (c) on the Business Day after delivery to a reputable nationally recognized overnight courier service or (d) upon receipt after being mailed by registered or certified mail (return receipt requested) to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

> If to Buyer, to:
> RPM Mortgage, Inc.
> 3240 Stone Valley Road West
> Alamo, CA 94507
> Attention: Robert Hirt, CEO
> Facsimile: 925 944 8910
> Email: RHirt@rpm-mtg.com

> With a copy to:
> K&L Gates, LLP
> 4 Embarcadero, Suite 1200
> San Francisco, CA 94111
> Attention: Lars Johansson
> Email: lars.johansson@klgates.com

> If to Seller:
> c/o JDI Management, LLC
> 8950 Fontana Del Sol Way
> Suite 100
> Naples, FL 34109
> ATTN: John C. Goede, Manager
> Email: jgoede@gadclaw.com

> With a copy to:
> Henderson, Franklin, Starnes & Holt, P.A.
> 1715 Monroe Street
> Fort Myers, FL 33901
> Attention: Guy E. Whitesman
> Email: guy.whitesman@henlaw.com

> If to Selling Parties, to:
> c/o JDI Management, LLC
> 8950 Fontana Del Sol Way

35

Suite 100
Naples, FL 34109
ATTN: John C. Geode, Manager
Email: jgoede@gadclaw.com

Such addresses may be changed from time to time by means of a notice given in the manner provided in this Section 9.6; provided that no such notice shall be effective until it is received by the other Parties hereto.

9.7     Governing Law.

(a)     This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware applicable to contracts executed in and to be performed in that state. All Actions arising out of or relating to this Agreement shall be heard and determined in the Chancery Court of the State of Delaware or any federal court sitting in the State of Delaware. Consistent with the preceding sentence, the Parties hereto hereby (i) submit to the exclusive jurisdiction of the Chancery Court in the State of Delaware or any federal court sitting in the State of Delaware for the purpose of any Action arising out of or relating to this Agreement brought by any Party and (ii) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the Contemplated Transactions may not be enforced in or by any of the above-named courts.

(b)     EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR THE CONTEMPLATED TRANSACTIONS. EACH PARTY CERTIFIES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS SET FORTH ABOVE IN THIS SECTION 9.7.

9.8     Severability.  If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect the legality, validity or enforceability of any other provision hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is found by a court or other Governmental Authority of competent jurisdiction to be invalid or unenforceable, (a) a suitable and equitable provision will be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

9.9     Waiver.  Waiver of any term or condition of this Agreement by any Party shall be effective if in writing and shall not be construed as a waiver of any subsequent breach or failure of the same term or condition, or a waiver of any other term of this Agreement. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor

36

shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

9.10    Counterparts; Facsimile.   This Agreement may be executed in any number of counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more such counterparts have been signed by each Party and delivered to the other Parties.  Signatures of the Parties transmitted by facsimile or other electronic communication means shall be binding and effective for all purposes.  Such Party shall subsequently deliver to the other Parties an original, executed copy of this Agreement; provided, however, that a failure to deliver such original shall not invalidate a facsimile or other electronic signature.

9.11    Entire Agreement.   This Agreement, including the Disclosure Schedules and Exhibits hereto, and the Ancillary Agreements contain the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements, negotiations, correspondence, undertakings and understandings, oral or written, relating to such subject matter including the Letter of Intent, dated as of March 12, 2016, between Seller and Buyer.

9.12    Interpretation.   All references to immediately available funds or dollar amounts contained in this Agreement shall mean U.S. dollars.  The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  References in this Agreement to any gender include references to all genders, and references to the singular include references to the plural and vice versa.  The words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation."  Unless the context otherwise requires, references in this Agreement to Articles, Sections, Exhibits, Schedules and Disclosure Schedules shall be deemed references to Articles and Sections of, and Exhibits and Disclosure Schedules to, this Agreement.  Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision of this Agreement.  Whenever the words "made available to Buyer" or similar words are used in this Agreement with respect to any documents or other information, such words shall mean that such documents or information as Seller has provided to Buyer in electronic form or as have otherwise been provided by Seller to Buyer at Seller's office facilities.  The Parties have participated jointly in negotiating and drafting this Agreement.  In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.  Nothing in this Agreement shall be construed to require any Party hereto to violate any Law.

9.13    Enforcement in Equity and at Law.   The Parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the Parties shall be entitled to seek injunctive relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which they are entitled at Law or in equity.

**ARTICLE X**
**DEFINITIONS**

10.1   Definitions.   The terms not defined in the Agreement shall have the meanings ascribed to them in this ARTICLE X.

(a)   Certain Definitions.   As used in this Agreement, the following terms shall have the following meanings:

"*Accounts Receivable*" means all accounts receivable of AEM or any of its Affiliates.

"*Action*" means any action, suit, litigation, arbitration, inquiry, proceeding or investigation, including, without limitation, those by or before any Governmental Authority.

"*Advances*" means, with respect to AEM and the Servicing Agreements, the moneys that have been advanced by AEM on or before the Closing Date from its funds in connection with its Servicing of Mortgage Loans in accordance with applicable Mortgage Loan Requirements.

"*AEE*" means The American Eagle Mortgage Escrow Co., LLC, an Ohio limited liability company.

"*Affiliate*" shall have the meaning given to such term in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended from time to time.

"*Agency*" means, as applicable, FHA, HUD, GNMA, FHLMC or FNMA.

"*Ancillary Agreements*" means the documents, the instruments and agreements to be executed and/or delivered pursuant to this Agreement or any Ancillary Agreement including without limitation instruments of assignment and assumption, and employment agreements.

"*Book Value*" means the value accorded to a particular asset or Liability as reflected on the books and records of AEM or any of its Affiliates, as the case may be, at any time of determination calculated in accordance with GAAP consistently applied.

"*Business Day*" means any day other than (i) a Saturday or Sunday, (ii) a day on which commercial banks in California or New York, New York generally are required or authorized by law or executive order to close or (iii) a day when the New York Stock Exchange is closed.

"*Buyer Material Adverse Effect*" means any Event that has had, or would be reasonably expected to have, a material and adverse effect upon the ability of Buyer to consummate the Contemplated Transactions or perform its obligations under this Agreement or any of the Ancillary Agreements, as applicable.

"*CERCLA*" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and the regulations promulgated thereunder.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated thereunder.

"*Collateral*" means the property securing a Mortgage Loan.

38

"*Company Benefit Plans*" means all "employee benefit plans" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, including the documents, Contracts, and policies thereunder, and all employment, bonus, equity compensation, pension, profit sharing, savings and thrift, deferred compensation, severance pay and medical and life insurance plans, programs, or agreements entered into, maintained or contributed to by AEM in which any of the Employees or their dependents participate.

"*Company Intellectual Property*" means the Intellectual Property (x) owned by AEM and/or otherwise (y) owned by an Affiliate of AEM and used primarily in the operation of the Business by AEM as presently conducted by AEM.

"*Contemplated Transactions*" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"*Contracts*" means all agreements, contracts, commitments and undertakings, written or oral, including any amendments thereto, to which any Person is a party, an obligor or a beneficiary, or by which any of its assets or properties is bound.

"*Custodial Funds*" means all funds held or controlled by AEM with respect to any Mortgage Loan or any Pipeline Loan, including all principal and interest funds and any other funds due Investors, buy down funds, funds for the payment of Taxes, assessments, insurance premiums, ground rents and similar charges, funds from hazard insurance loss drafts and other mortgage escrow and impound amounts (including interest thereon for the benefit of mortgagors, if applicable).

"*Cut-off Date*" means 5:00 p.m., Eastern time, on the Business Day immediately prior to the Closing Date.

"*Disclosure Schedules*" or "*Schedules*" means the disclosure schedules attached hereto being delivered by the Parties on the date hereof.

"*Economic Interest*" means the annual bonus payment payable to the Principals pursuant to Management Incentive Program, as amended from time to time.

"*Employee*" means any employee employed by AEM, including those employees on medical leave, family leave, military leave or personal leave under AEM's policies.

"*Encumbrances*" means any claims, liens, encumbrances, pledges, easements, servitudes, mortgages, deeds of trust, security interests, options, charges or similar rights of any Person, other than the owner of the assets, of any kind whatsoever against the asset.

"*Environmental Laws*" means all applicable federal, state and local Laws concerning pollution or protection of the environment or health and safety including (i) CERCLA, (ii) RCRA, (iii) the Federal Water Pollution Control Act, (iv) the Federal Clean Air Act, (v) the Toxic Substances Control Act, (vi) the Safe Drinking Water Act, (vii) the Pollution Control Act of 1990, (viii) the Federal Insecticide, Fungicide and Rodenticide Act, (ix) Laws related to releases or threatened releases of Hazardous Substances into the environment (including ambient air, surface water, ground water, land, surface and subsurface waste) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, release, transport or handling of Hazardous

39

Substances, and (x) comparable state and local Laws, as each of the foregoing may be amended from time to time.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"*Event*" means any event, circumstance, change, occurrence or effect.

"*Excluded Assets*" means the assets described in *Schedule 1.2*.

"*FHA*" means the Federal Housing Administration, or any successor thereto.

"*FHLMC*" means Federal Home Loan Mortgage Corporation or any successor thereto.

"*FNMA*" means Federal National Mortgage Association (now known as "Fannie Mae") or any successor thereto.

"*Freddie Mac*" means the Federal Home Loan Mortgage Corporation, or any successor thereto.

"*GAAP*" means generally accepted accounting principles in the United States.

"*GNMA*" means Government National Mortgage Association or any successor thereto.

"*Governmental Approval(s)*" means, as to each party hereto, the applicable approvals by the Governmental Authorities necessary to complete the Contemplated Transactions.

"*Governmental Authority*" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, national, supranational, state, provincial, or local, or any similar government, governmental, regulatory or administrative agency, commission, instrumentality or authority thereof (including without limitation any Agency and the Consumer Financial Protection Bureau), or any court, tribunal, judicial or arbitrator (public or private) or self-regulatory organization.

"*Guarantee*" of or by any Person means any obligation, contingent or otherwise, of such Person guaranteeing any Indebtedness of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) any Indebtedness of any primary obligor or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness, (ii) to purchase property, securities or services for the purpose of assuring the owner of any Indebtedness of any primary obligor of the payment of such Indebtedness or (iii) to maintain working capital, equity capital or other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay any Indebtedness of such primary obligor.

"*Hazardous Substances*" means "hazardous substances" pursuant to CERCLA, "hazardous waste" pursuant to RCRA, "toxic pollutants" pursuant to the Federal Water Pollution Control Act and any materials, wastes and substances defined as "hazardous substances" or regulated

40

as such under any other Environmental Law, including asbestos, polychlorinated biphenyls and petroleum products.

"*HUD*" means the Rural Housing Service of the U.S. Department of Housing and Urban Development, or any successor thereto.

"*Indebtedness*" of any Person means (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all obligations of such Person upon which interest charges are customarily paid by such Person, other than trade credit incurred in the ordinary course of business, (iv) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (v) all obligations of such Person issued or assumed as the deferred purchase price of property or services, (vi) all indebtedness of others secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (vii) all Guarantees by such Person, (viii) all capital lease obligations of such Person, (ix) the notional amount of all obligations of such Person in respect of interest rate protection agreements, foreign currency exchange agreements or other interest or exchange rate hedging arrangements and (x) all obligations of such Person as an account party in respect of letters of credit and bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner.

"*Independent Accountant*" means an independent nationally recognized auditing firm selected by Seller and Buyer that is not the independent auditing firm for either Buyer or Seller or any of their Affiliates.

"*Insurer*" means a Person who insures or Guarantees for the benefit of the mortgagee all or any portion of the risk of loss upon borrower default on any Mortgage Loan or Pipeline Loan and any provider of hazard, title or other insurance with respect to any Mortgage Loan or Pipeline Loan or the Collateral securing any such loan.

"*Intellectual Property*" means (i) patents and patent applications together with reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof; (ii) trademarks, service marks, trade dress, logos, domain names, and trade names, including goodwill associated therewith, and applications, registrations and renewals in connection therewith; (iii) works of authorship, copyrights, and applications, registrations and renewals in connection therewith; (iv) trade secrets; and (v) computer software (including source code, object code and data).

"*Investor*" means any Person (including any Agency) having a beneficial interest in a Mortgage Loan or a security backed by or representing an interest in a Mortgage Loan or any Person with authority to act for and on behalf of any such Person (or Agency), such as a trustee.

"*Key Employee*" means those individuals listed on Schedule 7.2(h).

"*Knowledge*" means, with respect to Seller, the actual knowledge of and by John Goede, John Schrenkel, and David Berry after reasonable inquiry, and with respect to a Principal, the actual knowledge of the Principal after reasonable inquiry.

"*Law*" means any federal, state, local, municipal, foreign, international, multinational, or other constitution, law, rule, standard, requirement, administrative ruling, order, ordinance, principle of common law, legal doctrine, code, regulation, statute, treaty or process.

"*Liability*" means any Liability whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due.

"*Losses*" means any and all actual and direct out-of-pocket losses, costs, deficiencies, claims, damages or expenses, including reasonable attorneys' fees and disbursements in respect of any obligation to indemnify any Person pursuant to the terms of this Agreement; provided, however, that Losses shall not include any consequential, punitive, indirect or special losses or damages, other than such damages or losses paid to a third party or imposed on an Indemnified Party by a third party, including any Agency.

"*Management Incentive Program*" means that certain incentive program pursuant to which Buyer will issue the Economic Interests to the Principals.

"*Mortgage*" means, with respect to a Mortgage Loan, a mortgage, deed of trust or other security instrument creating an Encumbrance upon real property and any other property described therein which secures a Mortgage Note, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"*Mortgaged Property*" means a fee simple property (or such other estate in real property as is commonly accepted as collateral for Mortgage Loans that are subject to secondary mortgage sales or securitizations) that secures a Mortgage Note and that is subject to a Mortgage Instrument.

"*Mortgage Files*" means the file or files containing the photostatic copy or copies on any other media and, to the extent required by applicable Law, original documents, of the Mortgage Note, any Mortgage or other documents creating or evidencing a security interest in the related Collateral and other related loan documents, including the related credit and closing packages, disclosures, custodial documents, and all other files, books, records and documents related to the foregoing reasonably necessary to (i) establish the eligibility of the Mortgage Loans for insurance by an Insurer or for sale or delivery to AEM or an Investor, (ii) Service the Mortgage Loans in accordance with applicable Laws and the Mortgage Loan Requirements or (iii) comply with applicable Laws and the Mortgage Loan Requirements regarding documentation to be maintained by a servicer of a Mortgage Loan, or by the document custodian thereof.

"*Mortgage Instrument*" means any deed of trust, security deed, mortgage, security agreement or any other instrument which constitutes a lien on real estate securing payment by a Mortgagor of a Mortgage Note.

"*Mortgage Loan*" means any loan that is, or upon closing or funding will be, evidenced by a Mortgage Instrument evidencing the Indebtedness of the Mortgagor under a Mortgage Note.

"*Mortgage Loan Requirements*" means (i) federal, state and local Laws applicable to the origination of a Pipeline Loan or the origination, sale, securitization or Servicing of a Mortgage

42

Loan or the handling of REO, including Laws relating to real estate settlement procedures, consumer credit protection, truth-in-lending, usury limitations, fair housing, collection practices, equal credit opportunity and adjustable rate mortgages, (ii) the responsibilities and obligations relating to any Mortgage Loan or Pipeline Loan or REO set forth in any agreement between AEM, on the one hand, and any Agency, Investor or Insurer, on the other hand, including Servicing Agreements (iii) applicable Laws as well as guidelines and handbooks of AEM and all applicable guidelines, handbooks and other published written requirements of an Investor, Agency or Insurer with respect to the origination, sale, securitization or Servicing of a Mortgage Loan, (iv) federal and state fair labor standards Laws or similar wage and hour Laws, (v) the terms and provisions of the Mortgage Files, and (vi) all other applicable judicial and administrative judgments, orders, stipulations, awards, writs and injunctions.

"*Mortgage Note*" means, with respect to a Mortgage Loan, a promissory note or notes, or other evidence of Indebtedness, with respect to such Mortgage Loan secured by a Mortgage or Mortgages, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"*Mortgagor*" means, with respect to a Mortgage Loan, the borrower of such Mortgage Loan.

"*Net Book Value*" means the value accorded to the difference between the Book Value of all assets of AEM and the Book Value of all Liabilities of AEM at any given point in time calculated in accordance with GAAP and consistent with past practice.

"*Office Leases*" means the office leases and subleases set forth on Schedule 3.9(a).

"*Order*" means any preliminary or permanent order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

"*Ordinary Course of Business*" means the ordinary and usual course of normal day-to-day operations of the Business as conducted from January 1, 2016, through the date hereof.

"*Originator*" means, with respect to any Mortgage Loan, any Person(s) that (i) took the loan application, (ii) processed the loan application, (iii) underwrote the loan application, or (iv) closed and/or funded the Mortgage Loan.

"*Permit*" means any license, permit, order, consent, registration, authorization qualification, certificate or filing with any Governmental Authority or pursuant to any Law.

"*Permitted Encumbrances*" means (i) mechanics', materialmen's, carriers', workmen's, repairmen's, contractors' or other similar Encumbrances arising or incurred in the ordinary course of business and for amounts which are incurred in the ordinary course of business and are not delinquent and may be paid without penalty or as to which AEM agrees, and has funds available, to pay any resulting penalty, (ii) Encumbrances for Taxes not yet due and payable or for Taxes that the taxpayer is contesting and may be paid without penalty, (iii) in the case of the Office Leases, as applicable, zoning, building or other restrictions, variances, covenants, rights of way, conditions, easements and Encumbrances arising as a matter of Law in favor of landlords or sublessors and (iv) Encumbrances created by Buyer or pursuant to any Ancillary Agreement.

"_Person_" means an individual, an entity, a corporation, a partnership, a limited liability company, a joint venture, a trust, an unincorporated associated or organization, or a Governmental Authority.

"_Pipeline Loans_" means applications in process for residential Mortgage Loans whether or not registered and designated as price protected on AEM's residential mortgage loan origination system and which have not closed or funded as of the Closing Date.

"_Previously Disposed of Mortgage Loans_" means all Mortgage Loans or any other type of loans or loan servicing rights that, as at any time as of or prior to Closing, AEM owned and subsequently sold, transferred, conveyed or assigned and for which AEM retains a contingent Liability to third parties for failure to originate, service, sell, securitize or otherwise handle such Mortgage Loans or other loans or servicing rights in accordance with the then current Mortgage Loan Requirements or comparable requirements including, without limitation, the obligation to repurchase or indemnify the Investor or any purchaser pursuant to the applicable loan or servicing purchase agreement.

"_Proportional Percentage_" means, for each Principal, Thirty-Three and One-Third Percent (33 1/3%).

"_RCRA_" means the Resource Conservation and Recovery Act of 1976, as amended from time to time, and the regulations promulgated thereunder.

"_REO_" means any residential real property owned by AEM or an Investor (whether for its own account or on behalf of an Investor) as a result of an actual or threatened commencement or completion of foreclosure proceedings.

"_Representative(s)_" means each of the respective attorneys, accountants, officers, employees and other authorized agents, advisors and representatives of Buyer or Seller.

"_RESPA_" shall mean the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§ 2601 _et seq._ and related regulations.

"_Securities Laws_" means the Securities Act of 1933, as amended; the Securities Exchange Act of 1934, as amended; the Investment Seller Act of 1940, as amended; the Investment Advisers Act of 1940, as amended; the Trust Indenture Act of 1939, as amended; the rules and regulations of the Securities and Exchange Commission promulgated thereunder, and state securities or "blue sky" laws.

"_Seller Material Adverse Effect_" means any Event that (i) has or would reasonably be expected to have, individually or in the aggregate, a material and adverse effect upon the business, assets, liabilities, financial condition, reputation, or operating results of AEM or that has prevented or materially impaired, (ii) would reasonably be expected to prevent or materially impair or delay: (A) the ability of Buyer to operate the Business, taken as a whole, or to conduct the Business in the ordinary course as conducted by AEM as of the date of this Agreement and (B) the ability of AEM or Seller to consummate the Contemplated Transactions or perform their obligations under this Agreement or any of the Ancillary Agreements, or (iii) involves any civil litigation or criminal litigation against AEM or any of its employees.

"_Servicing_" or "_Serviced_" means residential Mortgage Loan servicing and subservicing rights and obligations and the exercise or performance thereof, including one or more of

the following functions (or a portion thereof):  (i) the administration and collection of payments for the reduction of principal and/or the application of interest on a residential Mortgage Loan; (ii) the collection of payments on account of Taxes and insurance; (iii) the remittance of appropriate portions of collected payments; (iv) the provision of escrow administration; (v) the pursuit of foreclosure and alternate remedies against the Collateral; and (vi) the administration and liquidation of REO, together with the right to receive the Servicing compensation and any ancillary fees arising from or connected to the Mortgage Loans, the benefit of the related Custodial Funds and any other related accounts maintained by AEM pursuant to applicable Mortgage Loan Requirements and, in each case, all rights, powers and privileges incident to any of the foregoing.

"*Servicing Agreement*" means an agreement pursuant to which AEM services Mortgage Loans.

"*Straddle Period*" means a Tax period beginning before and ending after the Closing Date.

"*Tax*" means any foreign, federal, state or local income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding or other tax, of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"*Tax Return*" means any return, report, claim for refund or other written statements or information required to be filed with a Governmental Authority with respect to Taxes.

"*Trade Rights*" means rights in the following:  (i) all trademark rights, business identifiers, trade dress, service marks, trade names, domain names and brand names; (ii) all copyrights and all other rights associated therewith and the underlying works of authorship; (iii) all patents and all proprietary rights associated therewith; (iv) all contracts or agreements granting any right, title, license or privilege under the intellectual property rights of any third party; (v) all inventions, mask works and mask work registrations, know-how, discoveries, improvements, designs, computer source codes, programs and other software (including all machine readable code, printed listings of code, documentation and related property and information), trade secrets, websites, shop and royalty rights, employee covenants and agreements respecting intellectual property and non-competition and all other types of intellectual property; and (vi) all registrations of any of the foregoing, all applications therefor, all goodwill associated with any of the foregoing and all claims for infringement or breach thereof.

"*VA*" means the United States Department of Veteran Affairs and any successor thereto.

(b)     Other Definitions.  The following defined terms shall have the meaning set forth in the section referenced below:

| Term | Section |
|------|---------|
| Adjustment | 2.5(a)(i) |

Agreement .................................................................................................... Preamble
Audited Financial Statements....................................................................... 3.6(a)
Business......................................................................................................... Background
Buyer .............................................................................................................. Preamble
Buyer Indemnified Parties ............................................................................ 8.2
Buyer Losses ................................................................................................. 8.2(c)
Claim .............................................................................................................. 8.4(b)
Closing............................................................................................................ 2.1
Closing Date................................................................................................... 2.1
Closing Date Balance Sheet ......................................................................... 2.5(b)
Closing Date Income Statement ................................................................... 2.5(b)
Common Stock ............................................................................................... Background
Competing Transaction ................................................................................. 5.5
Data Room...................................................................................................... 3.25
Dispute Notice ............................................................................................... 2.5(c)
Earn-Out Payments........................................................................................ 2.6(a)
Earn-Out Periods ........................................................................................... 2.6(a)
Earn-Out Statements ..................................................................................... 2.6(b)
Environmental Permits .................................................................................. 3.19
Estimated Closing Balance Sheet................................................................. 2.4(a)(i)
Estimated Closing Income Statement .......................................................... 2.4(a)
Final Calculation Statement .......................................................................... 2.5(b)
Final Determination....................................................................................... 2.6(e)
Final Purchase Price ...................................................................................... 2.5(d)
General Survival Period ................................................................................ 8.1
Indemnified Party .......................................................................................... 8.4(a)
Indemnifying Party ....................................................................................... 8.4(a)
Initial Purchase Price .................................................................................... 2.2
Interim Financial Statements........................................................................ 3.6(a)
Licensed IP Agreements................................................................................ 3.10(d)
Limited Representation .................................................................................. 8.1
Limited Survival Period ................................................................................ 8.1
Materials Contracts........................................................................................ 3.7(a)
Measurement Date ......................................................................................... 2.4(a)
Membership Interest(s).................................................................................. 3.27
Non-Compete Agreement.............................................................................. 2.7
NVD Consulting............................................................................................. 2.3(b)(iii)
Objection Notice............................................................................................ 2.6(c)
Objection Period ............................................................................................ 2.6(c)
Office Leases.................................................................................................. 3.9(a)
Party/Parties................................................................................................... Preamble
Pre-Closing Tax Period ................................................................................. 5.7(a)
Principal(s) ..................................................................................................... Preamble
Purchase Price ............................................................................................... 2.5(d)
Purchase Price Allocation............................................................................. 2.7
Real Property ................................................................................................. 3.9(a)
Regulatory Authority..................................................................................... 3.16
Repurchase Obligation .................................................................................. 3.18(b)
Required Net Book Value .............................................................................. 2.4(c)

Resolution Period ................................................................................................ 2.5(c)
Retained Amount .............................................................................................. 2.3(a)(ii)
Seller .............................................................................................................. Preamble
Employment Agreement ..................................................................................... 7.2(h)
Seller Financial Statements ................................................................................ 3.6(a)
Seller Governmental Approvals and Third Party Consents ................................ 3.3(b)
Special Representations ........................................................................................ 8.1
Termination Date ............................................................................................ 9.3(a)(ii)
Third-Party Action ............................................................................................ 8.4(b)
Transferred Receivables .................................................................................... 1.1(i)

[SIGNATURE PAGES TO FOLLOW]

DocuSign Envelope ID: 30BA14B4-70D5-4FF1-A88I-E25AE704B322

IN WITNESS WHEREOF, the Parties have caused this Equity Purchase Agreement to be duly executed as of the date first written above.

**BUYER:**

**RPM Mortgage, Inc.**

By: _E. Robert Hirt_

       Name: Rob Hirt
       Title:   Chief Executive Officer

**COMPANY:**

**American Eagle Mortgage Co., LLC**

By: _____

       Name:  John Schrenkel
       Title:    Chief Executive Officer

**MEMBER:**

**JDJ Management, LLC**

By: _____
Name:  John Goede
Title:   Manager

**PRINCIPALS:**

_____
John Schrenkel

_____
John Goede

_____
David Berry

IN WITNESS WHEREOF, the Parties have caused this Equity Purchase Agreement to be duly executed as of the date first written above.

**BUYER:**

**RPM Mortgage, Inc.**

By: _____
       Name: Rob Hirt
       Title:  Chief Executive Officer

**COMPANY:**

**American Eagle Mortgage Co., LLC**

By: _____
       Name:  John Schrenkel
       Title:   Chief Executive Officer

**MEMBER:**

**JDJ Management, LLC**

By: _____
Name:  John Goede
Title:  Manager

**PRINCIPALS:**

_____
John Schrenkel

_____
John Goede

_____
David Berry

IN WITNESS WHEREOF, the Parties have caused this Equity Purchase Agreement to be duly executed as of the date first written above.

**BUYER:**

**RPM Mortgage, Inc.**

By: _____
     Name:  Rob Hirt
     Title:   Chief Executive Officer

**COMPANY:**

**American Eagle Mortgage Co., LLC**

By: _____
     Name:  John Schrenkel
     Title:   Chief Executive Officer

**MEMBER:**

**JDJ Management, LLC**

By: _____
Name:  John Goede
Title:  Manager

**PRINCIPALS:**

_____
John Schrenkel

_____
John Goede

_____
David Berry

DocuSign Envelope ID: 30BA14B4-7005-4FF1-A893-E25AE704B322

Solely as to Section 9.1

RPM Mortgage, Inc.

By: _____

      E. Robert Hirt

Name: Rob Hirt

Title:   Authorized Representative

# EXHIBIT A

Form of Employment Agreement (Key Employees)

[Letterhead of AEM]


_____, 2016

PERSONAL AND CONFIDENTIAL

[_____]
[Street Address]
[City, State, Zip]


Dear [●]:

As you are aware, RPM Mortgage, Inc., or its subsidiary, RPM Holdings I, LLC ("RPM") has entered into an Equity Purchase Agreement ("EPA") with you and American Eagle Mortgage Co., LLC, an Ohio limited liability company (the "Company"), pursuant to which RPM will purchase all of the outstanding membership interests of the Company, subject to the terms and conditions set forth in the EPA. One of the conditions to the effectiveness of the EPA and the consummation of the transactions contemplated thereunder is your entering into an employment relationship with the Company, pursuant to the terms and conditions set forth in this offer letter. Additionally, the establishment of the Management Incentive Program for your benefit by RPM is part of the consideration for you to enter into the EPA and to consummate the transactions contemplated thereby.

Subject to the terms and conditions of the EPA, the Company is pleased to offer you the full-time position of [●]. This letter summarizes the initial terms of your employment, which terms will be effective immediately after the Closing (as defined in the EPA). Please note that if the Closing does not occur, this offer letter shall be null and void and of no legal effect.

During your employment with the Company, you will be responsible for performing those duties as are consistent with your title and/or position and as may from time to time otherwise be reasonably assigned to or requested of you. You shall devote your full business time, attention, skill and best efforts to perform such responsibilities faithfully and to the best of your abilities so as to maintain and promote the business and reputation of the Company and RPM. To that end, you shall not engage in any other active business or occupation while employed by the Company.

Your salary will be paid at the rate of $[●] per month (which is annualized to a rate of $[●] per annum) for the initial two years following the Closing (as defined in the EPA), after which we may review your salary in accordance with our standard practice. You will be paid in accordance with the Company's normal payroll practices as established or modified from time to time, and your salary shall be subject to all applicable federal, state and local taxes and withholdings. The Company currently pays salaries on a semi-weekly basis (every other Friday).

In addition to your salary, you will also be (i) paid a sign-on bonus of $[●], and (ii) granted a profit interest pursuant to the terms set forth in the Management Incentive Program attached hereto as Exhibit A ("Bonus Program").

If your profit interest is redeemed in connection with a Change in Control (as defined in the Bonus Program), you will have the right to purchase an equity interest in the Business (as defined in the Bonus Program) within thirty days after the closing of the Change in Control at the then current fair market, as determined following the Change in Control event in accordance with the Bonus Program.  The right to purchase such equity interest shall be limited to the percentage profit interest that you hold immediately before the closing of such Change in Control ("Percentage Interest").  For example, if you hold an 8.33% profit interest in the Business immediately prior to the Change in Control, then you will have the right to acquire an equity interest representing up to 8.33% of the Business after the Change in Control. In addition, and subject to the consent of the acquirer of RPM, in the event you do not purchase the full Percentage Interest, you will have the right to invest subsequent distributions until your capital account for the Business relative to all outstanding capital accounts is equal to the Percentage Interest. For clarity, this right to invest (i) is limited to the Business (legacy AEM assets) and shall not be exercisable for an interest in RPM or its affiliates, and (ii) the equity interest might be structured as a special interest directly tied to the AEM assets even if, at that time, such AEM assets have been combined with the business assets of RPM or its affiliates.

Furthermore, you will be eligible to participate in the Company's employee benefits programs, which currently include those listed on Exhibit B attached hereto.   Your participation in the Company's benefit programs shall be subject to (a) the terms and conditions of the applicable program documents; (b) generally applicable Company policies; and (c) the discretion of any administrative or other committee overseeing each program. Please note that the Company (in RPM's sole discretion) may alter, add to, modify or delete its benefits programs at any time in its sole discretion.

RPM requires you to verify that the performance of your position at the Company does not and will not breach or contravene (i) any agreement or contract entered into by you prior to the Closing (i.e., you have not entered into any agreements that are in conflict with your obligations to AEM); or (ii) any obligation you may otherwise have under applicable law to any other person. You further represent and warrant that you have delivered or disclosed, as the case may be, to RPM all agreements, contracts and/or obligations relevant to clauses (i) and (ii) above.

In connection with the purchase of the Company and the mutual promises set forth herein, you will also be required to sign a separate Noncompetition and Nondisclosure Agreement, which will be effective as of the Closing.

The above terms are a summary of our proposed initial employment relationship and are subject to later modification by RPM and/or the Company.  Your employment will be "at-will," meaning that either you or the Company (at the sole discretion of RPM) may terminate your employment relationship at any time, for any reason, with or without prior notice. RPM is a not guarantor, financial or otherwise, of the employment arrangement discussed herein

other than in its commitment to ensure that the terms and conditions set forth herein will be offered to you by the Company from and after the Closing Date.

[●], we are excited about the prospect of you joining our team, and look forward to the addition of your professionalism and experience to help the RPM team achieve its goals. If this offer letter meets your approval, please countersign below and return a fully executed copy of the offer letter to me.

[Signature Page Follows]

Sincerely,

RPM MORTGAGE, INC.

By:_____

Accepted and Agreed By:

_____
[●], as an individual

Exhibit A

Executive Incentive Bonus Program

(See attached.)

Exhibit 8

Employee Benefits

19

# EXHIBIT B

Form of Non-Compete & Non-Solicitation Agreement

CONFIDENTIAL

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

THIS NON-COMPETITION AND NON-SOLICITATION AGREEMENT (this "**Agreement**") is being executed and delivered as of [•], 2016 by [•] (the "**Covenantor**") in favor of, and for the benefit of: RPM Mortgage, Inc., a California corporation ("**RPM**"), RPM Holdings I, LLC, a Delaware limited liability company ("**RPM Holdings**") and an affiliate of RPM Mortgage, American Eagle Mortgage Co., LLC, an Ohio limited liability company (the "**Company**") and the other Beneficiaries (as hereinafter defined). Certain capitalized terms used in this Agreement but not otherwise defined shall have the meaning set forth in Section 20 hereof.

### R E C I T A L S

A.    Pursuant to an Equity Purchase Agreement, dated as of the date hereof, by and among RPM, American Eagle Mortgage Co., LLC, an Ohio limited liability company ("**AEM**"), and the Covenantor (the "**Acquisition Agreement**"), RPM will acquire all of the issued and outstanding ownership interest of AEM ("**Transaction**").

B.    As a key employee and significant equity owner of AEM, the Covenantor has obtained extensive and valuable knowledge and confidential information concerning the business of AEM. The Covenantor has or had a substantial financial interest in AEM, and as a result of Covenantor's equity interest in AEM (via AEM's holding company) shall receive significant consideration in connection with the Transaction.

C.    In connection with the Transaction (and as a condition and mutual inducement to the consummation of such Transaction), to enable RPM to secure more fully the benefits of such Transaction, to preserve the value and goodwill of the Company after the Transaction and to protect the trade secrets of the Company, the parties have agreed to enter into this Agreement.

D.    In connection with the Transaction (and as a condition and mutual inducement to the consummation of such Transaction), RPM and the Covenantor are, contemporaneously with the execution and delivery of this Agreement, executing an offer letter (the "**Offer Letter**") pursuant to which the Covenantor will become an employee of the Company subject to the terms and conditions of the Offer Letter, including any and all conditions to employment outlined in the Offer Letter, and will accordingly obtain extensive and valuable knowledge, Confidential Information and other confidential information concerning the respective businesses of the Restricted Entities.

E.    The Restricted Entities have conducted, are conducting or plan to conduct their respective businesses on a nation-wide basis.

### AGREEMENT

In order to induce RPM to consummate the Transaction, and for other good and valuable consideration, the Covenantor agrees as follows:

1.    *Restriction on Competition*.    The Covenantor agrees that, during the Non-Competition Period, the Covenantor shall not, and shall not direct, instruct or support any efforts of any of the Covenantor's Affiliates to:

(a)    engage, directly or indirectly, in Competition in any Restricted Territory;

CONFIDENTIAL

(b)      directly or indirectly be or become an officer, director, stockholder, owner, co-owner, Affiliate, partner, promoter, employee, agent, representative, designer, consultant, advisor, manager, licensor, sublicensor, licensee or sublicensee of, for or to, or otherwise acquire or hold (of record, beneficially or otherwise) any direct or indirect interest in, any Person that engages, directly or indirectly, in Competition in any Restricted Territory; *provided, however,* that the Covenantor may, without violating this **Section 1**, (1) engage as an independent duly licensed attorney in representing any Person in legal matters only in Competition; or (2) own, as a passive investment, shares of capital stock of a publicly-held corporation that engages in Competition if (i) such shares are actively traded on an established national securities market in the U.S.; (ii) the number of shares of such corporation's capital stock that are owned beneficially (directly or indirectly) by the Covenantor together with the number of shares of such corporation's capital stock that are owned beneficially (directly or indirectly) by the Covenantor's Affiliates and/or immediate family collectively represent less than one percent of the total number of shares of such corporation's capital stock outstanding; and (iii) neither the Covenantor nor any Affiliate of the Covenantor is otherwise associated directly or indirectly with such corporation or with any Affiliate of such corporation; or

(c)      take any action intended to interfere or which interferes with any business relationship (whether formed heretofore or during the Non-Competition Period) between any of the Restricted Entities and any customers, suppliers or prospects of any of the Restricted Entities.

2.      *No Solicitation*.  The Covenantor agrees that during the Non-Competition Period, the Covenantor shall not, and shall not direct, instruct or support any efforts of any of the Covenantor's Affiliates to directly or indirectly, personally or through others, encourage, induce, attempt to induce, solicit or attempt to solicit (on the Covenantor's own behalf or on behalf of any other Person) any Specified Individuals to leave his or her employment with any Restricted Entity, provided, however, that  general solicitation in any media that is not directed at any such Specified Individuals shall not constitute solicitation.  For purposes of this **Section 2**, "**Specified Individuals**" shall mean any individual who is or was an employee, contractor or consultant of any Restricted Entity as of the Closing Date or at any time during the Non-Competition Period.

3.      *Confidentiality*.  During the Non-Competition Period and at all times thereafter, the Covenantor will keep in confidence and trust all Confidential Information, and the Covenantor will not, directly or indirectly, use or disclose any Confidential Information or any information directly relating to any Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing the Covenantor's duties as an employee of the Company or any of its Affiliates or as required to be disclosed by law or by a subpoena or order issued by a court of competent jurisdiction.  Notwithstanding the foregoing, it is understood that the Covenantor is free to use information which is generally known in the trade or industry, so long as Covenantor's knowledge or possession of such information is not as a result of a breach of this Agreement or any other agreement between the Covenantor and any Restricted Entity or third person regarding confidentiality, non-use, invention assignment, or similar terms.

4.      *Representations and Warranties*.  The Covenantor represents and warrants, to and for the benefit of the Beneficiaries, that: (a) the Covenantor has full power and capacity to execute and deliver, and to perform all of the Covenantor's obligations under, this Agreement and (b) neither the execution and delivery of this Agreement nor the performance of the Covenantor's obligations under this Agreement will result directly or indirectly in a violation or breach of (i) any agreement or obligation by which the Covenantor or any of the Covenantor's Affiliates is or may be bound during the Non-Competition Period or (ii) any law, rule or regulation.  The Covenantor's representations

CONFIDENTIAL

and warranties set forth herein shall survive the expiration of the Non-Competition Period for the longest applicable statute of limitations.

5.    **Specific Performance.**  The Covenantor agrees that, in the event of any breach or threatened breach by the Covenantor of any covenant or obligation contained in this Agreement, each of the Beneficiaries shall be entitled (in addition to any other remedy that may be available to it, including monetary damages), without the necessity of proving the inadequacy of monetary damages, to seek and obtain (a) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation and (b) injunctive relief, including but not limited to a temporary restraining order, preliminary injunction and/or permanent injunction, restraining such breach or threatened breach. The Covenantor further agrees that no Beneficiary shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this **Section 5**, and the Covenantor irrevocably waives any right the Covenantor may have to require any Beneficiary to obtain, furnish or post any such bond or similar instrument.

6.    **Indemnification.**  Without in any way limiting any of the rights or remedies otherwise available to any of the Beneficiaries, the Covenantor shall indemnify and hold harmless each Beneficiary against and from any loss, damage, liability, claim, demand, settlement, judgment, award, fine, penalty, tax, fee (including attorneys' reasonable fees), charge or expense (whether or not relating to any third-party claim) that is directly or indirectly suffered or incurred at any time (whether during or after the Non-Competition Period) by such Beneficiary, or to which such Beneficiary otherwise becomes subject at any time (whether during or after the Non-Competition Period), and that arises directly or indirectly out of or by virtue of, or relates directly or indirectly to, (a) any inaccuracy in or breach of any representation or warranty by the Covenantor contained in this Agreement or (b) any failure on the part of the Covenantor to observe, perform or abide by, or any other breach of, any  restriction, covenant, obligation or other provision contained in this Agreement.

7.    **Non-Exclusivity.**  The rights and remedies of the Beneficiaries under this Agreement are not exclusive of or limited by any other rights or remedies which they may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative). Without limiting the generality of the foregoing, the rights and remedies of any of the Beneficiaries under this Agreement, and the obligations and liabilities of the Covenantor under this Agreement, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, under laws relating to misappropriation of trade secrets, under other laws and common law requirements and under all applicable rules and regulations. Nothing in this Agreement shall limit any of the Covenantor's obligations, or the rights or remedies of any of the Beneficiaries, under the Acquisition Agreement or the Offer Letter; and nothing in the Acquisition Agreement or the Offer Letter shall limit any of the Covenantor's obligations, or any of the rights or remedies of any of the Beneficiaries, under this Agreement. No breach on the part of RPM, the Company or any other party of any covenant or obligation contained in the Acquisition Agreement, the Offer Letter or any other agreement shall terminate, limit or otherwise affect any right or remedy of any of the Beneficiaries, or any obligation of the Covenantor, under this Agreement.

8.    **Severability.**  Any term or provision of this Agreement that is deemed or determined to be invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or

CONFIDENTIAL

unenforceable, the parties hereto agree that the court making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified. In the event such court does not exercise the power granted to it in the prior sentence, the parties hereto agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

9.      *Governing Law.*   This Agreement shall be construed in accordance with, and governed in all respects by, the laws of the State of [Ohio][Florida] and the federal laws of the United States applicable therein.

10.      *Exclusive Jurisdiction.*   Each of the parties hereto irrevocably consents to the exclusive jurisdiction and venue of any state court in [Columbus, Ohio][Fort Myers, Florida] or any federal court in [Ohio][Lee County, Florida] in connection with any matter based upon or arising out of this Agreement and the other matters contemplated herein. Each party agrees not to commence any legal proceedings related hereto except in such courts. By execution and delivery of this Agreement, each party hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and to the appellate courts therefrom solely for the purposes of disputes arising under this Agreement and not as a general submission to such jurisdiction or with respect to any other dispute, matter or claim whatsoever. The parties hereto irrevocably consent to the service of process out of any of the aforementioned courts in any such action or proceeding by the delivery of copies thereof by overnight courier to the address for such party to which notices are deliverable hereunder. Any such service of process shall be effective upon delivery. Nothing herein shall affect the right to serve process in any other manner permitted by applicable law. The parties hereto hereby waive any right to stay or dismiss any action or proceeding under or in connection with this Agreement brought before the foregoing courts on the basis of (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason, or that it or any of its property is immune from the above-described legal process, (b) that such action or proceeding is brought in an inconvenient forum, that venue for the action or proceeding is improper or that this Agreement may not be enforced in or by such courts, or (c) any other defense that would hinder or delay the levy, execution or collection of any amount to which any party hereto is entitled pursuant to any final judgment of any court having jurisdiction.

11.      *Waiver.*   No failure on the part of any Beneficiary to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Beneficiary in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy. No Beneficiary shall be deemed to have waived any claim of such Beneficiary arising out of this Agreement, or any power, right, privilege or remedy of such Beneficiary under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Beneficiary; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

12.      *Successors and Assigns.*   Each of the Beneficiaries may freely assign any or all of its rights under this Agreement, at any time, in whole or in part, to any Person without obtaining the consent or approval of the Covenantor or of any other Person. This Agreement and all obligations

CONFIDENTIAL

hereunder are personal to the Covenantor and may not be assigned, delegated or otherwise transferred by the Covenantor at any time. This Agreement shall be binding upon the Covenantor and the Covenantor's heirs, executors, estate, personal representatives and successors, and shall inure to the benefit of the Beneficiaries.

13. **Further Assurances**. The Covenantor shall (at the Beneficiary's sole expense) execute and/or cause to be delivered to each Beneficiary such instruments and other documents, and shall (at the Beneficiary's sole expense) take such other actions, as such Beneficiary may reasonably request at any time during the Non-Competition Period for the purpose of carrying out or evidencing any of the provisions of this Agreement.

14. **Captions**. The captions contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

15. **Construction**. Whenever required by the context, the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; and the neuter gender shall include the masculine and feminine genders. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement. Neither the drafting history nor the negotiating history of this Agreement shall be used or referred to in connection with the construction or interpretation of this Agreement. As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation." Except as otherwise indicated in this Agreement, all references in this Agreement to "Sections" are intended to refer to Sections of this Agreement.

16. **Survival of Obligations**. Except as specifically provided herein, the obligations of the Covenantor under this Agreement (including the Covenantor's obligations under **Sections 3, 6** and **13**) shall survive the expiration of the Non-Competition Period. The expiration of the Non-Competition Period shall not operate to relieve the Covenantor of any obligation or liability arising from any prior breach by the Covenantor of any provision of this Agreement.

17. **Amendment**. This Agreement may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of the all of the parties hereto.

18. **Counterpart Execution; Exchanges by Electronic Transmission**. This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart. The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement.

19. **Defined Terms**. For all purposes of and under this Agreement, the following capitalized terms shall have the respective meanings below:

CONFIDENTIAL

(a)　"**Affiliate**" means, with respect to any specified Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person.

(b)　"**Beneficiaries**" shall include: (i) RPM; (ii) RPM Holdings; (iii) each Person who is or becomes an Affiliate of RPM or RPM Holdings; and (iv) the successors and assigns of each of the Persons referred to in clauses (i), (ii), and (iii) of this sentence.

(c)　A Person shall be deemed to be engaged in "**Competition**" if such Person or any of such Person's Affiliates is engaged directly or indirectly in (i) originating, making, selling or servicing residential mortgage loans, (ii) the origination, production, sales or service of any products or services that offer, facilitate, support or otherwise relate to residential mortgage loans, or (iii) any product or service that is substantially the same as, is based upon, or competes in any material respect with any product or service referred to in clauses (i) or (ii) of this sentence.

(d)　"**Confidential Information**" means any Company proprietary information, data, trade secrets or know-how, including, but not limited to, research, business plans, proposals, product plans, products, services, personnel information, customer lists and customers (including, but not limited to, customers of the Company on whom the Covenantor called or with whom the Covenantor became acquainted during the term of the Covenantor's relationship with the Company), market research, works of original authorship, intellectual property, photographs, negatives, digital images, software, computer programs, ideas, developments, inventions (whether or not patentable), processes, formulas, technology, designs, drawings and engineering, hardware configuration information, forecasts, strategies and marketing, finance or other business information disclosed to the Covenantor by the Company either directly or indirectly in writing, orally or by drawings or observation or inspection of parts or equipment.

(e)　"**Closing Date**" has the meaning assigned to such term in the Acquisition Agreement.

(f)　"**Non-Competition Period**" means the period commencing on the Closing Date and ending on the later of (i) the third anniversary of the Closing Date; or (ii) the third anniversary of the Covenantor's separation from employment (for any reason) with the Company.

(g)　"**Person**" means any: (i) individual; (ii) corporation, general partnership, limited partnership, limited liability partnership, trust, company (including any limited liability company or joint stock company) or other organization or entity; or (iii) governmental body or authority.

(h)　"**Restricted Entities**" means (i) RPM; (ii) RPM Holdings; (iii) each Person who is or becomes an Affiliate of RPM or RPM Holdings; and (iv) the successors and assigns of each of the Persons referred to in clauses (i), (ii), and (iii) of this sentence (and any one of the Restricted Entities being a "**Restricted Entity**").

(i)　"**Restricted Territory**" means the states in which the Company (or any Affiliate of the Company) does business

(j)　"**Transaction**" means the transactions contemplated by the Acquisition Agreement.

CONFIDENTIAL

20.     **_Effective Date_**. This Agreement shall become effective upon the Closing Date. This Agreement shall be null and void if the Acquisition Agreement is terminated prior to the Closing Date.

The Covenantor has duly executed and delivered this Agreement as of the date first above written.

[•] _____

Address: _____

_____

Telephone No.: _____

Facsimile No.: _____

**RPM Mortgage, Inc.**

By: _____

Name: _____

Title: _____

**RPM Holdings I, LLC**

By _____

Name: _____

Title: _____

Signature Page to Non-Competition and Non-Solicitation Agreement

**Exhibit C**

Form of Management Incentive Program

## MANAGEMENT INCENTIVE PROGRAM

### PURPOSE AND EFFECTIVE DATE

The Plan is adopted as of _____, 2016 with an effective date as specified below. The purpose of the Plan is to retain employees of the Company by providing Participants with an opportunity to receive annual bonuses and a long-term interest in the profits attributable to the business assets of The American Eagle Mortgage Co., LLC, an Ohio limited liability company ("AEM" or "Company"). This Plan is adopted by AEM in connection with RPM's acquisition of the outstanding membership interests of AEM (the "Acquisition") and the profit interests defined herein are expressly limited to the profits generated by such AEM assets. The Plan is intended to be exempt from the reporting and disclosure requirements of Title I of ERISA because it is an unfunded plan maintained by an employer for the purpose of providing benefits for a select group of management or highly compensated employees.

### ARTICLE I
### DEFINITIONS

The following words and phrases when used in the Plan will have the meanings indicated in this Article I. Unless indicated otherwise, references in the Plan to articles and sections are to articles and sections of the Plan.

1.1    "Account" means the bookkeeping account of each Participant to which annual Net Profits and Net Losses of the Business (as defined below) are credited.

1.2    "Acquisition Agreement" means that certain equity purchase agreement by and among the Company, AEM, and certain members of AEM, dated June 30, 2016.

1.3    "Administrator" means the person designated by the Company to administer the Plan.

1.4    "Beneficiary" means any individual designated by a Participant as his beneficiary in accordance with procedures established by the Administrator. If a Participant has no Beneficiary designation in effect or the Participant's designated Beneficiary predeceases the Participant, the Participant's Beneficiary will be his surviving spouse or, if none, his estate.

1.5    "Business" means the business of originating, making, selling and servicing residential mortgage loans attributable only to the assets of AEM acquired by the Company, and shall be exclusive of any and all business assets of the Company or other affiliates of the Company, as the case may be.

1.6    "Cause" means (i) conviction of a felony, (ii) an act that constitutes gross negligence or willful misconduct in the performance of services, (iii) theft or misappropriation of property, (iv) breach of any confidentiality or non-compete agreement, or (v) failure to perform the Services or his or her obligations and duties (other than due to his death or disability) after there has been delivered to him or her a written notice of such failure to perform and his or her failure to substantially cure such failure within thirty (30) calendar days after written notice is given by the Company.

1.7    "Change of Control Event" means:  (i) any acquisition of the Company by an unaffiliated third party by means of merger or other form of corporate reorganization; (ii) any issuance, sale or other disposition (or series of related sales or dispositions) of the outstanding stock of the Company to an unaffiliated third party, in which the stockholders immediately prior to such event do not hold a majority of the outstanding stock of the Company immediately after such event, except where such issuance, sale or disposition is for the purposes of an equity financing of the Company; or (iii) any sale, disposition or transfer of all or substantially all of the assets of the Company or the Business to an unaffiliated third party.

1.8    "Code" means the Internal Revenue Code of 1986, as amended, and the regulations and other guidance thereunder.

1.9    "Company" means The American Eagle Mortgage Co., LLC, an Ohio limited liability company, or its assigns.

1.10    "Economic Interest" means, with respect to a Participant, his or her percentage interest in the Net Profits and Net Losses shown opposite such Participant's name on Appendix A.

1.11    "Effective Date" means the date this Plan becomes effective, which is anticipated to occur on the earlier of (i) the date the full Earn-Out Amount (as defined in the Acquisition Agreement) has been earned by the Principals (as defined in the Acquisition Agreement), or (ii) August __, 2018.

1.12    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations and other guidance thereunder.

1.13    "Net Profits" and "Net Losses" shall be calculated in accordance with GAAP based on a separate income statement for the assets attributable to the Business. The Company shall at all times maintain a separate income statement for the Business, which shall track the income and cost, net profits and net losses directly related to the legacy assets of AEM, and will exclude income and cost related to other business assets of the Company and its affiliates.

1.14    "Participant" means an employee of the Company or any of its affiliates who is designated by the Company as a Participant on Appendix A.

1.15    "Plan" means this Management Incentive Program, as amended from time to time.

1.16    "Plan Year" means the period from the Effective Date *through* December 31 of the same year and each 12-month period thereafter from each January 1 through each December 31.

1.17    "RPM" means RPM Holdings I, LLC, a Delaware limited liability company, or its assigns.

1.18    "Separation from Service" means a Participant's death or the Company's termination of Participant's employment with the Company without Cause.

2

ARTICLE II
PARTICIPATION

The Participants in the Plan will consist of the individuals set forth on Appendix A attached hereto. It is intended that the Participants be part of management of the Business or other highly compensated employees of the Company and its affiliates.

ARTICLE III
ANNUAL BONUS PAYMENT

3.1     Determination and Payment of Annual Bonus.

(a)     The balance of each Participant's Account shall be $0 on the Effective Date. Before or as soon as practicable but in any event within ninety (90) days after the end of each Plan Year, the Company will determine the Net Profit or Net Loss of the Business for such Plan Year and will notify the Participants in writing of such determination. Any payout hereunder is contingent upon continuous employment with the Company as of the date the payment obligation matures and becomes due and payable. If Participant voluntarily leaves the employment of the Company or if Participant's services are terminated for Cause, then the Participant's Economic Interest shall be transferred to the remaining Participants equally; provided, that to the extent RPM needs to replace the Participant who voluntarily leaves or is terminated for Cause, then the cost associated with such hire, including but not limited to excess salary over the salary paid to the departing Participant, equity, profit interests and any sign-on bonus, shall be deducted from any payout based on any Economic Interest transferred under the preceding sub-clause.

(b)     A Participant shall have the right to dispute in writing the calculation of such Net Profit or Net Loss within thirty (30) days following receipt of the calculation thereof (such 30-day period, the "Notice Period"). If the Company has not received notice of such a dispute within the Notice Period, the Company will increase (in the case of a Net Profit for such Plan Year) or decrease (in the case of a Net Loss for such Plan Year) each Participant's Account with an amount equal to the product of (i) such Net Profit or Net Loss, and (ii) such Participant's Economic Interest for such Plan Year. If the Company has received a notice of such a dispute within the Notice Period, then the Participant and the Company shall, for an additional thirty (30) days following receipt of such notice of dispute (such additional 30-day period, the "Resolution Period"), attempt to reach agreement on the determination of such Net Profit or Net Loss. If no resolution of this dispute is finalized within the Resolution Period, the disputed items or amounts shall be submitted for review and final determination by an auditing firm jointly selected by the Participant and the Company which is not then providing substantial services to either the Participant or the Company (the "Independent Accounting Firm"). If the Company and the Participant are unable to agree upon the selection of the Independent Accounting Firm within thirty (30) days following the end of the Resolution Period, the Company, on the one hand, and the Participant, on the other, shall select one independent accounting firm within ten (10) days following the end of such thirty (30) day period. Such accounting firms shall jointly select a third independent accounting firm, and such firm shall be the Independent Accounting Firm. The Independent Accounting Firm shall review all relevant data, including any necessary books and records of the Company, to determine the changes to such Net Profit or Net Loss, if any,

3

necessary to resolve the disputed items or amounts. The determination by the Independent Accounting Firm shall be made as promptly as practical but in no event beyond thirty (30) days, and shall be final and binding on the parties. In the event that the final Net Profit or Net Loss differs from the initial amount determined by the Company by five percent (5%) or less, the costs of the Independent Accounting Firm shall be borne exclusively by the Participant(s). In the event that the final Net Profit or Net Loss differs from the initial amount determined by the Company by more than five percent (5%), the costs of the Independent Accounting Firm shall be borne exclusively by the Company.

(c)     As soon as practicable after the Participant's Account is adjusted for a Plan Year in accordance with Section 3.1(a) or 3.1(b) above, the Company will determine the Participant's Account balance. If the Participant was employed on the last day of such Plan Year, and the Participant's Account balance is a positive amount, the Company shall pay such Account balance to the Participant as soon as practicable following the end of such Plan Year, and in any event no later than April 15 of the year following such Plan Year. If the Participant's Account balance is a negative amount or if Participant is not employed on the last day of the applicable Plan Year, no amount shall be paid for such Plan Year. Any negative Account balance will be set off against Net Profits for the following fiscal year (and any future fiscal years) until all Net Losses has been set off against Net Profits. For clarity, the bonus amount payable hereunder with respect to any fiscal year with respect to which Net Losses occur shall be zero (0) and such Net Losses shall reduce the Net Profits payable to the Participant, if any, for subsequent years until such Net Losses have been used in their entirety. Allocations of Net Profits and Net Losses shall be allocated among the Participants in accordance with such Participant's Economic Interest.

(d)     Deductions from Accounts. The Participant's Account will be reduced by the amount of any payment made to the Participant pursuant to this Article III. The Company may reduce the Participant's Account or any payment owed by the Participant to the Company or any of its affiliates by the amount of any debt or monetary obligation that a Participant owes the Company, provided that no such reduction will be applied to the extent that such reduction would cause the Plan or any other deferred compensation arrangement to fail to comply with the requirements of Section 409A of the Code or the regulations thereunder.

### ARTICLE IV
### SETTLEMENT OF INTEREST IN NET PROFITS

4.1     Determination of Settlement Amounts.

(a)     Company Right to Redeem after Five Years. Following (i) the death of a Participant, or (ii) the fifth anniversary of the Effective Date, the Company shall have the right, but not the obligation, to redeem the Economic Interests by paying to the Participants the Settlement Amount (as defined below) by issuing a Promissory Note (as defined below) to the Participant(s) within thirty (30) days after delivering written notice of exercise, the Promissory Note to be in the principal amount equal to the Settlement Amount *less* any tax withholding required in connection with such redemption. In the case of death, the Company shall have thirty days after receiving notice of death to exercise its option to redeem the profit interest. The Company shall exercise such right of redemption by written notice delivered to the Participants.

For purposes of this Section 4.1(a), the term "*Promissory Note*" shall mean a 1% 3-year promissory note pursuant to which the acquirer (or the surviving entity in the Change in Control Event) shall agree to pay the Participant the Settlement Amount *less* applicable tax withholdings in three equal annual installments, with the first payment being made on the 12-month anniversary of the Promissory Note.

(b)     Automatic Redemption.   In the event the Company terminates a Participant's employment without Cause or upon a Change of Control Event but and only if Participant agrees to remain an employee during a 90-day transition period after the consummation of such Change of Control Event, then the Participants' Economic Interests shall be redeemed automatically and without any further action required on the part of the Company or the Participants in exchange for the payment of the Settlement Amount in accordance with Section 4.2 below.

(c)     For purposes of this Section 4.1, the "*Settlement Amount*" shall mean (i) the fair value of the Participant's Economic Interest *multiplied by* (ii) a fraction (not to exceed one), the numerator of which shall be the total number of the Participant's years of continuous service with the Company and its affiliates (up to five years) from and after the Closing (as defined in the Acquisition Agreement), and the denominator of which shall be five.  The fair market value of such interest shall be determined by an independent accounting firm (acting as a third party appraiser) mutually acceptable to the Company and the Participants.  Such appraiser shall determine such fair market value by taking into account factors typically used for such valuations, including, but not limited to, the size and profitability of the Business, cash flow, the market or the lack of a market for the sale of the interests, non-equity interests, and the net income and mortgage loan production of the Business relative to the aggregate net income and mortgage loan production of the Company and its affiliates, but shall disregard the fact that the Participant's interest is directly tied to employment.

4.2     Payment of Settlement Amount.  The Settlement Amount determined in Section 4.1(b) shall be paid to the Participant(s) in three (3) equal annual installments, the first of which shall be made on the one-year anniversary of the event prompting the redemption, followed by subsequent installment payments on the second and third anniversaries.

4.3     Non-Competition and Non-Solicitation Agreement.  A Participant who engages in Competition with the Company shall not be entitled to any payments set forth in Article III or this Article IV to the extent such payments are not related to the last day of the immediately preceding Plan Year as of the date the Participant engages in Competition and all entitlement to future payments shall abate.  For purposes of this Plan, the term "Competition" means any activity prohibited under that certain Non-competition and Non-solicitation Agreement.

4.4     Section 409A Specified Employees.  Notwithstanding any provision of this Plan to the contrary, and solely to the extent required by Section 409A of the Code and not otherwise eligible for exclusion from the requirements of Section 409A of the Code, if as of the date of a Participant's Separation from Service, (a) the Participant is deemed to be a "specified employee" (as defined in Section 409A of the Code and the related regulations) and (b) the Company or any member of a controlled group including the Company is publicly traded on an established securities market or otherwise, to the extent required by Section 409A of the Code and the

regulations thereunder, no payment or other distribution required to be made to the Participant under the Plan (including any payment of cash, any transfer of property and any provision of taxable benefits) solely as a result of the Participant's Separation from Service will be made earlier than the first day of the seventh month following the date of the Participant's Separation from Service.

<div align="center">

ARTICLE V

ADMINISTRATION

</div>

5.1    Administrator.

(a)    The Plan will be administered by the Administrator, which will be responsible for interpreting the Plan and establishing rules and regulations governing the Plan's administration consistent with the terms of the Plan.  Except as otherwise set forth in the Plan, the Administrator's decision in any matter involving the interpretation and application of the Plan will be final and binding on all parties.  Neither the Administrator, the Company, the Company of Directors of the Company nor any member of the Company will be liable for any action or determination made in good faith with respect to the Plan or any person's rights under the Plan.

(b)    The Administrator may execute or deliver any instrument, make any payment or perform any other act that the Administrator determines necessary or appropriate to administer the Plan, including, without limitation, the retention of counsel and other agents required in carrying out the Plan.

(c)    The Administrator will keep all records necessary for the Plan's administration and will furnish any periodic information to Participants as required pursuant to Section 3.1(b), or that is otherwise necessary or desirable, in the Administrator's reasonable discretion.  All expenses of administering the Plan will be paid by the Company and will not affect a Participant's right to or the amount of benefits.

5.2    Claims Procedures.

(a)    Except as otherwise required by the Plan, all claims for benefits under the Plan will be submitted to, and within 90 days thereafter decided by, in writing, the Administrator.  If the Administrator determines that it needs an extension of time for processing the claim, it may extend the date by which a decision is required to 180 days after the claim is submitted if it notifies the claimant in writing of the extension prior to the termination of the initial 90-day period, including the special circumstances requiring an extension of time and the date by which it expects to render a decision.

(b)    Written notice of the decision on each claim will be furnished reasonably promptly to the claimant.  If the claim is wholly or partially denied, such written notice will set forth (i) the specific reasons for the denial, (ii) reference to the specific Plan provisions on which the denial is based, (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary and (iv) a description of the Plan's review procedures and the time limits applicable to

<div align="center">6</div>

such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following the denial of a claim on review.

(c)   A claimant may request a review by the Administrator of a decision denying a claim in writing within 60 days following receipt of the denial. All such reviews will be decided in writing by the Administrator within 60 days after receipt of the request for review. If the Administrator determines that an extension of time for processing the review is required, it may extend the date by which a decision is required to 120 days after the request for review is submitted if it notifies the claimant in writing of the extension prior to the termination of the initial 60-day period, including the special circumstances requiring an extension of time and the date by which it expects to render a decision.

(d)   In connection with a review of a denied claim for benefits, a claimant will have the opportunity to submit written comments, documents, records and other information relating to the claim for benefits and be provided, on request and free of charge, reasonable access to and copies of all documents, records and other information relevant to his claim for benefits. The review of a denied claim will take into account all comments, documents, records and other information submitted by the claimant related to the claim, without regard to whether such information was submitted or considered in the initial review of the claim. If a claim is denied on review, the written notice of the denial will specify (i) the specific reasons for the denial, (ii) reference to the specific Plan provisions on which the denial is based and (iii) a statement that the claimant is entitled to receive, on request and free of charge, reasonable access to and copies of all documents, records and other information relevant to his claim for benefits.

(e)   The claimant may have an authorized representative to act on his behalf in pursuing a benefit claim or appeal of the denial of the benefit. For a representative to be recognized as acting on the claimant's behalf, the claimant must provide the name, address and phone number of his authorized representative in writing to the Administrator and a statement that the representative is authorized to act on his behalf concerning his claim for benefit and, if applicable, an appeal of the denial of the claim.

## ARTICLE VI
## FUNDING

The Plan is an unfunded arrangement. No portion of any funds of the Company or any of its affiliates is required to be set apart for a Participant or Beneficiary. Accounts will be payable from the Company's general assets, and the rights of a Participant or Beneficiary to his Account is limited to those of a general, unsecured creditor of the Company who has a claim equal to the value of the Participant's Account.

## ARTICLE VII
## AMENDMENT AND TERMINATION

This Plan may only be amended or terminated upon the written agreement of the Company and the Participants. However, no amendment or termination may result in an acceleration of benefit payment (except as permitted by Section 409A of the Code).

## ARTICLE VIII
## GENERAL PROVISIONS

8.1     Payments to Minors and Incompetents.   If the Participant or any Beneficiary entitled to receive any benefits under the Plan is a minor or is deemed by the Administrator or is adjudged to be legally incapable of giving valid receipt and discharge for such benefits, they will be paid to the person or institution the Administrator designates or to a duly appointed guardian. Such payment will, to the extent made, be deemed a complete discharge of any payment due under the Plan.

8.2     No Contract.   The Plan will not be deemed a contract of employment with the Participant and will not affect the Company's right to terminate the Participant's employment.

8.3     Non-Alienation of Benefits.   No amount payable to or held under the Plan for the account of the Participant or any Beneficiary will be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same will be void.   No amount payable to or held under the Plan for the account of the Participant will be subject to any legal process of levy or attachment.

8.4     Income Tax Withholding.   The Company may withhold from any payments under the Plan any amount it is required to withhold under applicable federal, state or other income tax law, and transmit such withheld amounts to the appropriate taxing authority.   In lieu thereof, the Company will have the right, to the extent permitted by law, to withhold the amount of such taxes from any other sums due from the Company to the Participant on such terms and conditions as the Administrator may prescribe.

8.5     Governing Law.   The Plan will be interpreted, construed and administered under the laws of the State of California without regard to the choice of law provisions thereof and to the extent that ERISA and other federal laws do not apply.

8.6     Captions.   The captions contained in the Plan are inserted only as a matter of convenience and for reference and in no way define, limit, enlarge or describe the scope or intent of the Plan or in any way affect the construction of any provision of the Plan.

8.7     Severability.   If any provision of the Plan is held invalid or unenforceable, its invalidity or unenforceability will not affect any other provision of the Plan, and the Plan will be construed and enforced as if such provision had not been included.

8.8     Notices.   The Participant will be responsible for furnishing the Administrator with the current and proper address for the mailing of notices and delivery of payments.   Any notice required or permitted to be given will be deemed given if directed to the person to whom addressed at such address and mailed by regular United States first class mail, postage prepaid. If any item mailed to such address is returned as undeliverable to the addressee, mailing will be suspended until the Participant furnishes the proper address.

8.9     No Guaranty of Performance or Payout.     Each Participant agrees and acknowledges that the Company is not in any way or manner guarantying the performance of the

8

Business or any particular financial result or payout under this Plan, nor undertaking or committing to invest additional capital or resources in the Business.

8.10   Interpretation.   All pronouns and variations thereof will be deemed to refer to the masculine, feminine or neuter, as the identity of the person requires.  As the context may require, the singular may be read as the plural and the plural as the singular.

The Plan is intended to comply with Section 409A of the Code.  Consistent with that intent, the Plan will be interpreted in a manner consistent with Section 409A of the Code.  If any provision that is necessary for the Plan to comply with Section 409A of the Code is determined by the Administrator, in its sole discretion, to have been omitted, such omitted provision will be deemed included in the Plan.  Company agrees to hold harmless and indemnify Participant for all additional taxes, interest and penalties Participant may incur in the event this Plan is found to be in violation of Section 409A.

## APPENDIX A

Participants shall receive an aggregate of 25% of the Net Profits attributable to the Business.

| Participant | 25% Economic Interest |
|---|---|
| John Goede | 8 1/3% |
| John Schrenkel | 8 1/3% |
| David Berry | 8 1/3% |

Schedule 2.2(a)

Purchase Price Calculation

The table below provides an example of the calculation of the Initial Purchase Price using a multiple of Seller's net income for the 12-month period that ended on May 31, 2016.

| 12 Month Rolling - projected as of 5/31/16 | | | 2016 *pro forma* | |
|---|---|---|---|---|
| AEM net income before state taxes | $7,064,724 | | AEM net income before state taxes | $9,581,559 |
| One time losses or Events | - | | State specific taxes (?) | |
| AE Escrow Corp - net income | $1,959,518 | | AE Escrow Corp - net income | $1,899,422 |
| Add back officer salaries & one time events | $840,000 | | Add back officer salaries | $800,000 |
| Add back Pipeline profit | $765,601 | | | |
| **Unaudited** | **$10,629,843** | | **Unaudited** | **$12,280,981** |
| | | | | |
| Value - 4X | $42,519,374 | | Value - 4X | $49,123,924 |
| **After tax value @ 60%** | **$25,511,624** | | **After tax value @ 60%** | **$29,474,354** |
| | | | | |
| Value based on 2015 unaudited | 2.40 | | Value based on 2015 unaudited | 2.77 |
| Value based on 2015 balance sheet of $7.8mm | 3.27 | | Value based on 2015 balance sheet of $7.8mm | 3.78 |
| Balance sheet multiple needed after adjusted 12 month rolling P&L | 2.75 | | | |
| Balance sheet equity needed after adjusted 12 month rolling P&L | $9,276,954 | | | |
| | | | | |
| Payout | | | | |
| **Upfront @75%** | **$19,133,718** | | | |
| **Remaining @25%** | **$6,377,906** | | | $10,340,636.15 |
| | | | | |
| *Version date: May 25, 2016* | | | | |
| | | | | |

[ADD LEGAL DESCRIPTION OF FORMULA]

## Schedule 2.2(b)

### Net Book Value Calculation

| ASSETS | | as of 5/31/2016 | | Non Book adjustments | | Adjusted book as of 5/31/2016 | Explanations |
|---|---|---|---|---|---|---|---|
| Cash | | | | | | | |
| Operating Cash | $ | 3,657,243.09 | | | $ | 3,657,243.09 | |
| Restricted Cash | $ | 402,103.77 | | | $ | 402,103.77 | |
| | | | | | | | |
| Receivables | | | | | | | |
| Mtg Payments Rcvbl | $ | 54,069.25 | | | $ | 54,069.25 | |
| Accts Rcvbl Credit Cards | $ | 6,565.99 | | | $ | 6,565.99 | |
| Accts Rcvbl Closing $ | $ | 88,483.25 | | | $ | 88,483.25 | |
| Accts Rcvbl Investors | $ | 531,762.15 | | | $ | 531,762.15 | |
| Employee Advances Rcvbl | $ | - | | | $ | - | |
| | | | | | | | |
| Prepaids | | | | | | | |
| Prepaid Health Insurance | $ | 85,477.72 | | | $ | 85,477.72 | |
| Prepaid Rent | $ | 1,350.00 | | | $ | 1,350.00 | |
| Prepaid Other Costs | $ | 167,110.81 | $ | (150,000.00) | $ | 17,110.81 | |
| Prepaid Corp. Insurance | $ | 6,850.50 | | | $ | 6,850.50 | |
| | | | | | | | |
| Receivables Loans | | | | | | | |
| Mortgages Rcvbl | $ | 53,086,986.00 | | | $ | 53,086,986.00 | |
| Revenue Receivable Closings | $ | 2,350,771.25 | | | $ | 2,350,771.25 | |
| | | | | | $ | - | |
| Mandatory Derivatives | | | | | $ | - | |
| Open Pipeline | $ | 2,757,443.12 | | | $ | 2,757,443.12 | |
| Hedges | $ | (24,179.69) | | | $ | (24,179.69) | |
| | | | | | | | |
| Fixed Assets | | | | | | | |
| Furniture & Fixtures | $ | 180,596.80 | $ | (124,005.00) | $ | 56,591.80 | Ineligible Assets |
| Goodwill | $ | 8,531.00 | $ | (8,531.00) | $ | - | Ineligible Assets |
| Land | $ | 95,000.00 | | | $ | 95,000.00 | |
| Computers & Equipment | $ | 103,383.91 | $ | (2,675.00) | $ | 100,708.91 | Ineligible Assets |
| Buildings | $ | 695,603.00 | $ | (40,000.00) | $ | 655,603.00 | Ineligible Assets |
| Covenant Non Compete | $ | 4,000.67 | $ | (4,000.67) | $ | - | Ineligible Assets |

| | | | | | | | Ineligible Assets |
|---|---|---|---|---|---|---|---|
| Leasehold | $ | 190,635.88 | $ | (48,624.00) | $ | 142,011.88 | |
| | | | | | | | |
| Security Deposits | | | | | | | |
| Rent | $ | 35,441.08 | | | $ | 35,441.08 | |
| Telephone/Utilities | $ | 1,480.00 | | | $ | 1,480.00 | |
| Inloans & repurchases | $ | 9,000.00 | | | $ | 9,000.00 | |
| Workers Comp | $ | 10.00 | | | $ | 10.00 | |
| | | | | | | | |
| TOTAL ASSETS | $ | 64,315,719.55 | $ | (377,835.67) | $ | 63,937,883.88 | |
| | | | | | | | |
| LIABILITIES | | | | | | | |
| | | | | | | | |
| Payables | | | | | | | |
| W/H Notes pybl - Cimmerica | $ | 13,742,375.50 | | | $ | 13,742,375.50 | |
| W/H Notes pybl - 1st Term | $ | 39,043,050.65 | | | $ | 39,043,050.65 | |
| Repair Reserves Pybl | $ | 191,889.43 | | | $ | 191,889.43 | |
| MIP Pybl | $ | - | | | $ | - | |
| Escrow Reserves Pybl | $ | 210,214.34 | | | $ | 210,214.34 | |
| Mortgage Payable | $ | 440,080.00 | | | $ | 440,080.00 | |
| Accts Pybl Investors | $ | 3,950.00 | | | $ | 3,950.00 | |
| Accts Pybl Hedges | $ | 15,820.31 | | | $ | 15,820.31 | |
| Accts Pybl Pymts Held | $ | 11,169.06 | | | $ | 11,169.06 | |
| | | | | | | | |
| Accruals | | | | | | | |
| General Expenses | $ | 671,884.80 | | | $ | 671,884.80 | |
| Interest | $ | 90,572.88 | | | $ | 90,572.88 | |
| Payroll | $ | 414,878.90 | | | $ | 414,878.90 | |
| Commissions on Hedges | $ | 886,578.89 | | | $ | 886,578.89 | |
| Taxes | $ | 35,459.65 | | | $ | 35,459.65 | |
| | | | | | | | |
| TOTAL LIABILITIES | $ | 55,727,844.41 | | | $ | 55,727,844.41 | |
| | | | | | | | |
| Equity | | | | | | | |
| Prior Year Retained Earnings | $ | 5,712,620.62 | | | $ | 5,712,620.62 | |
| Current Earnings | $ | 2,875,254.52 | | | $ | 2,875,254.52 | |
| | | | | | | | |
| TOTAL CAPITAL | $ | 8,587,875.14 | $ | (377,835.67) | $ | 8,210,039.47 | |
| | | | | | | | |
| TOTAL LIABILITIES PLUS CAPITAL | $ | 64,315,719.55 | $ | (377,835.67) | $ | 63,937,885.88 | |

**Exhibit D**

**PURCHASE PRICE ALLOCATION PRINCIPLES**

The Purchase Price, together with any additional amounts deemed to be consideration for the assets of AEM, shall be allocated among such assets in accordance with Treasury Regulations under Section 1060 of the Code and the Treasury Regulations thereunder, and specifically in accordance with the following principles:

•       First, a total of $500,000 shall be allocated to the Non-Compete Agreement.

•       Second, the Purchase Price shall be allocated to Class I through V assets in an amount equal to the fair value of such assets set forth on the AEM balance sheets as of the Closing Date.

•       The remainder of the Purchase Price shall be allocated to goodwill and/or going-concern value.

# AMENDMENT AND CLARIFICATION AGREEMENT

## AMENDMENT AND CLARIFICATION AGREEMENT

THIS AMENDMENT AND CLARIFICATION AGREEMENT (this "*Agreement*") is entered into as of July 29, 2016, by and between on the one hand (1) RPM Mortgage, Inc., a California corporation, or its assigns (collectively the "*Buyer*"), and on the other hand (2) The American Eagle Mortgage Co., LLC, an Ohio limited liability company ("*AEM*" or "*Company*"), JDJ Management, LLC, a Florida limited liability company (the "*Seller*") and John Goede, John Schrenkel, David Berry (the "*Principal(s)*" and together with the Seller, the "*Selling Parties*"). Buyer, AEM, and the Selling Parties are referred to collectively herein as the "*Parties*" and each individually as a "*Party*."

A.   The Parties previously entered into an equity purchase agreement dated as of June 30, 2016 ("*EPA*") pursuant to which Buyer agreed to acquire all of the outstanding membership interests of AEM from the Selling Parties ("*Transaction*").

B.   The Parties wish to clarify certain terminology used in the EPA and also set forth the agreed upon methodology for calculating the net profits for purposes of the earn-out provisions set forth in the EPA and the management incentive program that will be adopted in connection with the Transaction.

C.   Any terms not defined herein shall have the meanings assigned to them in the EPA.

In consideration of the promises and mutual covenants contained herein, the undersigned hereby agree as follows:

**SECTION 1. AMENDMENT AND CLARIFICATION OF EPA.** Section 2.6 of the EPA is hereby amended so as to clarify that the Earn-Out Payments shall be based on "*net income*" of the Business and not "*net operating income*" and shall be restated in its entirety to read as follows:

"2.6     Earn-Out PaymentsEarn-Out Payments.  Subject to the procedures specified below, the Principals may be entitled to contingent cash consideration payments (collectively, the "*Earn-Out Payments*") if the net income of the Business exceeds certain thresholds for the period starting on the Closing Date and ending on June 30, 2017 (the "*Year One Earn-Out Period*"), and for the period starting on the July 1, 2017 and ending on June 30, 2018 ("*Year Two Earn-Out Period*" and, together with the Year One Earn-Out Period, the "*Earn-Out Periods*").  The threshold amount for any Earn-Out Payment shall be $100,000 of net income during the applicable Earn-Out Period.  Each Earn-Out Payment, if any earned, shall be made by the Buyer to the Principals as set forth below:

(i)     Year One Earn-Out.  No later than August 31, 2017, the Buyer shall pay the Principals an Earn-Out Payment equal to seventy-five percent (75%) of the net income of the Business during the Year One Earn-Out Period, which Earn-Out Payment shall not exceed Ten Million, Three Hundred Forty Thousand, Six Hundred Thirty-Six and 15/100ths Dollars ($10,340,636.15) (the "*Year One Earn-Out*").

(ii)     Year Two Earn-Out.  No later than August 31, 2018, the Buyer shall pay the Principals an Earn-Out Payment equal to equal to seventy-five percent (75%) of the net income of the Business during the Year Two Earn-Out Period *less* any losses during the Year

One Earn-Out, which Earn-Out Payment shall not exceed the difference between Ten Million, Three Hundred Forty Thousand, Six Hundred Thirty-Six and 15/100ths Dollars ($10,340,636.15) and the Year One Earn-Out, if any (the "*Year Two Earn-Out*").

(b)     Earn-Out Statements.  Within twenty (20) Business Days following the end of the applicable Earn-Out Period, the Buyer shall prepare and deliver to the Seller Representative its calculation of the applicable Earn-Out Payment (the "*Earn-Out Statement*"), which statement shall be prepared and calculated in accordance with GAAP, applied on a basis consistent with the policies, procedures and practices utilized in the preparation of the financial statements of AEM.  The Earn-Out Statement shall include a reasonably detailed calculation of (i) the profits and losses of the Business for the applicable Earn-Out Period, and (ii) the amount, if any, of the Earn-Out Payment.

(c)     Objection Notice.  The Seller Representative shall have twenty (20) days from delivery of the Earn-Out Statement (the "*Objection Period*") to raise any objection thereto by delivery of written notice to the Buyer setting forth such objections in reasonable detail (the "*Objection Notice*").  During the Objection Period, the Seller Representative shall be entitled, subject to execution of a nondisclosure agreement, to access the books and records and employees and agents involved in the preparation of the Earn-Out Statement for purposes of determining any objections and preparing the Objection Notice; provided, however, that such access shall not unreasonably interfere with the conduct of the Business.  If the Seller Representative does not deliver an Objection Notice within the Objection Period, then the Earn-Out Statement shall be deemed final and binding on the parties.

(d)     Dispute.  In the event that an Objection Notice is delivered within the Objection Period, the Buyer and the Seller Representative shall attempt, in good faith, to resolve such objections and, if unable to do so within twenty-five (25) days after delivery of the Objection Notice, shall follow the dispute mechanism contemplated in Section **Error! Reference source not found.** above.  The determination of the Independent Accountant shall be (i) in writing, (ii) delivered to the Buyer and the Seller Representative, and (iii) final and binding on the parties absent manifest error (the "*Final Determination*").  Subject to Section **Error! Reference source not found.** and Section **Error! Reference source not found.**, the Buyer shall pay to the each Principal such Principal's Proportional Percentage of such Earn-Out Payment shown on the Final Determination within ten (10) Business Days after receipt of the Final Determination.  The fees and expenses of the Independent Accountant shall be borne equally by the Buyer (on the one hand) and the Seller Representative (on the other hand).

(e)     Allocation of Earn-Out Payments.  Each Earn-Out Payment shall be allocated among the Principals based on their Proportional Percentage, provided however:

(i)     in the event a Principal voluntarily terminates his employment with the Company between the Closing and June 30, 2017, such Principal shall not be entitled to receive his Proportional Percentage of the Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the Principal who voluntarily terminates his employment with the Company on or prior to June 30, 2017 to the remaining Principals' Proportional Percentages;

(ii)     in the event a Principal voluntarily terminates his employment with the Company between July 1, 2017 and June 30, 2018, such Principal shall not be entitled to receive his Proportional Percentage of the Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the

Principal who voluntarily terminates his employment with the Company between July 1, 2017 and June 30, 2018 to the remaining Principals' Proportional Percentages; and

(iii)    in the event the Company terminates the employment of a Principal for Cause (as such term is defined in the Management Incentive Program) at any time, such Principal shall not be entitled to receive his Proportional Percentage of any unpaid Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the Principal whose employment with the Company is terminated for Cause to the remaining Principals' Proportional Percentages.

(iv)    The Company's termination of employment of a Principal without Cause (as such term is defined in the Management Incentive Program) shall not affect, reduce, change or eliminate such Principal's Proportional Percentage for purposes of the Earn-Out Payments.

(v)    The Parties acknowledge and agree that the Earn-Out Payments constitute compensation for services performed by the Principals as employees of the Company. Each Earn-Out Payment made to a Principal will be reported on such Principal's Form W-2 for the year in which the payment was made and will be reduced by required withholdings of applicable income and payroll Taxes."

**SECTION 2. METHODOLOGY FOR CALCULATING NET INCOME.**   Each Party agrees as follows:

A.    For purposes of the Earn-Outs and the Management Incentive Program, "net income" of the Business shall mean the net income after all applicable taxes (including but not limited to income taxes, employer paid payroll taxes, property taxes), calculated in accordance with U.S. Generally Accepted Accounting Principles (GAAP).

B.    The Earn-Out Payments will be reduced by all employer paid payroll taxes pertaining to the Earn-Out Payment; however, the following expenses shall not be included as expenses when calculating the Earn-Out Payment: (i) the sign-on bonuses of $300,000 in the aggregate, payable to the Sellers, (ii) payments to NVD Consulting, Inc. at the Closing, or (iii) the Purchase Price.

**SECTION 3. EFFECT ON THE EPA AND ANCILLARY AGREEMENTS.**   Except as amended herein, the EPA shall continue in full force and effect as originally executed and delivered.  Any reference in the EPA to "this Agreement," "hereunder," hereof," "herein," or words of like import referring to such agreement shall refer to the EPA as amended and clarified by this Agreement.

**SECTION 4. COUNTERPARTS.**   This Agreement may be executed in any number of counterparts, with each executed counterpart constituting an original and all counterparts together constituting one agreement.

**SECTION 5. EFFECTIVENESS.**   This Agreement shall become effective as of the date hereof upon the execution of counterparts hereof by the parties hereto.

**SECTION 6. GOVERNING LAW.** This Agreement shall be governed by, and construed in accordance with, the laws of the state of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

*[Signature Page Follows]*

DocuSign Envelope ID: 5A5311D1-A2EA-4A15-8FA0-4E1258F241FA

**IN WITNESS WHEREOF,** the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

BUYER:

RPM Mortgage, Inc.

By: _____
Name: Rob Hirt
Title:  Chief Executive Officer

COMPANY:

American Eagle Mortgage Co., LLC

By: _____
Name:  John Schrenkel
Title:   Chief Executive Officer

MEMBER:

JDJ Management, LLC

By: _____
Name:  John Goede
Title:   Manager

PRINCIPALS:

_____
John Schrenkel

_____
John Goede

_____
David Berry

IN WITNESS WHEREOF, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

BUYER:

RPM Mortgage, Inc.

By: _____
          Name: Rob Hirt
          Title:  Chief Executive Officer

COMPANY:

American Eagle Mortgage Co., LLC

By: _____
          Name:  John Schrenkel
          Title:   Chief Executive Officer

MEMBER:

JDJ Management, LLC

By: _____
Name:  John Goede
Title:  Manager

PRINCIPALS:

_____
John Schrenkel

_____
John Goede

_____
David Berry

IN WITNESS WHEREOF, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

**BUYER:**

RPM Mortgage, Inc.

By: _____
          Name: Rob Hirt
          Title:   Chief Executive Officer

**COMPANY:**

American Eagle Mortgage Co., LLC

By: _____
          Name:  John Schrenkel
          Title:    Chief Executive Officer

**MEMBER:**

JDJ Management, LLC

By: _____
Name:  John Goede
Title:   Manager

**PRINCIPALS:**

_____
John Schrenkel

_____
John Goede

_____
David Berry

IN WITNESS WHEREOF, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

**BUYER:**

**RPM Mortgage, Inc.**

By: _____
    Name: Rob Hirt
    Title:   Chief Executive Officer

**COMPANY:**

**American Eagle Mortgage Co., LLC**

By: _____
    Name:  John Schrenkel
    Title:   Chief Executive Officer

**MEMBER:**

**JDJ Management, LLC**

By: _____
Name:  John Goede
Title:  Manager

**PRINCIPALS:**

_____
John Schrenkel

_____
John Goede

_____
David Berry

# SECOND AMENDING AGREEMENT

## SECOND AMENDING AGREEMENT

THIS SECOND AMENDING AGREEMENT (this "*Agreement*") is entered into as of July __, 2017, by and between on the one hand (1) LendUSA, LLC, a Delaware limited liability company (formerly RPM Mortgage, Inc., a California corporation), or its assigns (collectively the "*Buyer*"), and on the other hand (2) The American Eagle Mortgage Co., LLC, an Ohio limited liability company ("*AEM*" or "Company"), JDJ Management, LLC, a Florida limited liability company (the "*Seller*"), and the remaining signatory principals John Goede and John Schrenkel (the "*Principal(s)*" and together with the Seller, the "*Selling Parties*"). Buyer, AEM, and the Selling Parties are referred to collectively herein as the "*Parties*" and each individually as a "*Party*."

A. The Parties previously entered into an equity purchase agreement dated as of June 30, 2016, as amended ("*EPA*") pursuant to which Buyer agreed to acquire all of the outstanding membership interests of AEM from the Selling Parties ("*Transaction*").

B. The Parties amended the EPA and certain ancillary agreements on or about December 1, 2016, in order to among other things accommodate Dave Berry's request to have his equity interest redeemed and that he no longer be a party to the EPA and the ancillary agreements.

C. On June 16, 2017, RPM Mortgage, Inc. merged with and into LendUSA, LLC.

C. The Parties now wish to amend the EPA to memorialize a modified time schedule for the payment of Earn-Outs.

D. Any terms not defined herein shall have the meanings assigned to them in the EPA.

In consideration of the promises and mutual covenants contained herein, the undersigned hereby agree as follows:

**SECTION 1. AMENDED PAYMENT SCHEDULE FOR EARN-OUT.** The payment schedule for the Earn-Out Payments shall be modified as follows:

(i)     on August 31, 2017, the Buyer shall pay $1,000,000 each to the Principals and Dave Barry out of the Earn-Out for the Year One Earn-Out Period;

(ii)    on January 5, 2018 ("*New Payment Date*"), the Buyer shall pay to the Principals the remaining balance of the Earn-Out for the Year One Earn-Out Period;

(iii)   on the New Payment Date, the Buyer shall also calculate and pay to the Principals the Earn-Out Payment for the initial five months (August - December) of the Year Two Earn-Out Period; and

(iv)    thereafter the Buyer shall pay the balance of the Earn-Out, if any, for the Year Two Earn-Out Period *plus* any profit share under the Management Incentive Program that follows the calendar year, ending on December 31 and restarting the following year, with the

effective date of January 1, after the release of the 2018 audited financials for the Buyer in early 2019 (April 5 or earlier).

As provided in the EPA, the Earn-Out Payments may cease to accrue before the end of the Year Two Earn-Out Period if on an earlier date the Buyer has paid (or reserved for later payment) an aggregate of $10,340,636.15 in Earn-Out Payments, following which the Management Incentive Program will become effective and replace the Earn-Out Payments. To illustrate, if the Earn-Out exceeds $10,340,636.15 on June 30, 2018, then from July 1 through December 31, 2018, the Principals shall receive 25% of the Net Profits under the Management Incentive Program.

In all other respects, the terms and conditions of the Earn-Out Payments shall remain in full force and continue to be governed by Section 2.6 of the EPA, as amended.

**SECTION 2. EFFECT ON THE EPA AND ANCILLARY AGREEMENTS.** Except as amended herein, the EPA shall continue in full force and effect as originally executed and delivered. Any reference in the EPA to "this Agreement," "hereunder," hereof," "herein," or words of like import referring to such agreement shall refer to the EPA as amended and clarified by this Agreement.

**SECTION 3. COUNTERPARTS.** This Agreement may be executed in any number of counterparts, with each executed counterpart constituting an original and all counterparts together constituting one agreement.

**SECTION 4. EFFECTIVENESS.** This Agreement shall become effective as of the date hereof upon the execution of counterparts hereof by the parties hereto.

**SECTION 5. GOVERNING LAW.** This Agreement shall be governed by, and construed in accordance with, the laws of the state of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

BUYER:

LendUSA, LLC
(formerly RPM Mortgage, Inc.)

By: _____
      Name: Ava Noack
      Title:  President

COMPANY:

American Eagle Mortgage Co., LLC

By _____
      Name:  John Schrenkel
      Title:   Chief Executive Officer

MEMBER:

JDJ Management, LLC

By _____
Name:  John Goede
Title:  Manager

PRINCIPALS:

_____

John Schrenkel

_____

John Goede

A00476000.v5

# ROBERT HIRT EMAIL

From: Rob Hirt [mailto:RHirt@lend.us]
Sent: Monday, January 01, 2018 11:56 PM
To: John Schrenkel <jschrenkel@aem.com>; John C. Goede, Esq. <jgoede@goedelaw.com>
Cc: Ava Noack <ahoack@lend.us>
Subject: Matters at hand –

John and John

Happy New Year! In order to keep our discussions relevant I asked Ava to go back against our definitive agreement to be certain that we clearly understand what we all agreed upon when we signed our deal in July of '16.

As we all know: in '17 overall COGS at AEM was down over 100 basis points plus RPM accepted $800,000 in expenses that we did NOT charge AEM, If originations stayed even over '16 then AEM is down over $5mm in net profit. When we signed the deal to purchase AEM that price we paid was based on net income (P&L), not loan originations in $'s. Regardless, I cannot use any metric below which supports John S's perspective that we should pay you more than what is agreed per our definitive agreement.

Matters at hand:

- Expense allocations – In the Management Incentive Agreement, under section 1.13, it has been clarified that AEM's books "shall track the income and cost, net profits and net losses directly related to the AEM assets" and have to exclude any income or loss related to other business assets of the company. Assuming that expenses utilized by the AEM team will be absorbed by other boutiques was never the case. We also discussed that if there are any expenses incurred by the other boutiques via sharing labor or by other means, the expense allocations will be 1:1 and will never be more than the actual cost was.

At the end of the day, only expenses were allocated to date that were primarily related to Cindy Garron's accounting work.

- Payout of the earnout: The relevant schedule is copied below and attached.

At the end of the day, the new payout arrangement is more beneficial for John and John.

**Payout term 1**

| Month | Earnout | Guarantees | | Net payout |
|---|---|---|---|---|
| August | 1,141,614 | | | |
| September | 469,399 | | | |
| October | 551,278 | | | |
| November | 323,929 | | | |
| December | 269,668 | | | |
| January | 153,816 | | | |
| February | 405,984 | | | |
| March | 739,152 | | | |
| April | 445,445 | | | |
| May | 768,257 | 445,967 | | 1,214,224 |
| June | 1,316,138 | (22,297) | | 1,293,841 |
| July | 820,814 | (22,297) | | 798,517 |
| | 7,406,494 | 401,373 | | 7,809,867 |

| August payout to Dave, John and John | (3,552,077) |
|---|---|
| Delayed payout | 4,252,790 |
| Delayed payout @ one @ a month average | 127,554 |
| (Sept, Oct, Nov, Dec, Jan, Feb) | |

Payout term 2

| | Earnout | guarantee amortization | Repurchase adj | Net payout |
|---|---|---|---|---|
| August | 1,076,635 | (22,297) | | 1,054,368 |
| September | 15,398 | (22,297) | | (6,899) |
| October | 284,728 | (22,297) | | 262,431 |
| November | 922,049 | (22,297) | (26,156) | 874,496 |
| December (assuming) | 368,712 | (22,297) | | 346,415 |
| | | Early payout - | | 2,530,201 |
| | | Early payout @ 6% till 13 month average | | 164,502,017 |
| | | (March, April, May, June, July, Aug, Sept, Oct, Nov, Dec, Jan, Feb, March) | | |
| | | Benefits of the modified arrangement to John and John | | 36,918,36 |

Promise of $1mm if double the size of the company -

   o Production of AEM for 2016 = $642mm

   o Production of AEM for 2017 = $921mm

At the end of the day, production did not double, earnings plummeted by 100bps

• Promise of paying  Dec, Jan, Feb, March we would get 50/50 once we hit our mark. So take those 4 months just assume its $400/600 a 4 way assertian we did this year its $800/600 to us

   o ???

New hire incentives - was only a one-time agreement and was never discussed in forever continue as GAAP, the accounting principles we have to follow do not allow

amortization of guarantees.

At the end of the day, we should keep everything as is. Close December and based on the December 31 financials, we will pay $3.5mm on February 1 and the remaining in the payroll cycle immediately following April 1.

Lets work on getting on a call tomorrow or Wednesday. I am also still trying to get Lauren's agreement understood and agreed upon by all of us.

Thank you,

Rob

Robert Hirt
CEO
RPM Mortgage, Inc.
3240 Stone Valley Road West
Alamo, CA 94507

D: 925-295-9340
F: 925-944-8910
E: rhirt@rpm-mtg.com
www.rpm-mtg.com

*The RPM Story:*
Take a Closer Look at RPM

Protect your personal financial information by not sending it in an e-mail. Only send personal financial information attached to an e-mail if you use encryption software. This message, and any attachments, is intended only for the intended recipient(s) and it may be privileged and confidential. Please note that any views or opinions expressed in this e-mail are solely those of the author and do not necessarily represent those of LendUS, LLC, and/or its affiliates. If you are not the intended recipient(s), or agent responsible to deliver this message to the intended recipient(s), you are hereby notified that any review, re-transmission, conversion to hard copy, copying, circulation, or other use of this message or any attachments is strictly prohibited and may be illegal. If you are not the intended recipient(s), please notify the sender immediately by return e-mail and permanently delete this message and any attachments. Thank you.

# Initial Claim/Report John Schrenkel

LABOR COMMISSIONER, STATE OF CALIFORNIA
DEPARTMENT OF INDUSTRIAL RELATIONS – DIVISION OF LABOR STANDARDS ENFORCEMENT

**CLEAR**          **PRINT**

## Initial Report or Claim

*PLEASE PRINT OR TYPE ALL INFORMATION*
*Refer to the accompanying check list to assist you in filling out this form.*

| FOR OFFICE USE ONLY | | |
|---|---|---|
| Taken by: | Office: | Case #: |
| Date filed: | WC #: | |
| RCI Complaint? ☐ YES ☐ NO | Limits: | |

## PRELIMINARY QUESTIONS

1. Is your claim about a public works project? [If your answer is "YES," STOP here, DO NOT FILL OUT THIS FORM, and fill out the "PW-1" claim form instead. If your answer is "NO," proceed with this form.]

2. Have you filed a retaliation complaint against your employer with the Labor Commissioner?
   ☐ YES on ___/___/___ (Month Day Year)   ☒ NO [ If you have been retaliated against, you may file a retaliation complaint by filling out another form, "DLSE FORM 605."]

3. Is there a union contract covering your employment?
   ☐ YES [If "YES," attach a copy of the Collective Bargaining Agreement.]
   ☑ NO

4. Are other employees also filing wage claims against your employer? ☒ YES ☐ NO ☐ I DON'T KNOW

## Part 1: LANGUAGE ASSISTANCE & REPRESENTATION

| 5a. Do you need an interpreter? ☐ YES ☑ NO | 5b. If you checked "YES" in Box 5a, enter the language needed |
|---|---|

6a. If you are being assisted with your claim by a lawyer or other advocate, enter your ADVOCATE'S NAME and ORGANIZATION    6b. ADVOCATE'S PHONE ( )

6c. Your ADVOCATE'S MAILING ADDRESS (Number, Street, Floor, Suite)    CITY    STATE    ZIP CODE

## Part 2: YOUR INFORMATION

| 7. Your FIRST NAME | 8. Your LAST NAME | 9. HOME PHONE | 10. OTHER PHONE | 11. BIRTH DATE |
|---|---|---|---|---|
| John | Schrenkel | 239 221-7313 | ( ) | 6/6/65 |

| 12. Your MAILING ADDRESS (Street Number, Street Name, Apartment Number) | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 14717 Reserve Lane | Naples | FL | 34109 |

## Part 3: CLAIM FILED AGAINST (EMPLOYER INFORMATION)

| 13. EMPLOYER / BUSINESS NAME(S) | 14. EMPLOYER'S VEHICLE LICENSE PLATE # | 15. EMPLOYER PHONE |
|---|---|---|
| LendUS, LLC | | (925) 295-9300 |

| 16. ADDRESS of EMPLOYER / BUSINESS (Street Number, Street Name, Floor, Suite) | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 3240 Stone Valley Road West | Alamo | CA | 94507 |

| 17. ADDRESS where you worked, if different from Box 16 (Number, Street, Floor, Suite) | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 305 5th Avenue South, Unit 204 | Naples | FL | 34102 |

| 18. NAME of PERSON IN CHARGE (First Name, Last Name) | 19. JOB TITLE / POSITION of PERSON IN CHARGE |
|---|---|
| Robert Hirt | Chief Executive Officer |

| 20. TYPE OF BUSINESS | 21. TYPE OF WORK PERFORMED | 22. TOTAL NUMBER OF EMPLOYEES | 23. EMPLOYER STILL IN BUSINESS? |
|---|---|---|---|
| Mortgage Lending | Management | 1200 | ☑ YES ☐ NO ☐ DON'T KNOW |

24. Check which box describes your employer: (If you know) ☐ CORPORATION ☐ INDIVIDUAL ☐ PARTNERSHIP ☒ LLC ☐ LLP

PRINT YOUR NAME  John Schrenkel

## Part 4: FINAL WAGES / BOUNCED CHECKS

| 25. DATE OF HIRE | 26. Check which box applies to you: |
|---|---|
| 8 / 1 / 2016<br>Month  Day  Year | ☐ Still working for employer  ☐ QUIT on ___/___/___  Month Day Year   ☑ DISCHARGED on 3 /30 /2018  Month Day Year<br><br>☐ Other (specify) _____ |

| 27a. If you QUIT, did you give 72 hours notice before quitting?<br>☐ YES<br>☑ NO | 27b. If you QUIT, have you received your final payment of wages including all wages owed?<br>☐ YES on ___/___/___  Month Day Year<br>☐ NO |
|---|---|

28. If you were DISCHARGED, have you received your final payment of wages including all wages owed?

☐ YES on ___/___/___  Month Day Year
☑ NO

| 29a. How were your wages paid?<br>☐ BY CHECK  ☐ BY CASH  ☐ BY BOTH CASH & CHECK<br>☑ OTHER: Direct deposit | 29b. If paid by check, did any of your paychecks "bounce" (for example, paycheck could not be cashed because employer has insufficient funds)?<br>☐ YES    ☐ NO |
|---|---|

## Part 5: HOURS YOU TYPICALLY WORKED

30. Check which box applies ☑ My work hours and days of work were usually the same each week that I worked.

☐ My work hours and/or days of work varied per week or were irregular. If you checked this box and you are claiming unpaid wages or meal and rest period violations, you should also fill out and submit the DLSE FORM 55.

31. If your work hours and days of work were usually the same each week, give your BEST ESTIMATE below of the hours you usually worked and any time you took for a duty-free meal period during your TYPICAL workweek.  DO NOT fill this out if your work hours were too irregular to estimate a typical or average workweek (instead fill out the DLSE Form 55).

| | TIME WORK STARTED | TIME WORK ENDED | 1st MEAL START TIME (if applicable) | 1st MEAL END TIME (if applicable) | 2nd MEAL START TIME (if applicable) | 2nd MEAL END TIME (if applicable) | ONLY IF YOU WORKED A SPLIT SHIFT: | |
|---|---|---|---|---|---|---|---|---|
| DAY 1 of your workweek | 8 ☑am ☐pm | 5 ☐am ☑pm | ☐am ☐pm | ☐am ☐pm | ☐am ☐pm | ☐am ☑pm | 1st shift ended at ☐am ☑pm | 2nd shift started at ☐am ☐pm |
| DAY 2 of your workweek | 8 ☑am ☐pm | 5 ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | 1st shift ended at ☐am ☑pm | 2nd shift started at ☐am ☐pm |
| DAY 3 of your workweek | 8 ☑am ☐pm | 5 ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | 1st shift ended at ☐am ☑pm | 2nd shift started at ☐am ☑pm |
| DAY 4 of your workweek | 8 ☑am ☐pm | 5 ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | 1st shift ended at ☐am ☑pm | 2nd shift started at ☐am ☑pm |
| DAY 5 of your workweek | 8 ☑am ☐pm | 5 ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | 1st shift ended at ☐am ☑pm | 2nd shift started at ☐am ☑pm |
| DAY 6 of your workweek | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | 1st shift ended at ☐am ☑pm | 2nd shift started at ☐am ☑pm |
| DAY 7 of your workweek | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | ☐am ☑pm | 1st shift ended at ☐am ☑pm | 2nd shift started at ☐am ☑pm |

## Part 6: PAYMENT OF WAGES

32. Were you paid or promised a FIXED amount of wages per pay period, no matter how many hours you worked (for example, $400 per week, regardless of how many hours you worked)?

☑ YES: I was paid $ __17,067.31__ per ☐ day ☐ week ☑ every 2 weeks ☐ month ☐ semi-monthly
☐ other (specify): _____

I was promised $ _____ per ☐ day ☐ week ☐ every 2 weeks ☐ month ☐ semi-monthly
☐ other (specify): _____

☐ NO

| | |
|---|---|
| 33a. Were you an HOURLY employee?<br><br>☐ YES  I was paid $_____ per hour<br>I was promised $_____ per hour<br>☒ NO | 33b. If you were an HOURLY employee, were you paid or promised more than one hourly rate (based on the hours you worked or different job tasks)?<br><br>☐ YES (describe)<br><br>☐ NO |
| 34. Were you paid by PIECE RATE? ☐ YES ☑ NO | 35. Were you paid by COMMISSION? ☑ YES ☐ NO |

## Part 7: WAGES, COMPENSATION & PENALTIES OWED

| 36. CLAIMS (Check all boxes below that apply) | CLAIM PERIOD: START DATE (Month/ Day/ Year) | CLAIM PERIOD: END DATE (Month/ Day/ Year) | AMOUNT EARNED / CLAIMED |
|---|---|---|---|
| ☐ REGULAR WAGES (for non-overtime hours) | | | $ |
| ☐ OVERTIME WAGES (including double time) | | | $ |
| ☐ MEAL PERIOD WAGES | | | $ |
| ☐ REST PERIOD WAGES | | | $ |
| ☐ SPLIT SHIFT PREMIUM | | | $ |
| ☐ REPORTING TIME PAY | | | $ |
| ☑ COMMISSIONS *** | 12/31/2017 | 4/2/2018 | $ 1,400,000 |
| ☑ VACATION WAGES *** | 8/1/2016 | 3/30/2018 | $ 42,668.28 |
| ☐ BUSINESS EXPENSES | | | $ |
| ☐ UNLAWFUL DEDUCTIONS | | | $ |
| ☑ OTHER (Specify): bonus | 1/1/2018 | 3/31/2018 | $ $37,500 |
| ENTER SUBTOTAL (add all Amounts Earned/Claimed): | | | $ 1,480,168.28 |
| ENTER TOTAL AMOUNT PAID: | | | $ 0 |
| GRAND TOTAL OWED [Subtotal minus Total Amount Paid]: | | | $ 1,480,168.28 |

*** Additional DLSE form should be submitted if you are making this claim. See "Instructions for Filing a Wage Claim."

37. Check box(es) if you are claiming: ☑ Waiting time penalties [Labor Code §203]
☐ Penalties for "bounced" checks (checks issued with insufficient funds) [Labor Code §203.1]

I hereby certify that the information I have provided is true to the best of my knowledge and/or recollection. The amounts claimed are based on my best estimates at this time and may be adjusted based on further information, or based on assistance with my claim provided by DLSE.

Signed: _____  Date: April 5, 2018

Print Name: John Schrenkel

DLSE FORM 1 / WAGE ADJUDICATION DIV. (REV. 10/13)                    Continued page 2 of ...

**DO NOT WRITE ON THIS SIDE – For Office Use Only**

Claimant:

Address of Claimant:

Phone No. of Claimant:
Name & Address of Advocate:

Phone No. of Advocate:
Address/change of Claimant as of

Against:

Address of Defendant:

Phone No. of Defendant:

Address/change of Defendant as of

Interpreter Needed:

Date(s) Date:

DATE(S) CLAIM RECEIVED

DATE HOPE COMPLAINT FILED (if applicable)

Action Number:

Date Closed

DATE RCT COMPLAINT FILED (if applicable)

**RECORD OF RECEIPTS**

| Date Received | Check Code, etc. | Receipt Number | Amount |
|---|---|---|---|
| | | | |
| | | | |

**RECORD OF PAYMENTS TO CLAIMANT**

| Division Check Number | Date Paid | Time Paid | Balance Due | Signature/Remarks |
|---|---|---|---|---|
| | | | | |
| | | | | |

**CONFERENCE DATES**

**PEND: DATES**

NOTES:

# EMPLOYMENT AGREEMENT

## John Schrenkel



August 1, 2016

<u>PERSONAL AND CONFIDENTIAL</u>

John Schrenkel
12126 Via Cercina Drive
Bonita Springs FL 34135

Dear John:

As you are aware, RPM Mortgage, Inc., or its subsidiary, RPM Holdings I, LLC ("RPM") has entered into an Equity Purchase Agreement ("EPA") with you and American Eagle Mortgage Co., LLC, an Ohio limited liability company (the "Company"), pursuant to which RPM will purchase all of the outstanding membership interests of the Company, subject to the terms and conditions set forth in the EPA. One of the conditions to the effectiveness of the EPA and the consummation of the transactions contemplated thereunder is your entering into an employment relationship with the Company, pursuant to the terms and conditions set forth in this offer letter. Additionally, the establishment of the Management Incentive Program for your benefit by RPM is part of the consideration for you to enter into the EPA and to consummate the transactions contemplated thereby.

Subject to the terms and conditions of the EPA, the Company is pleased to offer you the full-time position of Chief Executive Officer. This letter summarizes the initial terms of your employment, which terms will be effective immediately after the Closing (as defined in the EPA). Please note that if the Closing does not occur, this offer letter shall be null and void and of no legal effect.

During your employment with the Company, you will be responsible for performing those duties as are consistent with your title and/or position and as may from time to time otherwise be reasonably assigned to or requested of you. You shall devote your full business time, attention, skill and best efforts to perform such responsibilities faithfully and to the best of your abilities so as to maintain and promote the business and reputation of the Company and RPM. To that end, you shall not engage in any other active business or occupation while employed by the Company.

Your salary will be paid at the rate of $22,916.67 per month (which is annualized to a rate of $275,000 per annum) for the initial two years following the Closing (as defined in the EPA), after which we may review your salary in accordance with our standard practice. You will be paid in accordance with the Company's normal payroll practices as established or modified from time to time, and your salary shall be subject to all applicable federal, state and

local taxes and withholdings. The Company currently pays salaries on a semi-weekly basis (every other Friday).

In addition to your salary, you will also be (i) paid a sign-on bonus of $100,000, and (ii) granted a profit interest pursuant to the terms set forth in the Management Incentive Program attached hereto as Exhibit A ("Bonus Program").

If your profit interest is redeemed in connection with a Change in Control (as defined in the Bonus Program), you will have the right to purchase an equity interest in the Business (as defined in the Bonus Program) within thirty days after the closing of the Change in Control at the then current fair market, as determined following the Change in Control event in accordance with the Bonus Program. The right to purchase such equity interest shall be limited to the percentage profit interest that you hold immediately before the closing of such Change in Control ("Percentage Interest"). For example, if you hold an 8.33% profit interest in the Business immediately prior to the Change in Control, then you will have the right to acquire an equity interest representing up to 8.33% of the Business after the Change in Control. In addition, and subject to the consent of the acquirer of RPM, in the event you do not purchase the full Percentage Interest, you will have the right to invest subsequent distributions until your capital account for the Business relative to all outstanding capital accounts is equal to the Percentage Interest. For clarity, this right to invest (i) is limited to the Business (legacy AEM assets) and shall not be exercisable for an interest in RPM or its affiliates, and (ii) the equity interest might be structured as a special interest directly tied to the AEM assets even if, at that time, such AEM assets have been combined with the business assets of RPM or its affiliates.

Furthermore, you will be eligible to participate in the Company's employee benefits programs, which currently include those listed on Exhibit B attached hereto. Your participation in the Company's benefit programs shall be subject to (a) the terms and conditions of the applicable program documents; (b) generally applicable Company policies; and (c) the discretion of any administrative or other committee overseeing each program. Please note that the Company (in RPM's sole discretion) may alter, add to, modify or delete its benefits programs at any time in its sole discretion.

RPM requires you to verify that the performance of your position at the Company does not and will not breach or contravene (i) any agreement or contract entered into by you prior to the Closing (i.e., you have not entered into any agreements that are in conflict with your obligations to AEM); or (ii) any obligation you may otherwise have under applicable law to any other person. You further represent and warrant that you have delivered or disclosed, as the case may be, to RPM all agreements, contracts and/or obligations relevant to clauses (i) and (ii) above.

In connection with the purchase of the Company and the mutual promises set forth herein, you will also be required to sign a separate Noncompetition and Nondisclosure Agreement, which will be effective as of the Closing.

The above terms are a summary of our proposed initial employment relationship and are subject to later modification by RPM and/or the Company. Your employment will be "at-

will," meaning that either you or the Company (at the sole discretion of RPM) may terminate your employment relationship at any time, for any reason, with or without prior notice. RPM is a not guarantor, financial or otherwise, of the employment arrangement discussed herein other than in its commitment to ensure that the terms and conditions set forth herein will be offered to you by the Company from and after the Closing Date.

John, we are excited about the prospect of you joining our team, and look forward to the addition of your professionalism and experience to help the RPM team achieve its goals. If this offer letter meets your approval, please countersign below and return a fully executed copy of the offer letter to me.

[Signature Page Follows]

DocuSign Envelope ID: 5A531101-A2E4-4A15-8FA0-AE125BF2417A

Sincerely,

**RPM MORTGAGE, INC.**

By: E. Robert Hirt

Accepted and Agreed By:

John Schrenkel, as an individual

Sincerely,

RPM MORTGAGE, INC.

By:_____

Accepted and Agreed By:

John Schrenkel, as an individual

Exhibit A

Management Incentive Program
(aka Bonus Program)

(See attached.)

## MANAGEMENT INCENTIVE PROGRAM

### PURPOSE AND EFFECTIVE DATE

The Plan is adopted as of _____, 2016 with an effective date as specified below. The purpose of the Plan is to retain employees of the Company by providing Participants with an opportunity to receive annual bonuses and a long-term interest in the profits attributable to the business assets of The American Eagle Mortgage Co., LLC, an Ohio limited liability company ("AEM" or "Company"). This Plan is adopted by AEM in connection with RPM's acquisition of the outstanding membership interests of AEM (the "Acquisition") and the profit interests defined herein are expressly limited to the profits generated by such AEM assets. The Plan is intended to be exempt from the reporting and disclosure requirements of Title I of ERISA because it is an unfunded plan maintained by an employer for the purpose of providing benefits for a select group of management or highly compensated employees.

### ARTICLE I
### DEFINITIONS

The following words and phrases when used in the Plan will have the meanings indicated in this Article I. Unless indicated otherwise, references in the Plan to articles and sections are to articles and sections of the Plan.

1.1     "Account" means the bookkeeping account of each Participant to which annual Net Profits and Net Losses of the Business (as defined below) are credited.

1.2     "Acquisition Agreement" means that certain equity purchase agreement by and among the Company, AEM, and certain members of AEM, dated June 30, 2016.

1.3     "Administrator" means the person designated by the Company to administer the Plan.

1.4     "Beneficiary" means any individual designated by a Participant as his beneficiary in accordance with procedures established by the Administrator. If a Participant has no Beneficiary designation in effect or the Participant's designated Beneficiary predeceases the Participant, the Participant's Beneficiary will be his surviving spouse or, if none, his estate.

1.5     "Business" means the business of originating, making, selling and servicing residential mortgage loans attributable only to the assets of AEM acquired by the Company, and shall be exclusive of any and all business assets of the Company or other affiliates of the Company, as the case may be.

1.6     "Cause" means (i) conviction of a felony, (ii) an act that constitutes gross negligence or willful misconduct in the performance of services, (iii) theft or misappropriation of property, (iv) breach of any confidentiality or non-compete agreement, or (v) failure to perform the Services or his or her obligations and duties (other than due to his death or disability) after there has been delivered to him or her a written notice of such failure to perform and his or her failure to substantially cure such failure within thirty (30) calendar days after written notice is given by the Company.

1.7    "Change of Control Event" means:   (i) any acquisition of the Company by an unaffiliated third party by means of merger or other form of corporate reorganization; (ii) any issuance, sale or other disposition (or series of related sales or dispositions) of the outstanding stock of the Company to an unaffiliated third party, in which the stockholders immediately prior to such event do not hold a majority of the outstanding stock of the Company immediately after such event, except where such issuance, sale or disposition is for the purposes of an equity financing of the Company; or (iii) any sale, disposition or transfer of all or substantially all of the assets of the Company or the Business to an unaffiliated third party.

1.8    "Code" means the Internal Revenue Code of 1986, as amended, and the regulations and other guidance thereunder.

1.9    "Company" means The American Eagle Mortgage Co., LLC, an Ohio limited liability company, or its assigns.

1.10    "Economic Interest" means, with respect to a Participant, his or her percentage interest in the Net Profits and Net Losses shown opposite such Participant's name on Appendix A.

1.11    "Effective Date" means the date this Plan becomes effective, which is anticipated to occur on the earlier of (i) the date the full Earn-Out Amount (as defined in the Acquisition Agreement) has been earned by the Principals (as defined in the Acquisition Agreement), or (ii) August ___, 2018.

1.12    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations and other guidance thereunder.

1.13    "Net Profits" and "Net Losses" shall be calculated in accordance with GAAP based on a separate income statement for the assets attributable to the Business. The Company shall at all times maintain a separate income statement for the Business, which shall track the income and cost, net profits and net losses directly related to the legacy assets of AEM, and will exclude income and cost related to other business assets of the Company and its affiliates.

1.14    "Participant" means an employee of the Company or any of its affiliates who is designated by the Company as a Participant on Appendix A.

1.15    "Plan" means this Management Incentive Program, as amended from time to time.

1.16    "Plan Year" means the period from the Effective Date *through* December 31 of the same year and each 12-month period thereafter from each January 1 through each December 31.

1.17    "RPM" means RPM Holdings I, LLC, a Delaware limited liability company, or its assigns.

1.18    "Separation from Service" means a Participant's death or the Company's termination of Participant's employment with the Company without Cause.

2

## ARTICLE II
## PARTICIPATION

The Participants in the Plan will consist of the individuals set forth on Appendix A attached hereto. It is intended that the Participants be part of management of the Business or other highly compensated employees of the Company and its affiliates.

## ARTICLE III
## ANNUAL BONUS PAYMENT

### 3.1    Determination and Payment of Annual Bonus.

(a)    The balance of each Participant's Account shall be $0 on the Effective Date. Before or as soon as practicable but in any event within ninety (90) days after the end of each Plan Year, the Company will determine the Net Profit or Net Loss of the Business for such Plan Year and will notify the Participants in writing of such determination. Any payout hereunder is contingent upon continuous employment with the Company as of the date the payment obligation matures and becomes due and payable. If Participant voluntarily leaves the employment of the Company or if Participant's services are terminated for Cause, then the Participant's Economic Interest shall be transferred to the remaining Participants equally; provided, that to the extent RPM needs to replace the Participant who voluntarily leaves or is terminated for Cause, then the cost associated with such hire, including but not limited to excess salary over the salary paid to the departing Participant, equity, profit interests and any sign-on bonus, shall be deducted from any payout based on any Economic Interest transferred under the preceding sub-clause.

(b)    A Participant shall have the right to dispute in writing the calculation of such Net Profit or Net Loss within thirty (30) days following receipt of the calculation thereof (such 30-day period, the "Notice Period"). If the Company has not received notice of such a dispute within the Notice Period, the Company will increase (in the case of a Net Profit for such Plan Year) or decrease (in the case of a Net Loss for such Plan Year) each Participant's Account with an amount equal to the product of (i) such Net Profit or Net Loss, and (ii) such Participant's Economic Interest for such Plan Year. If the Company has received a notice of such a dispute within the Notice Period, then the Participant and the Company shall, for an additional thirty (30) days following receipt of such notice of dispute (such additional 30-day period, the "Resolution Period"), attempt to reach agreement on the determination of such Net Profit or Net Loss. If no resolution of this dispute is finalized within the Resolution Period, the disputed items or amounts shall be submitted for review and final determination by an auditing firm jointly selected by the Participant and the Company which is not then providing substantial services to either the Participant or the Company (the "Independent Accounting Firm"). If the Company and the Participant are unable to agree upon the selection of the Independent Accounting Firm within thirty (30) days following the end of the Resolution Period, the Company, on the one hand, and the Participant, on the other, shall select one independent accounting firm within ten (10) days following the end of such thirty (30) day period. Such accounting firms shall jointly select a third independent accounting firm, and such firm shall be the Independent Accounting Firm. The Independent Accounting Firm shall review all relevant data, including any necessary books and records of the Company, to determine the changes to such Net Profit or Net Loss, if any,

3

necessary to resolve the disputed items or amounts. The determination by the Independent Accounting Firm shall be made as promptly as practical but in no event beyond thirty (30) days, and shall be final and binding on the parties. In the event that the final Net Profit or Net Loss differs from the initial amount determined by the Company by five percent (5%) or less, the costs of the Independent Accounting Firm shall be borne exclusively by the Participant(s). In the event that the final Net Profit or Net Loss differs from the initial amount determined by the Company by more than five percent (5%), the costs of the Independent Accounting Firm shall be borne exclusively by the Company.

(c)     As soon as practicable after the Participant's Account is adjusted for a Plan Year in accordance with Section 3.1(a) or 3.1(b) above, the Company will determine the Participant's Account balance. If the Participant was employed on the last day of such Plan Year, and the Participant's Account balance is a positive amount, the Company shall pay such Account balance to the Participant as soon as practicable following the end of such Plan Year, and in any event no later than April 15 of the year following such Plan Year. If the Participant's Account balance is a negative amount or if Participant is not employed on the last day of the applicable Plan Year, no amount shall be paid for such Plan Year. Any negative Account balance will be set off against Net Profits for the following fiscal year (and any future fiscal years) until all Net Losses has been set off against Net Profits. For clarity, the bonus amount payable hereunder with respect to any fiscal year with respect to which Net Losses occur shall be zero (0) and such Net Losses shall reduce the Net Profits payable to the Participant, if any, for subsequent years until such Net Losses have been used in their entirety. Allocations of Net Profits and Net Losses shall be allocated among the Participants in accordance with such Participant's Economic Interest.

(d)     Deductions from Accounts. The Participant's Account will be reduced by the amount of any payment made to the Participant pursuant to this Article III. The Company may reduce the Participant's Account or any payment owed by the Participant to the Company or any of its affiliates by the amount of any debt or monetary obligation that a Participant owes the Company, provided that no such reduction will be applied to the extent that such reduction would cause the Plan or any other deferred compensation arrangement to fail to comply with the requirements of Section 409A of the Code or the regulations thereunder.

### ARTICLE IV
### SETTLEMENT OF INTEREST IN NET PROFITS

4.1     Determination of Settlement Amounts.

(a)     Company Right to Redeem after Five Years. Following (i) the death of a Participant, or (ii) the fifth anniversary of the Effective Date, the Company shall have the right, but not the obligation, to redeem the Economic Interests by paying to the Participants the Settlement Amount (as defined below) by issuing a Promissory Note (as defined below) to the Participant(s) within thirty (30) days after delivering written notice of exercise, the Promissory Note to be in the principal amount equal to the Settlement Amount *less* any tax withholding required in connection with such redemption. In the case of death, the Company shall have thirty days after receiving notice of death to exercise its option to redeem the profit interest. The Company shall exercise such right of redemption by written notice delivered to the Participants.

4

For purposes of this Section 4.1(a), the term "*Promissory Note*" shall mean a 1% 3-year promissory note pursuant to which the acquirer (or the surviving entity in the Change in Control Event) shall agree to pay the Participant the Settlement Amount *less* applicable tax withholdings in three equal annual installments, with the first payment being made on the 12-month anniversary of the Promissory Note.

        (b)    Automatic Redemption.   In the event the Company terminates a Participant's employment without Cause or upon a Change of Control Event but and only if Participant agrees to remain an employee during a 90-day transition period after the consummation of such Change of Control Event, then the Participants' Economic Interests shall be redeemed automatically and without any further action required on the part of the Company or the Participants in exchange for the payment of the Settlement Amount in accordance with Section 4.2 below.

        (c)    For purposes of this Section 4.1, the "*Settlement Amount*" shall mean (i) the fair value of the Participant's Economic Interest *multiplied by* (ii) a fraction (not to exceed one), the numerator of which shall be the total number of the Participant's years of continuous service with the Company and its affiliates (up to five years) from and after the Closing (as defined in the Acquisition Agreement), and the denominator of which shall be five. The fair market value of such interest shall be determined by an independent accounting firm (acting as a third party appraiser) mutually acceptable to the Company and the Participants. Such appraiser shall determine such fair market value by taking into account factors typically used for such valuations, including, but not limited to, the size and profitability of the Business, cash flow, the market or the lack of a market for the sale of the interests, non-equity interests, and the net income and mortgage loan production of the Business relative to the aggregate net income and mortgage loan production of the Company and its affiliates, but shall disregard the fact that the Participant's interest is directly tied to employment.

    4.2    Payment of Settlement Amount. The Settlement Amount determined in Section 4.1(b) shall be paid to the Participant(s) in three (3) equal annual installments, the first of which shall be made on the one-year anniversary of the event prompting the redemption, followed by subsequent installment payments on the second and third anniversaries.

    4.3    Non-Competition and Non-Solicitation Agreement. A Participant who engages in Competition with the Company shall not be entitled to any payments set forth in Article III or this Article IV to the extent such payments are not related to the last day of the immediately preceding Plan Year as of the date the Participant engages in Competition and all entitlement to future payments shall abate. For purposes of this Plan, the term "Competition" means any activity prohibited under that certain Non-competition and Non-solicitation Agreement.

    4.4    Section 409A Specified Employees. Notwithstanding any provision of this Plan to the contrary, and solely to the extent required by Section 409A of the Code and not otherwise eligible for exclusion from the requirements of Section 409A of the Code, if as of the date of a Participant's Separation from Service, (a) the Participant is deemed to be a "specified employee" (as defined in Section 409A of the Code and the related regulations) and (b) the Company or any member of a controlled group including the Company is publicly traded on an established securities market or otherwise, to the extent required by Section 409A of the Code and the

regulations thereunder, no payment or other distribution required to be made to the Participant under the Plan (including any payment of cash, any transfer of property and any provision of taxable benefits) solely as a result of the Participant's Separation from Service will be made earlier than the first day of the seventh month following the date of the Participant's Separation from Service.

## ARTICLE V
## ADMINISTRATION

### 5.1   Administrator.

(a)   The Plan will be administered by the Administrator, which will be responsible for interpreting the Plan and establishing rules and regulations governing the Plan's administration consistent with the terms of the Plan. Except as otherwise set forth in the Plan, the Administrator's decision in any matter involving the interpretation and application of the Plan will be final and binding on all parties. Neither the Administrator, the Company, the Company of Directors of the Company nor any member of the Company will be liable for any action or determination made in good faith with respect to the Plan or any person's rights under the Plan.

(b)   The Administrator may execute or deliver any instrument, make any payment or perform any other act that the Administrator determines necessary or appropriate to administer the Plan, including, without limitation, the retention of counsel and other agents required in carrying out the Plan.

(c)   The Administrator will keep all records necessary for the Plan's administration and will furnish any periodic information to Participants as required pursuant to Section 3.1(b), or that is otherwise necessary or desirable, in the Administrator's reasonable discretion. All expenses of administering the Plan will be paid by the Company and will not affect a Participant's right to or the amount of benefits.

### 5.2   Claims Procedures.

(a)   Except as otherwise required by the Plan, all claims for benefits under the Plan will be submitted to, and within 90 days thereafter decided by, in writing, the Administrator. If the Administrator determines that it needs an extension of time for processing the claim, it may extend the date by which a decision is required to 180 days after the claim is submitted if it notifies the claimant in writing of the extension prior to the termination of the initial 90-day period, including the special circumstances requiring an extension of time and the date by which it expects to render a decision.

(b)   Written notice of the decision on each claim will be furnished reasonably promptly to the claimant. If the claim is wholly or partially denied, such written notice will set forth (i) the specific reasons for the denial, (ii) reference to the specific Plan provisions on which the denial is based, (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary and (iv) a description of the Plan's review procedures and the time limits applicable to

6

such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following the denial of a claim on review.

(c)     A claimant may request a review by the Administrator of a decision denying a claim in writing within 60 days following receipt of the denial. All such reviews will be decided in writing by the Administrator within 60 days after receipt of the request for review. If the Administrator determines that an extension of time for processing the review is required, it may extend the date by which a decision is required to 120 days after the request for review is submitted if it notifies the claimant in writing of the extension prior to the termination of the initial 60-day period, including the special circumstances requiring an extension of time and the date by which it expects to render a decision.

(d)     In connection with a review of a denied claim for benefits, a claimant will have the opportunity to submit written comments, documents, records and other information relating to the claim for benefits and be provided, on request and free of charge, reasonable access to and copies of all documents, records and other information relevant to his claim for benefits. The review of a denied claim will take into account all comments, documents, records and other information submitted by the claimant related to the claim, without regard to whether such information was submitted or considered in the initial review of the claim. If a claim is denied on review, the written notice of the denial will specify (i) the specific reasons for the denial, (ii) reference to the specific Plan provisions on which the denial is based and (iii) a statement that the claimant is entitled to receive, on request and free of charge, reasonable access to and copies of all documents, records and other information relevant to his claim for benefits.

(e)     The claimant may have an authorized representative to act on his behalf in pursuing a benefit claim or appeal of the denial of the benefit. For a representative to be recognized as acting on the claimant's behalf, the claimant must provide the name, address and phone number of his authorized representative in writing to the Administrator and a statement that the representative is authorized to act on his behalf concerning his claim for benefit and, if applicable, an appeal of the denial of the claim.

ARTICLE VI
FUNDING

The Plan is an unfunded arrangement. No portion of any funds of the Company or any of its affiliates is required to be set apart for a Participant or Beneficiary. Accounts will be payable from the Company's general assets, and the rights of a Participant or Beneficiary to his Account is limited to those of a general, unsecured creditor of the Company who has a claim equal to the value of the Participant's Account.

ARTICLE VII
AMENDMENT AND TERMINATION

This Plan may only be amended or terminated upon the written agreement of the Company and the Participants. However, no amendment or termination may result in an acceleration of benefit payment (except as permitted by Section 409A of the Code).

7

## ARTICLE VIII
## GENERAL PROVISIONS

8.1     Payments to Minors and Incompetents.  If the Participant or any Beneficiary entitled to receive any benefits under the Plan is a minor or is deemed by the Administrator or is adjudged to be legally incapable of giving valid receipt and discharge for such benefits, they will be paid to the person or institution the Administrator designates or to a duly appointed guardian. Such payment will, to the extent made, be deemed a complete discharge of any payment due under the Plan.

8.2     No Contract.  The Plan will not be deemed a contract of employment with the Participant and will not affect the Company's right to terminate the Participant's employment.

8.3     Non-Alienation of Benefits.  No amount payable to or held under the Plan for the account of the Participant or any Beneficiary will be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same will be void.  No amount payable to or held under the Plan for the account of the Participant will be subject to any legal process of levy or attachment.

8.4     Income Tax Withholding.  The Company may withhold from any payments under the Plan any amount it is required to withhold under applicable federal, state or other income tax law, and transmit such withheld amounts to the appropriate taxing authority.  In lieu thereof, the Company will have the right, to the extent permitted by law, to withhold the amount of such taxes from any other sums due from the Company to the Participant on such terms and conditions as the Administrator may prescribe.

8.5     Governing Law.  The Plan will be interpreted, construed and administered under the laws of the State of California without regard to the choice of law provisions thereof and to the extent that ERISA and other federal laws do not apply.

8.6     Captions.  The captions contained in the Plan are inserted only as a matter of convenience and for reference and in no way define, limit, enlarge or describe the scope or intent of the Plan or in any way affect the construction of any provision of the Plan.

8.7     Severability.  If any provision of the Plan is held invalid or unenforceable, its invalidity or unenforceability will not affect any other provision of the Plan, and the Plan will be construed and enforced as if such provision had not been included.

8.8     Notices.  The Participant will be responsible for furnishing the Administrator with the current and proper address for the mailing of notices and delivery of payments.  Any notice required or permitted to be given will be deemed given if directed to the person to whom addressed at such address and mailed by regular United States first class mail, postage prepaid. If any item mailed to such address is returned as undeliverable to the addressee, mailing will be suspended until the Participant furnishes the proper address.

8.9     No Guaranty of Performance or Payout.     Each Participant agrees and acknowledges that the Company is not in any way or manner guarantying the performance of the

8

Business or any particular financial result or payout under this Plan, nor undertaking or committing to invest additional capital or resources in the Business.

8.10    Interpretation.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine or neuter, as the identity of the person requires.  As the context may require, the singular may be read as the plural and the plural as the singular.

The Plan is intended to comply with Section 409A of the Code.  Consistent with that intent, the Plan will be interpreted in a manner consistent with Section 409A of the Code.  If any provision that is necessary for the Plan to comply with Section 409A of the Code is determined by the Administrator, in its sole discretion, to have been omitted, such omitted provision will be deemed included in the Plan.  Company agrees to hold harmless and indemnify Participant for all additional taxes, interest and penalties Participant may incur in the event this Plan is found to be in violation of Section 409A.

## APPENDIX A

Participants shall receive an aggregate of 25% of the Net Profits attributable to the Business.

| Participant | 25% Economic Interest |
|---|---|
| John Goede | 8 1/3% |
| John Schrenkel | 8 1/3% |
| David Berry | 8 1/3% |

A

## Exhibit B

## Employee Benefits

1.      AEMC Benefit Explanation
2.      American Eagle Mortgage #574708 STD LTD Booklet
3.      Buy-up Plan I Summary of Benefits and Coverage
4.      Buy-up Plan III Summary of Benefits and Coverage
5.      Core Plan HSA Summary of Benefits and Coverage
6.      SuperDental Advanced PPO
7.      Key Person
8.      401(k) Plan

# PAY STUB

# John Schrenkel

# LendUS

3240 Stone Valley Road West
Second Floor
Alamo, CA 94507

| Pay Statement | |
|---|---|
| Period Start Date | 03/04/2018 |
| Period End Date | 03/17/2018 |
| Pay Date | 03/23/2018 |
| Document | 21093 |
| Net Pay | $10,250.76 |

## Pay Details

| | | | | | | |
|---|---|---|---|---|---|---|
| John J Schrenkel | Employee Number | 003260 | Pay Group | AEM Bi-Weekly E | Federal Income Tax | M 0 |
| 14717 Reserve Lane | SSN | XXX-XX-XXXX | Location | Naples (5th) - AEM | FL State Income Tax (Residence) | M 0 |
| Naples, FL 34109 | Job | PRESIDENT AEM | Division | AEM - American Eagle | FL State Income Tax (Work) | M 0 |
| USA | Pay Rate | $213.3412 | | Mortgage | | |
| | Pay Frequency | Biweekly | Region | AEM500 - AEM 500 | | |
| | | | Branch | 500 - AEMC Corp(former Reg500) | | |
| | | | Department | MGR - Manager | | |

## Earnings

| Pay Type | Hours | Pay Rate | Current | YTD |
|---|---|---|---|---|
| Holiday | 0.0000 | 10.0000 | $0.00 | $6,826.92 |
| Regular Pay | 80.0000 | 213.3412 | $17,067.31 | $155,578.94 |

Total Hours 80.0000

## Deductions

| Deduction | Based On | Pre-Tax | Employee Current | YTD | Employer Current | YTD |
|---|---|---|---|---|---|---|
| 401K Catch up % | $17,067.31 | Yes | $1,536.05 | $9,216.36 | $0.00 | $0.00 |
| AD & D | $5.77 | No | $5.77 | $34.62 | $0.00 | $0.00 |
| Blue Shield 900 | $0.00 | Yes | $566.68 | $3,400.08 | $586.66 | $3,400.08 |
| Delta Den BU | $0.00 | Yes | $45.60 | $273.60 | $37.30 | $223.80 |
| Employee LTD | $81.54 | No | $81.54 | $489.24 | $0.00 | $0.00 |
| Ind Armor Fmy | $8.26 | No | $8.26 | $49.66 | $0.00 | $0.00 |
| Mercer 2E5HUB | $1.97 | Yes | $1.97 | $11.82 | $0.00 | $0.00 |
| Sup Life Child | $1.85 | No | $1.85 | $11.10 | $0.00 | $0.00 |
| Sup Life Emp | $17.28 | No | $17.28 | $103.68 | $0.00 | $0.00 |
| Vision | $0.00 | Yes | $8.81 | $52.86 | $0.00 | $0.00 |
| Voya Critical | $20.08 | No | $20.08 | $120.48 | $0.00 | $0.00 |
| Voya Hospital | $21.99 | No | $21.99 | $131.94 | $0.00 | $0.00 |
| Voya Accident | $9.91 | No | $9.91 | $59.46 | $0.00 | $0.00 |
| Voya Crit Spouse | $12.78 | No | $12.78 | $76.68 | $0.00 | $0.00 |
| 401K ER MatchSY | $0.00 | Yes | $0.00 | $0.00 | $341.35 | $2,048.10 |
| AD&D - ER | $0.00 | No | $0.00 | $0.00 | $0.05 | $0.30 |
| ER - STD | $0.00 | No | $0.00 | $0.00 | $12.00 | $72.00 |
| Group Term Life | $0.00 | No | $0.00 | $0.00 | $0.28 | $1.68 |

## Taxes

| Tax | Based On | Current | YTD |
|---|---|---|---|
| Federal Income Tax | $14,908.19 | $3,210.92 | $19,956.57 |
| Employee Medicare | $16,464.25 | $239.44 | $1,430.85 |
| Social Security Employee Tax | $16,464.25 | $1,019.54 | $6,117.20 |

## Paid Time Off

| Plan | Taken | Current | Balance |
|---|---|---|---|
| Floating Hol | 0.0000 | 0.0000 | 8.0000 |
| SICK | 0.0000 | 0.0000 | 24.0000 |
| Vacation | 0.0000 | 0.0000 | 124.6400 |
| Volunteer | 0.0000 | 0.0000 | 8.0000 |

## Net Pay Distribution

| Account Number | Account Type | Amount |
|---|---|---|
| xxxxx3737 | Checking | $10,250.76 |
| Total | | $10,250.76 |

## Pay Summary

| | Gross | FIT Taxable Wages | Taxes | Deductions | Net Pay |
|---|---|---|---|---|---|
| Current | $17,067.31 | $14,908.19 | $4,477.90 | $2,338.65 | $10,250.76 |
| YTD | $102,403.86 | $89,549.14 | $27,504.48 | $14,101.60 | $60,857.78 |

# EQUITY PURCHASE AGREEMENT

EQUITY PURCHASE AGREEMENT

by and among

RPM Mortgage, Inc.,

JDJ Management, LLC, John Goede, John Schrenkel, and David Berry

and

The American Eagle Mortgage Co., LLC.

Dated as of June 30, 2016

*This document (1) is not intended to create, nor will it be deemed to create, a legally binding or enforceable offer or agreement of any type or nature, unless and until agreed to and executed and delivered by the parties hereto; and (2) remains subject to parties' agreement on formula for purchase price and Buyer's continuing due diligence.*

## TABLE OF CONTENTS

Page

ARTICLE I PURCHASE AND SALE OF EQUITY .................................................. 1

| 1.1 | Purchase and Sale of Securities ................................................ 1 |
| 1.2 | Excluded Assets ........................................................................ 1 |

ARTICLE II CLOSING; PURCHASE PRICE; DELIVERABLES ......................... 2

| 2.1 | Closing .................................................................................. 2 |
| 2.2 | Purchase Price ........................................................................ 2 |
| 2.3 | Closing Obligations ............................................................... 2 |
| 2.4 | Calculation of the Initial Purchase Price; Net Tangible Worth .... 3 |
| 2.5 | Purchase Price and Adjustment Retained Amount Calculation .... 3 |
| 2.6 | Earn-Out Payments ................................................................ 5 |
| 2.7 | Allocation .............................................................................. 7 |

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLING PARTIES ........... 8

| 3.1 | Organization and Authority .................................................... 8 |
| 3.2 | Capitalization of Seller ........................................................... 8 |
| 3.3 | No Conflict ............................................................................. 9 |
| 3.4 | Absence of Certain Changes or Events ................................... 9 |
| 3.5 | No Brokers ............................................................................. 10 |
| 3.6 | Financial Statements .............................................................. 10 |
| 3.7 | Contracts and Commitments ................................................... 10 |
| 3.8 | Absence of Undisclosed Liabilities ........................................ 11 |
| 3.9 | Real Property ......................................................................... 11 |
| 3.10 | Intellectual Property .............................................................. 12 |
| 3.11 | Transactions with Affiliates .................................................... 13 |
| 3.12 | Litigation and Orders ............................................................. 13 |
| 3.13 | Employment Matters; Benefit Plans ....................................... 13 |
| 3.14 | Labor Relations ..................................................................... 14 |
| 3.15 | Compliance with Laws ........................................................... 14 |
| 3.16 | Regulatory Matters ................................................................ 14 |
| 3.17 | Permits .................................................................................. 15 |
| 3.18 | Mortgage Loans ..................................................................... 15 |
| 3.19 | Environmental Matters .......................................................... 17 |
| 3.20 | Taxes ..................................................................................... 17 |
| 3.21 | Risk Management Instruments ............................................... 18 |
| 3.22 | Insurance ............................................................................... 19 |
| 3.23 | Advances; Receivables .......................................................... 19 |
| 3.24 | No Regulatory Impediment .................................................... 19 |
| 3.25 | Statements Made; Diligence Materials .................................... 19 |
| 3.26 | [Intentionally Left Blank] ...................................................... 20 |

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER .............. 20

| 4.1 | Organization, Authority ......................................................... 20 |
| 4.2 | No Conflict ............................................................................. 20 |
| 4.3 | Financial Ability .................................................................... 21 |
| 4.4 | No Brokers ............................................................................. 21 |

ARTICLE V COVENANTS ......................................................................................................... 21

    5.1    Covenants of Seller ............................................................................................. 21
    5.2    Cooperation ........................................................................................................ 24
    5.3    Publicity ............................................................................................................. 24
    5.4    Further Assurances ............................................................................................. 24
    5.5    Exclusivity ......................................................................................................... 24
    5.6    Notification of Certain Matters .......................................................................... 24
    5.7    Tax Matters ......................................................................................................... 25
    5.8    Building Loan Mortgage .................................................................................... 26
    5.9    Warehouse Line Guarantees .............................................................................. 26
    5.10   Liquidation of AEE ........................................................................................... 26

ARTICLE VI EMPLOYEES ...................................................................................................... 26

    6.1    Key Employees .................................................................................................. 26
    6.2    At-Will Employment; Employees ...................................................................... 26

ARTICLE VII CONDITIONS TO CLOSING .............................................................................. 26

    7.1    Conditions to the Obligations of Buyer, the Selling Parties, and Seller ............ 26
    7.2    Conditions to the Obligations of Buyer ............................................................ 27
    7.3    Conditions to the Obligations of Seller ............................................................. 28

ARTICLE VIII INDEMNIFICATION ......................................................................................... 29

    8.1    Survival of Representations, Warranties and Covenants ................................... 29
    8.2    Indemnification by the Selling Parties and Seller .............................................. 30
    8.3    Indemnification by the Buyer of Seller and Selling Parties ............................... 30
    8.4    Determination of Losses; Method of Asserting Claims ..................................... 31

ARTICLE IX MISCELLANEOUS ............................................................................................. 33

    9.1    Assignment ......................................................................................................... 33
    9.2    No Third-Party Beneficiaries ............................................................................ 33
    9.3    Termination ........................................................................................................ 33
    9.4    Expenses ............................................................................................................ 34
    9.5    Amendment and Modification ........................................................................... 35
    9.6    Notices ............................................................................................................... 35
    9.7    Governing Law .................................................................................................. 36
    9.8    Severability ........................................................................................................ 36
    9.9    Waiver ................................................................................................................ 36
    9.10   Counterparts; Facsimile .................................................................................... 37
    9.11   Entire Agreement ............................................................................................... 37
    9.12   Interpretation ...................................................................................................... 37
    9.13   Enforcement in Equity and at Law .................................................................... 37

ARTICLE X DEFINITIONS ....................................................................................................... 38

    10.1   Definitions .......................................................................................................... 38
    The table below provides an example of the calculation of the Initial Purchase Price
    using a multiple of Seller's net income for the 12-month period that ended
    on May 31, 2016. ................................................................................................................ 1

Exhibits

A    Form of Employment Agreement (Key Employees)
B    Form of Non-Compete & Non-Solicitation Agreement

C       Form of Management Incentive Program
D       Purchase Price Allocation Principles

Schedules of Seller
2.2       Purchase Price Calculation & Schedule of Principals
2.2(a)   Financial Statements of AEM dated March 5, 2016
3.2       Capitalization of AEM
3.3(b)   Seller Governmental Approvals and Consents
3.4       Absence of Certain Changes and Events
3.7       Material Contracts
3.8       Absence of Undisclosed Liabilities
3.9(a)   Real Property
3.10(a) Company Intellectual Property
3.10(b) IP Infringements
3.10(d) Licensed Intellectual Property
3.11     Transactions with Affiliates
3.12(a) Litigation
3.12(b) Orders
3.13(a) Employment Agreements
3.13(b) Company Benefit Plans
3.13(e) Nonqualified Plans
3.15     Compliance with Laws
3.16     Regulatory Matters
3.17     Permits
3.19     Environmental Matters
3.21     Risk Management
3.23     Advances
7.2(h)   Key Employees
7.2(i)   Termination of Contracts

# EQUITY PURCHASE AGREEMENT

THIS EQUITY PURCHASE AGREEMENT, dated as of June 30, 2016 (this "*Agreement*"), is by and between on the one hand (1) RPM Mortgage, Inc., a California corporation, or its assigns (collectively the "*Buyer*"), and on the other hand (2) The American Eagle Mortgage Co., LLC, an Ohio limited liability company ("*AEM*" or "Company"), JDJ Management, LLC, a Florida limited liability company (the "*Seller*") and John Goede, John Schrenkel, David Berry (the "*Principal(s)*" and together with the Seller, the "*Selling Parties*"). Buyer, AEM, and the Selling Parties are referred to collectively herein as the "*Parties*" and each individually as a "*Party*."

## BACKGROUND

WHEREAS, AEM is engaged in the business of originating, making, selling and servicing residential mortgage loans and providing related escrow services in various states including Florida, Georgia, Indiana, Kentucky, Ohio and West Virginia (collectively, the "*Business*");

WHEREAS, Seller owns all of the issued and outstanding membership interests of AEM (the "*Membership Interests*");

WHEREAS, Buyer desires to purchase from Seller and Seller desires to sell, transfer and assign to Buyer, all of the Membership Interests upon the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, the terms not defined in this Agreement will have the meanings assigned to them in ARTICLE X below.

## AGREEMENT

In consideration of the foregoing and the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the Parties hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF EQUITY

1.1     Purchase and Sale of Securities. On the terms and subject to the conditions of this Agreement, at the Closing, the Buyer shall purchase and acquire from Seller, and Seller shall sell, transfer, assign and convey to Buyer, and Buyer will purchase and accept from the Seller, the Membership Interests free and clear of all Encumbrances. At the Closing, in full payment for the Membership Interests, the Buyer will pay to, or on behalf of, Seller the amounts specified in Section 2.2.

1.2     Excluded Assets. The Company's assets at the Closing will not include the assets described in Schedule 1.2 (which assets are not owned by the Company or will be distributed to the Selling Parties prior to the Closing).

## ARTICLE II
## CLOSING; PURCHASE PRICE; DELIVERABLES

2.1     Closing.  Unless this Agreement shall have been terminated pursuant to Section 9.3, the closing of the Contemplated Transactions (the "*Closing*") shall take place at the offices of K&L Gates LLP, Embarcadero 4, Suite 1200, San Francisco, California  on a date mutually agreed upon by the Parties; provided that if the conditions set forth in ARTICLE VII (other than those conditions that by their nature are to be satisfied at the Closing, but subject to those conditions in fact being satisfied at Closing) shall not have been satisfied or waived by such date, then the Closing shall occur five (5) Business Days after the satisfaction or waiver of such conditions (the time and date on which the Closing occurs is hereinafter referred to as the "*Closing Date*").

2.2     Purchase Price.  The purchase price (the "*Purchase Price*") shall be paid as follows: (a) the payment of the Initial Purchase Price (as defined below) in cash to the Seller at the Closing (the "*Initial Purchase Price*"), as adjusted in accordance with the provisions set forth in Section 2.5, and (b) the Retained Amount (as defined below) shall be held back by the Buyer from the Initial Purchase Price to cover any adjustment under Section 2.5.  The "*Initial Purchase Price*" shall be calculated based on AEM's net income (including for the sake of clarity the net income of AEE) over the 12-month period that ended on May 31, 2016, as specified in Schedule 2.2(a).  Based on the *pro forma* calculations in Schedule 2.2(a) the Initial Purchase Price is estimated to be $19,133,718.  The underlying financial statements shall be prepared in accordance with Generally Accepted Accounting Principles ("*GAAP*") as of the Closing Date.

2.3     Closing Obligations.

(a)     Deliveries of the Selling Parties.

(i)     No later than the Cut-Off Date, the Selling Parties shall deliver the Seller Governmental Approvals, Third Party Consents, the "Estimated Closing Balance Sheet," and the Estimated Income Statement to Buyer;

(ii)     No later than two (2) Business Days prior to the Closing Date, Seller shall deliver to Buyer payment instructions indicating the bank account or accounts to which Buyer shall pay, by wire transfer of immediately available funds, the Initial Purchase Price *less* the amount determined by multiplying the Initial Purchase Price by a factor of 0.05 (the "*Retained Amount*") in consideration for the Membership Interests; and

(iii)     At the Closing, Seller shall deliver to Buyer or shall cause to be delivered to Buyer, (A) duly executed Ancillary Agreements, and (B) any and all other agreements, certificates, instruments and documents otherwise required of Seller under this Agreement or as may reasonably be requested by Buyer.

(b)     Deliveries of Buyer.

(i)     At the Closing, Buyer shall deliver to Seller the Initial Purchase Price *less* the Retained Amount in immediately available funds by wire transfer to the account designated by Seller.

(ii)     At the Closing, Buyer shall execute and deliver to Seller (A) duly executed Ancillary Agreements, and (B) any and all other agreements, certificates, instruments and documents otherwise required of Buyer under this Agreement or as may reasonably be requested by Seller.

(iii)    At the Closing, Buyer shall pay Seven Hundred Fifty Thousand Dollars ($750,000) to NVD Consulting, Inc., a New York corporation, qualified to do business in Florida ("*NVD Consulting*"), for services rendered in connection with the transactions contemplated herein, as specified in a separate agreement among AEM, Selling Parties, NVD Consulting, and RPM.

(iv)    Notwithstanding any other provision in this Agreement, Buyer and AEM will be entitled to deduct and withhold from any payment to be made under this Agreement all Taxes that Buyer or AEM, as the case may be, is required to deduct and withhold with respect to such payment under the Code (or any provision of applicable Law).  Taxes withheld pursuant to this Agreement will be (A) timely remitted by Buyer or AEM, as the case may be, to the appropriate Governmental Authority and (B) treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

2.4     Calculation of the Initial Purchase Price; Net Tangible Worth.

(a)     Seller shall furnish to Buyer on the Cut-Off Date an unaudited income statement of AEM for the 12-month period ending on the Measurement Date (the "*Estimated Income Statement*"), and a statement detailing the estimated calculation of the Initial Purchase Price.  The Estimated Closing Income Statement shall be prepared in accordance with GAAP applied on a basis consistent with the preparation of AEM's full unaudited financial statements at that date (except that the Estimated Closing Income Statement will not contain footnotes).  The "Measurement Date" shall be May 31, 2016.

(b)     The Final Purchase Price shall be determined after the Closing in accordance with Section 2.5.

(c)     The Net Book Value of the Company shall be at least $9,276,954 ("*Required Net Book Value*") at the Closing, calculated in a manner consistent with AEM's financial statements and the example attached hereto as Schedule 2.2(b).  To the extent the Net Book Value of the Company as of the Closing Date is in excess of the Required Net Book Value, Buyer shall pay Seller the amount of the excess within thirty (30) days of the Closing Date.  To the extent the Net Book Value of the Company as of the Closing Date is less than the Required Net Book Value, Seller shall pay Buyer the amount of the difference within thirty (30) days of the Closing Date.  An unaudited pro forma balance sheet of AEM for the period ending on the Closing Date (the "*Estimated Balance Sheet*") shall be prepared in a manner consistent with Schedule 2.2(b) and delivered to Buyer no later than 8:00 a.m. (PST) on the Closing Date.

2.5     Purchase Price and Adjustment Retained Amount Calculation.

(a)     The Purchase Price shall be adjusted, dollar-for-dollar, based on any adjustment in the income statement for AEM as provided in this Section 2.5.  Upon the earlier to occur of (i) the Parties' agreement (or deemed agreement pursuant to Section 2.5(d)) below with

respect to the calculation of the final Purchase Price, or (ii) the delivery of any report of the Independent Accountant as provided in Section 2.5(d) with respect to the Purchase Price, as applicable, the Purchase Price shall be adjusted as follows:

(i)     if the Initial Purchase Price is greater than the Final Purchase Price, then the Purchased Price shall be reduced by (and Buyer shall withdraw (or retain) from the Retained Amount) an amount equal to the difference between the Initial Purchase Price and Final Purchase Price (the "*Adjustment*").  If the Retained Amount is insufficient to cover such Adjustment in full, then the Retained Amount shall be released to (or retained by) the Buyer and Seller shall pay to Buyer an amount equal to the difference between the Adjustment *less* the Retained Amount.  If the Retained Amount is greater than the amount of the Adjustment, then the remaining balance of the Retained Amount after payment of the Adjustment to the Buyer shall be paid to the Seller.  Any settlement of an Adjustment shall be paid by wire transfer within five (5) Business Days after the earlier to occur of the events described in Section 2.5(a); and

(ii)    if the Final Purchase Price is equal to or greater than the Initial Purchase Price, then Buyer shall (i) release the Retained Amount to the Seller, and (ii) pay an amount equal to the difference between the Final Purchase Price and the Initial Purchase Price, if any, by wire transfer of immediately available funds to the Seller within five (5) Business Days after the earlier to occur of the events described in Section 2.5(a).

(b)     As soon as practicable after the Closing, but in no event later than sixty (60) days after the Closing Date, Buyer shall prepare and deliver to the Seller an audited income statement as of the Measurement Date (the "*Measurement Date Income Statement*"), together with a calculation of the Purchase Price as of the Measurement Date, calculated in accordance with the methodology required to calculate the Estimated Income Statement in accordance with the formula set forth in Schedule 2.2(a) (the "*Final Calculation Statement*").

(c)     Seller shall have fifteen (15) days from receipt of the Final Calculation Statement to give Buyer written notice of objection to any item or calculation contained in the Final Calculation Statement specifying in reasonable detail all disputed items and the basis therefor (a "*Dispute Notice*").  If Seller concurs with the Final Calculation Statement or otherwise do not give Seller a Dispute Notice within such fifteen (15) day period, such Final Calculation Statement shall be deemed final and conclusive with respect to the determination of the Purchase Price, and shall be binding on the Parties for all purposes under this Agreement. If, however, Seller delivers to Buyer a Dispute Notice objecting to any items or calculations contained in the Final Calculation Statement within the applicable fifteen (15) day period, the Parties shall meet within fifteen (15) days following the date of the Dispute Notice (in each case, the "*Resolution Period*") and shall attempt in good faith to resolve such objections and any written resolution by them as to any disputed amount shall be deemed final and conclusive with respect to the determination of the Purchase Price, and shall be binding on the Parties for all purposes under this Agreement.  Any amounts that were not timely disputed pursuant to a Dispute Notice (or if so disputed, subsequently resolved) may not be disputed. In all events the Final Calculation Statement shall be final and binding, except to the extent of those amounts timely identified in a Dispute Notice as disputed items and not resolved in accordance with this paragraph.

(d)     If the Parties are unable to resolve Seller's objections within the Resolution Period, then, no later than five (5) Business Days after the end of the applicable Resolution Period,

all amounts and issues remaining in dispute and Seller's responses thereto will be submitted by Seller and Buyer for review by the Independent Accountant. The Parties agree to execute, if requested by the Independent Accountant, a reasonable engagement letter with respect to the determination to be made by the Independent Accountant. The Independent Accountant will determine only those issues still in dispute at the end of the applicable Resolution Period and the Independent Accountant's determination will be based upon and consistent with the terms and conditions of this Agreement. The determination by the Independent Accountant will be based solely on presentations with respect to such disputed items by Buyer and Seller to the Independent Accountant and not on the Independent Accountant's independent review. Each of Buyer and Seller will use its commercially reasonable efforts to make its presentation as promptly as practicable following submission to the Independent Accountant of the disputed items, and each such Party will be entitled, as part of its presentation, to respond to the presentation of the other Party and any questions and requests of the Independent Accountant. Discovery shall be limited to documents designated by the Independent Accountant as necessary for it to assess the proper calculation of the Purchase Price, consistent with this Agreement. The Independent Accountant's determination will be made within thirty (30) days after its engagement, or as soon thereafter as possible, and will be set forth in a written statement delivered to Buyer and Seller. The Final Calculation Statement, as finalized by the Independent Accountant, shall be deemed final and conclusive with respect to the Purchase Price and shall be binding on Buyer and Seller for all purposes under this Agreement. In deciding any matter, the Independent Accountant (i) will be bound by the provisions of this Section 2.5 and (ii) may not assign a value to any item greater than the greatest value for such item claimed by either Buyer or Seller or less than the smallest value for such item claimed by Buyer or Seller. The fees and expenses of the Independent Accountant in resolving all such objections shall be borne by (i) Buyer in an amount equal to the proportion of the total disputed amount that the Independent Accountant finds in favor of Seller and (ii) Seller in an amount equal to the proportion of the total disputed amount that the Independent Accountant finds in favor of Buyer. Except as provided in the preceding sentence, all other costs and expenses incurred by the Parties in connection with resolving any dispute hereunder before the Independent Accountant will be borne by the Party incurring such cost and expense. "*Final Purchase Price*" means the Purchase Price as finally adjusted in accordance with this Section 2.5.

2.6    Earn-Out Payments.

(a)    Earn-Out Payments. Subject to the procedures specified below, the Principals may be entitled to contingent cash consideration payments (collectively, the "*Earn-Out Payments*") if the net operating income of the Business (inclusive only of the net income attributable to the Business) exceeds certain thresholds for the period starting on the Closing Date and ending on June 30, 2017 (the "*Year One Earn-Out Period*"), and for the period starting on the July 1, 2017 and ending on June 30, 2018 ("*Year Two Earn-Out Period*" and, together with the Year One Earn-Out Period, the "*Earn-Out Periods*"). The threshold amount for any Earn-Out Payment shall be $100,000 of net operating income during the applicable Earn-Out Period. Each Earn-Out Payment, if any earned, shall be made by the Buyer to the Principals as set forth below:

(i)    Year One Earn-Out. No later than August 31, 2017, the Buyer shall pay the Principals an Earn-Out Payment equal to seventy-five percent (75%) of the net operating income of the Business during the Year One Earn-Out Period, which Earn-Out Payment shall not exceed Ten Million, Three Hundred Forty Thousand, Six Hundred Thirty-Six and 15/100ths Dollars ($10,340,636.15) (the "*Year One Earn-Out*").

(ii)    Year Two Earn-Out.  No later than August 31, 2018, the Buyer shall pay the Principals an Earn-Out Payment equal to equal to seventy-five percent (75%) of the net operating income of the Business during the Year Two Earn-Out Period *less* any losses during the Year One Earn-Out, which Earn-Out Payment shall not exceed the difference between Ten Million, Three Hundred Forty Thousand, Six Hundred Thirty-Six and 15/100ths Dollars ($10,340,636.15) and the Year One Earn-Out, if any (the "*Year Two Earn-Out*").

(b)    Earn-Out Statements.  Within twenty (20) Business Days following the end of the applicable Earn-Out Period, the Buyer shall prepare and deliver to the Seller Representative its calculation of the applicable Earn-Out Payment (the "*Earn-Out Statement*"), which statement shall be prepared and calculated in accordance with GAAP, applied on a basis consistent with the policies, procedures and practices utilized in the preparation of the financial statements of AEM.  The Earn-Out Statement shall include a reasonably detailed calculation of (i) the profits and losses of the Business for the applicable Earn-Out Period, and (ii) the amount, if any, of the Earn-Out Payment.

(c)    Objection Notice.  The Seller Representative shall have twenty (20) days from delivery of the Earn-Out Statement (the "*Objection Period*") to raise any objection thereto by delivery of written notice to the Buyer setting forth such objections in reasonable detail (the "*Objection Notice*").  During the Objection Period, the Seller Representative shall be entitled, subject to execution of a nondisclosure agreement, to access the books and records and employees and agents involved in the preparation of the Earn-Out Statement for purposes of determining any objections and preparing the Objection Notice; provided, however, that such access shall not unreasonably interfere with the conduct of the Business.  If the Seller Representative does not deliver an Objection Notice within the Objection Period, then the Earn-Out Statement shall be deemed final and binding on the parties.

(d)    Dispute.  In the event that an Objection Notice is delivered within the Objection Period, the Buyer and the Seller Representative shall attempt, in good faith, to resolve such objections and, if unable to do so within twenty-five (25) days after delivery of the Objection Notice, shall follow the dispute mechanism contemplated in Section 2.5 above.  The determination of the Independent Accountant shall be (i) in writing, (ii) delivered to the Buyer and the Seller Representative, and (iii) final and binding on the parties absent manifest error (the "*Final Determination*").  Subject to Section 2.2 and Section 8.2, the Buyer shall pay to the each Principal such Principal's Proportional Percentage of such Earn-Out Payment shown on the Final Determination within ten (10) Business Days after receipt of the Final Determination.  The fees and expenses of the Independent Accountant shall be borne equally by the Buyer (on the one hand) and the Seller Representative (on the other hand).

(e)    Allocation of Earn-Out Payments.  Each Earn-Out Payment shall be allocated among the Principals based on their Proportional Percentage, provided however:

(i)    in the event a Principal voluntarily terminates his employment with the Company between the Closing and June 30, 2017, such Principal shall not be entitled to receive his Proportional Percentage of the Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the Principal who voluntarily terminates his employment with the Company on or prior to June 30, 2017 to the remaining Principals' Proportional Percentages;

(ii)    in the event a Principal voluntarily terminates his employment with the Company between July 1, 2017 and June 30, 2018, such Principal shall not be entitled to receive his Proportional Percentage of the Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the Principal who voluntarily terminates his employment with the Company between July 1, 2017 and June 30, 2018 to the remaining Principals' Proportional Percentages; and

(iii)    in the event the Company terminates the employment of a Principal for Cause (as such term is defined in the Management Incentive Program) at any time, such Principal shall not be entitled to receive his Proportional Percentage of any unpaid Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the Principal whose employment with the Company is terminated for Cause to the remaining Principals' Proportional Percentages.

(iv)    The Company's termination of employment of a Principal without Cause (as such term is defined in the Management Incentive Program) shall not affect, reduce, change or eliminate such Principal's Proportional Percentage for purposes of the Earn-Out Payments.

(v)    The Parties acknowledge and agree that the Earn-Out Payments constitute compensation for services performed by the Principals as employees of the Company. Each Earn-Out Payment made to a Principal will be reported on such Principal's Form W-2 for the year in which the payment was made and will be reduced by required withholdings of applicable income and payroll Taxes.

2.7    Allocation.    The amount of the aggregate Purchase Price allocated to the noncompetition provisions contained in the Non-Competition & Non-Solicitation Agreement in the form attached hereto as Exhibit B (the "Non-Compete Agreement") shall be Five Hundred Thousand Dollars ($500,000). Buyer shall prepare an allocation of the remainder of the aggregate Purchase Price (together with other amounts deemed to be consideration for applicable income Tax purposes) among the assets of AEM (the "Purchase Price Allocation"). The Purchase Price Allocation shall be prepared in accordance with the applicable provisions of Section 1060 of the Code and the regulations thereunder, and in accordance with the principles set forth on Exhibit D. Buyer shall deliver such Purchase Price Allocation to Seller as soon as practicable after the determination of the Final Purchase Price. If Seller has any objection to the Purchase Price Allocation, it shall notify Buyer in writing of such objection within 15 days after receipt of the Purchase Price Allocation, specifying in reasonable detail its objections and its proposed modification to the Purchase Price Allocation (the "Dispute Notice"). Buyer and Seller shall act in good faith to resolve any disagreement over the Purchase Price Allocation. In the event that Buyer and Seller cannot agree on a mutually satisfactory Purchase Price Allocation within 60 days after the date of the Dispute Notice, the Parties shall submit the dispute to the Independent Accountant to determine the appropriate Purchase Price Allocation, with the understanding that the Independent Accountant shall resolve only the items set forth in the Dispute Notice. The determination of the Independent Accountant shall be final and binding upon the Parties. Each Party shall file all Tax Returns (including amended Tax Returns and claims for refund) in a manner reflecting the Purchase Price Allocation as finally determined in accordance with this Section 2.7. The Parties shall each execute and timely file a Form 8594 consistent with the Purchase Price Allocation, after exchanging mutually acceptable drafts of such form (and any equivalent state, municipal, county, local, foreign or other Tax forms).

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLING PARTIES

To induce the Buyer to enter into this Agreement, Seller, the Company, and each Principal, jointly and severally, hereby represents and warrants to Buyer as of the date hereof and as of the Closing Date, with respect to the Seller and AEM, as follows, except to the extent set forth in Seller's disclosure schedule, dated as of the date of this Agreement and attached to this Agreement as Schedule 3 (the "*Disclosure Schedule*"):

3.1     Organization and Authority.  Seller is duly organized, validly existing and in good standing as a limited liability company under the Laws of Florida and has the requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement and the Ancillary Agreements and to consummate the Contemplated Transactions.  AEM has the requisite power and authority to carry on the Business as currently conducted, and is duly qualified or otherwise authorized to do business in each jurisdiction where the ownership or operation of the Business requires such qualification, except where the failure to be so qualified has not and would not reasonably be expected to, individually or in the aggregate, result in a Seller Material Adverse Effect.   All necessary corporate action and other proceedings required to be taken by Seller to authorize the execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the Contemplated Transactions have been duly taken or will be taken before execution of such documents or consummation of the related transaction, as applicable.  This Agreement has been, and each of the Ancillary Agreements will be, duly executed and delivered by Seller, and, assuming the due execution by Buyer of this Agreement and the Ancillary Agreements, constitute the legal, valid and binding obligations of Seller, enforceable against it in accordance with their terms, except as such enforceability may be limited by Laws applicable to receivership, bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and other similar Laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies or by general principles of equity.  Since its date of formation, Seller has not engaged in any business other than the Business. True, complete and correct copies of the articles of organization, and any amendment thereto (collectively, the "*Articles of Organization*"), and the operating agreement, and any amendments thereto (collectively, the "*Operating Agreement*"), of the Company in effect as of the date of this Agreement, have been previously made available to Buyer.

3.2     Capitalization of Seller.  Schedule 3.2 contains a complete and accurate capitalization table of AEM, setting forth the name of each member, the number and class of units held by each member, and the total number of units of each class that are outstanding.  Other than the units listed on such capitalization table, no units of any class of AEM's securities are issued or outstanding. Seller owns one hundred percent (100%) of the Membership Interests of AEM, which interest constitutes all outstanding equity securities of AEM.  All of the Membership Interests: (i) have been duly and validly issued; (ii) are fully paid and nonassesable; (iii) were not issued in violation of any preemptive rights or rights of first refusal or first offer, any purchase or call option, subscription right or any similar rights and were offered, sold and issued in compliance with applicable Laws, including the securities Laws.  No prior sales or issuances of equity, or redemptions of outstanding equity, were completed in violation of any preemptive rights or rights of first refusal or first offer, any purchase or call option, subscription right or any similar rights and were offered, sold and issued, or redeemed, in compliance with applicable Laws, including the securities Laws.  The Seller has full capacity, power, legal right and authority to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by the Seller pursuant hereto and to carry out the transactions contemplated hereby and thereby.  All of the Membership Interests have been duly

authorized and legally issued, and fully paid and nonassessable. Upon consummation of the Contemplated Transactions, the Buyer will be the owner of the Membership Interests, which in the hands of the Buyer shall be duly authorized and legally issued, fully paid and nonassessable, and free and clear of all Encumbrances, other than pursuant to the Securities Laws. There are no subscriptions, options, warrants, calls, commitments, preemptive rights or other rights of any kind outstanding for the purchase of, or any securities convertible or exchangeable for, any units of ownership of the Company. Except as set forth in Schedule 3.2, there are no restrictions upon, or obligations with respect to, the voting or transfer of the Membership Interests. AEM has no subsidiaries and does not own any interest in any other Person.

3.3    No Conflict.

(a)    The execution, delivery and performance by Seller of this Agreement and any of the Ancillary Agreements, and the consummation by Seller of the Contemplated Transactions, will not:

(i)    violate or conflict with Seller's or AEM's charter documents, including their respective articles of organization or operating agreements, as amended;

(ii)    assuming the receipt of Seller Governmental Approvals and Third Party Consents, violate any provision of Law to which Seller or the conduct of the Business is subject or violate or conflict with any Order applicable to Seller or the conduct of its Business;

(iii)    assuming the receipt of Seller Governmental Approvals and Third Party Consents, violate, breach or constitute a default (with or without notice or lapse of time or both) under or give rise to a right of termination, cancellation or acceleration of any right, remedy or obligation of Seller or any of its applicable Affiliates with respect to any Material Contract to which Seller is a party; or

(iv)    result in the creation of any Encumbrance other than a Permitted Encumbrance on any of the assets of Seller.

(b)    Except for notices or consents listed on Schedule 3.3(b) (the "*Seller Governmental Approvals and Third Party Consents*"), the execution, delivery and performance by Seller of this Agreement, the Ancillary Agreements and the consummation by Seller of the Contemplated Transactions do not require any consent from, registration, declaration or other filing with or approval or authorization of any Agency, other Governmental Authority or other third party by or with respect to Seller or the Business.

(c)    There are no rights of first refusal, rights of first offer or other similar rights of any Person that would be applicable to any of the Contemplated Transactions or the execution, delivery or performance by Seller under this Agreement or any of the Ancillary Agreements.

3.4    Absence of Certain Changes or Events.

(a)    Except as set forth on Schedule 3.4(a), since January 1, 2016 AEM has been operating the Business in the Ordinary Course of Business.

9

(b)      Except as set forth on Schedule 3.4(b), since January 1, 2016, there has not been (i) any material damage, destruction or loss, whether or not covered by insurance with respect to any material portion of AEM's assets, (ii) any change in financial or tax accounting methods, principles or practices by AEM, except insofar as may have been required by a change in GAAP or applicable Law, (iii) any Tax election or change in Tax election or any settlement or compromise of any Tax Liability, (iv) any revaluation by AEM of any of its assets, (v) any licensing or other agreement with regard to the acquisition or disposition of any material assets or rights thereto, or (vi) any Seller Material Adverse Effect.

3.5      No Brokers.      Except as contemplated in Section 2.3(b)(iii), no agent, broker, investment banker, financial advisor or other Person is or will be entitled to any broker's or finder's fee or any other similar commission or fee from Seller or any of its Affiliates in connection with any of the Contemplated Transactions.

3.6      Financial Statements.

(a)      True, correct and complete copies of the audited balance sheet and the related statements of income, of member's equity and of cash flows of AEM at December 31, 2013, December 31, 2014 and December 31, 2015, including the footnotes thereto (the "*Audited Financial Statements*"), and the unaudited balance sheet and the related statements of income, of member's equity and of cash flows of AEM at March 31, 2016 (the "*Interim Financial Statements*", together with the Audited Financial Statements, the "*Seller Financial Statements*"), have been delivered to Buyer by Seller. The Financial Statements are based on the books and records of AEM, and fairly present, the financial position and results of operations of AEM, as of the date or for the periods indicated therein, in accordance with GAAP (except, in the case of the Interim Financial Statements, for the omission of footnotes required in accordance with GAAP and subject to normal year-end adjustments). All business currently conducted through AEE shall be conducted through AEM after the Closing such that AEM will capture all revenue and net profits previously projected for AEE.

(b)      AEM maintains internal controls over financial reporting designed to provide assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP, including policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of AEM, (ii) are designed to provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that receipts and expenditures of AEM are being made only in accordance with authorizations of the board of directors (or comparable management group) of AEM, and (iii) are designed to provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of AEM that could have a material effect on Seller Financial Statements.

3.7      Contracts and Commitments.

(a)      Except for this Agreement, the Ancillary Agreements and Mortgage Loan documents, including loan applications and Serviced Mortgage Loans documents, Schedule 3.7 sets forth, with respect to AEM, a complete list of each (i) material (for the purposes of this item (i) material means an obligation requiring the payment of more than $10,000 per annum in the aggregate in any consecutive twelve month period) Contract not made in the Ordinary Course of Business; (ii) each warehouse agreement and each other Contract relating to the borrowing or lending of money in excess of $50,000 or Guarantee of any such obligation; (iii) Contract that by its terms limits the

payment of dividends or distributions by AEM or that by its terms either requires AEM to do business with the contract party on an exclusive basis or restricts or limits AEM from owning, managing or operating any business or in any geographical location (including non-competition agreements); (iv) Contract that is a joint venture or partnership agreement; (v) Contract that grants any right of first refusal, right of first offer or similar right to third parties, or that limits or purports to limit the ability of AEM to pledge, sell, transfer or otherwise dispose of any material amounts of assets or business; (vi) Contract providing for any future payments that are conditioned, in whole or in part, on a change of control with respect to AEM; (vii) agency, broker, sale representative, loan referral, marketing or similar Contract; (viii) Contract that contains a "most favored nation" clause obligating AEM to change the material terms and conditions of such Contract based on better terms or conditions provided to other parties in similar contracts; (ix) Contract relating to (A) any merger or business combination concerning AEM, (B) the acquisition by AEM of all or substantially all of the assets of any other Person, or (C) the disposition by AEM of all or substantially all of its assets to any other Person; (x) Contract with AEM, any manager, director, officer, employee or Affiliate of AEM; (xi) Servicing Agreement; and (xii) other Contract involving aggregate annual expenditures or revenues in excess of $50,000 (the contracts of the type covered in clauses (i) through (xii), the "*Material Contracts*").

(b)     Except as set forth in Schedule 3.7(b), (i) each Material Contract is valid and binding on AEM, in full force and effect and is valid and binding on the other parties thereto, except as such enforceability may be limited by Laws applicable to receivership, bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and other similar Laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies or by general principles of equity, and (ii) AEM (and, to the Knowledge of Seller, any counterparty thereto) has performed all obligations required to be performed by it to date under each Material Contract.  AEM is not in default in any material respect under any Material Contract, and there has not occurred any event that, with the lapse of time or giving of notice or both, would constitute such a default.

3.8     Absence of Undisclosed Liabilities.  AEM has no material Liability (contingent or otherwise), including with respect to (a) any deferred compensation arrangements with any person employed or formerly employed by AEM or (b) any business, operations or activities conducted or undertaken pursuant to joint venture or partnership arrangements except (i) as specifically disclosed or reserved against in Seller Financial Statements or on Schedule 3.8, (ii) for liabilities incurred in the Ordinary Course of Business consistent with past practice since the date of the Interim Financial Statements, or (iii) for obligations arising out of future performance under Material Contracts.

3.9     Real Property.

(a)     Schedule 3.9(a) sets forth the parties to and dates of each office leased or subleased by AEM (the "*Office Leases*"), date of execution and expiry date, the rent, the location, the particulars of any options to renew, particulars of any requirement necessary for AEM to continue the Office Lease, and, with respect to the real property owned by AEM (the "*Real Property*"), the locations (including municipal addresses) and the terms of any outstanding mortgage of such property.

(b)     AEM has a good and marketable title of the Real Property, free and clear of all Encumbrances, except Permitted Encumbrances, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and

subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(c)     AEM has valid, binding and enforceable leasehold interests under the Office Leases, free and clear of all Encumbrances, except Permitted Encumbrances, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity). The Office Leases are in full force and effect, and AEM has not received any notice of any default or event that with notice or lapse of time, or both, would constitute a default under the Office Leases and no party to the Office Leases is in default or has exercised any termination rights with respect thereto. AEM has no obligation to enter into any office lease or sublease other than the Office Leases.

(d)     AEM has all material Permits of any Governmental Authority required under applicable Law for the current use and operation of the Business under the Office Leases, and AEM has fully complied with all conditions of the Permits applicable to it. No material default or violation, or event that with the lapse of time or giving of notice or both would become a material default or violation, has occurred in the due observance of any Permit.

(e)     There does not exist any actual, threatened or contemplated condemnation or eminent domain proceedings that affects any Office Lease or any part thereof, and AEM has not received any notice of the intention of any Governmental Authority or other Person to take or use all or any part thereof.

3.10    Intellectual Property.

(a)     AEM owns or otherwise has the right to use (free and clear of any Encumbrances other than a Permitted Encumbrance) all Company Intellectual Property, including all Company Intellectual Property material to the conduct of the Business as set forth on and as limited by Schedule 3.10(a).

(b)     Except as set forth in Schedule 3.10(b), AEM, the conduct of the Business as presently conducted by AEM, and Company Intellectual Property are not infringing upon the rights of any Person with regard to any Intellectual Property owned by such Person. No Person is infringing on or otherwise violating any right of AEM with respect to any of Company Intellectual Property.

(c)     There is no outstanding Order by or with any Governmental Authority relating to any of Company Intellectual Property by which AEM is bound.

(d)     Set forth on Schedule 3.10(d) is a true, correct and complete list of all licenses, agreements, authorizations and permissions pursuant to which AEM uses any one or more items of Intellectual Property licensed from third parties in connection with the Business ("*Licensed IP Agreements*"), other than software that is generally commercially available at retail. Seller has delivered to Buyer correct and complete copies of each of the Licensed IP Agreements. Each of the Licensed IP Agreements is legal, valid, binding, enforceable and in full force and effect. AEM has performed all obligations imposed upon it under each of the Licensed IP Agreements, and is not in breach of any of the Licensed IP Agreements, and no other party to any of the Licensed IP Agreements is in breach thereof. AEM has not granted any sublicense or similar right with respect to

12

any Licensed IP Agreement. AEM has not received any notice that the other parties to the Licensed IP Agreements intend to cancel, terminate or refuse to renew the same or to exercise or decline to exercise any option or right thereunder. Consummation of the Contemplated Transactions will not cause a breach of any of the Licensed IP Agreements.

(e)     Except as set forth on Schedule 3.10(e), no action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand is pending or threatened against AEM, that challenges the legality, validity, enforceability, or ownership of, or the right of AEM to use, any one or more items of the Intellectual Property owned or used by AEM in connection with the Business.

3.11    Transactions with Affiliates.  Except with respect to any distributions, salaries or bonuses payable pursuant to written Contracts set forth on Schedule 3.11 and any business expense reimbursement payments (or advances) and other similar payments made or payable in the ordinary course, there are no Contracts with, outstanding amounts payable to or receivable from, or outstanding advances by AEM to Seller, to any director, manager or officer of AEM or any Affiliates of AEM other than AEE.

3.12    Litigation and Orders.

(a)     Litigation.  Schedule 3.12(a) sets forth a true, correct and complete list of all material claims or Actions pending or threatened against AEM, or any of its Affiliates relating to or involving the conduct of the Business.

(b)     Orders.  Except as disclosed on Schedule 3.12(b), there is no Order relating to or involving AEM, the conduct of the Business by AEM or Seller with respect to the Business.  AEM is not in breach or default (with or without notice or lapse of time, or both) under any Order.

3.13    Employment Matters; Benefit Plans.

(a)     Except as set forth on Schedule 3.13(a), none of the Employees are bound by employment agreements.

(b)     Schedule 3.13(b) sets forth a list of all Company Benefit Plans.  Seller has made available to Buyer complete and correct copies of each Company Benefit Plan, including any amendments thereto.

(c)     Each Company Benefit Plan has been operated and administered in accordance with the terms of such Plan and applicable Law, including ERISA and the Code, except to the extent that any noncompliance would not reasonably be expected to result in a material Liability to AEM.

(d)     AEM does not maintain, participate in, contribute to, or have any obligation to contribute to, and has never maintained, participated in, or contributed to, or had any obligation to contribute to (i) a Company Benefit Plan subject to Title IV of ERISA; (ii) a multiemployer plan within the meaning of Section 3(37) of ERISA; or (iii) a Company Benefit Plan subject to the minimum funding standards of Section 412 of the Code or Section 302 of ERISA.  For the purposes of this Section 3.13(d), the term "Company" includes AEM and any Person that would have been treated as a single employer with AEM under Section 414(b), (c), (m) or (o) of the Code.

(e)    AEM has not made any promises or incurred any Liability under any Company Benefit Plan or otherwise to provide health or other welfare benefits to employees (or their spouses or dependents) following retirement or other termination of employment, except as specifically required by Law or as disclosed on Schedule 3.13(e). Except as set forth on Schedule 13.3 (e), AEM is not a party to any agreement, contract, plan or other arrangement (whether or not written and whether or not a Company Benefit Plan) that is a "nonqualified deferred compensation plan" within the meaning of Section 409A of the Code and the Treasury Regulations promulgated thereunder.

(f)    Except as otherwise provided in this Agreement, the execution of this Agreement and consummation of the contemplated Transactions do not constitute a triggering event under any Company Benefit Plan or other arrangement or agreement that will or may result in any payment, acceleration, vesting or increase in benefits to any Employee or former Employee of AEM which could be payable by AEM or Buyer on or after the Closing Date.

3.14    Labor Relations. None of the Employees is a member of, represented by or otherwise subject to any (a) labor union, works council or similar organization or (b) collective bargaining agreement. With respect to the Employees, AEM is, and has been, in compliance with all applicable Laws and Orders with respect to labor relations, employment and employment practices, occupational safety and health standards, terms and conditions of employment, payment of wages, classification of employees, immigration, visa, work status and workers' compensation, and is not engaged in any unfair labor practices. There is no unfair labor practice charge or complaint against AEM pending or, to the Knowledge of AEM, threatened before the National Labor Relations Board or any comparable Governmental Authority. There is no labor dispute or strike pending or threatened in writing, against AEM that would reasonably be expected to interfere with the operation of the Business. AEM has not initiated any plant or facility closing or mass layoff which would trigger any obligations under the WARN Act.

3.15    Compliance with Laws. Except as set forth on Schedule 3.15, AEM and its Affiliates are in compliance with all Laws and Mortgage Loan Requirements applicable to the conduct of the Business. Except as set forth on Schedule 3.15, neither AEM nor its Affiliates has received any communication from any Governmental Authority, the substance of which has not been resolved, regarding any actual or potential violation of, or failure to comply with, any Law or Mortgage Loan Requirements. No fact or circumstance exists that could reasonably be expected to give rise to a claim by any Investor, Insurer, Governmental Authority, Regulatory Authority or other Person based on AEM's failure to comply with any Law or Mortgage Loan Requirements.

3.16    Regulatory Matters. Except as set forth on Schedule 3.16, none of AEM, nor any of its managers, officers, directors or Employees or any of their respective Affiliates, including Seller, is or in the last five (5) years has been, in connection with conduct of the Business by AEM, a party to or is subject to any suspension, debarment, outstanding order, decree, agreement, finding, memorandum of understanding or similar supervisory arrangement with, or a commitment letter or similar submission to, or extraordinary supervisory letter from, any Investor, Insurer or any Governmental Authority charged with the supervision or regulation of residential mortgage lenders (including the Agencies) or the supervision or regulation of AEM and its Employees (each, a "*Regulatory Authority*"). Except as set forth on Schedule 3.16, no current or former officer and no Mortgage Loan Originator or other current personnel of AEM has been indicted, arraigned or convicted (or has been in the last five (5) years or currently is under investigation) for any criminal offenses, any dishonesty or fraudulent activity related to the origination, servicing or sale of

Mortgage Loans or the conduct of the Business. Except for normal examinations conducted by a Regulatory Authority in the ordinary course of business of AEM, no Governmental Authority or Regulatory Authority has initiated or, to the Knowledge of AEM, threatened, any material proceeding or investigation into the business or operations of AEM that is ongoing or pending. There is no unresolved violation by any Governmental Authority or Regulatory Authority with respect to any report or statement relating to any examinations or investigation of AEM or any Employee.

3.17    Permits. Except as set forth on Schedule 3.17, AEM and its applicable Employees have all of the Permits that are required to carry on the Business as presently conducted by AEM. AEM is (i) an approved servicer, seller/servicer or issuer, as applicable, of Mortgage Loans for HUD, FNMA, FHLMC, GNMA, FHA and VA, (ii) properly licensed and qualified to do business and in good standing in each jurisdiction in which such licensing and qualification is necessary to act as the servicer under any Servicing Agreement and applicable Law, and (iii) qualified to act as the servicer under each Servicing Agreement, and no event has occurred which would make AEM unable to comply with all such eligibility requirements or which would require notification to FNMA, FHLMC, GNMA, FHA or VA. Except as set forth on Schedule 3.17, AEM and its applicable Employees have complied in all material respects with all requirements in connection with such Permits and such Permits are in full force and effect and, to the Knowledge of Seller, no suspension or cancellation of any of them has been threatened and the Permits will not be subject to suspension, modification or revocation as a result of this Agreement or the consummation of the Contemplated Transactions.   AEM has not received any notice or other written communication from any Governmental Authority or Regulatory Authority that such Governmental Authority or Regulatory Authority intends to terminate or restrict AEM's status as an approved participant in its programs involving the Business for which AEM is as of the date hereof registered, approved or authorized.

3.18    Mortgage Loans.

(a)    Portfolio Information.

(i)    Seller has previously delivered to Buyer, in agreed form and, as of the date hereof (which will be updated as of the Closing Date), the following information with respect to each Mortgage Loan:

(A)    the loan number;

(B)    the unpaid principal balance and original term to maturity;

(C)    the payment status;

(D)    the monthly principal and interest payments;

(E)    the monthly escrow payment;

(F)    the interest rate, and whether such interest rate is adjustable;

(G)    the state in which the secured property is located;

(H)    the identity of the Agency or Investor; and

(I)    whether such Mortgage Loan is secured by a first or second lien.

(ii)    Seller has previously delivered to Buyer, in agreed form, certain information with respect to each Pipeline Loan, including, without limitation, the proposed loan amount, interest rate, loan type, and closing date, as of the date hereof (which will be updated as of the Closing Date).

(b)    Each Mortgage Loan sold by AEM was eligible for sale to, insurance by, or pooling to back securities issued or guaranteed by, the applicable Investor or Insurer upon such sale, issuance of insurance or pooling.  Each Mortgage Loan held by AEM intended for sale by AEM is eligible for sale under the agreement with the related Investor.  No Investor or Insurer has taken, or threatened to take any action, and there exists no fact or circumstance that would entitle the applicable Insurer or Investor to take any action, including, but not limited to (i) demand from AEM either repurchase of any Serviced Mortgage Loan or Previously Disposed of Mortgage Loan (the "*Repurchase Obligation*") or to refuse to purchase a Mortgage Loan, (ii) impose on AEM sanctions, penalties or special requirements in respect of any Mortgage Loan, or (iii) rescind any insurance policy or reduce insurance benefits in respect of any Mortgage Loan that would result in a breach of any obligation of AEM under any Contract.  Each Pipeline Loan complied with Mortgage Loan Requirements for the stage of processing that had been achieved as of the Closing Date based on the Investor or Insurer program under which AEM originated such Pipeline Loan, including but not limited to compliance with applicable Laws and procurement of requirement settlement services (e.g., appraisal, title and insurance).  AEM has handled each REO in accordance with Mortgage Loan Requirements.

(c)    Each Mortgage Loan held by AEM is evidenced by a Mortgage Note and is duly secured by a valid first lien or, if applicable, second Mortgage on the related Mortgaged Property, in each case, on such forms and with such terms that comply with all Mortgage Loan Requirements.  Each Mortgage Note and the related Mortgage is genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting generally the enforcement of creditors' rights and the discretion of a court to grant specific performance.  All parties to the Mortgage Note and the Mortgage had legal capacity to execute the Mortgage Note and the Mortgage and each Mortgage Note and Mortgage has been duly and properly executed by such parties.  Each Mortgage Loan is not subject to any rights of rescission, set-off, counterclaim or defense (other than payment), including the defense of usury, or will with operation of any of the terms of the Mortgage Note or the Mortgage be unenforceable by AEM, in whole or in part, or subject to any right of rescission (except any Mortgage Loans that are closed but not funded), set-off, counterclaim or defense (other than payment), including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto.  All Mortgage Loan files are complete and have been maintained in accordance with applicable Mortgage Loan Requirements.  For purposes of this Section 3.18, references to Mortgage Notes shall be deemed to include mortgage notes in respect of REO.

(d)    AEM and each Originator have complied with applicable Mortgage Loan Requirements in all material respects.

(e)    There has not been any fraudulent action on the part of any Person (including without limitation any borrower, appraiser, builder or developer, credit reporting agency, settlement agent, realtor, broker or correspondent) in connection with the origination of any Mortgage Loan or

Pipeline Loan or the application of any insurance proceeds with respect to a Mortgage Loan or the Collateral for which AEM is responsible to the applicable Investor or Insurer.

(f)     The Servicing of all Mortgage Loans subject to Servicing Agreements, and otherwise, has complied in all material respects with all applicable Mortgage Loan Requirements.

(g)     All Custodial Funds accounts required to be maintained by AEM have been established and continuously maintained in accordance with Mortgage Loan Requirements.  All Custodial Funds account balances required by the Mortgage Loans and paid to AEM for the account of the Mortgagors under the Mortgage Loans have been credited to the appropriate account in accordance with the Mortgage Loan Requirements.  Subject to and in accordance with Mortgage Loan Requirements pertaining generally to the type, size, rating or capitalization of depository institution qualified to hold such balances, AEM has the right and power to determine the financial institution in which the Custodial Funds accounts are held.

(h)     Each appraisal made in connection with the origination of a Mortgage Loan or, if applicable, a Pipeline Loan, was performed in accordance with Mortgage Loan Requirements.

(i)     All flood and hazard insurance policies with respect to Mortgage Loans were obtained where required by applicable Law and are in compliance with Mortgage Loan Requirements.

(j)     There are no taxes, ground rents, water charges, sewer rents, assessments (including assessments payable in future installments), insurance premiums, leasehold payments or other outstanding charges affecting the related Mortgaged Properties (i) with respect to any Mortgage Loans held by AEM or REO and (ii) with respect to any Serviced Mortgage Loan (except those items which, if unpaid, are not obligations of AEM under Mortgage Loan Requirements), in each case that are past due and for which a penalty is payable.

3.19    Environmental Matters.  Except as set forth on Schedule 3.19 hereto, AEM has all Permits required for the conduct of the Business as presently conducted under applicable Environmental Laws ("*Environmental Permits*") and is in compliance with all terms and conditions of such Environmental Permits and all applicable Environmental Laws.  AEM has not received any communication concerning any violation or alleged violation of any Environmental Law or any alleged Liability involving the presence of or exposure to any Hazardous Substance.  There are no Orders outstanding, or any Actions pending, relating to compliance by AEM with or any Liability under any Environmental Law affecting AEM.

3.20    Taxes.

(a)     Each of Seller and AEM has timely filed, subject to permitted extensions, all Tax Returns that it was required to file.  All such Tax Returns were correct and complete and were prepared in compliance with all applicable Laws.  All Taxes owed by Seller and AEM (whether or not shown or required to be shown on any Tax Return) have been paid.  There are no outstanding claims in any jurisdiction in which Seller or AEM does not file Tax Returns that such entity is or may be subject to taxation by that jurisdiction.

(b)     Each of Seller and AEM has withheld and paid all Taxes, social security and any other applicable withholdings required to have been withheld and paid in connection with any

17

amounts paid or owing to any employee, independent contractor, creditor, member or other third party, and all forms required with respect thereto have been properly completed and timely filed.

(c)     No federal, state, local or foreign audits, examinations, investigations or other administrative proceedings or court proceedings are currently ongoing, pending or threatened with regard to any Taxes or Tax Returns of Seller or AEM.  There are no claimed, proposed, or asserted Tax deficiencies or assessments of Tax with respect to Seller or AEM that have not been fully paid.

(d)     None of Seller, AEM or AEE has waived any statute of limitations in respect of Taxes or has agreed to any extension of time with respect to a Tax assessment or deficiency.

(e)     None of Seller or AEM has any obligation to make a payment that is not deductible under Sections 280G or 162(m) of the Code.

(f)     There are no liens for Taxes upon any asset of AEM, except for Permitted Encumbrances.

(g)     AEM will not be required to include any item of income in, or exclude any item of deduction from, income for any Tax period (or portion thereof) ending after the Closing Date as a result of any (i) change in method of accounting made on or prior to the Closing Date pursuant to Code Section 481(a) (or any comparable provision of applicable Law), (ii) closing agreement described in Code Section 7121 (or any comparable provision of applicable Law), (iii) installment sale or open transaction disposition made on or prior to the Closing Date, or (iv) prepaid amount received on or prior to the Closing Date.

(h)     AEM is, and has been since 2010 been, properly treated  as either an entity treated as a partnership or as an entity "disregarded as an entity separate from its owner," within the meaning of Treasury Regulation Section 301.7701-2, and since 2010 no election has ever been made under Treasury Regulation Section 301.7701-3 to cause AEM to be treated as an association taxable as a corporation for U.S. federal income Tax purposes during said period.

(i)     Each of Seller and AEM has disclosed on its federal income Tax Returns all positions taken that could give rise to a substantial understatement of federal income Tax within the meaning of Section 6662 of the Code.  None of Seller or AEM is a party to any Tax allocation or sharing agreement.  None of Seller or AEM (a) has been a member of an affiliated group filing a consolidated federal income Tax Return or (b) has any Liability for the Taxes of any Person under Treasury Regulation Section 1.1502-6 (or any other similar provision of state, local or non-U.S. law) as a transferee or successor, by contract or otherwise.

3.21     Risk Management Instruments.  All material interest rate swaps, caps, floors, option agreements, futures and forward contracts and other similar risk management arrangements (all of which are listed on Schedule 3.21) were entered into (i) in accordance with commercially reasonable business practices and all applicable Laws and (ii) with counterparties believed to be financially responsible at the time, and each of them constitutes the valid and legally binding obligation of AEM, enforceable in accordance with its terms (except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar Laws of general applicability relating to or affecting creditors' rights or by general equity principles) and is in full force and effect.  Neither AEM nor any other party thereto, is in breach of any of its obligations under such agreement or arrangement.

18

3.22    Insurance.   Seller has previously disclosed all material insurance Contracts and policies of insurance relating to the Business (other than title insurance policies or insurance policies relating materially to loans which AEM Services) that name AEM as an insured party thereunder. All such insurance Contracts and insurance policies are in full force and effect.  AEM is not in material default thereunder, and all claims thereunder have been filed in a timely fashion.

3.23    Advances; Receivables.

(a)    The Advances reflected in the Interim Financial Statements, and those to be reflected on the Closing Date Balance Sheet, are or will be valid and subsisting amounts owing to AEM and are carried on the books of AEM at values determined consistent with the applicable policies, procedures and methodologies currently employed by AEM.  Except as set forth in Schedule 3.23, no Investor has claimed or has threatened to claim any material defense, offset or counterclaim to repayment of any outstanding Advance that is pending.

(b)    The accounts receivable reflected on the Interim Balance Sheet, and those to be reflected on the Closing Date Balance Sheet, have or will have arisen from bona fide transactions in the ordinary course of business of AEM and are or will be valid obligations of the respective makers thereof and are not and will not be subject to material setoffs or claims, except for the amounts properly reserved for doubtful or uncollectible accounts as reflected on the Interim Financial Statements or the Closing Date Balance Sheet, as the case may be.

3.24    No Regulatory Impediment.  To the Knowledge of Seller, there are no facts relating to AEM, AEM or the conduct of Business that might reasonably be expected to impair AEM's, Seller's or Buyer's ability to obtain all consents, orders, authorizations and approvals from Governmental Authorities or Regulatory Authorities necessary for the consummation of the Contemplated Transactions.

3.25    Statements Made; Diligence Materials.   Subject to applicable Knowledge or materiality limitations contained in the relevant provisions of this Agreement, no representation, warranty or statement made by Seller, or document that is within the control of Seller, in connection with this Agreement, or any exhibit, Schedule, data tape, statement or certificate furnished to Buyer by Seller or, to Seller's Knowledge, by any other Person on Seller's behalf who is not an Employee, in connection with the Contemplated Transactions contains or will contain, as of the date provided or date stated in such materials, any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading.  All due diligence information that Seller has provided to Buyer in connection with this Agreement, whether provided directly, made available in an electronic data room at provided by Seller through Teraverde Management Advisors ShareFile Folders entitled (i) AEMC Disclosure Schedules for RPM KLGates Attachments to Schedules at https://teraverde.sharefile.com/app/#home/shared/foa3d6f5-c62f-418u-a8b1-f4d8e6e35bf8;    and,    (ii)    American    Eagle    Data    Room    at https://teraverde.sharefile.com/app/#home/shared/foc90f37-70d9-460d-ba6b-3f7f604f33bf    or otherwise, is true, accurate and complete as of the date provided or specified therein.  All due diligence information that Seller has provided to Buyer in connection with this Agreement is true, accurate and complete as of the date provided or specified therein.  If at any time prior to the Closing, Seller becomes aware of any inaccuracy, misstatement or omission with respect to any Schedule delivered pursuant to this ARTICLE II, Seller shall notify Buyer promptly after becoming so aware and shall promptly provide Buyer with a corrected Schedule.  No matter included on such corrected Schedule shall affect Seller's indemnification obligations under ARTICLE VIII, and any such matter

may be taken into account by Buyer in determining whether any condition to closing has been satisfied, unless Buyer consents to such correction, which consent may be withheld in Buyer's sole discretion, provided, however, the Closing of the Contemplated Transactions hereunder shall evidence Buyer's consent to such correction or waiver of the applicable condition to closing.

3.26    [Intentionally Left Blank].

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the date hereof and as of the Closing Date as follows:

4.1    Organization; Authority.  Buyer is duly organized and validly existing and in good standing as a corporation under California law.  Buyer has all corporate power and authority to enter into this Agreement and to consummate the Contemplated Transactions.  All necessary corporate action and other proceedings required to be taken by Buyer to authorize the execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the Contemplated Transactions have been duly taken.  This Agreement has been, and each of the Ancillary Agreements will be, duly executed and delivered by or on behalf of Buyer and, assuming the due execution by Seller and the Selling Parties of this Agreement and the Ancillary Agreements, constitute the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with its terms, except as such enforceability may be limited by Laws applicable to bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and other similar Laws relating to, or affecting generally, the enforcement of applicable creditors' rights and remedies or by general principles of equity.

4.2    No Conflict.

(a)    Except as set forth on Schedule 4.2(a), the execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the Contemplated Transactions will not:

(i)    violate or conflict with the organizational documents of Buyer;

(ii)    assuming the receipt of Buyer Governmental Approvals, violate any provision of Law to which Buyer is subject or violate or conflict with any Order applicable to Buyer, or

(iii)    violate, breach or constitute a default (with or without notice or lapse of time or both) under or give rise to a right of termination, cancellation or acceleration of any right, remedy or obligation under any term or provision of any Material Contract to which Buyer is a party which breach could reasonably be expected to result in a Buyer Material Adverse Effect.

(b)    Buyer has obtained or will have obtained Buyer Governmental Approvals, and the execution, delivery and performance by Buyer of this Agreement and the consummation by Buyer of the Contemplated Transactions do not require any consent from, registration, declarations

or other filing with or approval or authorization of any Agency, other Governmental Authority or any other third party.

4.3     Financial Ability.  Buyer has immediate access to all funds necessary to pay the Purchase Price and related fees and expenses, and Buyer has the financial capacity to perform all of its other obligations under this Agreement.

4.4     No Brokers.  Except for the fee of Seven Hundred and Fifty Thousand Dollars ($750,000.00) owed by Buyer to NVD Consulting, Inc., no agent, broker, investment banker, financial advisor or other Person is or will be entitled to any broker's or finder's fee or any other similar commission or fee from Buyer or any of its Affiliates in connection with any of the Contemplated Transactions.

### ARTICLE V
### COVENANTS

5.1     Covenants of Seller.  Seller hereby covenants and agrees as follows:

(a)     Pre-Closing Access.  Prior to the Closing, Seller shall (i) give Buyer and its Representatives reasonable access to the officers, management, agents, books, records, offices and other facilities and properties of AEM during mutually agreeable business hours and (ii) furnish to Buyer and its Representatives such information concerning AEM and the Business that is reasonably requested by Buyer or its Representatives; provided, however, that any such access shall be granted at reasonable times during normal business hours and in such a manner as not to interfere with the normal business operations of AEM.  No investigation by Buyer or its Representatives pursuant to this Section 5.1(a) shall affect or be deemed to modify any representation or warranty made by AEM or the Selling Parties herein.

(b)     Ordinary Conduct.  From and after the date hereof and prior to the Closing Date or the earlier termination of this Agreement, except (i) as consented to in writing by Buyer, (ii) to the extent required to comply with any Law, (iii) as set forth on Schedule 5.1(b), or (iv) as otherwise contemplated by this Agreement, Seller shall cause AEM to:

(i)     conduct the Business in the Ordinary Course of Business, including with respect to the management of its working capital;

(ii)     not make any capital expenditure or commitment for capital expenditures in excess of $50,000 in the aggregate unless approved by Buyer in writing in advance;

(iii)     use its best efforts to (i) maintain AEM's company or other existence in good standing, (ii) preserve the business organization in a commercially reasonable manner, (iii) retain the Employees, (iv) maintain complete and accurate business and accounting records relative to the Business, (v) preserve the goodwill of the suppliers, customers and others having business dealings with AEM; (vi) maintain AEM's assets in good condition and repair, subject to ordinary wear and tear, (vii) maintain procedures for protection of Company Intellectual Property, and (viii) maintain presently existing insurance coverages with respect to the Business; and

(iv)     not enter into, amend or terminate any Material Contract except in the Ordinary Course of Business;

(v)      not increase or decrease its work force except specifically set forth on Schedule 5.1(b)(v), not enter into any employment agreement with any Person, and not grant any salary, wage or compensation increase or increase any employee benefit for any Employee (including incentive, commission or bonus payments), except in either case to satisfy contractual obligations existing as of the date hereof, which have been disclosed to Buyer;

(vi)     except for the sale of Mortgage Loans in the Ordinary Course of Business, not sell, transfer, assign, pledge, lease, license or otherwise dispose of or encumber any of AEM's assets in one transaction or a series of related transactions having a value in excess of $10,000;

(vii)    not sell, transfer, assign, pledge, lease, license or otherwise dispose of or encumber the Real Property;

(viii)   not cancel any debt or waive or compromise any claim or right relating to the Business in one transaction or a series of related transactions having a value in excess of $10,000;

(ix)     not incur, assume or Guarantee or otherwise become responsible for any Indebtedness;

(x)      not enter into any joint venture, partnership or other similar arrangement, form any other new material arrangement for the conduct of its Business (including any new marketing or loan referral agreement) or purchase any material assets or securities of any Person;

(xi)     not terminate, cancel or amend any material insurance coverage with respect to the assets or activities of the Business that is not replaced by an adequate amount of insurance coverage at reasonable cost;

(xii)    not merge or consolidate with or into any other Person or permit any other Person to merge or consolidate with or into it;

(xiii)   not transfer, mortgage, encumber or otherwise dispose of any of Pipeline Loans other than in the Ordinary Course of Business;

(xiv)    except as necessary in order to comply with applicable Laws or this Agreement, not make any material changes in its policies and practices with respect to (a) underwriting, pricing, originating, acquiring or buying or selling Mortgage Loans or rights to Service Mortgage Loans or (b) hedging the Pipeline Loans;

(xv)     not make any changes to its accounting methods, practices or policies, except as may be required by Law or under GAAP, in each case as concurred in writing by AEM's independent public accountant;

(xvi) not settle or consent to the settlement of any action filed or otherwise instituted against it, any of its Affiliates, or any officer or director of it or any of their respective Affiliates, or related to AEM's Business, if such settlement would contain any relief against or otherwise affect AEM's assets, the Business or AEM's operation of the Business;

(xvii) not enter into any new master loan sale agreements with any Investors or originate any new loan products or materially modify any existing loan products;

(xviii) maintain all existing state and federal governmental licenses, permits, registrations, consents and approvals;

(xix) not declare or pay any dividend on its units, distribute profits, eliminate receivables or payables between AEM and any of its Affiliates, or transfer assets of AEM to any of its Affiliates, except for payments for services to AEE in the ordinary course of business;

(xx) not (i) issue any units or other equity interests, or rights, warrants or options to purchase its units or other equity interests, (ii) split, combine or reclassify any of its units or other equity interests, or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for units or (iii) purchase, redeem or otherwise acquire any units or other equity interests, or any other securities thereof or any rights, warrants or options to acquire any such units, interests or other securities except for the redemption of certain membership interests disclosed in Section 3.2 of the Disclosure Schedule;

(xxi) not amend its charter documents, including its articles of organization or operating agreement;

(xxii) not make any tax election or settle or compromise any Tax Liability, or agree to an extension of a statute of limitations for taxes;

(xxiii) take any action that is intended or may reasonably be expected to result in any of its representations and warranties set forth in this Agreement being or becoming untrue at any time prior to the Closing Date, or in any of the conditions set forth in ARTICLE VII not being satisfied or in a violation of any provision of this Agreement;

(xxiv) engage in any transaction with, or enter into any agreement, arrangement, or understanding with, directly or indirectly, any officer, director, Key Employees or any of their respective Affiliates, or make any payment or distribution to any officer, director, Key Employees, or any of their respective Affiliates (other than payments for services as an officer, director, or Employee of Seller), except for transactions in the Ordinary Course of Business consistent with past practice or involving immaterial amounts or terms or pursuant to the Contracts listed in Schedule 3.7;

(xxv) enter into, establish, adopt or amend (except as may be required by applicable Laws) any pension, retirement, stock option, stock purchase, savings, profit sharing, deferred compensation, consulting, bonus, group insurance or other employee benefit, incentive or welfare contract, plan or arrangement, or any trust agreement (or similar arrangement) related thereto, in respect of any current or former director, officer, employee or other service

23

provider of or to AEM or take any action to accelerate the vesting or exercisability of stock options, restricted stock or other compensation or benefits payable thereunder;

(xxvi)  other than in the Ordinary Course of Business, acquire (other than by way of foreclosures or acquisitions of control in a bona fide fiduciary capacity or in satisfaction of debts previously contracted in good faith) all or any portion of the assets, business, deposits or properties of any other entity;

(xxvii)  close or relocate any offices at which the Business is conducted or open any new offices or enter into any new leases except as set forth on Schedule 5.1(b); and

(xxviii)  not agree to do any of the foregoing.

5.2    Cooperation.  Buyer, Seller and the Selling Parties shall cooperate with each other at their own cost and expense and use (and shall cause their respective Affiliates to use) commercially reasonable efforts to take or cause to be taken all actions, and to do or cause to be done all things necessary, reasonably proper or advisable under this Agreement and applicable Law to consummate the Contemplated Transactions and enable Buyer to operate the Business after the Closing, including: (i) the obtaining of all necessary consents and approvals from Governmental Authorities, Regulatory Authorities and third parties, (ii) taking of all steps as may be necessary to lift any injunction or other legal bar in order to consummate Contemplated Transactions.

5.3    Publicity.  None of the Parties hereto shall issue any press release or other public announcement, or otherwise communicate with the media, concerning the Contemplated Transactions without the prior consent of the others, or after the Closing without the prior consent of Buyer, except as such release or announcement may be required by Law, in which case Party shall notify the other Parties and, to the extent possible, allow other Parties reasonable time to comment on such release or announcement in advance of the issuance.

5.4    Further Assurances.  On and after the Closing Date, and for no additional consideration, the Parties will take all appropriate action and execute all documents, instruments or conveyances of any kind that may be reasonably necessary or advisable to carry out any of the provisions hereof or to more effectively complete the Contemplated Transactions.

5.5    Exclusivity.  Until the termination of this Agreement pursuant to Section 9.3 or the Closing, whichever is sooner, Seller and the Selling Parties shall not, and shall not permit AEM or any of its Affiliates to, directly or indirectly, through any Representative or otherwise, initiate, solicit, encourage, negotiate or discuss with any third party (including by way of furnishing non-public information concerning AEM or any of its Affiliates, or their respective businesses, assets or properties), or take any other action to facilitate any inquiries with respect to or the making of, any proposal that constitutes or may reasonably be expected to lead to a Competing Transaction.  For purposes hereof, the term "*Competing Transaction*" shall mean any proposal with respect to the acquisition of any of AEM or any subsidiary or their respective materials, assets or properties other than as contemplated by this Agreement.

5.6    Notification of Certain Matters.  Seller shall give prompt written notice to Buyer, and Buyer shall give prompt written notice to Seller, of the occurrence or non-occurrence of any Event that is likely to result in the failure of a condition set forth in ARTICLE VII; provided, however, that

the delivery of any notice pursuant to this Section 5.6 shall not limit or otherwise affect the remedies available hereunder to a Party receiving such notice.

5.7    Tax Matters.

(a)    Tax Returns.  Seller shall prepare or cause to be prepared all Tax Returns of AEM in a manner consistent with past practice, for any Tax period ending on or before the Closing Date (each such period, a "*Pre-Closing Tax Period*").  Seller shall provide a copy of such Tax Returns to Buyer no less than thirty (30) days prior to the filing due date.  No later than fifteen (15) days following receipt of such Tax Returns from Seller, Buyer shall inform Seller of any disagreements with such Tax Returns or inform Seller that it is approving the filing of such Tax Returns.  Buyer and Seller shall work in good faith to resolve any such disagreements as soon as possible and in any event before such Tax Returns are due to be filed.  Buyer shall prepare or cause to be prepared all Tax Returns of AEM for any Straddle Period, and shall provide a copy of such Tax Returns to Seller no less than thirty (30) days prior to the filing due date.  No later than fifteen (15) days following receipt of such Tax Returns from Buyer, Seller shall inform Buyer of any disagreements with such Tax Returns or inform Buyer that it is approving the filing of such Tax Returns. Buyer and Seller shall work in good faith to resolve any such disagreements as soon as possible and in any event before such Tax Returns are due to be filed. Buyer shall timely file or cause to be timely filed the Tax Returns for any Pre-Closing Tax Period or Straddle Period, provided that, no later than five (5) days prior to the due date for each such Tax Return, Seller shall pay to Buyer, as applicable, the full amount of any Taxes due with such Tax Returns for Pre-Closing Tax Periods or otherwise attributable to the applicable Pre-Closing Tax Period, or Seller's share of the Taxes due with respect to any Straddle Period (determined in accordance with Section 5.7(b)).

(b)    Straddle Period.   In the case of a Straddle Period: (i) the amount of any Taxes based on or measured by income, gains, or receipts of AEM for the portion of such Straddle Period through the end of the Closing Date will be determined based on an interim closing of the books as of the close of business on the Closing Date; and (ii) the amount of any other Taxes of AEM for a Straddle Period that relate to the portion of such Straddle Period through the end of the Closing Date will be deemed to be the total amount of such Taxes for the Straddle Period multiplied by a fraction, (A) the numerator of which is the number of days in the Straddle Period up to and including the Closing Date, and (B) the denominator of which is the total number of days in such Straddle Period.

(c)    Tax-Sharing Agreements.  All contracts, agreements, or other arrangements regarding the sharing or allocation of either Liability for Taxes or payment of Taxes to which AEM is a party or by which AEM is bound will be terminated as of the Closing Date (and will have no further effect for any Tax period).

(d)    Cooperation.  Seller and Buyer shall cooperate reasonably in (i) preparing and filing all Tax Returns with respect to AEM, including the furnishing or making available during normal business hours of records, personnel (as reasonably required), books of account, powers of attorney and other materials reasonably necessary or helpful for the preparation of such Tax Returns and (ii) giving the other party timely written notice of and responding to any inquiries, audits or similar proceedings by any Governmental Authority of AEM.

(e)    Transfer Taxes.  The Selling Parties will (i) be responsible for and timely pay all transfer, documentary, sales, use, value added, goods and services, stamp, registration, and similar Taxes arising in connection with or as a result of the transactions contemplated by this Agreement,

and (ii) properly prepare and timely file, at their own expense, all Tax Returns with respect to such Taxes.

5.8     Building Loan Mortgage. The Company is the borrower on a building loan mortgage in the amount of $440,000 ("Building Mortgage"). The Company agrees to keep the Building Mortgage in place and to continue to make the required monthly payments thereunder. If RPM decides to keep the Building Mortgage in place post Closing, then RPM and the Company agree to use commercially reasonable efforts to: (a) negotiate with the Building Mortgage lender the release of John Schrenkel, John Goede, and David Berry from their personal guarantees of the Building Mortgage or (b) refinance the Building Mortgage through another lender to remove the personal guarantees of John Schrenkel, John Goede, and David Berry for the Building Mortgage.

5.9     Warehouse Line Guarantees. Each of the Principals is a guarantor under a Warehouse Credit Agreement with Comerica Bank and First Tennessee Bank (the "Warehouse Credit Agreements"). RPM and the Company agree to use commercially reasonable efforts to: (a) negotiate with the warehouse credit lenders the release of John Schrenkel, John Goede, and David Berry from their personal guarantees of the Warehouse Credit Agreements or (b) close down the warehouse credit lines and establish one or more new lines to accommodate the Company's funding needs.

5.10    Liquidation of AEE. The Selling Parties agree to liquidate AEE after the Closing, to not conduct AEM related business via AEE or any other entity, and to direct all AEE business and revenue opportunities to AEM after the Closing.

## ARTICLE VI
## EMPLOYEES

6.1     Key Employees.   The Key Employees shall have entered into employment agreements with AEM in a form agreed to by Buyer.

6.2     At-Will Employment; Employees.  After the Closing, Buyer shall be entitled to cause AEM to modify any compensation or benefits provided to any Employee and any other terms or conditions of employment with any Employee in its sole discretion.  Notwithstanding the foregoing, Buyer intends that as of the Closing Date AEM will continue to maintain current employment and compensation levels for its Employees.  Nothing contained in this Agreement shall be construed as an offer of employment or contract between Buyer and any Employee and no Employee shall be considered a third party beneficiary of the provisions of this ARTICLE VI.

## ARTICLE VII
## CONDITIONS TO CLOSING

7.1     Conditions to the Obligations of Buyer, the Selling Parties, and Seller.   The respective obligations of Buyer, on the one hand, and the Selling Parties and Seller, on the other hand, to effect the Contemplated Transactions shall be subject to the satisfaction or waiver by Buyer, the Selling Parties, and Seller at or prior to the Closing Date of the following:  (i) no Law that restrains, enjoins or otherwise prohibits the Contemplated Transactions shall have been enacted, adopted or promulgated or be in effect, (ii) no Order that materially impairs, restrains, enjoins or otherwise prohibits the Contemplated Transactions shall have been issued, entered or enforced or be in effect and (iii) no action or proceeding by a Governmental Authority seeking such an Order shall be pending.

7.2     Conditions to the Obligations of Buyer.   The obligation of Buyer to effect the Contemplated Transactions shall be subject to the satisfaction or written waiver by Buyer at or prior to the Closing Date of the following conditions (provided, however, the Closing of the Contemplated Transaction shall constitute the waiver of any condition contained herein absent a written agreement between Seller and Buyer otherwise):

(a)     Representations and Warranties.   All representations and warranties of the Selling Parties and Seller contained in this Agreement:

(i)     that are qualified as to materiality or Seller Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct, as of the date of this Agreement (or in the case of any representation and warranty that specifically relates to an earlier date, as of such earlier date), and

(ii)     shall be true and correct as of the Closing Date as though made on and as of the Closing Date (or in the case of any representation and warranty that specifically relates to an earlier date, as of such earlier date), except for the failure or failures of such representations and warranties to be so true and correct that (after excluding any effect of materiality or Seller Material Adverse Effect qualifications set forth in any such representation or warranty) they have not had and would not have, individually or in the aggregate, a Seller Material Adverse Effect.

(b)     Covenants and Agreements.   The Seller and the Selling Parties shall have performed all of the covenants and agreements required to be performed by them under this Agreement prior to the Closing.

(c)     Officer's Certificate.   Seller shall have delivered to Buyer a certificate from a duly authorized officer, dated as of the Closing Date, stating that the conditions specified in subsections (a) and (b) of this Section 7.2 have been satisfied.

(d)     Secretary's Certificate.   The Seller shall have delivered to Buyer a certificate of Seller's secretary certifying that it has company authority to execute this Agreement and consummate the Contemplated Transactions.

(e)     No Seller Material Adverse Effect.   A Seller Material Adverse Effect shall not have occurred.

(f)     Government Approvals and Third Party Consents.   Seller shall have obtained Seller Governmental Approvals and Third Party Consents set forth on Schedule 3.3(b).

(g)     Closing Deliveries.   Seller and the Selling Parties shall have delivered (i) all of the closing deliveries set forth in Section 2.3(a); (ii) assignments, representing the Membership Interests, duly endorsed for transfer to Buyer and otherwise in form acceptable for transfer on the books of AEM; and (iii) resignations effective immediately following the Closing of the directors, managers, and officers of AEM as set forth on Schedule 7.1(g).

(h)     Key Employees.   The Key Employees shall have executed employment agreements or offer letters with Buyer or its assign, in substantially the form attached hereto as Exhibit C ("*Employment Agreement(s)*"), effective as of the Closing Date.

27

(i)     Executed Settlements. Seller shall have received and delivered to Buyer executed settlements of all repurchase and indemnity claims from the three largest Investors of AEM as of the date hereof (which Investors are set forth on Schedule 7.2(i)).

(j)     Insurance for AEM. AEM shall, at its cost, on or prior to the Closing Date, have caused Buyer to become a primary beneficiary under the existing life insurance policies on the Key Employees.

(k)     Insurance Policies. AEM shall have purchased, at its cost, on or prior to the Closing Date, all of the tail-end insurance policies for Seller as Buyer may reasonably request, on terms and conditions satisfactory to Buyer.

(l)     Termination of Certain Contractual Commitments. AEM shall have amended, revised, modified or terminated, at its cost, the Contracts as set forth on Schedule 7.2(l).

(m)     Office Leases. AEM shall have entered into a long term leases for the Office Leases designated by Buyer, on terms and conditions satisfactory to Buyer, and the parties shall have agreed to the terms and conditions of a long term lease of at least three (3) years for the Real Property, which lease may not become effective until a sale of the Real Property.

(n)     Legal Opinions. Buyer shall have received legal opinions of Baker & Hostetler, LLP and such other counsel reasonably acceptable to Buyer, dated as of the Closing Date, in form and substance reasonably satisfactory to Buyer and its counsel.

(o)     Non-compete. The Key Employees shall have entered into a non-compete agreement in the form attached hereto as Exhibit C.

(p)     Office Lease. New office lease in the form attached hereto as Exhibit F.

(q)     Net Book Value. The Net Book Value calculated in accordance with GAAP and consistent with past practice shall not be less than the Required Net Book Value at the Closing.

(r)     Due Diligence. Buyer shall have completed its due diligence, to its satisfaction, by end of business on July 11, 2016, with any mutually agreed upon actions to be taken or implemented before the Closing.

(s)     FIRPTA Affidavit. Seller shall have provided to Buyer a non-foreign affidavit, dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, and reasonably acceptable to Buyer, duly executed by Seller and stating that Seller is not a "foreign person" as defined in Section 1445 of the Code.

(t)     Other Documents. All such other documents as Buyer may reasonably request in order to consummate the Contemplated Transactions.

7.3     Conditions to the Obligations of Seller. The obligation of Seller and the Selling Parties to effect the Contemplated Transactions shall be subject to the satisfaction or written waiver by Seller at or prior to the Closing Date of the following conditions:

28

(a)     Representations and Warranties. All representations and warranties of Buyer contained in this Agreement:

(i)     that are qualified as to materiality or Buyer Material Adverse Effect shall be true and correct, and those not so qualified shall be true and correct, as of the date of this Agreement (or in the case of any representation and warranty that specifically relates to an earlier date, as of such earlier date), and

(ii)     shall be true and correct as of the Closing Date as though made on and as of the Closing Date (or in the case of any representation and warranty that specifically relates to an earlier date, as of such earlier date), except for the failure or failures of such representations and warranties to be so true and correct that (after excluding any effect of materiality or Buyer Material Adverse Effect qualifications as set forth in any such representation or warranty) they have not had and would not have, individually or in the aggregate, a Buyer Material Adverse Effect.

(b)     Covenants and Agreements. Buyer shall have performed all of the covenants and agreements required to be performed by it under this Agreement prior to the Closing.

(c)     Government Approvals. Buyer shall have obtained Buyer Governmental Approvals.

(d)     Closing Deliveries. Buyer shall have delivered all of the closing deliveries set forth in Section 2.3(b).

(e)     Employment Agreements. The Buyer shall have executed the Employment Agreements with the Key Employees effective as of the Closing Date.

(f)     Office Lease. New office lease in the form attached hereto as Exhibit E.

(g)     Other Documents. All such other documents as Seller may reasonably request in order to consummate the Contemplated Transactions.

## ARTICLE VIII
## INDEMNIFICATION

8.1     Survival of Representations, Warranties and Covenants. All of the representations and warranties of Seller and the Selling Parties contained in ARTICLE III and all of the representations and warranties of Buyer contained in ARTICLE IV shall survive the Closing and continue in full force and effect for a period of twenty-four (24) months thereafter (the "General Survival Period"), except that the representations and warranties in Sections 3.3(a)(ii), 3.3(b), 3.9, 3.12, 3.13, 3.14, 3.16, 3.17, 3.18(b), 3.18(i), 3.18(j), 3.19, 3.20 and 3.24 (collectively "Special Representations") shall survive the Closing and continue in full force and effect until the fifth (5th) anniversary of the Closing Date ("Limited Survival Period") and the representations and warranties in Sections 3.1, and 3.2 shall survive the Closing and continue in full force and effect perpetually.

Except as otherwise provided in this Section 8.1, Buyer may not seek indemnification under this ARTICLE VIII with respect to a breach of a representation or warranty after the expiration of the applicable Survival Period. The foregoing limitations shall not apply with respect to (i) those specific pending claims for indemnification for which the requisite written notice was given by

Buyer to the Seller and the Selling Parties of Buyer's claim for indemnification on or prior to the end of the applicable Survival Period for which the requisite written notice shall effectively toll such time limitation until such specific claims are resolved, (ii) fraud, in which case the applicable representations and warranties shall survive the Closing and continue in full force and effect until the expiration of the applicable statutes of limitations (after giving effect to any extensions or waivers), or (iii) under subparagraphs 8.2(b) through 8(d).  The Parties' respective covenants and agreements to be performed at or after the Closing Date contained in this Agreement shall survive indefinitely unless otherwise set forth herein; provided, however, that any such survival shall not be deemed, directly or indirectly, to affect the applicable Survival Period for representations and warranties.

8.2     Indemnification by the Selling Parties and Seller.  Subject to the limitation of Sections 8.1 and 8.4, Seller and the Selling Parties, jointly and severally, agree to indemnify Buyer and its Representatives (collectively, the "*Buyer Indemnified Parties*") and hold them harmless against any Losses or claimed Losses that any of Buyer Indemnified Parties actually suffer or incur or be forced to defend (or in the event of (b) or (c) below, Losses incurred by Seller after the Closing) that are caused by or are a result of or related to:

(a)     any inaccuracy in or breach of any representation or warranty of Seller or any Selling Party contained in this Agreement without regard to any materiality, Seller Material Adverse Effect or Knowledge qualifier, and any Knowledge of Buyer with respect to any matters, direction or indirectly, related to any such disclosures;

(b)     any breach of, or failure to perform, any covenant or agreement of Seller or the Selling Parties contained in this Agreement; and

(c)     any Repurchase Obligation with respect to a Previously Disposed of Mortgage Loan or Mortgage Loan (excluding Pipeline Contracts) approved by the underwriter but not funded until after the Closing, whether accrued or not accrued or the closing balance sheet (collectively, "*Buyer Losses*").

(d)     all Taxes of Seller, (ii) all Taxes of AEM relating to all taxable periods ended on or before the Closing Date, and (iii) the portion of Taxes of AEM attributable to the portion of any Straddle Period beginning as of the first day of such Straddle Period and ending as of the Closing Date (calculated in the manner provided in Section 5.7(b)).

8.3     Indemnification by the Buyer of Seller and Selling Parties.  Buyer agrees to indemnify Seller and the Selling Parties and their Representatives (collectively, the "Seller Indemnified Parties") and hold them harmless against any Losses or claimed Losses that any of Seller Indemnified Parties actually suffer or incur or be forced to defend, and will reimburse Seller and Selling Parties, for any Losses arising from or in connection with:

(a)     any breach of any representation or warranty made by Buyer in this Agreement or in any certificate, document, writing or instrument delivered by Buyer pursuant to this Agreement; and

(b)     any breach of any covenant or obligation of Buyer in this Agreement or in any other certificate, document, writing or instrument delivered by Buyer pursuant to this Agreement.

8.4     Determination of Losses; Method of Asserting Claims.

(a)     With respect to the obligations of the Selling Parties as provided in Section 8.2 above, "*Indemnified Parties*" shall refer to a Buyer Indemnified Parties and the "*Indemnifying Parties*" shall refer to the Selling Parties a obligated to indemnify such Indemnified Parties. With respect to the obligations of Buyer as provided in Section 8.3 above, "*Indemnified Parties*" shall refer to a Seller Indemnified Parties and the "*Indemnifying Parties*" shall refer to the Buyer.

(b)     In the event that any of the Indemnified Parties is (i) made a defendant in or party to any Action, instituted by any third party that may result in Losses (any such third-party Action being referred to as a "*Third-Party Action*") or (ii) otherwise receives a claim or demand by any third party that may result in Losses (any such third-party claim or demand being referred to as a "*Claim*"), the Indemnified Party shall notify the Indemnifying Party in writing, and in reasonable detail, of the Third-Party Action or Claim within ten (10) Business Days after receipt by such Indemnified Party of written notice of the Third-Party Action or Claim; provided, however, that, notwithstanding the foregoing, with respect to any Third-Party Action or Claim, the Indemnified Party shall deliver to the Indemnifying Party copies of all notices, documents and court papers within seven (7) Business Days of the Indemnified Party's receipt thereof. Such notice of the Third-Party Action or Claim from the Indemnified Party shall contain a reference to the section of this Agreement upon which the Indemnified Party is basing its claim for indemnification, the facts giving rise to the basis for the claim and the amount of the Liability asserted against the Indemnifying Party. The failure to give such notice shall not relieve the Indemnifying Party of its obligations hereunder (or limit such obligations) except to the extent that it shall have been prejudiced by such failure.

(c)     With respect to any Third-Party Action or Claim, the Indemnifying Party shall have the sole and absolute right (which may be exercised by Buyer in the event that a Seller Indemnified Party and a Buyer Indemnified Party are the subject of the same Third-Party Action or Claim or Third-Party Actions or Claims brought by the same Person but arising out of the same set of circumstances and both Seller Indemnified Party and Buyer Indemnified Party are asserting a claim for indemnification hereunder), upon written notice thereof to the Indemnified Party provided within twenty (20) Business Days of its receipt of the notice of the Third-Party Action or Claim, at its option and at its own expense, to be represented by counsel of its choice and to control and assume the defense of such Third-Party Action or Claim; provided, however, that the Indemnified Party may participate in any such Third-Party Action or Claim with counsel of its choice and at its own expense. The Parties hereto agree to cooperate fully with each other in connection with the defense, negotiation or settlement of any such Third-Party Action or Claim and cooperate in such a manner as to preserve in full (to the extent possible) the confidentiality of all confidential information and the attorney-client and work-product privileges. Notwithstanding the foregoing, to the extent that (i) the Indemnifying Party elects not to defend such Third-Party Action or Claim (or fails to elect such defense within the twenty (20) Business Days period referred to above) and the Indemnified Party defends against or otherwise handles any such Third-Party Action or Claim, or (ii) in the reasonable opinion of counsel for the Indemnified Party, there is a conflict or potential conflict of interest between the Indemnified Party and the Indemnifying Party in such Third-Party Action or Claim, then in each case (A) the Indemnified Party may retain counsel of its own choosing, with the reasonable fees and expenses of one law firm for the Indemnified Parties being at the expense of the Indemnifying Party, and the Indemnified Party may control and assume the defense of such Third-Party Action or Claim and (B) the Indemnifying Party may participate in such defense with counsel of its choice and at its own expense. Neither the Indemnifying Party nor the Indemnified Party may settle any Third-Party Action or Claim which settlement obligates the other Party to pay money,

perform obligations or admit Liability without the consent of the other Party, which consent will not be unreasonably withheld; provided, however, if the Indemnifying Party requests the Indemnified Party to accept a proposed financial settlement or financial compromise as the primary aspect of any such settlement with respect to any Third-Party Action or Claim and the Indemnified Party withholds its consent thereto, the obligation of the Indemnifying Party to the Indemnified Party under this ARTICLE VIII with respect to such Third-Party Action or Claim shall not thereafter exceed the aggregate amount that the Indemnifying Party would have paid hereunder in connection with such settlement or compromise (including reimbursable expenses to the date thereof). After (i) any final judgment or award shall have been rendered by a Governmental Authority and the time in which to appeal therefrom has expired, (ii) a settlement shall have been consummated or (iii) the Indemnified Party and the Indemnifying Party shall arrive at a mutually binding agreement with respect to any matter alleged to be indemnified by the Indemnifying Party hereunder, the Indemnified Party shall forward to the Indemnifying Party notice of any sums due and owing by it with respect to such matter and the Indemnifying Party shall pay all of the sums so owing to the Indemnified Party by wire transfer, certified or bank cashier's check within ten (10) Business Days after the date of such notice.

(d)     In the event that any Indemnified Party should have a claim against any Indemnifying Party that does not involve a Third-Party Action or Claim, the Indemnified Party shall deliver a notice of such claim to the Indemnifying Party, setting forth in reasonable detail the identity, nature and estimated amount of Losses related to such claim or claims, with reasonable promptness and in any event prior to the expiration of the Indemnifying Party's indemnification obligation hereunder. If the Indemnifying Party notifies the Indemnified Party that the Indemnifying Party disputes the claim described in such notice, the Indemnifying Party and the Indemnified Party will proceed in good faith to negotiate a resolution of such dispute for a period of at least thirty (30) days. If the Indemnifying Party disputes its Liability to the Indemnified Party for the amount of the claim described in such notice and all or any part of such amount is subsequently determined in any settlement or final resolution by lawsuit to be owed to the Indemnified Party, Indemnifying Party shall promptly, upon such settlement or resolution, pay such amount.

(e)     Notwithstanding any other provision in this ARTICLE VIII, Buyer shall be entitled to indemnification only if and to the extent the aggregate Indemnifiable Amounts exceed Thirty-Seven Thousand Five Hundred Dollars ($37,500) (the "Threshold Amount"), provided that, at such time as the amount to which Buyer is entitled to the indemnified exceeds the Threshold Amount, Buyer shall be entitled to be indemnified from the first dollar up to the full Indemnifiable Amount. Notwithstanding any other provision in this Agreement, Seller and the Selling Parties' indemnification obligations described in this ARTICLE VIII shall be satisfied against payments due but not yet paid to the Principals under the Earn-Outs and the Economic Interests. In addition, the Selling Parties and the Seller's obligation to Buyer under this ARTICLE VIII shall not exceed the aggregate amount of the Earn-Outs plus the Economic Interests; provided, however, that such obligations and liabilities to Buyer arising out of fraud committed by Seller or the Selling Parties shall not be subject to the limitation described in this Section 8.4(e).

(f)     All indemnification and other payments under this ARTICLE VIII will, to the extent permitted by law, be treated for all Tax purposes as adjustments to the Earn-Out. Neither the Buyer nor the Seller will take any position on any Tax return, or before any Governmental Authority, that is inconsistent with such treatment unless otherwise required by any applicable Law.

(g)   An Indemnified Party shall take commercially reasonable steps to mitigate indemnifiable Losses to the extent required to do so by applicable Law.

(h)   Notwithstanding anything herein to the contrary, from and after the Closing, the sole and exclusive remedy for any breach or failure to be true and correct, or alleged breach or failure to be true and correct, of any representation or warranty or any covenant or agreement in this Agreement by the Selling Parties (other than claims of fraud), shall be indemnification in accordance with this ARTICLE VIII. Notwithstanding the foregoing, this Section 8.4(h) shall not operate to limit the rights of the parties to seek equitable remedies (including specific performance or injunctive relief). This Section 8.3(h) shall not affect the right of a party to pursue any remedy expressly permitted by any Ancillary Agreement.

## ARTICLE IX
## MISCELLANEOUS

9.1   Assignment. This Agreement and the rights hereunder shall not be assignable or transferable by any Party hereto without the prior written consent of the other Parties hereto; provided, however, that Buyer shall have the right to assign this Agreement (a) to any of its Affiliates or (b) in connection with a sale of interests or by operation of Law in connection with a conversion, merger or in connection with the sale of substantially all of its assets after the Closing; provided, however, that (i) Buyer shall be and remain liable to Seller and Selling Parties for all obligations of Buyer under this Agreement, the Ancillary Agreements, and the other documents and instruments to be executed and delivered by Buyer pursuant hereto and (ii) RPM Mortgage, Inc., a California corporation, shall be liable to Seller for any obligations arising directly and exclusively from this Agreement (whether or not this Agreement has been assigned to it) and expressly not for any liabilities arising from the Ancillary Agreements or any other documents or instructions to be executed and delivered by Buyer pursuant hereto other than to vote in favor of the transactions contemplated herein. Notwithstanding the above, this Agreement shall inure to the benefit of, and be binding upon and enforceable against, the respective successors and permitted assigns of the Parties.

9.2   No Third-Party Beneficiaries. Except for the provisions of ARTICLE VIII relating to Indemnified Parties, this Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and nothing herein expressed or implied shall give or be construed to give to any Person (including Employees), other than the Parties and such respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement.

9.3   Termination.

(a)   This Agreement may be terminated by written notice:

(i)   by the mutual written consent of Seller and Buyer;

(ii)   by either Seller or Buyer, if the Closing shall not have occurred on or before August 31, 2016, (the "*Termination Date*") (unless the failure to consummate the Contemplated Transactions is attributable to a failure on the part of the Party seeking to terminate the Agreement);

(iii)    by either Seller or Buyer, if (A) any Governmental Authority that must grant a required Governmental Approval has denied such approval and such denial has become final and nonappealable and Buyer does not waive the requirement of such approval or (B) any Governmental Authority shall have issued a final nonappealable Order enjoining or otherwise prohibiting the consummation of the Contemplated Transactions;

(iv)    by Buyer, if it is not in material breach of its obligations under this Agreement, and if (A) at any time that any of the representations and warranties of Seller or Seller herein become untrue or inaccurate such that Section 7.2(a) would not be satisfied or (B) there has been a breach on the part of Seller or Seller of any of its covenants or agreements contained in this Agreement such that Section 7.2(b) would not be satisfied, and, in both case (A) and case (B), such breach (if curable) has not been cured within ten (10) days after Buyer has provided written notice of such breach to Seller;

(v)    by Seller, if it and the other Selling Parties are not in material breach of their obligations under this Agreement, and if (A) at any time that any of the representations and warranties of Buyer herein become untrue or inaccurate such that Section 7.3(a) would not be satisfied or (B) there has been a breach on the part of Buyer of any of its covenants or agreements contained in this Agreement such that Section 7.3(b) would not be satisfied, and, in both case (A) and case (B), such breach (if curable) has not been cured within ten (10) days after Seller has provided written notice of such breach to Buyer; or

(vi)    by Buyer, if Buyer is not satisfied with the results of its due diligence by 5:00 p.m. (EST) on July 11, 2016.

(b)    In the event of termination by Seller or Buyer pursuant to Section 9.3(a), written notice thereof shall forthwith be given to the other Parties, this Agreement shall become void and have no effect and the Contemplated Transactions shall be terminated without further action by any Party. If the Contemplated Transactions are terminated as provided herein:

(i)    Buyer shall return to Seller all documents and other material received from Seller or its respective Affiliates or Representatives relating to the Contemplated Transactions, whether so obtained before or after the execution hereof;

(ii)    all confidential information received by Buyer with respect to the Business shall be treated in accordance with the Confidentiality Agreement, which shall remain in full force and effect notwithstanding the termination of this Agreement; and

(iii)    the provisions of this ARTICLE IX shall remain in full force and effect.

(c)    In no event shall any termination of this Agreement limit or restrict the rights and remedies of a Party hereto against any other Party which has breached any of the agreements or other provisions of this Agreement prior to termination hereof.

9.4    Expenses. Except as otherwise provided herein, Seller, AEM, Principals, and Buyer will each be liable for its own costs and expenses incurred in connection with the negotiation, preparation, execution or performance of this Agreement, whether or not the Closing shall have occurred. Notwithstanding anything contained herein to the contrary, if the Agreement is terminated due to the violation of Section 5.5 hereof, Buyer shall be entitled to a payment of $100,000 from

Seller, plus a reimbursement of all reasonable fees and costs Buyer has incurred in connection with the negotiation, preparation, execution or performance of this Agreement and the Contemplated Transactions, which amount shall be payable by wire transfer of immediately available funds.

9.5      Amendment and Modification.  This Agreement may not be amended except by an instrument or instruments in writing signed and delivered on behalf of each of the Parties hereto.

9.6      Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given (a) on the date of delivery if delivered personally, (b) on the date of transmission if sent via facsimile transmission or email to the facsimile number or email address given below, and, in the case of facsimile transmission, telephonic confirmation of receipt is obtained promptly after completion of transmission, (c) on the Business Day after delivery to a reputable nationally recognized overnight courier service or (d) upon receipt after being mailed by registered or certified mail (return receipt requested) to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice):

If to Buyer, to:
RPM Mortgage, Inc.
3240 Stone Valley Road West
Alamo, CA 94507
Attention:  Robert Hirt, CEO
Facsimile:  925 944 8910
Email:  RHirt@rpm-mtg.com

With a copy to:
K&L Gates, LLP
4 Embarcadero, Suite 1200
San Francisco, CA 94111
Attention:  Lars Johansson
Email:  lars.johansson@klgates.com

If to Seller:
c/o JDJ Management, LLC
8950 Fontana Del Sol Way
Suite 100
Naples, FL 34109
ATTN: John C. Geode, Manager
Email:  jgoede@gadclaw.com

With a copy to:
Henderson, Franklin, Starnes & Holt, P.A.
1715 Monroe Street
Fort Myers, FL  33901
Attention:  Guy E. Whitesman
Email:  guy.whitesman@henlaw.com

If to Selling Parties, to:
c/o JDJ Management, LLC
8950 Fontana Del Sol Way

35

Suite 100
Naples, FL 34109
ATTN: John C. Geode, Manager
Email: jgoede@gadclaw.com

Such addresses may be changed from time to time by means of a notice given in the manner provided in this Section 9.6; provided that no such notice shall be effective until it is received by the other Parties hereto.

9.7    Governing Law.

(a)    This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Delaware applicable to contracts executed in and to be performed in that state. All Actions arising out of or relating to this Agreement shall be heard and determined in the Chancery Court of the State of Delaware or any federal court sitting in the State of Delaware. Consistent with the preceding sentence, the Parties hereto hereby (i) submit to the exclusive jurisdiction of the Chancery Court in the State of Delaware or any federal court sitting in the State of Delaware for the purpose of any Action arising out of or relating to this Agreement brought by any Party and (ii) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the Contemplated Transactions may not be enforced in or by any of the above-named courts.

(b)    EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY ANCILLARY AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.   EACH PARTY CERTIFIES THAT IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS SET FORTH ABOVE IN THIS SECTION 9.7.

9.8    Severability.   If any provision of this Agreement or the application of any such provision to any Person or circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect the legality, validity or enforceability of any other provision hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is found by a court or other Governmental Authority of competent jurisdiction to be invalid or unenforceable, (a) a suitable and equitable provision will be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances will not be affected by such invalidity or unenforceability, nor will such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

9.9    Waiver.   Waiver of any term or condition of this Agreement by any Party shall be effective if in writing and shall not be construed as a waiver of any subsequent breach or failure of the same term or condition, or a waiver of any other term of this Agreement. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor

shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

9.10    Counterparts; Facsimile.   This Agreement may be executed in any number of counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more such counterparts have been signed by each Party and delivered to the other Parties.  Signatures of the Parties transmitted by facsimile or other electronic communication means shall be binding and effective for all purposes.  Such Party shall subsequently deliver to the other Parties an original, executed copy of this Agreement; provided, however, that a failure to deliver such original shall not invalidate a facsimile or other electronic signature.

9.11    Entire Agreement.  This Agreement, including the Disclosure Schedules and Exhibits hereto, and the Ancillary Agreements contain the entire agreement and understanding between the Parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements, negotiations, correspondence, undertakings and understandings, oral or written, relating to such subject matter including the Letter of Intent, dated as of March 12, 2016, between Seller and Buyer.

9.12    Interpretation.   All references to immediately available funds or dollar amounts contained in this Agreement shall mean U.S. dollars. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  References in this Agreement to any gender include references to all genders, and references to the singular include references to the plural and vice versa.  The words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation."   Unless the context otherwise requires, references in this Agreement to Articles, Sections, Exhibits, Schedules and Disclosure Schedules shall be deemed references to Articles and Sections of, and Exhibits and Disclosure Schedules to, this Agreement. Unless the context otherwise requires, the words "hereof," "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety and not to any particular Article, Section or provision of this Agreement.  Whenever the words "made available to Buyer" or similar words are used in this Agreement with respect to any documents or other information, such words shall mean that such documents or information as Seller has provided to Buyer in electronic form or as have otherwise been provided by Seller to Buyer at Seller's office facilities.  The Parties have participated jointly in negotiating and drafting this Agreement.  In the event that an ambiguity or a question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Nothing in this Agreement shall be construed to require any Party hereto to violate any Law.

9.13    Enforcement in Equity and at Law.  The Parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the Parties shall be entitled to seek injunctive relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which they are entitled at Law or in equity.

**ARTICLE X**
**DEFINITIONS**

10.1    Definitions.  The terms not defined in the Agreement shall have the meanings ascribed to them in this ARTICLE X.

(a)    Certain Definitions.  As used in this Agreement, the following terms shall have the following meanings:

"*Accounts Receivable*" means all accounts receivable of AEM or any of its Affiliates.

"*Action*" means any action, suit, litigation, arbitration, inquiry, proceeding or investigation, including, without limitation, those by or before any Governmental Authority.

"*Advances*" means, with respect to AEM and the Servicing Agreements, the moneys that have been advanced by AEM on or before the Closing Date from its funds in connection with its Servicing of Mortgage Loans in accordance with applicable Mortgage Loan Requirements.

"*AEE*" means The American Eagle Mortgage Escrow Co., LLC, an Ohio limited liability company.

"*Affiliate*" shall have the meaning given to such term in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended from time to time.

"*Agency*" means, as applicable, FHA, HUD, GNMA, FHLMC or FNMA.

"*Ancillary Agreements*" means the documents, the instruments and agreements to be executed and/or delivered pursuant to this Agreement or any Ancillary Agreement including without limitation instruments of assignment and assumption, and employment agreements.

"*Book Value*" means the value accorded to a particular asset or Liability as reflected on the books and records of AEM or any of its Affiliates, as the case may be, at any time of determination calculated in accordance with GAAP consistently applied.

"*Business Day*" means any day other than (i) a Saturday or Sunday, (ii) a day on which commercial banks in California or New York, New York generally are required or authorized by law or executive order to close or (iii) a day when the New York Stock Exchange is closed.

"*Buyer Material Adverse Effect*" means any Event that has had, or would be reasonably expected to have, a material and adverse effect upon the ability of Buyer to consummate the Contemplated Transactions or perform its obligations under this Agreement or any of the Ancillary Agreements, as applicable.

"*CERCLA*" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, and the regulations promulgated thereunder.

"*Code*" means the Internal Revenue Code of 1986, as amended from time to time, and the Treasury Regulations promulgated thereunder.

"*Collateral*" means the property securing a Mortgage Loan.

"*Company Benefit Plans*" means all "employee benefit plans" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, including the documents, Contracts, and policies thereunder, and all employment, bonus, equity compensation, pension, profit sharing, savings and thrift, deferred compensation, severance pay and medical and life insurance plans, programs, or agreements entered into, maintained or contributed to by AEM in which any of the Employees or their dependents participate.

"*Company Intellectual Property*" means the Intellectual Property (x) owned by AEM and/or otherwise (y) owned by an Affiliate of AEM and used primarily in the operation of the Business by AEM as presently conducted by AEM.

"*Contemplated Transactions*" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"*Contracts*" means all agreements, contracts, commitments and undertakings, written or oral, including any amendments thereto, to which any Person is a party, an obligor or a beneficiary, or by which any of its assets or properties is bound.

"*Custodial Funds*" means all funds held or controlled by AEM with respect to any Mortgage Loan or any Pipeline Loan, including all principal and interest funds and any other funds due Investors, buy down funds, funds for the payment of Taxes, assessments, insurance premiums, ground rents and similar charges, funds from hazard insurance loss drafts and other mortgage escrow and impound amounts (including interest thereon for the benefit of mortgagors, if applicable).

"*Cut-off Date*" means 5:00 p.m., Eastern time, on the Business Day immediately prior to the Closing Date.

"*Disclosure Schedules*" or "*Schedules*" means the disclosure schedules attached hereto being delivered by the Parties on the date hereof.

"*Economic Interest*" means the annual bonus payment payable to the Principals pursuant to Management Incentive Program, as amended from time to time.

"*Employee*" means any employee employed by AEM, including those employees on medical leave, family leave, military leave or personal leave under AEM's policies.

"*Encumbrances*" means any claims, liens, encumbrances, pledges, easements, servitudes, mortgages, deeds of trust, security interests, options, charges or similar rights of any Person, other than the owner of the assets, of any kind whatsoever against the asset.

"*Environmental Laws*" means all applicable federal, state and local Laws concerning pollution or protection of the environment or health and safety including (i) CERCLA, (ii) RCRA, (iii) the Federal Water Pollution Control Act, (iv) the Federal Clean Air Act, (v) the Toxic Substances Control Act, (vi) the Safe Drinking Water Act, (vii) the Pollution Control Act of 1990, (viii) the Federal Insecticide, Fungicide and Rodenticide Act, (ix) Laws related to releases or threatened releases of Hazardous Substances into the environment (including ambient air, surface water, ground water, land, surface and subsurface waste) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, release, transport or handling of Hazardous

Substances, and (x) comparable state and local Laws, as each of the foregoing may be amended from time to time.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.

"*Event*" means any event, circumstance, change, occurrence or effect.

"*Excluded Assets*" means the assets described in *Schedule 1.2*.

"*FHA*" means the Federal Housing Administration, or any successor thereto.

"*FHLMC*" means Federal Home Loan Mortgage Corporation or any successor thereto.

"*FNMA*" means Federal National Mortgage Association (now known as "Fannie Mae") or any successor thereto.

"*Freddie Mac*" means the Federal Home Loan Mortgage Corporation, or any successor thereto.

"*GAAP*" means generally accepted accounting principles in the United States.

"*GNMA*" means Government National Mortgage Association or any successor thereto.

"*Governmental Approval(s)*" means, as to each party hereto, the applicable approvals by the Governmental Authorities necessary to complete the Contemplated Transactions.

"*Governmental Authority*" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, national, supranational, state, provincial, or local, or any similar government, governmental, regulatory or administrative agency, commission, instrumentality or authority thereof (including without limitation any Agency and the Consumer Financial Protection Bureau), or any court, tribunal, judicial or arbitrator (public or private), or self-regulatory organization.

"*Guarantee*" of or by any Person means any obligation, contingent or otherwise, of such Person guaranteeing any Indebtedness of any other Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) any Indebtedness of any primary obligor or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness, (ii) to purchase property, securities or services for the purpose of assuring the owner of any Indebtedness of any primary obligor of the payment of such Indebtedness or (iii) to maintain working capital, equity capital or other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay any Indebtedness of such primary obligor.

"*Hazardous Substances*" means "hazardous substances" pursuant to CERCLA, "hazardous waste" pursuant to RCRA, "toxic pollutants" pursuant to the Federal Water Pollution Control Act and any materials, wastes and substances defined as "hazardous substances" or regulated

40

as such under any other Environmental Law, including asbestos, polychlorinated biphenyls and petroleum products.

"*HUD*" means the Rural Housing Service of the U.S. Department of Housing and Urban Development, or any successor thereto.

"*Indebtedness*" of any Person means (i) all obligations of such Person for borrowed money, (ii) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (iii) all obligations of such Person upon which interest charges are customarily paid by such Person, other than trade credit incurred in the ordinary course of business, (iv) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (v) all obligations of such Person issued or assumed as the deferred purchase price of property or services, (vi) all indebtedness of others secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance on property owned or acquired by such Person, whether or not the obligations secured thereby have been assumed, (vii) all Guarantees by such Person, (viii) all capital lease obligations of such Person, (ix) the notional amount of all obligations of such Person in respect of interest rate protection agreements, foreign currency exchange agreements or other interest or exchange rate hedging arrangements and (x) all obligations of such Person as an account party in respect of letters of credit and bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any partnership in which such Person is a general partner.

"*Independent Accountant*" means an independent nationally recognized auditing firm selected by Seller and Buyer that is not the independent auditing firm for either Buyer or Seller or any of their Affiliates.

"*Insurer*" means a Person who insures or Guarantees for the benefit of the mortgagee all or any portion of the risk of loss upon borrower default on any Mortgage Loan or Pipeline Loan and any provider of hazard, title or other insurance with respect to any Mortgage Loan or Pipeline Loan or the Collateral securing any such loan.

"*Intellectual Property*" means (i) patents and patent applications together with reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof; (ii) trademarks, service marks, trade dress, logos, domain names, and trade names, including goodwill associated therewith, and applications, registrations and renewals in connection therewith; (iii) works of authorship, copyrights, and applications, registrations and renewals in connection therewith; (iv) trade secrets; and (v) computer software (including source code, object code and data).

"*Investor*" means any Person (including any Agency) having a beneficial interest in a Mortgage Loan or a security backed by or representing an interest in a Mortgage Loan or any Person with authority to act for and on behalf of any such Person (or Agency), such as a trustee.

"*Key Employee*" means those individuals listed on Schedule 7.2(h).

"*Knowledge*" means, with respect to Seller, the actual knowledge of and by John Goede, John Schrenkel, and David Berry after reasonable inquiry, and with respect to a Principals, the actual knowledge of the Principal after reasonable inquiry.

41

"_Law_" means any federal, state, local, municipal, foreign, international, multinational, or other constitution, law, rule, standard, requirement, administrative ruling, order, ordinance, principle of common law, legal doctrine, code, regulation, statute, treaty or process.

"_Liability_" means any Liability whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due.

"_Losses_" means any and all actual and direct out-of-pocket losses, costs, deficiencies, claims, damages or expenses, including reasonable attorneys' fees and disbursements in respect of any obligation to indemnify any Person pursuant to the terms of this Agreement; provided, however, that Losses shall not include any consequential, punitive, indirect or special losses or damages, other than such damages or losses paid to a third party or imposed on an Indemnified Party by a third party, including any Agency.

"_Management Incentive Program_" means that certain incentive program pursuant to which Buyer will issue the Economic Interests to the Principals.

"_Mortgage_" means, with respect to a Mortgage Loan, a mortgage, deed of trust or other security instrument creating an Encumbrance upon real property and any other property described therein which secures a Mortgage Note, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"_Mortgaged Property_" means a fee simple property (or such other estate in real property as is commonly accepted as collateral for Mortgage Loans that are subject to secondary mortgage sales or securitizations) that secures a Mortgage Note and that is subject to a Mortgage Instrument.

"_Mortgage Files_" means the file or files containing the photostatic copy or copies on any other media and, to the extent required by applicable Law, original documents, of the Mortgage Note, any Mortgage or other documents creating or evidencing a security interest in the related Collateral and other related loan documents, including the related credit and closing packages, disclosures, custodial documents, and all other files, books, records and documents related to the foregoing reasonably necessary to (i) establish the eligibility of the Mortgage Loans for insurance by an Insurer or for sale or delivery to AEM or an Investor, (ii) Service the Mortgage Loans in accordance with applicable Laws and the Mortgage Loan Requirements or (iii) comply with applicable Laws and the Mortgage Loan Requirements regarding documentation to be maintained by a servicer of a Mortgage Loan, or by the document custodian thereof.

"_Mortgage Instrument_" means any deed of trust, security deed, mortgage, security agreement or any other instrument which constitutes a lien on real estate securing payment by a Mortgagor of a Mortgage Note.

"_Mortgage Loan_" means any loan that is, or upon closing or funding will be, evidenced by a Mortgage Instrument evidencing the Indebtedness of the Mortgagor under a Mortgage Note.

"_Mortgage Loan Requirements_" means (i) federal, state and local Laws applicable to the origination of a Pipeline Loan or the origination, sale, securitization or Servicing of a Mortgage

Loan or the handling of REO, including Laws relating to real estate settlement procedures, consumer credit protection, truth-in-lending, usury limitations, fair housing, collection practices, equal credit opportunity and adjustable rate mortgages, (ii) the responsibilities and obligations relating to any Mortgage Loan or Pipeline Loan or REO set forth in any agreement between AEM, on the one hand, and any Agency, Investor or Insurer, on the other hand, including Servicing Agreements (iii) applicable Laws as well as guidelines and handbooks of AEM and all applicable guidelines, handbooks and other published written requirements of an Investor, Agency or Insurer with respect to the origination, sale, securitization or Servicing of a Mortgage Loan, (iv) federal and state fair labor standards Laws or similar wage and hour Laws, (v) the terms and provisions of the Mortgage Files, and (vi) all other applicable judicial and administrative judgments, orders, stipulations, awards, writs and injunctions.

"*Mortgage Note*" means, with respect to a Mortgage Loan, a promissory note or notes, or other evidence of Indebtedness, with respect to such Mortgage Loan secured by a Mortgage or Mortgages, together with any assignment, reinstatement, extension, endorsement or modification thereof.

"*Mortgagor*" means, with respect to a Mortgage Loan, the borrower of such Mortgage Loan.

"*Net Book Value*" means the value accorded to the difference between the Book Value of all assets of AEM and the Book Value of all Liabilities of AEM at any given point in time calculated in accordance with GAAP and consistent with past practice.

"*Office Leases*" means the office leases and subleases set forth on Schedule 3.9(a).

"*Order*" means any preliminary or permanent order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

"*Ordinary Course of Business*" means the ordinary and usual course of normal day-to-day operations of the Business as conducted from January 1, 2016, through the date hereof.

"*Originator*" means, with respect to any Mortgage Loan, any Person(s) that (i) took the loan application, (ii) processed the loan application, (iii) underwrote the loan application, or (iv) closed and/or funded the Mortgage Loan.

"*Permit*" means any license, permit, order, consent, registration, authorization qualification, certificate or filing with any Governmental Authority or pursuant to any Law.

"*Permitted Encumbrances*" means (i) mechanics', materialmen's, carriers', workmen's, repairmen's, contractors' or other similar Encumbrances arising or incurred in the ordinary course of business and for amounts which are incurred in the ordinary course of business and are not delinquent and may be paid without penalty or as to which AEM agrees, and has funds available, to pay any resulting penalty, (ii) Encumbrances for Taxes not yet due and payable or for Taxes that the taxpayer is contesting and may be paid without penalty, (iii) in the case of the Office Leases, as applicable, zoning, building or other restrictions, variances, covenants, rights of way, conditions, easements and Encumbrances arising as a matter of Law in favor of landlords or sublessors and (iv) Encumbrances created by Buyer or pursuant to any Ancillary Agreement.

43

"*Person*" means an individual, an entity, a corporation, a partnership, a limited liability company, a joint venture, a trust, an unincorporated associated or organization, or a Governmental Authority.

"*Pipeline Loans*" means applications in process for residential Mortgage Loans whether or not registered and designated as price protected on AEM's residential mortgage loan origination system and which have not closed or funded as of the Closing Date.

"*Previously Disposed of Mortgage Loans*" means all Mortgage Loans or any other type of loans or loan servicing rights that, as at any time as of or prior to Closing, AEM owned and subsequently sold, transferred, conveyed or assigned and for which AEM retains a contingent Liability to third parties for failure to originate, service, sell, securitize or otherwise handle such Mortgage Loans or other loans or servicing rights in accordance with the then current Mortgage Loan Requirements or comparable requirements including, without limitation, the obligation to repurchase or indemnify the Investor or any purchaser pursuant to the applicable loan or servicing purchase agreement.

"*Proportional Percentage*" means, for each Principal, Thirty-Three and One-Third Percent (33 1/3%).

"*RCRA*" means the Resource Conservation and Recovery Act of 1976, as amended from time to time, and the regulations promulgated thereunder.

"*REO*" means any residential real property owned by AEM or an Investor (whether for its own account or on behalf of an Investor) as a result of an actual or threatened commencement or completion of foreclosure proceedings.

"*Representative(s)*" means each of the respective attorneys, accountants, officers, employees and other authorized agents, advisors and representatives of Buyer or Seller.

"*RESPA*" shall mean the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §§ 2601 *et seq.* and related regulations.

"*Securities Laws*" means the Securities Act of 1933, as amended; the Securities Exchange Act of 1934, as amended; the Investment Seller Act of 1940, as amended; the Investment Advisers Act of 1940, as amended; the Trust Indenture Act of 1939, as amended; the rules and regulations of the Securities and Exchange Commission promulgated thereunder, and state securities or "blue sky" laws.

"*Seller Material Adverse Effect*" means any Event that (i) has or would reasonably be expected to have, individually or in the aggregate, a material and adverse effect upon the business, assets, liabilities, financial condition, reputation, or operating results of AEM or that has prevented or materially impaired, (ii) would reasonably be expected to prevent or materially impair or delay: (A) the ability of Buyer to operate the Business, taken as a whole, or to conduct the Business in the ordinary course as conducted by AEM as of the date of this Agreement and (B) the ability of AEM or Seller to consummate the Contemplated Transactions or perform their obligations under this Agreement or any of the Ancillary Agreements, or (iii) involves any civil litigation or criminal litigation against AEM or any of its employees.

"*Servicing*" or "*Serviced*" means residential Mortgage Loan servicing and subservicing rights and obligations and the exercise or performance thereof, including one or more of

the following functions (or a portion thereof): (i) the administration and collection of payments for the reduction of principal and/or the application of interest on a residential Mortgage Loan; (ii) the collection of payments on account of Taxes and insurance; (iii) the remittance of appropriate portions of collected payments; (iv) the provision of escrow administration; (v) the pursuit of foreclosure and alternate remedies against the Collateral; and (vi) the administration and liquidation of REO, together with the right to receive the Servicing compensation and any ancillary fees arising from or connected to the Mortgage Loans, the benefit of the related Custodial Funds and any other related accounts maintained by AEM pursuant to applicable Mortgage Loan Requirements and, in each case, all rights, powers and privileges incident to any of the foregoing.

"*Servicing Agreement*" means an agreement pursuant to which AEM services Mortgage Loans.

"*Straddle Period*" means a Tax period beginning before and ending after the Closing Date.

"*Tax*" means any foreign, federal, state or local income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, real property gains, registration, value added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, social security, unemployment, disability, payroll, license, employee or other withholding or other tax, of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing.

"*Tax Return*" means any return, report, claim for refund or other written statements or information required to be filed with a Governmental Authority with respect to Taxes.

"*Trade Rights*" means rights in the following: (i) all trademark rights, business identifiers, trade dress, service marks, trade names, domain names and brand names; (ii) all copyrights and all other rights associated therewith and the underlying works of authorship; (iii) all patents and all proprietary rights associated therewith; (iv) all contracts or agreements granting any right, title, license or privilege under the intellectual property rights of any third party; (v) all inventions, mask works and mask work registrations, know-how, discoveries, improvements, designs, computer source codes, programs and other software (including all machine readable code, printed listings of code, documentation and related property and information), trade secrets, websites, shop and royalty rights, employee covenants and agreements respecting intellectual property and non-competition and all other types of intellectual property; and (vi) all registrations of any of the foregoing, all applications therefor, all goodwill associated with any of the foregoing and all claims for infringement or breach thereof.

"*VA*" means the United States Department of Veteran Affairs and any successor thereto.

(b)     Other Definitions. The following defined terms shall have the meaning set forth in the section referenced below:

| Term | Section |
|------|---------|
| Adjustment | 2.5(a)(i) |

45

Agreement ............................................................................................... Preamble
Audited Financial Statements ................................................................. 3.6(a)
Business ............................................................................................... Background
Buyer ..................................................................................................... Preamble
Buyer Indemnified Parties ...................................................................... 8.2
Buyer Losses ......................................................................................... 8.2(c)
Claim ..................................................................................................... 8.4(b)
Closing .................................................................................................. 2.1
Closing Date .......................................................................................... 2.1
Closing Date Balance Sheet .................................................................. 2.5(b)
Closing Date Income Statement ............................................................ 2.5(b)
Common Stock ...................................................................................... Background
Competing Transaction ......................................................................... 5.5
Data Room ............................................................................................ 3.25
Dispute Notice ...................................................................................... 2.5(c)
Earn-Out Payments ............................................................................... 2.6(a)
Earn-Out Periods .................................................................................. 2.6(a)
Earn-Out Statements ............................................................................ 2.6(b)
Environmental Permits .......................................................................... 3.19
Estimated Closing Balance Sheet .......................................................... 2.4(a)(i)
Estimated Closing Income Statement ..................................................... 2.4(a)
Final Calculation Statement ................................................................... 2.5(b)
Final Determination ............................................................................... 2.6(e)
Final Purchase Price ............................................................................. 2.5(d)
General Survival Period ......................................................................... 8.1
Indemnified Party .................................................................................. 8.4(a)
Indemnifying Party ................................................................................ 8.4(a)
Initial Purchase Price ............................................................................ 2.2
Interim Financial Statements ................................................................. 3.6(a)
Licensed IP Agreements ....................................................................... 3.10(d)
Limited Representation .......................................................................... 8.1
Limited Survival Period .......................................................................... 8.1
Materials Contracts ............................................................................... 3.7(a)
Measurement Date ................................................................................ 2.4(a)
Membership Interest(s) .......................................................................... 3.27
Non-Compete Agreement ...................................................................... 2.7
NVD Consulting ..................................................................................... 2.3(b)(iii)
Objection Notice .................................................................................... 2.6(c)
Objection Period .................................................................................... 2.6(c)
Office Leases ........................................................................................ 3.9(a)
Party/Parties .......................................................................................... Preamble
Pre-Closing Tax Period ......................................................................... 5.7(a)
Principal(s) ............................................................................................ Preamble
Purchase Price ...................................................................................... 2.5(d)
Purchase Price Allocation ..................................................................... 2.7
Real Property ........................................................................................ 3.9(a)
Regulatory Authority .............................................................................. 3.16
Repurchase Obligation .......................................................................... 3.18(b)
Required Net Book Value ....................................................................... 2.4(c)

Resolution Period ........................................................................................... 2.5(c)
Retained Amount ........................................................................................... 2.3(a)(ii)
Seller ................................................................................................................. Preamble
Employment Agreement .................................................................................. 7.2(h)
Seller Financial Statements ............................................................................ 3.6(a)
Seller Governmental Approvals and Third Party Consents .................... 3.3(b)
Special Representations .................................................................................. 8.1
Termination Date ............................................................................................. 9.3(a)(ii)
Third-Party Action .......................................................................................... 8.4(b)
Transferred Receivables ................................................................................. 1.1(i)

[SIGNATURE PAGES TO FOLLOW]

DocuSign Envelope ID: 30BA14B4-70D5-4FF1-A883-E25AE704B322

IN WITNESS WHEREOF, the Parties have caused this Equity Purchase Agreement to be duly executed as of the date first written above.

**BUYER:**

**RPM Mortgage, Inc.**

By: _E. Robert Hirt_ _____

Name: Robert Hirt

Title:   Chief Executive Officer

**COMPANY:**

**American Eagle Mortgage Co., LLC**

By: _____

Name:  John Schrenkel

Title:    Chief Executive Officer

**MEMBER:**

**JDJ Management, LLC**

By: _____

Name:  John Goede

Title:   Manager

**PRINCIPALS:**

_____

John Schrenkel

_____

John Goede

_____

David Berry

IN WITNESS WHEREOF, the Parties have caused this Equity Purchase Agreement to be duly executed as of the date first written above.

**BUYER:**

**RPM Mortgage, Inc.**

By: _____
      Name: Rob Hirt
      Title:  Chief Executive Officer

**COMPANY:**

**American Eagle Mortgage Co., LLC**

By: _____
      Name: John Schrenkel
      Title:  Chief Executive Officer

**MEMBER:**

**JDJ Management, LLC**

By: _____
Name: John Goede
Title: Manager

**PRINCIPALS:**

_____
John Schrenkel

_____
John Goede

_____
David Berry

IN WITNESS WHEREOF, the Parties have caused this Equity Purchase Agreement to be duly executed as of the date first written above.

**BUYER:**

**RPM Mortgage, Inc.**

By: _____
     Name: Rob Hirt
     Title:   Chief Executive Officer

**COMPANY:**

**American Eagle Mortgage Co., LLC**

By: _____
     Name: John Schrenkel
     Title:   Chief Executive Officer

**MEMBER:**

**JDJ Management, LLC**

By _____
Name: John Goede
Title: Manager

**PRINCIPALS:**

_____
John Schrenkel

_____
John Goede

_____
David Berry

DocuSign Envelope ID: 30BA14B4-7DD5-4FF1-A885-E25AE70#B322

Solely as to Section 9.1

RPM Mortgage, Inc.

By: _____
    E. Robert Hirt
Name: Rob Hirt
Title:   Authorized Representative

# EXHIBIT A

Form of Employment Agreement (Key Employees)

A-1

[Letterhead of AEM]

_____, 2016

<u>PERSONAL AND CONFIDENTIAL</u>

[_____]
[Street Address]
[City, State, Zip]

Dear [●]:

As you are aware, RPM Mortgage, Inc., or its subsidiary, RPM Holdings I, LLC ("<u>RPM</u>") has entered into an Equity Purchase Agreement ("<u>EPA</u>") with you and American Eagle Mortgage Co., LLC, an Ohio limited liability company (the "<u>Company</u>"), pursuant to which RPM will purchase all of the outstanding membership interests of the Company, subject to the terms and conditions set forth in the EPA. One of the conditions to the effectiveness of the EPA and the consummation of the transactions contemplated thereunder is your entering into an employment relationship with the Company, pursuant to the terms and conditions set forth in this offer letter. Additionally, the establishment of the Management Incentive Program for your benefit by RPM is part of the consideration for you to enter into the EPA and to consummate the transactions contemplated thereby.

Subject to the terms and conditions of the EPA, the Company is pleased to offer you the full-time position of [●]. This letter summarizes the initial terms of your employment, which terms will be effective immediately after the Closing (as defined in the EPA). Please note that if the Closing does not occur, this offer letter shall be null and void and of no legal effect.

During your employment with the Company, you will be responsible for performing those duties as are consistent with your title and/or position and as may from time to time otherwise be reasonably assigned to or requested of you. You shall devote your full business time, attention, skill and best efforts to perform such responsibilities faithfully and to the best of your abilities so as to maintain and promote the business and reputation of the Company and RPM. To that end, you shall not engage in any other active business or occupation while employed by the Company.

Your salary will be paid at the rate of $[●] per month (which is annualized to a rate of $[●] per annum) for the initial two years following the Closing (as defined in the EPA), after which we may review your salary in accordance with our standard practice. You will be paid in accordance with the Company's normal payroll practices as established or modified from time to time, and your salary shall be subject to all applicable federal, state and local taxes and withholdings. The Company currently pays salaries on a semi-weekly basis (every other Friday).

In addition to your salary, you will also be (i) paid a sign-on bonus of $[●], and (ii) granted a profit interest pursuant to the terms set forth in the Management Incentive Program attached hereto as Exhibit A ("Bonus Program").

If your profit interest is redeemed in connection with a Change in Control (as defined in the Bonus Program), you will have the right to purchase an equity interest in the Business (as defined in the Bonus Program) within thirty days after the closing of the Change in Control at the then current fair market, as determined following the Change in Control event in accordance with the Bonus Program. The right to purchase such equity interest shall be limited to the percentage profit interest that you hold immediately before the closing of such Change in Control ("Percentage Interest"). For example, if you hold an 8.33% profit interest in the Business immediately prior to the Change in Control, then you will have the right to acquire an equity interest representing up to 8.33% of the Business after the Change in Control. In addition, and subject to the consent of the acquirer of RPM, in the event you do not purchase the full Percentage Interest, you will have the right to invest subsequent distributions until your capital account for the Business relative to all outstanding capital accounts is equal to the Percentage Interest. For clarity, this right to invest (i) is limited to the Business (legacy AEM assets) and shall not be exercisable for an interest in RPM or its affiliates, and (ii) the equity interest might be structured as a special interest directly tied to the AEM assets even if, at that time, such AEM assets have been combined with the business assets of RPM or its affiliates.

Furthermore, you will be eligible to participate in the Company's employee benefits programs, which currently include those listed on Exhibit B attached hereto. Your participation in the Company's benefit programs shall be subject to (a) the terms and conditions of the applicable program documents; (b) generally applicable Company policies; and (c) the discretion of any administrative or other committee overseeing each program. Please note that the Company (in RPM's sole discretion) may alter, add to, modify or delete its benefits programs at any time in its sole discretion.

RPM requires you to verify that the performance of your position at the Company does not and will not breach or contravene (i) any agreement or contract entered into by you prior to the Closing (i.e., you have not entered into any agreements that are in conflict with your obligations to AEM); or (ii) any obligation you may otherwise have under applicable law to any other person. You further represent and warrant that you have delivered or disclosed, as the case may be, to RPM all agreements, contracts and/or obligations relevant to clauses (i) and (ii) above.

In connection with the purchase of the Company and the mutual promises set forth herein, you will also be required to sign a separate Noncompetition and Nondisclosure Agreement, which will be effective as of the Closing.

The above terms are a summary of our proposed initial employment relationship and are subject to later modification by RPM and/or the Company. Your employment will be "at-will," meaning that either you or the Company (at the sole discretion of RPM) may terminate your employment relationship at any time, for any reason, with or without prior notice. RPM is a not guarantor, financial or otherwise, of the employment arrangement discussed herein

other than in its commitment to ensure that the terms and conditions set forth herein will be offered to you by the Company from and after the Closing Date.

[●], we are excited about the prospect of you joining our team, and look forward to the addition of your professionalism and experience to help the RPM team achieve its goals.  If this offer letter meets your approval, please countersign below and return a fully executed copy of the offer letter to me.

[Signature Page Follows]

Sincerely,

**RPM MORTGAGE, INC.**

By:_____

Accepted and Agreed By:

_____
[■], as an individual

Exhibit A

Executive Incentive Bonus Program

(See attached.)

Exhibit H

Employee Benefits

# EXHIBIT B

Form of Non-Compete & Non-Solicitation Agreement

CONFIDENTIAL

## NON-COMPETITION AND NON-SOLICITATION AGREEMENT

THIS NON-COMPETITION AND NON-SOLICITATION AGREEMENT (this "**Agreement**") is being executed and delivered as of [●], 2016 by [●] (the "**Covenantor**") in favor of, and for the benefit of: RPM Mortgage, Inc., a California corporation ("**RPM**"), RPM Holdings 1, LLC, a Delaware limited liability company ("**RPM Holdings**") and an affiliate of RPM Mortgage, American Eagle Mortgage Co., LLC, an Ohio limited liability company (the "**Company**") and the other Beneficiaries (as hereinafter defined). Certain capitalized terms used in this Agreement but not otherwise defined shall have the meaning set forth in Section 20 hereof.

### RECITALS

A.    Pursuant to an Equity Purchase Agreement, dated as of the date hereof, by and among RPM, American Eagle Mortgage Co., LLC, an Ohio limited liability company ("**AEM**"), and the Covenantor (the "**Acquisition Agreement**"), RPM will acquire all of the issued and outstanding ownership interest of AEM ("**Transaction**").

B.    As a key employee and significant equity owner of AEM, the Covenantor has obtained extensive and valuable knowledge and confidential information concerning the business of AEM. The Covenantor has or had a substantial financial interest in AEM, and as a result of Covenantor's equity interest in AEM (via AEM's holding company) shall receive significant consideration in connection with the Transaction.

C.    In connection with the Transaction (and as a condition and mutual inducement to the consummation of such Transaction), to enable RPM to secure more fully the benefits of such Transaction, to preserve the value and goodwill of the Company after the Transaction and to protect the trade secrets of the Company, the parties have agreed to enter into this Agreement.

D.    In connection with the Transaction (and as a condition and mutual inducement to the consummation of such Transaction), RPM and the Covenantor are, contemporaneously with the execution and delivery of this Agreement, executing an offer letter (the "**Offer Letter**") pursuant to which the Covenantor will become an employee of the Company subject to the terms and conditions of the Offer Letter, including any and all conditions to employment outlined in the Offer Letter, and will accordingly obtain extensive and valuable knowledge, Confidential Information and other confidential information concerning the respective businesses of the Restricted Entities.

E.    The Restricted Entities have conducted, are conducting or plan to conduct their respective businesses on a nation-wide basis.

### AGREEMENT

In order to induce RPM to consummate the Transaction, and for other good and valuable consideration, the Covenantor agrees as follows:

1.    *Restriction on Competition*.  The Covenantor agrees that, during the Non-Competition Period, the Covenantor shall not, and shall not direct, instruct or support any efforts of any of the Covenantor's Affiliates to:

(a)    engage, directly or indirectly, in Competition in any Restricted Territory;

CONFIDENTIAL

(b)    directly or indirectly be or become an officer, director, stockholder, owner, co-owner, Affiliate, partner, promoter, employee, agent, representative, designer, consultant, advisor, manager, licensor, sublicensor, licensee or sublicensee of, for or to, or otherwise acquire or hold (of record, beneficially or otherwise) any direct or indirect interest in, any Person that engages, directly or indirectly, in Competition in any Restricted Territory; *provided, however*, that the Covenantor may, without violating this **Section 1**, (1) engage as an independent duly licensed attorney in representing any Person in legal matters only in Competition; or (2) own, as a passive investment, shares of capital stock of a publicly-held corporation that engages in Competition if (i) such shares are actively traded on an established national securities market in the U.S.; (ii) the number of shares of such corporation's capital stock that are owned beneficially (directly or indirectly) by the Covenantor together with the number of shares of such corporation's capital stock that are owned beneficially (directly or indirectly) by the Covenantor's Affiliates and/or immediate family collectively represent less than one percent of the total number of shares of such corporation's capital stock outstanding; and (iii) neither the Covenantor nor any Affiliate of the Covenantor is otherwise associated directly or indirectly with such corporation or with any Affiliate of such corporation; or

(c)    take any action intended to interfere or which interferes with any business relationship (whether formed heretofore or during the Non-Competition Period) between any of the Restricted Entities and any customers, suppliers or prospects of any of the Restricted Entities.

2.    *No Solicitation*.  The Covenantor agrees that during the Non-Competition Period, the Covenantor shall not, and shall not direct, instruct or support any efforts of any of the Covenantor's Affiliates to directly or indirectly, personally or through others, encourage, induce, attempt to induce, solicit or attempt to solicit (on the Covenantor's own behalf or on behalf of any other Person) any Specified Individuals to leave his or her employment with any Restricted Entity, provided, however, that general solicitation in any media that is not directed at any such Specified Individuals shall not constitute solicitation.  For purposes of this **Section 2**, "**Specified Individuals**" shall mean any individual who is or was an employee, contractor or consultant of any Restricted Entity as of the Closing Date or at any time during the Non-Competition Period.

3.    *Confidentiality*.  During the Non-Competition Period and at all times thereafter, the Covenantor will keep in confidence and trust all Confidential Information, and the Covenantor will not, directly or indirectly, use or disclose any Confidential Information or any information directly relating to any Confidential Information without the written consent of the Company, except as may be necessary in the ordinary course of performing the Covenantor's duties as an employee of the Company or any of its Affiliates or as required to be disclosed by law or by a subpoena or order issued by a court of competent jurisdiction.  Notwithstanding the foregoing, it is understood that the Covenantor is free to use information which is generally known in the trade or industry, so long as Covenantor's knowledge or possession of such information is not as a result of a breach of this Agreement or any other agreement between the Covenantor and any Restricted Entity or third person regarding confidentiality, non-use, invention assignment, or similar terms.

4.    *Representations and Warranties*.  The Covenantor represents and warrants, to and for the benefit of the Beneficiaries, that: (a) the Covenantor has full power and capacity to execute and deliver, and to perform all of the Covenantor's obligations under, this Agreement and (b) neither the execution and delivery of this Agreement nor the performance of the Covenantor's obligations under this Agreement will result directly or indirectly in a violation or breach of (i) any agreement or obligation by which the Covenantor or any of the Covenantor's Affiliates is or may be bound during the Non-Competition Period or (ii) any law, rule or regulation.  The Covenantor's representations

CONFIDENTIAL

and warranties set forth herein shall survive the expiration of the Non-Competition Period for the longest applicable statute of limitations.

5.    *Specific Performance*.  The Covenantor agrees that, in the event of any breach or threatened breach by the Covenantor of any covenant or obligation contained in this Agreement, each of the Beneficiaries shall be entitled (in addition to any other remedy that may be available to it, including monetary damages), without the necessity of proving the inadequacy of monetary damages, to seek and obtain (a) a decree or order of specific performance to enforce the observance and performance of such covenant or obligation and (b) injunctive relief, including but not limited to a temporary restraining order, preliminary injunction and/or permanent injunction, restraining such breach or threatened breach.  The Covenantor further agrees that no Beneficiary shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this **Section 5**, and the Covenantor irrevocably waives any right the Covenantor may have to require any Beneficiary to obtain, furnish or post any such bond or similar instrument.

6.    *Indemnification*.  Without in any way limiting any of the rights or remedies otherwise available to any of the Beneficiaries, the Covenantor shall indemnify and hold harmless each Beneficiary against and from any loss, damage, liability, claim, demand, settlement, judgment, award, fine, penalty, tax, fee (including attorneys' reasonable fees), charge or expense (whether or not relating to any third-party claim) that is directly or indirectly suffered or incurred at any time (whether during or after the Non-Competition Period) by such Beneficiary, or to which such Beneficiary otherwise becomes subject at any time (whether during or after the Non-Competition Period), and that arises directly or indirectly out of or by virtue of, or relates directly or indirectly to, (a) any inaccuracy in or breach of any representation or warranty by the Covenantor contained in this Agreement or (b) any failure on the part of the Covenantor to observe, perform or abide by, or any other breach of, any restriction, covenant, obligation or other provision contained in this Agreement.

7.    *Non-Exclusivity*.  The rights and remedies of the Beneficiaries under this Agreement are not exclusive of or limited by any other rights or remedies which they may have, whether at law, in equity, by contract or otherwise, all of which shall be cumulative (and not alternative).  Without limiting the generality of the foregoing, the rights and remedies of any of the Beneficiaries under this Agreement, and the obligations and liabilities of the Covenantor under this Agreement, are in addition to their respective rights, remedies, obligations and liabilities under the law of unfair competition, under laws relating to misappropriation of trade secrets, under other laws and common law requirements and under all applicable rules and regulations.  Nothing in this Agreement shall limit any of the Covenantor's obligations, or the rights or remedies of any of the Beneficiaries, under the Acquisition Agreement or the Offer Letter; and nothing in the Acquisition Agreement or the Offer Letter shall limit any of the Covenantor's obligations, or any of the rights or remedies of any of the Beneficiaries, under this Agreement.  No breach on the part of RPM, the Company or any other party of any covenant or obligation contained in the Acquisition Agreement, the Offer Letter or any other agreement shall terminate, limit or otherwise affect any right or remedy of any of the Beneficiaries, or any obligation of the Covenantor, under this Agreement.

8.    *Severability*.  Any term or provision of this Agreement that is deemed or determined to be invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If the final judgment of a court of competent jurisdiction declares that any term or provision hereof is invalid or

CONFIDENTIAL

unenforceable, the parties hereto agree that the court making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified. In the event such court does not exercise the power granted to it in the prior sentence, the parties hereto agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the extent possible, the economic, business and other purposes of such invalid or unenforceable term.

9.      **Governing Law.**  This Agreement shall be construed in accordance with, and governed in all respects by, the laws of the State of [Ohio][Florida] and the federal laws of the United States applicable therein.

10.      **Exclusive Jurisdiction.**  Each of the parties hereto irrevocably consents to the exclusive jurisdiction and venue of any state court in [Columbus, Ohio][Fort Myers, Florida] or any federal court in [Ohio][Lee County, Florida] in connection with any matter based upon or arising out of this Agreement and the other matters contemplated herein. Each party agrees not to commence any legal proceedings related hereto except in such courts. By execution and delivery of this Agreement, each party hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and to the appellate courts therefrom solely for the purposes of disputes arising under this Agreement and not as a general submission to such jurisdiction or with respect to any other dispute, matter or claim whatsoever. The parties hereto irrevocably consent to the service of process out of any of the aforementioned courts in any such action or proceeding by the delivery of copies thereof by overnight courier to the address for such party to which notices are deliverable hereunder. Any such service of process shall be effective upon delivery. Nothing herein shall affect the right to serve process in any other manner permitted by applicable law. The parties hereto hereby waive any right to stay or dismiss any action or proceeding under or in connection with this Agreement brought before the foregoing courts on the basis of (a) any claim that it is not personally subject to the jurisdiction of the above-named courts for any reason, or that it or any of its property is immune from the above-described legal process, (b) that such action or proceeding is brought in an inconvenient forum, that venue for the action or proceeding is improper or that this Agreement may not be enforced in or by such courts, or (c) any other defense that would hinder or delay the levy, execution or collection of any amount to which any party hereto is entitled pursuant to any final judgment of any court having jurisdiction.

11.      **Waiver.**  No failure on the part of any Beneficiary to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Beneficiary in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy. No Beneficiary shall be deemed to have waived any claim of such Beneficiary arising out of this Agreement, or any power, right, privilege or remedy of such Beneficiary under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such Beneficiary; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

12.      **Successors and Assigns.**  Each of the Beneficiaries may freely assign any or all of its rights under this Agreement, at any time, in whole or in part, to any Person without obtaining the consent or approval of the Covenantor or of any other Person. This Agreement and all obligations

CONFIDENTIAL

hereunder are personal to the Covenantor and may not be assigned, delegated or otherwise transferred by the Covenantor at any time. This Agreement shall be binding upon the Covenantor and the Covenantor's heirs, executors, estate, personal representatives and successors, and shall inure to the benefit of the Beneficiaries.

13.    **Further Assurances.**   The Covenantor shall (at the Beneficiary's sole expense) execute and/or cause to be delivered to each Beneficiary such instruments and other documents, and shall (at the Beneficiary's sole expense) take such other actions, as such Beneficiary may reasonably request at any time during the Non-Competition Period for the purpose of carrying out or evidencing any of the provisions of this Agreement.

14.    **Captions.**   The captions contained in this Agreement are for convenience of reference only, shall not be deemed to be a part of this Agreement and shall not be referred to in connection with the construction or interpretation of this Agreement.

15.    **Construction.**   Whenever required by the context, the singular number shall include the plural, and vice versa; the masculine gender shall include the feminine and neuter genders; and the neuter gender shall include the masculine and feminine genders.  Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.  Neither the drafting history nor the negotiating history of this Agreement shall be used or referred to in connection with the construction or interpretation of this Agreement.  As used in this Agreement, the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."  Except as otherwise indicated in this Agreement, all references in this Agreement to "Sections" are intended to refer to Sections of this Agreement.

16.    **Survival of Obligations.**   Except as specifically provided herein, the obligations of the Covenantor under this Agreement (including the Covenantor's obligations under **Sections 3, 6** and **13**) shall survive the expiration of the Non-Competition Period.  The expiration of the Non-Competition Period shall not operate to relieve the Covenantor of any obligation or liability arising from any prior breach by the Covenantor of any provision of this Agreement.

17.    **Amendment.**   This Agreement may not be amended, modified, altered or supplemented other than by means of a written instrument duly executed and delivered on behalf of the all of the parties hereto.

18.    **Counterpart Execution; Exchanges by Electronic Transmission.**   This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other party, it being understood that all parties need not sign the same counterpart.  The exchange of a fully executed Agreement (in counterparts or otherwise) by electronic transmission in .PDF format or by facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement.

19.    **Defined Terms.**   For all purposes of and under this Agreement, the following capitalized terms shall have the respective meanings below:

CONFIDENTIAL

(a)    "**Affiliate**" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such specified Person.

(b)    "**Beneficiaries**" shall include: (i) RPM; (ii) RPM Holdings; (iii) each Person who is or becomes an Affiliate of RPM or RPM Holdings; and (iv) the successors and assigns of each of the Persons referred to in clauses (i), (ii), and (iii) of this sentence.

(c)    A Person shall be deemed to be engaged in "**Competition**" if such Person or any of such Person's Affiliates is engaged directly or indirectly in (i) originating, making, selling or servicing residential mortgage loans, (ii) the origination, production, sales or service of any products or services that offer, facilitate, support or otherwise relate to residential mortgage loans, or (iii) any product or service that is substantially the same as, is based upon, or competes in any material respect with any product or service referred to in clauses (i) or (ii) of this sentence.

(d)    "**Confidential Information**" means any Company proprietary information, data, trade secrets or know-how, including, but not limited to, research, business plans, proposals, product plans, products, services, personnel information, customer lists and customers (including, but not limited to, customers of the Company on whom the Covenantor called or with whom the Covenantor became acquainted during the term of the Covenantor's relationship with the Company), market research, works of original authorship, intellectual property, photographs, negatives, digital images, software, computer programs, ideas, developments, inventions (whether or not patentable), processes, formulas, technology, designs, drawings and engineering, hardware configuration information, forecasts, strategies and marketing, finance or other business information disclosed to the Covenantor by the Company either directly or indirectly in writing, orally or by drawings or observation or inspection of parts or equipment.

(e)    "**Closing Date**" has the meaning assigned to such term in the Acquisition Agreement.

(f)    "**Non-Competition Period**" means the period commencing on the Closing Date and ending on the later of (i) the third anniversary of the Closing Date; or (ii) the third anniversary of the Covenantor's separation from employment (for any reason) with the Company.

(g)    "**Person**" means any: (i) individual; (ii) corporation, general partnership, limited partnership, limited liability partnership, trust, company (including any limited liability company or joint stock company) or other organization or entity; or (iii) governmental body or authority.

(h)    "**Restricted Entities**" means (i) RPM; (ii) RPM Holdings; (iii) each Person who is or becomes an Affiliate of RPM or RPM Holdings; and (iv) the successors and assigns of each of the Persons referred to in clauses (i), (ii), and (iii) of this sentence (and any one of the Restricted Entities being a "**Restricted Entity**").

(i)    "**Restricted Territory**" means the states in which the Company (or any Affiliate of the Company does business.

(j)    "**Transaction**" means the transactions contemplated by the Acquisition Agreement.

CONFIDENTIAL

20.    ***Effective Date.***  This Agreement shall become effective upon the Closing Date.  This Agreement shall be null and void if the Acquisition Agreement is terminated prior to the Closing Date.

The Covenantor has duly executed and delivered this Agreement as of the date first above written.

[●]

Address: _____

_____

Telephone No.: _____

Facsimile No.: _____

**RPM Mortgage, Inc.**

By: _____

Name: _____

Title: _____

**RPM Holdings I, LLC**

By: _____

Name: _____

Title: _____

Exhibit C

Form of Management Incentive Program

## MANAGEMENT INCENTIVE PROGRAM

### PURPOSE AND EFFECTIVE DATE

The Plan is adopted as of _____, 2016 with an effective date as specified below. The purpose of the Plan is to retain employees of the Company by providing Participants with an opportunity to receive annual bonuses and a long-term interest in the profits attributable to the business assets of The American Eagle Mortgage Co., LLC, an Ohio limited liability company ("AEM" or "Company"). This Plan is adopted by AEM in connection with RPM's acquisition of the outstanding membership interests of AEM (the "Acquisition") and the profit interests defined herein are expressly limited to the profits generated by such AEM assets. The Plan is intended to be exempt from the reporting and disclosure requirements of Title I of ERISA because it is an unfunded plan maintained by an employer for the purpose of providing benefits for a select group of management or highly compensated employees.

### ARTICLE I
### DEFINITIONS

The following words and phrases when used in the Plan will have the meanings indicated in this Article I. Unless indicated otherwise, references in the Plan to articles and sections are to articles and sections of the Plan.

1.1    "Account" means the bookkeeping account of each Participant to which annual Net Profits and Net Losses of the Business (as defined below) are credited.

1.2    "Acquisition Agreement" means that certain equity purchase agreement by and among the Company, AEM, and certain members of AEM, dated June 30, 2016.

1.3    "Administrator" means the person designated by the Company to administer the Plan.

1.4    "Beneficiary" means any individual designated by a Participant as his beneficiary in accordance with procedures established by the Administrator. If a Participant has no Beneficiary designation in effect or the Participant's designated Beneficiary predeceases the Participant, the Participant's Beneficiary will be his surviving spouse or, if none, his estate.

1.5    "Business" means the business of originating, making, selling and servicing residential mortgage loans attributable only to the assets of AEM acquired by the Company, and shall be exclusive of any and all business assets of the Company or other affiliates of the Company, as the case may be.

1.6    "Cause" means (i) conviction of a felony, (ii) an act that constitutes gross negligence or willful misconduct in the performance of services, (iii) theft or misappropriation of property, (iv) breach of any confidentiality or non-compete agreement, or (v) failure to perform the Services or his or her obligations and duties (other than due to his death or disability) after there has been delivered to him or her a written notice of such failure to perform and his or her failure to substantially cure such failure within thirty (30) calendar days after written notice is given by the Company

1.7    "Change of Control Event" means:  (i) any acquisition of the Company by an unaffiliated third party by means of merger or other form of corporate reorganization; (ii) any issuance, sale or other disposition (or series of related sales or dispositions) of the outstanding stock of the Company to an unaffiliated third party, in which the stockholders immediately prior to such event do not hold a majority of the outstanding stock of the Company immediately after such event, except where such issuance, sale or disposition is for the purposes of an equity financing of the Company; or (iii) any sale, disposition or transfer of all or substantially all of the assets of the Company or the Business to an unaffiliated third party.

1.8    "Code" means the Internal Revenue Code of 1986, as amended, and the regulations and other guidance thereunder.

1.9    "Company" means The American Eagle Mortgage Co., LLC, an Ohio limited liability company, or its assigns.

1.10    "Economic Interest" means, with respect to a Participant, his or her percentage interest in the Net Profits and Net Losses shown opposite such Participant's name on Appendix A.

1.11    "Effective Date" means the date this Plan becomes effective, which is anticipated to occur on the earlier of (i) the date the full Earn-Out Amount (as defined in the Acquisition Agreement) has been earned by the Principals (as defined in the Acquisition Agreement), or (ii) August__, 2018.

1.12    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations and other guidance thereunder.

1.13    "Net Profits" and "Net Losses" shall be calculated in accordance with GAAP based on a separate income statement for the assets attributable to the Business. The Company shall at all times maintain a separate income statement for the Business, which shall track the income and cost, net profits and net losses directly related to the legacy assets of AEM, and will exclude income and cost related to other business assets of the Company and its affiliates.

1.14    "Participant" means an employee of the Company or any of its affiliates who is designated by the Company as a Participant on Appendix A.

1.15    "Plan" means this Management Incentive Program, as amended from time to time.

1.16    "Plan Year" means the period from the Effective Date *through* December 31 of the same year and each 12-month period thereafter from each January 1 through each December 31.

1.17    "RPM" means RPM Holdings I, LLC, a Delaware limited liability company, or its assigns.

1.18    "Separation from Service" means a Participant's death or the Company's termination of Participant's employment with the Company without Cause.

2

ARTICLE II
PARTICIPATION

The Participants in the Plan will consist of the individuals set forth on Appendix A attached hereto. It is intended that the Participants be part of management of the Business or other highly compensated employees of the Company and its affiliates.

ARTICLE III
ANNUAL BONUS PAYMENT

3.1     Determination and Payment of Annual Bonus.

(a)     The balance of each Participant's Account shall be $0 on the Effective Date. Before or as soon as practicable but in any event within ninety (90) days after the end of each Plan Year, the Company will determine the Net Profit or Net Loss of the Business for such Plan Year and will notify the Participants in writing of such determination. Any payout hereunder is contingent upon continuous employment with the Company as of the date the payment obligation matures and becomes due and payable. If Participant voluntarily leaves the employment of the Company or if Participant's services are terminated for Cause, then the Participant's Economic Interest shall be transferred to the remaining Participants equally; provided, that to the extent RPM needs to replace the Participant who voluntarily leaves or is terminated for Cause, then the cost associated with such hire, including but not limited to excess salary over the salary paid to the departing Participant, equity, profit interests and any sign-on bonus, shall be deducted from any payout based on any Economic Interest transferred under the preceding sub-clause.

(b)     A Participant shall have the right to dispute in writing the calculation of such Net Profit or Net Loss within thirty (30) days following receipt of the calculation thereof (such 30-day period, the "Notice Period"). If the Company has not received notice of such a dispute within the Notice Period, the Company will increase (in the case of a Net Profit for such Plan Year) or decrease (in the case of a Net Loss for such Plan Year) each Participant's Account with an amount equal to the product of (i) such Net Profit or Net Loss, and (ii) such Participant's Economic Interest for such Plan Year. If the Company has received a notice of such a dispute within the Notice Period, then the Participant and the Company shall, for an additional thirty (30) days following receipt of such notice of dispute (such additional 30-day period, the "Resolution Period"), attempt to reach agreement on the determination of such Net Profit or Net Loss. If no resolution of this dispute is finalized within the Resolution Period, the disputed items or amounts shall be submitted for review and final determination by an auditing firm jointly selected by the Participant and the Company which is not then providing substantial services to either the Participant or the Company (the "Independent Accounting Firm"). If the Company and the Participant are unable to agree upon the selection of the Independent Accounting Firm within thirty (30) days following the end of the Resolution Period, the Company, on the one hand, and the Participant, on the other, shall select one independent accounting firm within ten (10) days following the end of such thirty (30) day period. Such accounting firms shall jointly select a third independent accounting firm, and such firm shall be the Independent Accounting Firm. The Independent Accounting Firm shall review all relevant data, including any necessary books and records of the Company, to determine the changes to such Net Profit or Net Loss, if any,

3

necessary to resolve the disputed items or amounts. The determination by the Independent Accounting Firm shall be made as promptly as practical but in no event beyond thirty (30) days, and shall be final and binding on the parties. In the event that the final Net Profit or Net Loss differs from the initial amount determined by the Company by five percent (5%) or less, the costs of the Independent Accounting Firm shall be borne exclusively by the Participant(s). In the event that the final Net Profit or Net Loss differs from the initial amount determined by the Company by more than five percent (5%), the costs of the Independent Accounting Firm shall be borne exclusively by the Company.

(c)     As soon as practicable after the Participant's Account is adjusted for a Plan Year in accordance with Section 3.1(a) or 3.1(b) above, the Company will determine the Participant's Account balance. If the Participant was employed on the last day of such Plan Year, and the Participant's Account balance is a positive amount, the Company shall pay such Account balance to the Participant as soon as practicable following the end of such Plan Year, and in any event no later than April 15 of the year following such Plan Year. If the Participant's Account balance is a negative amount or if Participant is not employed on the last day of the applicable Plan Year, no amount shall be paid for such Plan Year. Any negative Account balance will be set off against Net Profits for the following fiscal year (and any future fiscal years) until all Net Losses has been set off against Net Profits. For clarity, the bonus amount payable hereunder with respect to any fiscal year with respect to which Net Losses occur shall be zero (0) and such Net Losses shall reduce the Net Profits payable to the Participant, if any, for subsequent years until such Net Losses have been used in their entirety. Allocations of Net Profits and Net Losses shall be allocated among the Participants in accordance with such Participant's Economic Interest.

(d)     Deductions from Accounts. The Participant's Account will be reduced by the amount of any payment made to the Participant pursuant to this Article III. The Company may reduce the Participant's Account or any payment owed by the Participant to the Company or any of its affiliates by the amount of any debt or monetary obligation that a Participant owes the Company, provided that no such reduction will be applied to the extent that such reduction would cause the Plan or any other deferred compensation arrangement to fail to comply with the requirements of Section 409A of the Code or the regulations thereunder.

ARTICLE IV
SETTLEMENT OF INTEREST IN NET PROFITS

4.1     Determination of Settlement Amounts.

(a)     Company Right to Redeem after Five Years. Following (i) the death of a Participant, or (ii) the fifth anniversary of the Effective Date, the Company shall have the right, but not the obligation, to redeem the Economic Interests by paying to the Participants the Settlement Amount (as defined below) by issuing a Promissory Note (as defined below) to the Participant(s) within thirty (30) days after delivering written notice of exercise, the Promissory Note to be in the principal amount equal to the Settlement Amount *less* any tax withholding required in connection with such redemption. In the case of death, the Company shall have thirty days after receiving notice of death to exercise its option to redeem the profit interest. The Company shall exercise such right of redemption by written notice delivered to the Participants.

4

For purposes of this Section 4.1(a), the term "*Promissory Note*" shall mean a 1% 3-year promissory note pursuant to which the acquirer (or the surviving entity in the Change in Control Event) shall agree to pay the Participant the Settlement Amount *less* applicable tax withholdings in three equal annual installments, with the first payment being made on the 12-month anniversary of the Promissory Note.

        (b)    Automatic Redemption.  In the event the Company terminates a Participant's employment without Cause or upon a Change of Control Event but and only if Participant agrees to remain an employee during a 90-day transition period after the consummation of such Change of Control Event, then the Participants' Economic Interests shall be redeemed automatically and without any further action required on the part of the Company or the Participants in exchange for the payment of the Settlement Amount in accordance with Section 4.2 below.

        (c)    For purposes of this Section 4.1, the "*Settlement Amount*" shall mean (i) the fair value of the Participant's Economic Interest *multiplied by* (ii) a fraction (not to exceed one), the numerator of which shall be the total number of the Participant's years of continuous service with the Company and its affiliates (up to five years) from and after the Closing (as defined in the Acquisition Agreement), and the denominator of which shall be five. The fair market value of such interest shall be determined by an independent accounting firm (acting as a third party appraiser) mutually acceptable to the Company and the Participants. Such appraiser shall determine such fair market value by taking into account factors typically used for such valuations, including, but not limited to, the size and profitability of the Business, cash flow, the market or the lack of a market for the sale of the interests, non-equity interests, and the net income and mortgage loan production of the Business relative to the aggregate net income and mortgage loan production of the Company and its affiliates, but shall disregard the fact that the Participant's interest is directly tied to employment.

        4.2    Payment of Settlement Amount. The Settlement Amount determined in Section 4.1(b) shall be paid to the Participant(s) in three (3) equal annual installments, the first of which shall be made on the one-year anniversary of the event prompting the redemption, followed by subsequent installment payments on the second and third anniversaries.

        4.3    Non-Competition and Non-Solicitation Agreement. A Participant who engages in Competition with the Company shall not be entitled to any payments set forth in Article III or this Article IV to the extent such payments are not related to the last day of the immediately preceding Plan Year as of the date the Participant engages in Competition and all entitlement to future payments shall abate. For purposes of this Plan, the term "Competition" means any activity prohibited under that certain Non-competition and Non-solicitation Agreement.

        4.4    Section 409A Specified Employees. Notwithstanding any provision of this Plan to the contrary, and solely to the extent required by Section 409A of the Code and not otherwise eligible for exclusion from the requirements of Section 409A of the Code, if as of the date of a Participant's Separation from Service, (a) the Participant is deemed to be a "specified employee" (as defined in Section 409A of the Code and the related regulations) and (b) the Company or any member of a controlled group including the Company is publicly traded on an established securities market or otherwise, to the extent required by Section 409A of the Code and the

regulations thereunder, no payment or other distribution required to be made to the Participant under the Plan (including any payment of cash, any transfer of property and any provision of taxable benefits) solely as a result of the Participant's Separation from Service will be made earlier than the first day of the seventh month following the date of the Participant's Separation from Service.

<div align="center">

ARTICLE V
ADMINISTRATION

</div>

5.1     Administrator.

(a)     The Plan will be administered by the Administrator which will be responsible for interpreting the Plan and establishing rules and regulations governing the Plan's administration consistent with the terms of the Plan. Except as otherwise set forth in the Plan, the Administrator's decision in any matter involving the interpretation and application of the Plan will be final and binding on all parties. Neither the Administrator, the Company, the Company of Directors of the Company nor any member of the Company will be liable for any action or determination made in good faith with respect to the Plan or any person's rights under the Plan.

(b)     The Administrator may execute or deliver any instrument, make any payment or perform any other act that the Administrator determines necessary or appropriate to administer the Plan, including, without limitation, the retention of counsel and other agents required in carrying out the Plan.

(c)     The Administrator will keep all records necessary for the Plan's administration and will furnish any periodic information to Participants as required pursuant to Section 3.1(b), or that is otherwise necessary or desirable, in the Administrator's reasonable discretion. All expenses of administering the Plan will be paid by the Company and will not affect a Participant's right to or the amount of benefits.

5.2     Claims Procedures.

(a)     Except as otherwise required by the Plan, all claims for benefits under the Plan will be submitted to, and within 90 days thereafter decided by, in writing, the Administrator. If the Administrator determines that it needs an extension of time for processing the claim, it may extend the date by which a decision is required to 180 days after the claim is submitted if it notifies the claimant in writing of the extension prior to the termination of the initial 90-day period, including the special circumstances requiring an extension of time and the date by which it expects to render a decision.

(b)     Written notice of the decision on each claim will be furnished reasonably promptly to the claimant. If the claim is wholly or partially denied, such written notice will set forth (i) the specific reasons for the denial, (ii) reference to the specific Plan provisions on which the denial is based, (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary and (iv) a description of the Plan's review procedures and the time limits applicable to

<div align="center">6</div>

such procedures, including a statement of the claimant's right to bring a civil action under Section 502(a) of ERISA following the denial of a claim on review.

(c)     A claimant may request a review by the Administrator of a decision denying a claim in writing within 60 days following receipt of the denial. All such reviews will be decided in writing by the Administrator within 60 days after receipt of the request for review. If the Administrator determines that an extension of time for processing the review is required, it may extend the date by which a decision is required to 120 days after the request for review is submitted if it notifies the claimant in writing of the extension prior to the termination of the initial 60-day period, including the special circumstances requiring an extension of time and the date by which it expects to render a decision.

(d)     In connection with a review of a denied claim for benefits, a claimant will have the opportunity to submit written comments, documents, records and other information relating to the claim for benefits and be provided, on request and free of charge, reasonable access to and copies of all documents, records and other information relevant to his claim for benefits. The review of a denied claim will take into account all comments, documents, records and other information submitted by the claimant related to the claim, without regard to whether such information was submitted or considered in the initial review of the claim. If a claim is denied on review, the written notice of the denial will specify (i) the specific reasons for the denial, (ii) reference to the specific Plan provisions on which the denial is based and (iii) a statement that the claimant is entitled to receive, on request and free of charge, reasonable access to and copies of all documents, records and other information relevant to his claim for benefits.

(e)     The claimant may have an authorized representative to act on his behalf in pursuing a benefit claim or appeal of the denial of the benefit. For a representative to be recognized as acting on the claimant's behalf, the claimant must provide the name, address and phone number of his authorized representative in writing to the Administrator and a statement that the representative is authorized to act on his behalf concerning his claim for benefit and, if applicable, an appeal of the denial of the claim.

## ARTICLE VI
## FUNDING

The Plan is an unfunded arrangement. No portion of any funds of the Company or any of its affiliates is required to be set apart for a Participant or Beneficiary. Accounts will be payable from the Company's general assets, and the rights of a Participant or Beneficiary to his Account is limited to those of a general, unsecured creditor of the Company who has a claim equal to the value of the Participant's Account.

## ARTICLE VII
## AMENDMENT AND TERMINATION

This Plan may only be amended or terminated upon the written agreement of the Company and the Participants. However, no amendment or termination may result in an acceleration of benefit payment (except as permitted by Section 409A of the Code).

## ARTICLE VIII
## GENERAL PROVISIONS

8.1     Payments to Minors and Incompetents.  If the Participant or any Beneficiary entitled to receive any benefits under the Plan is a minor or is deemed by the Administrator or is adjudged to be legally incapable of giving valid receipt and discharge for such benefits, they will be paid to the person or institution the Administrator designates or to a duly appointed guardian. Such payment will, to the extent made, be deemed a complete discharge of any payment due under the Plan.

8.2     No Contract.  The Plan will not be deemed a contract of employment with the Participant and will not affect the Company's right to terminate the Participant's employment.

8.3     Non-Alienation of Benefits.  No amount payable to or held under the Plan for the account of the Participant or any Beneficiary will be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber or charge the same will be void.  No amount payable to or held under the Plan for the account of the Participant will be subject to any legal process of levy or attachment.

8.4     Income Tax Withholding.  The Company may withhold from any payments under the Plan any amount it is required to withhold under applicable federal, state or other income tax law, and transmit such withheld amounts to the appropriate taxing authority.  In lieu thereof, the Company will have the right, to the extent permitted by law, to withhold the amount of such taxes from any other sums due from the Company to the Participant on such terms and conditions as the Administrator may prescribe.

8.5     Governing Law.  The Plan will be interpreted, construed and administered under the laws of the State of California without regard to the choice of law provisions thereof and to the extent that ERISA and other federal laws do not apply.

8.6     Captions.  The captions contained in the Plan are inserted only as a matter of convenience and for reference and in no way define, limit, enlarge or describe the scope or intent of the Plan or in any way affect the construction of any provision of the Plan.

8.7     Severability.  If any provision of the Plan is held invalid or unenforceable, its invalidity or unenforceability will not affect any other provision of the Plan, and the Plan will be construed and enforced as if such provision had not been included.

8.8     Notices.  The Participant will be responsible for furnishing the Administrator with the current and proper address for the mailing of notices and delivery of payments.  Any notice required or permitted to be given will be deemed given if directed to the person to whom addressed at such address and mailed by regular United States first class mail, postage prepaid. If any item mailed to such address is returned as undeliverable to the addressee, mailing will be suspended until the Participant furnishes the proper address.

8.9     No Guaranty of Performance or Payout.   Each Participant agrees and acknowledges that the Company is not in any way or manner guarantying the performance of the

Business or any particular financial result or payout under this Plan, nor undertaking or committing to invest additional capital or resources in the Business.

8.10    Interpretation.  All pronouns and variations thereof will be deemed to refer to the masculine, feminine or neuter, as the identity of the person requires.  As the context may require, the singular may be read as the plural and the plural as the singular.

The Plan is intended to comply with Section 409A of the Code.  Consistent with that intent, the Plan will be interpreted in a manner consistent with Section 409A of the Code.  If any provision that is necessary for the Plan to comply with Section 409A of the Code is determined by the Administrator, in its sole discretion, to have been omitted, such omitted provision will be deemed included in the Plan.  Company agrees to hold harmless and indemnify Participant for all additional taxes, interest and penalties Participant may incur in the event this Plan is found to be in violation of Section 409A.

## APPENDIX A

Participants shall receive an aggregate of 25% of the Net Profits attributable to the Business.

| Participant | 25% Economic Interest |
|---|---|
| John Goede | 8 1/3% |
| John Schrenkel | 8 1/3% |
| David Berry | 8 1/3% |

Schedule 2.2(a)

Purchase Price Calculation

The table below provides an example of the calculation of the Initial Purchase Price using a multiple of Seller's net income for the 12-month period that ended on May 31, 2016.

| 12 Month Rolling - projected as of 5/31/16 | | 2016 *pro forma* | |
|---|---|---|---|
| AEM net income before state taxes | $7,064,724 | AEM net income before state taxes | $9,581,559 |
| One time losses or Events | - | State specific taxes (?) | |
| AE Escrow Corp - net income | $1,959,518 | AE Escrow Corp - net income | $1,899,422 |
| Add back officer salaries & one time events | $840,000 | Add back officer salaries | $800,000 |
| Add back Pipeline profit | $765,601 | | |
| **Unaudited** | **$10,629,843** | **Unaudited** | **$12,280,981** |
| | | | |
| Value - 4X | $42,519,374 | Value - 4X | $49,123,924 |
| **After tax value @ 60%** | **$25,511,624** | **After tax value @ 60%** | **$29,474,354** |
| | | | |
| Value based on 2015 unaudited | 2.40 | Value based on 2015 unaudited | 2.77 |
| Value based on 2015 balance sheet of $7.8mm | 3.27 | Value based on 2015 balance sheet of $7.8mm | 3.78 |
| Balance sheet multiple needed after adjusted 12 month rolling P&L | 2.75 | | |
| Balance sheet equity needed after adjusted 12 month rolling P&L | $9,276,954 | | |
| | | | |
| Payout | | | |
| **Upfront @75%** | **$19,133,718** | | |
| **Remaining @25%** | **$6,377,906** | | **$10,340,636.15** |
| | | | |
| *Version date:  May 25, 2016* | | | |
| | | | |
| | | | |

[ADD LEGAL DESCRIPTION OF FORMULA]

## Schedule 2.2(b)

### Net Book Value Calculation

| ASSETS | | as of 5/31/2016 | | Non Book adjustments | | Adjusted book as of 5/31/2016 | Explanations |
|---|---|---|---|---|---|---|---|
| Cash: | | | | | | | |
| Operating Cash | $ | 3,657,243.09 | | | $ | 3,637,243.09 | |
| Restricted Cash | $ | 402,103.77 | | | $ | 402,103.77 | |
| | | | | | | | |
| Receivables | | | | | | | |
| Mfg Payments Revbl | $ | 54,069.25 | | | $ | 54,069.25 | |
| Accts Recbl Credit Cards | $ | 6,565.99 | | | $ | 6,565.99 | |
| Accts Revbl Closing $ | $ | 88,483.25 | | | $ | 88,483.25 | |
| Accts Revbl Investors | $ | 551,762.15 | | | $ | 551,762.15 | |
| Employee Advances Revbl | $ | – | | | $ | – | |
| | | | | | | | |
| Prepaids | | | | | | | |
| Prepaid Health Insurance | $ | 85,477.72 | | | $ | 85,477.72 | |
| Prepaid Rent | $ | 1,350.00 | | | $ | 1,350.00 | |
| Prepaid Other Costs | $ | 167,110.81 | $ | (150,000.00) | $ | 17,110.81 | |
| Prepaid Corp. Insurance | $ | 6,850.50 | | | $ | 6,850.50 | |
| | | | | | | | |
| Receivables Long: | | | | | | | |
| Mortgages Revbl | $ | 53,086,986.00 | | | $ | 53,086,986.00 | |
| Revenue Receivable Closings | $ | 2,150,771.25 | | | $ | 2,150,771.25 | |
| | | | | | $ | – | |
| Mandatory Derivatives | | | | | $ | – | |
| Open Pipeline | $ | 2,757,443.12 | | | $ | 2,757,443.12 | |
| Hedges | $ | (24,179.69) | | | $ | (24,179.69) | |
| | | | | | | | |
| Fixed Assets | | | | | | | |
| Furniture & Fixtures | $ | 180,596.80 | $ | (124,605.00) | $ | 56,591.80 | Ineligible Assets |
| Goodwill | $ | 8,851.00 | $ | (8,851.00) | $ | – | Ineligible Assets |
| Land | $ | 95,000.00 | | | $ | 95,000.00 | |
| Computers & Equipment | $ | 103,383.91 | $ | (2,675.00) | $ | 100,708.91 | Ineligible Assets |
| Buildings | $ | 695,603.00 | $ | (40,000.00) | $ | 655,603.00 | Ineligible Assets |
| Covenant Non Compete | $ | 4,000.67 | $ | (4,000.67) | $ | – | Ineligible Assets |

| | | | | | | Ineligible Assets |
|---|---|---|---|---|---|---|
| Leasehold | $ | 790,635.88 | $ | (48,624.00) | $ | 142,011.88 | |
| | | | | | | |
| Security Deposits | | | | | | |
| Rent | $ | 35,441.08 | | | $ | 35,441.08 | |
| Telephone/Utilities | $ | 1,480.00 | | | $ | 1,480.00 | |
| Interest & repurchases | $ | 9,000.00 | | | $ | 9,000.00 | |
| Workers Comp | $ | 10.00 | | | $ | 10.00 | |
| | | | | | | |
| TOTAL ASSETS | $ | 64,315,719.55 | $ | (377,835.67) | $ | 63,937,883.88 | |
| | | | | | | |
| LIABILITIES | | | | | | |
| | | | | | | |
| Payables | | | | | | |
| W/H Notes pybl - Comerica | $ | 13,742,375.50 | | | $ | 13,742,375.50 | |
| W/H Notes pybl - 1st Term | $ | 39,043,050.65 | | | $ | 39,043,050.65 | |
| Repair Reserves Pybl | $ | 191,889.43 | | | $ | 191,889.43 | |
| MIP Pybl | $ | - | | | $ | - | |
| Escrow Reserves Pybl | $ | 210,214.34 | | | $ | 210,214.34 | |
| Mortgage Payable | $ | 410,000.00 | | | $ | 410,000.00 | |
| Accts Pybl Investors | $ | 3,950.00 | | | $ | 3,950.00 | |
| Accts Pybl Hedges | $ | 15,820.31 | | | $ | 15,820.31 | |
| Accts Pybl Pymts Held | $ | 11,169.06 | | | $ | 11,169.06 | |
| | | | | | | |
| Accruals | | | | | | |
| General Expenses | $ | 671,884.80 | | | $ | 671,884.80 | |
| Interest | $ | 90,572.88 | | | $ | 90,572.88 | |
| Payroll | $ | 414,878.90 | | | $ | 414,878.90 | |
| Commissions on Hedges | $ | 886,578.89 | | | $ | 886,578.89 | |
| Taxes | $ | 35,459.65 | | | $ | 35,459.65 | |
| | | | | | | |
| TOTAL LIABILITIES | $ | 55,727,844.41 | | | $ | 55,727,844.41 | |
| | | | | | | |
| Equity | | | | | | |
| Prior Year Retained Earnings | $ | 5,712,620.62 | | | $ | 5,712,620.62 | |
| Current Earnings | $ | 2,875,254.52 | | | $ | 2,875,254.52 | |
| | | | | | | |
| TOTAL CAPITAL | $ | 8,587,875.14 | $ | (377,835.67) | $ | 8,210,039.47 | |
| | | | | | | |
| TOTAL LIABILITIES PLUS CAPITAL | $ | 64,315,719.55 | $ | (377,835.67) | $ | 63,937,883.88 | |

## Exhibit D

## PURCHASE PRICE ALLOCATION PRINCIPLES

The Purchase Price, together with any additional amounts deemed to be consideration for the assets of AEM, shall be allocated among such assets in accordance with Treasury Regulations under Section 1060 of the Code and the Treasury Regulations thereunder, and specifically in accordance with the following principles:

- First, a total of $500,000 shall be allocated to the Non-Compete Agreement.

- Second, the Purchase Price shall be allocated to Class I through V assets in an amount equal to the fair value of such assets set forth on the AEM balance sheets as of the Closing Date.

- The remainder of the Purchase Price shall be allocated to goodwill and/or going concern value.

# AMENDMENT AND CLARIFICATION AGREEMENT

## AMENDMENT AND CLARIFICATION AGREEMENT

THIS AMENDMENT AND CLARIFICATION AGREEMENT (this *"Agreement"*) is entered into as of July 29, 2016, by and between on the one hand (1) RPM Mortgage, Inc., a California corporation, or its assigns (collectively the *"Buyer"*), and on the other hand (2) The American Eagle Mortgage Co., LLC, an Ohio limited liability company (*"AEM"* or "Company"), JDJ Management, LLC, a Florida limited liability company (the *"Seller"*) and John Goede, John Schrenkel, David Berry (the *"Principal(s)"* and together with the Seller, the *"Selling Parties"*). Buyer, AEM, and the Selling Parties are referred to collectively herein as the *"Parties"* and each individually as a *"Party."*

A. The Parties previously entered into an equity purchase agreement dated as of June 30, 2016 (*"EPA"*) pursuant to which Buyer agreed to acquire all of the outstanding membership interests of AEM from the Selling Parties (*"Transaction"*).

B. The Parties wish to clarify certain terminology used in the EPA and also set forth the agreed upon methodology for calculating the net profits for purposes of the earn-out provisions set forth in the EPA and the management incentive program that will be adopted in connection with the Transaction.

C. Any terms not defined herein shall have the meanings assigned to them in the EPA.

In consideration of the promises and mutual covenants contained herein, the undersigned hereby agree as follows:

**SECTION 1. AMENDMENT AND CLARIFICATION OF EPA.** Section 2.6 of the EPA is hereby amended so as to clarify that the Earn-Out Payments shall be based on "*net income*" of the Business and not "*net operating income*" and shall be restated in its entirety to read as follows:

"2.6    Earn-Out PaymentsEarn-Out Payments. Subject to the procedures specified below, the Principals may be entitled to contingent cash consideration payments (collectively, the *"Earn-Out Payments"*) if the net income of the Business exceeds certain thresholds for the period starting on the Closing Date and ending on June 30, 2017 (the *"Year One Earn-Out Period"*), and for the period starting on the July 1, 2017 and ending on June 30, 2018 (*"Year Two Earn-Out Period"* and, together with the Year One Earn-Out Period, the *"Earn-Out Periods"*). The threshold amount for any Earn-Out Payment shall be $100,000 of net income during the applicable Earn-Out Period. Each Earn-Out Payment, if any earned, shall be made by the Buyer to the Principals as set forth below:

(i)    Year One Earn-Out. No later than August 31, 2017, the Buyer shall pay the Principals an Earn-Out Payment equal to seventy-five percent (75%) of the net income of the Business during the Year One Earn-Out Period, which Earn-Out Payment shall not exceed Ten Million, Three Hundred Forty Thousand, Six Hundred Thirty-Six and 15/100ths Dollars ($10,340,636.15) (the *"Year One Earn-Out"*).

(ii)    Year Two Earn-Out. No later than August 31, 2018, the Buyer shall pay the Principals an Earn-Out Payment equal to equal to seventy-five percent (75%) of the net income of the Business during the Year Two Earn-Out Period *less* any losses during the Year

One Earn-Out, which Earn-Out Payment shall not exceed the difference between Ten Million, Three Hundred Forty Thousand, Six Hundred Thirty-Six and 15/100ths Dollars ($10,340,636.15) and the Year One Earn-Out, if any (the "*Year Two Earn-Out*").

(b)     Earn-Out Statements.  Within twenty (20) Business Days following the end of the applicable Earn-Out Period, the Buyer shall prepare and deliver to the Seller Representative its calculation of the applicable Earn-Out Payment (the "*Earn-Out Statement*"), which statement shall be prepared and calculated in accordance with GAAP, applied on a basis consistent with the policies, procedures and practices utilized in the preparation of the financial statements of AEM.  The Earn-Out Statement shall include a reasonably detailed calculation of (i) the profits and losses of the Business for the applicable Earn-Out Period, and (ii) the amount, if any, of the Earn-Out Payment.

(c)     Objection Notice.  The Seller Representative shall have twenty (20) days from delivery of the Earn-Out Statement (the "*Objection Period*") to raise any objection thereto by delivery of written notice to the Buyer setting forth such objections in reasonable detail (the "*Objection Notice*").  During the Objection Period, the Seller Representative shall be entitled, subject to execution of a nondisclosure agreement, to access the books and records and employees and agents involved in the preparation of the Earn-Out Statement for purposes of determining any objections and preparing the Objection Notice; provided, however, that such access shall not unreasonably interfere with the conduct of the Business.  If the Seller Representative does not deliver an Objection Notice within the Objection Period, then the Earn-Out Statement shall be deemed final and binding on the parties.

(d)     Dispute.  In the event that an Objection Notice is delivered within the Objection Period, the Buyer and the Seller Representative shall attempt, in good faith, to resolve such objections and, if unable to do so within twenty-five (25) days after delivery of the Objection Notice, shall follow the dispute mechanism contemplated in Section **Error! Reference source not found.** above.  The determination of the Independent Accountant shall be (i) in writing, (ii) delivered to the Buyer and the Seller Representative, and (iii) final and binding on the parties absent manifest error (the "*Final Determination*").  Subject to Section **Error! Reference source not found.** and Section **Error! Reference source not found.**, the Buyer shall pay to the each Principal such Principal's Proportional Percentage of such Earn-Out Payment shown on the Final Determination within ten (10) Business Days after receipt of the Final Determination.  The fees and expenses of the Independent Accountant shall be borne equally by the Buyer (on the one hand) and the Seller Representative (on the other hand).

(e)     Allocation of Earn-Out Payments.  Each Earn-Out Payment shall be allocated among the Principals based on their Proportional Percentage, provided however:

(i)     in the event a Principal voluntarily terminates his employment with the Company between the Closing and June 30, 2017, such Principal shall not be entitled to receive his Proportional Percentage of the Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the Principal who voluntarily terminates his employment with the Company on or prior to June 30, 2017 to the remaining Principals' Proportional Percentages;

(ii)     in the event a Principal voluntarily terminates his employment with the Company between July 1, 2017 and June 30, 2018, such Principal shall not be entitled to receive his Proportional Percentage of the Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the

Principal who voluntarily terminates his employment with the Company between July 1 2017 and June 30, 2018 to the remaining Principals' Proportional Percentages; and

(iii)    in the event the Company terminates the employment of a Principal for Cause (as such term is defined in the Management Incentive Program) at any time, such Principal shall not be entitled to receive his Proportional Percentage of any unpaid Earn-Out Payments and the Proportional Percentage of each of the other remaining Principals for purposes of the Earn-Out Payments shall be increased by adding an equal portion of the Proportional Percentage held by the Principal whose employment with the Company is terminated for Cause to the remaining Principals' Proportional Percentages.

(iv)    The Company's termination of employment of a Principal without Cause (as such term is defined in the Management Incentive Program) shall not affect, reduce, change or eliminate such Principal's Proportional Percentage for purposes of the Earn-Out Payments.

(v)    The Parties acknowledge and agree that the Earn-Out Payments constitute compensation for services performed by the Principals as employees of the Company. Each Earn-Out Payment made to a Principal will be reported on such Principal's Form W-2 for the year in which the payment was made and will be reduced by required withholdings of applicable income and payroll Taxes."

**SECTION 2. METHODOLOGY FOR CALCULATING NET INCOME.**    Each Party agrees as follows:

A.  For purposes of the Earn-Outs and the Management Incentive Program, "net income" of the Business shall mean the net income after all applicable taxes (including but not limited to income taxes, employer paid payroll taxes, property taxes), calculated in accordance with U.S. Generally Accepted Accounting Principles (GAAP).

B.  The Earn-Out Payments will be reduced by all employer paid payroll taxes pertaining to the Earn-Out Payment; however, the following expenses shall not be included as expenses when calculating the Earn-Out Payment: (i) the sign-on bonuses of $300,000 in the aggregate, payable to the Sellers, (ii) payments to NVD Consulting, Inc. at the Closing, or (iii) the Purchase Price.

**SECTION 3. EFFECT ON THE EPA AND ANCILLARY AGREEMENTS.** Except as amended herein, the EPA shall continue in full force and effect as originally executed and delivered.  Any reference in the EPA to "this Agreement," "hereunder," hereof," "herein," or words of like import referring to such agreement shall refer to the EPA as amended and clarified by this Agreement.

**SECTION 4. COUNTERPARTS.** This Agreement may be executed in any number of counterparts, with each executed counterpart constituting an original and all counterparts together constituting one agreement.

**SECTION 5. EFFECTIVENESS.** This Agreement shall become effective as of the date hereof upon the execution of counterparts hereof by the parties hereto.

**SECTION 6. GOVERNING LAW.**   This Agreement shall be governed by, and construed in accordance with, the laws of the state of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

*[Signature Page Follows]*

DocuSign Envelope ID: 5A5311D1-A2EA-4A15-8FA0-AE1250F241FA

IN WITNESS WHEREOF, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

**BUYER:**

**RPM Mortgage, Inc.**

By:    *E. Robert Hirt*
      Name: Rob Hirt
      Title:   Chief Executive Officer

**COMPANY:**

**American Eagle Mortgage Co., LLC**

By: _____
      Name:  John Schrenkel
      Title:   Chief Executive Officer

**MEMBER:**

**JDJ Management, LLC**

By: _____
Name:  John Goede
Title:  Manager

**PRINCIPALS:**

_____
John Schrenkel

_____
John Goede

_____
David Berry

IN WITNESS WHEREOF, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

BUYER:

RPM Mortgage, Inc.

By: _____
          Name: Rob Hirt
          Title:  Chief Executive Officer

COMPANY:

American Eagle Mortgage Co., LLC

By: _____
      Name:  John Schrenkel
      Title:   Chief Executive Officer

MEMBER:

JDJ Management, LLC

By: _____
Name:  John Goede
Title:   Manager

PRINCIPALS:

_____
John Schrenkel

_____
John Goede

_____
David Berry

IN WITNESS WHEREOF, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

BUYER:

RPM Mortgage, Inc.

By: _____
        Name: Rob Hirt
        Title:  Chief Executive Officer

COMPANY:

American Eagle Mortgage Co., LLC

By: _____
        Name:  John Schrenkel
        Title:  Chief Executive Officer

MEMBER:

JDJ Management, LLC

By: _____
Name:  John Goode
Title:  Manager

PRINCIPALS:

_____
John Schrenkel

_____
John Goode

_____
David Berry

IN WITNESS WHEREOF, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

**BUYER:**

RPM Mortgage, Inc.

By: _____
      Name: Rob Hirt
      Title:   Chief Executive Officer

**COMPANY:**

American Eagle Mortgage Co., LLC

By: _____
      Name:  John Schrenkel
      Title:   Chief Executive Officer

**MEMBER:**

JDJ Management, LLC

By: _____
Name:  John Goede
Title:   Manager

**PRINCIPALS:**

_____
John Schrenkel

_____
John Goede

_____
David Berry

# SECOND AMENDING AGREEMENT

## SECOND AMENDING AGREEMENT

THIS SECOND AMENDING AGREEMENT (this "*Agreement*") is entered into as of July __, 2017, by and between on the one hand (1) LendUSA, LLC, a Delaware limited liability company (formerly RPM Mortgage, Inc., a California corporation), or its assigns (collectively the "*Buyer*"), and on the other hand (2) The American Eagle Mortgage Co., LLC, an Ohio limited liability company ("*AEM*" or "*Company*"), JDJ Management, LLC, a Florida limited liability company (the "*Seller*"), and the remaining signatory principals John Goede and John Schrenkel (the "*Principal(s)*" and together with the Seller, the "*Selling Parties*"). Buyer, AEM, and the Selling Parties are referred to collectively herein as the "*Parties*" and each individually as a "*Party*."

A. The Parties previously entered into an equity purchase agreement dated as of June 30, 2016, as amended ("*EPA*") pursuant to which Buyer agreed to acquire all of the outstanding membership interests of AEM from the Selling Parties ("*Transaction*").

B. The Parties amended the EPA and certain ancillary agreements on or about December 1, 2016, in order to among other things accommodate Dave Berry's request to have his equity interest redeemed and that he no longer be a party to the EPA and the ancillary agreements.

C. On June 16, 2017, RPM Mortgage, Inc. merged with and into LendUSA, LLC.

C. The Parties now wish to amend the EPA to memorialize a modified time schedule for the payment of Earn-Outs.

D. Any terms not defined herein shall have the meanings assigned to them in the EPA.

In consideration of the promises and mutual covenants contained herein, the undersigned hereby agree as follows:

**SECTION I. AMENDED PAYMENT SCHEDULE FOR EARN-OUT.** The payment schedule for the Earn-Out Payments shall be modified as follows:

(i)   on August 31, 2017, the Buyer shall pay $1,000,000 each to the Principals and Dave Barry out of the Earn-Out for the Year One Earn-Out Period;

(ii)   on January 5, 2018 ("*New Payment Date*"), the Buyer shall pay to the Principals the remaining balance of the Earn-Out for the Year One Earn-Out Period;

(iii)   on the New Payment Date, the Buyer shall also calculate and pay to the Principals the Earn-Out Payment for the initial five months (August - December) of the Year Two Earn-Out Period; and

(iv)   thereafter the Buyer shall pay the balance of the Earn-Out, if any, for the Year Two Earn-Out Period *plus* any profit share under the Management Incentive Program that follows the calendar year, ending on December 31 and restarting the following year, with the

effective date of January 1, after the release of the 2018 audited financials for the Buyer in early 2019 (April 5 or earlier).

As provided in the EPA, the Earn-Out Payments may cease to accrue before the end of the Year Two Earn-Out Period if on an earlier date the Buyer has paid (or reserved for later payment) an aggregate of $10,340,636.15 in Earn-Out Payments, following which the Management Incentive Program will become effective and replace the Earn-Out Payments. To illustrate, if the Earn-Out exceeds $10,340,636.15 on June 30, 2018, then from July 1 through December 31, 2018, the Principals shall receive 25% of the Net Profits under the Management Incentive Program.

In all other respects, the terms and conditions of the Earn-Out Payments shall remain in full force and continue to be governed by Section 2.6 of the EPA, as amended.

**SECTION 2. EFFECT ON THE EPA AND ANCILLARY AGREEMENTS.** Except as amended herein, the EPA shall continue in full force and effect as originally executed and delivered. Any reference in the EPA to "this Agreement," "hereunder," hereof," "herein," or words of like import referring to such agreement shall refer to the EPA as amended and clarified by this Agreement.

**SECTION 3. COUNTERPARTS.** This Agreement may be executed in any number of counterparts, with each executed counterpart constituting an original and all counterparts together constituting one agreement.

**SECTION 4. EFFECTIVENESS.** This Agreement shall become effective as of the date hereof upon the execution of counterparts hereof by the parties hereto.

**SECTION 5. GOVERNING LAW.** This Agreement shall be governed by, and construed in accordance with, the laws of the state of California, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

*[Signature Page Follows]*

**IN WITNESS WHEREOF**, the Company, Buyer, and Selling Parties have caused this Amendment and Clarification Agreement to be duly executed and delivered as of the date first above written.

BUYER:

LendUSA, LLC
(formerly RPM Mortgage, Inc.)

By: _____
     Name: Ava Noack
     Title:  President

COMPANY:

American Eagle Mortgage Co., LLC

By: _____
     Name: John Schrenkel
     Title:   Chief Executive Officer

MEMBER:

JDJ Management, LLC

By: _____
Name:  John Goede
Title:   Manager

PRINCIPALS:

_____
John Schrenkel

_____
John Goede

# ROBERT HIRT EMAIL

From: Rob Hirt [mailto:RHirt@llerd.us]
Sent: Monday, January 01, 2018 11:58 PM
To: John Schrenkel <jschrenkel@aemcorp.com>; John L. Goode, Esq. <jgoode@goodelaw.com>
Cc: Ava Nizack <ANizack@llerd.us>
Subject: Matters at hand....

John and John

Happy New Year! In order to keep our discussions relevant I asked Ava to go back against our definitive agreement to be certain that we clearly understand what we all agreed upon when we signed our deal in July of '16.

As we all know, in '17 overall GOS at AEM was down over 100 basis points plus RPW accepted $500,000 in expenses that we did NOT charge AEM. If originations stayed even over '16 then AEM is down over $5mm in net profit. When we slipped the deal to purchase AEM that price we paid was based on net income (P&L), not total originations in 5's. Regardless, I cannot see any metric below which supports John S's perspective that we should pay you more than what is agreed per our definitive agreement.

Matters at hand;

Expense allocations – In the Management Incentive Agreement, under section 1.13  it has been clarified that AEM's books "will track the income and cost, net profits and net losses directly related to the AEM assets" and have to exclude any income or loss related to other business assets of the company.  Assuming that expenses utilized by the AEM team will be absorbed by other boutiques was never the case.  We also discussed that if there are any expense incurred by the other boutiques via sharing labor or by other means, the expense allocations will be 1:1 and will never be more than the actual cost was.

At the end of the day, only expenses were allocated to date that were primarily related to Cindy Garron's accounting work.

Payout of the earnout. The relevant schedule is copied below and attached.

At the end of the day, the new payout arrangement is more beneficial for John and John.

**Payout term 1**

| Month | Earnout | Guarantees | Net payout |
|---|---|---|---|
| August | 1,147,614 | | |
| September | 469,399 | | |
| October | 551,279 | | |
| November | 323,929 | | |
| December | 269,668 | | |
| January | 153,816 | | |
| February | 405,984 | | |
| March | 139,152 | | |
| April | 448,443 | | |
| May | 768,257 | 415,907 | 1,214,224 |
| June | 1,316,638 | (22,397) | 1,293,841 |
| July | 820,814 | (22,397) | 798,517 |
| | 7,408,494 | 401,313 | 7,809,967 |

| | |
|---|---|
| August payout to Dave, John and John | (3,557,077) |
| Delayed payout | 4,252,790 |
| Delayed payout @ 6% @ 6 month average | 127,584 |
| (Sept, Oct, Nov, Dec, Jan, Feb) | |

Payout terms?

| | Earnout | guarantee amortization | Repurchase adj | Net payout |
|---|---|---|---|---|
| August | 1,076,655 | (22,297) | | 1,054,358 |
| September | 15,398 | (22,297) | | (6,898) |
| October | 284,728 | (22,297) | | 262,431 |
| November | 922,949 | (22,297) | (26,156) | 874,496 |
| December (balance) | 368,711 | (22,297) | | 346,413 |
| | | | | |
| | Early payout | | | 2,530,801 |
| | Early payout @ 6% @ 13 month average | | | 164,502.07 |
| | (March, April, May, June, July, Aug, Sept, Oct, Nov, Dec, Jan, Feb, March) | | | |
| | | | | |
| | Benefit of the modified arrangement to John and John | | | 36,916.36 |

Premise of $1mm if double the size of the company –

□ Production of AEM for 2016 = $682mm

□ Production of AEM for 2017 = $920mm

At the end of the day, production did not double, earnings plummeted by 100bps.

- Promise of payout, Dec, Jan, Feb, March we would pay 50/50 once we hit earnout. So, take those 4 months just assume a $400,000 x 4 way less than we did last year. In $300,000 in ... us ... ???

New hire incentives – was only a one-time agreement and was never discussed to forever continue as GAAP, the accounting principles we have to follow do not allow...

amortization of guarantees.

At the end of the day, we should keep everything as is. Clare December and based on the December 31 financials, we will pay $3.5mm on February 1 and the remaining in the payoff cycle immediately following April 1.

Lets work on getting on a call tomorrow or Wednesday. I am also still trying to get Lauren't agreement understood and agreed upon by all of us.

Thank you.

Bob

Robert Hirt
CEO
RPM Mortgage, Inc.
3240 Stone Valley Road West
Alamo, CA 94507

D: 925-295-9340
F: 925-944-8910
E: rhirt@rpm-mtg.com
www.rpm-mtg.com

*The RPM Story:*
Take a Closer Look at RPM

Protect your personal financial information by not sending it in an e-mail. Only send personal financial information attached to an e-mail if you use encryption software. This message, and any attachments, is intended only for the intended recipient(s) and it may be privileged and confidential. Please note that any views or opinions expressed in this e-mail are solely those of the author and do not necessarily represent those of LendUS, LLC, and/or its affiliates. If you are not the intended recipient(s), or agent responsible to deliver this message to the intended recipient(s), you are hereby notified that any review, re-transmission, conversion to hard copy, copying, circulation, or other use of this message or any attachments is strictly prohibited and may be illegal. If you are not the intended recipient(s), please notify the sender immediately by return e-mail and permanently delete this message and any attachments. Thank you.